# **EXHIBIT 1**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AKOUSTIS TECHNOLOGIES, INC., *et al.*,[1] | Case No. 24-12796 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 14, 15, 115, 121, 124, 125, 176, 208, 384, 388, 452, 453, 469, 474, 479 & 480** |

**ORDER (I) APPROVING THE SALE OF ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS
AND ENCUMBRANCES, (II) APPROVING THE ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION THEREWITH AND (III) GRANTING RELATED RELIEF**

This matter coming before the Court on the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into the Stalking Horse Purchase Agreements and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 14] (the "Sale Motion"),[2] filed by the debtors (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Akoustis Technologies, Inc. (9046), Akoustis, Inc. (5617), Grinding and Dicing Services, Inc. (7929), and RFM Integrated Device Inc. (1138).  The Debtors' corporate headquarters is located at 9805 Northcross Center Court, Suite A, Huntsville, NC 28078.

[2]  Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Sale Motion or the Asset Purchase Agreement (as hereinafter defined), as applicable.

Cases"), seeking entry of an order (this "Order"), pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and the Court having previously entered the *Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter into Stalking Horse Agreement and to Provide Bidding Protections Thereunder, (III) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (IV) Approving Assumption and Assignment Procedures, (V) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (VI) Granting Related Relief* [Docket No. 176], as amended on March 25, 2025 [Docket No. 384] (the "Bidding Procedures Order"); and an auction (the "Auction") having been held on April 25, 2025 at 11:00 a.m. (prevailing Eastern Time) in accordance with the Bidding Procedures Order; and Tune Holdings Corp. (the "Purchaser"), a wholly-owned subsidiary of Space Exploration Technologies Corp. ("SpaceX"), having submitted the highest or otherwise best bid for the Transferred Assets, as reflected in that certain Asset Purchase Agreement, dated as of April 25, 2025, by and among Purchaser, SpaceX (as guarantor), Akoustis Technologies, Inc., Akoustis, Inc., and RFM Integrated Device Inc. (as amended, supplemented, or modified from time to time prior to entry of this Order, the "Asset Purchase Agreement"), a copy of which is attached hereto as Exhibit 1; and the Court having conducted a hearing to consider certain relief requested in the Sale Motion on April 30, 2025 (the "Sale Hearing"), at which time all objecting and interested parties were offered an opportunity to be heard with respect to the Sale Motion; and the Court having reviewed and considered (i) the Sale Motion, (ii) the Asset Purchase Agreement, (iii) the

Bidding Procedures, (iv) the Bidding Procedures Order, (v) the record of the Bidding Procedures Hearing, (vi) the *Declaration of Michael Pokrassa in Support of Motion of the Debtors for Entry of Orders (I) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. [●]], (vii) the *Declaration of Mark D. Podgainy in Support of Motion of the Debtors for Entry of Orders (I) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. [●]], (viii) all Qorvo Trade Secret Objections (such Qorvo Trade Secret Objections having been overruled or otherwise resolved in a manner acceptable to Purchaser) and Orders thereon; and (ix) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and after due deliberation the Court having determined that the legal and factual bases set forth in the Sale Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Sale Motion is in the best interest of the Debtors, their estates and their creditors, and the Debtors having demonstrated good, sufficient, and sound business justifications for the relief granted herein;

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

    A.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction to consider the Sale Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of

---

[3]  The findings and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings also shall include any oral findings of fact and conclusions of law made by the Court during the Sale Hearing.

February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      <u>Final Order</u>.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

C.      <u>Statutory Predicates</u>.  The statutory and other legal predicates for the relief sought in the Sale Motion and granted herein are sections 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 4001, 6004, 6006, 9007, 9008 and 9014 of the Bankruptcy Rules and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules.

D.      <u>Notice and Opportunity to Be Heard</u>.  As evidenced with the certificates of service filed with the Court [Docket Nos. 85, 137, 207, 218, 247, 396, 415, 460, 470], the Debtors have provided proper, timely, adequate, and sufficient notice of, and a fair and reasonable opportunity to object and be heard with respect to, the Sale Motion, the Bidding Procedures, the Bidding Procedures Order, the Auction, the Sale Hearing, the sale of the Transferred Assets pursuant to the Asset Purchase Agreement (the "<u>Sale Transaction</u>") free and clear of any Interests (as hereinafter defined) within the meaning of section 363(f) of the Bankruptcy Code, the Notice of Auction Results [Docket No. 479], the Assumption and Assignment Notices [Docket Nos. 208, 388, 452, 474], and the assumption and assignment of the executory contracts and unexpired leases to be assumed and assigned to the Purchaser at Closing pursuant to this Order and the terms of the Asset Purchase Agreement (collectively, the "<u>Contracts</u>"), in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, 9007 and 9014, Local Rules 2002-1, 6004-1 and 9006-1 and the Bidding Procedures Order, to all persons and entities entitled to such notice, including the Sale Notice Parties (as defined in the Bidding Procedures) and all other persons and entities as directed by the Court.  Such notice was good, sufficient, and

appropriate under the circumstances, including but not limited to providing each Counterparty a full and fair opportunity to object to the assumption and assignment of its Contract and its proposed Cure Cost; and no other or further notice of any of the foregoing is required.  With respect to parties in interest whose identities could not be reasonably ascertained by the Debtors, the Publication Notice published in the national edition of the Wall Street Journal on January 17, 2025 and in the Local Publications on January 17, 2025 was sufficient and reasonably calculated to provide notice to such parties under the circumstances.  The Debtors published the Sale Motion, Bidding Procedures Order, the Bidding Procedures, the Stalking Horse Agreement (and all exhibits and schedules thereto), the Sale Notice, the Assumption and Assignment Notices, the Asset Purchase Agreement, and certain other documents relevant to the Sale on the Stretto Website.

E.      Disclosures.  The disclosures made by the Debtors in the Sale Motion, the Sale Notice, the Assumption and Assignment Notices, the Notice of Auction Results, and all other related notices and documents filed with the Court concerning the Asset Purchase Agreement and Sale Transaction were complete and adequate.

F.      Sound Business Purpose.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of the Sale Motion, and the approval of and entry into the Sale Transaction, the Asset Purchase Agreement, the Related Documents and any other ancillary agreements thereto, including, but not limited to, the Separation Agreements, (a) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (b) provide value and are beneficial to the Debtors' estates, and are in the best interests of the Debtors, their estates, and their stakeholders; and (c) are reasonable and appropriate under the circumstances.   Business

justifications for entry into the Sale Transaction and the Asset Purchase Agreement include, without limitation, the following: (a) the Asset Purchase Agreement constitutes the highest or otherwise best bid received for the Transferred Assets; (b) the Asset Purchase Agreement presents the best opportunity to maximize the value of the Transferred Assets on a going-concern basis and to avoid decline and devaluation as a result of delay or liquidation; (c) failure to consummate the Sale Transaction expeditiously, as provided under the Asset Purchase Agreement, could materially diminish creditor recoveries; and (d) the immediate consummation of the Sale Transaction is necessary to maximize the value of the Debtors' estates.

G.      <u>Compliance with Bidding Procedures</u>.  The Debtors conducted an open and fair sale process.  The sale process was non-collusive in all respects, and all interested parties were provided a full, fair, and reasonable opportunity to make an offer to purchase the Transferred Assets. The Debtors, the Purchaser, SpaceX and their respective counsel and other advisors have complied with the Bidding Procedures and the Bidding Procedures Order.

H.      <u>Highest or Otherwise Best Bid</u>.  The Debtors determined, in their reasonable business judgment, in a manner consistent with their fiduciary duties and, in consultation with the Consultation Parties, that the Purchaser's Qualified Bid, as documented in the Asset Purchase Agreement, was the highest or otherwise best Qualified Bid for the Transferred Assets. Consummating the Sale Transaction will yield greater value to the Debtors' estates than would have been provided by any other available alternative transaction.

I.      <u>Fair Consideration</u>.  The consideration the Purchaser will pay under the Asset Purchase Agreement constitutes (a) fair and reasonable consideration for the Transferred Assets; and (b) reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable

Transactions Act, and other laws of the United States, any state, territory, possession thereof, or the District of Columbia.

J.    <u>Free and Clear Sale</u>.  The Debtors may sell the Transferred Assets free and clear of all Interests (unless otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement), because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Any holders of Interests that objected to the Sale Transaction or the Sale Motion and that have an Interest on the Transferred Assets could be compelled in a legal or equitable proceeding to accept money in satisfaction of such Interest pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f)—including, with respect to any Interest that is a Lien, that the price at which the Transferred Assets will be sold is greater than the aggregate value of all Liens on the Transferred Assets pursuant to section 363(f)(3)–and, therefore, are adequately protected by having their Interests on the Transferred Assets attach solely to the proceeds of the Sale Transaction ultimately attributable to the sale of the property on which such holders have an Interest, in the same order of priority, and with the same validity, force and effect that such Interests had prior to the consummation of the Sale Transaction, subject to any rights, claims or defenses of the Debtors and their estates.  Any Interest holders that did not object, or that withdrew their objections, to the Sale Motion or the Sale Transaction, are deemed to have consented to the sale of the Transferred Assets free and clear of their respective Interests on the Transferred Assets pursuant to section 363(f)(2) of the Bankruptcy Code.

K.    <u>Purchaser's Reliance on Free and Clear Sale</u>.  The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction or the other transactions contemplated thereby if the sale of the Transferred Assets were not free and

clear of all Interests, or if the Purchaser would, or in the future could, be liable for any such Interests. A sale of the Transferred Assets other than one free and clear of all Interests would adversely impact the Debtors, their estates, and their creditors, and would yield substantially less value for the Transferred Assets and the Debtors' estates, with less certainty than provided by the Sale Transaction. The total consideration to be provided under the Asset Purchase Agreement reflects the Purchaser's reliance on this Order, as a good-faith purchaser pursuant to section 363(m) of the Bankruptcy Code, to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to, and possession of, the Transferred Assets free and clear of all Interests, including, without limitation, any potential derivative, vicarious, transferee or successor liability Interests.

      L.    <u>Interests</u>. As used in this Order, the term "<u>Interest</u>" includes, in each case to the extent against or with respect to any of the Debtors or in, on, or against or with respect to any of the Transferred Assets: Liens, claims (as defined in section 101(5) of the Bankruptcy Code), debts (as defined in section 101(12) of the Bankruptcy Code), encumbrances, obligations, Liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights, or interests of any kind or nature whatsoever, whether known or unknown, inchoate or not, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, (a) mortgages, deeds of trust, pledges, charges, security interests, hypothecations, encumbrances, easements, servitudes, leases,

subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, rights of use or possession, subleases, leases, condition sale arrangements, or any similar rights, (b) all claims, including, without limitation, all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise; (c) all debts, liabilities, obligations, contractual rights and claims, and labor, employment, and pension claims; (d) any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors' or the Purchaser's interest in the Transferred Assets, or any similar rights; (e) any rights under labor or employment agreements; (f) any rights under pension, multiemployer plan (as such term is defined in section 3(37), or section 4001(a)(3) of the Employment Retirement Income Security Act of 1974 (as amended, "ERISA")), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (g) any other employee claims related to worker's compensation, occupation disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of

the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, each as amended, (vii) the Americans with Disabilities Act of 1990, (viii) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code of any similar state law, (ix) state discrimination laws, (x) state unemployment compensation laws or any other similar state laws, (xi) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (xii) the WARN Act (29 U.S.C. §§ 2101, *et seq.*) or any state or other laws of similar effect; (h) any bulk sales or similar law; (i) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the assets or businesses of the Debtors prior to the Closing; (j) any unexpired and executory contract or unexpired lease to which a Debtor is a party that is not an Assigned Contract; (k) any other Excluded Liabilities under the Asset Purchase Agreement; and (l) Interests arising under or in connection with any acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors, affiliates, or Subsidiaries, including, but not limited to, Interests arising under any doctrines of successor, transferee, or vicarious liability, violation of the Securities Act, the Exchange Act, or other applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of fiduciary duty, or any similar theories under applicable Law or otherwise.

M.    <u>No Successor or Other Derivative Liability</u>.    By consummating the Sale Transaction pursuant to the Asset Purchase Agreement, the Purchaser is not a mere continuation of any of the Debtors or any Debtor's estate, and there is no continuity of enterprise or otherwise

or common identity between the Purchaser and any Debtor.  The Purchaser is not holding itself

out as a continuation of any Debtor.  The Purchaser is not a successor to any Debtor or any Debtor's

estate by reason of any theory of law or equity, and the Sale Transaction does not amount to a

consolidation, merger, or *de facto* merger of the Purchaser and the Debtors or any of the Debtors'

estates.  Neither the Purchaser nor any of its affiliates or their respective successors, assigns,

members, partners, principals, or shareholders (or the equivalent thereof) shall assume or in any

way be responsible for any obligation or liability of any Debtor (or any affiliate of any Debtor) or

any Debtor's estate, except as expressly provided in the Asset Purchase Agreement.  The sale and

transfer of the Transferred Assets to the Purchaser, including the assumption by the Debtors and

assignment, transfer, and/or sale to the Purchaser of any of the Contracts, will not subject the

Purchaser to any liability with respect to the operation of the Debtors' businesses prior to the

Closing or by reason of such transfer, except that, upon the Closing, the Purchaser shall remain

liable for the applicable Assumed Liabilities.

  N. <u>Good Faith</u>.  The Debtors, the Purchaser and their respective counsel and other

advisors have negotiated and entered into the Asset Purchase Agreement and each of the

transactions contemplated thereby in good faith, without collusion and from arms'-length

bargaining positions.  The Purchaser is a good-faith purchaser, and is acting in good faith within

the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all of the

protections afforded thereby.  The Debtors were free to deal with any other party interested in

acquiring all or some of the Transferred Assets.  Neither the Debtors nor the Purchaser have

engaged in any conduct that would cause or permit the Sale Transaction, the Asset Purchase

Agreement, or any of the transactions contemplated thereby to be avoided or subject to monetary

damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of

sections 363(m) of the Bankruptcy Code.  The Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  Specifically, the Purchaser has not acted in a collusive manner with any person or entity, and the Purchaser's participation in and bidding at the Auction were not controlled by any agreement among bidders.  All payments to be made by the Purchaser and all agreements entered into by the Purchaser and the Debtors under the Asset Purchase Agreement in connection with the Sale Transaction have been disclosed and are appropriate.  The Asset Purchase Agreement was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors under laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor the Purchaser have entered into the Asset Purchase Agreement or are consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

O.      <u>Insider Status</u>.  The Purchaser is not an "insider" of any Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  No common identity of directors or controlling stockholders (or the equivalent thereof) exists between the Purchaser and any of the Debtors.

P.      <u>Assumption and Assignment of Contracts</u>.  The assumption and assignment of the Contracts are an integral part of the Sale Transaction, are in the best interests of the Debtors and their estates and represent the valid and reasonable exercise of the Debtors' sound business judgment.  Specifically, the assumption and assignment of the Contracts (a) are necessary to sell the Transferred Assets to the Purchaser as contemplated by the Asset Purchase Agreement, (b) allow the Debtors to sell the Transferred Assets to the Purchaser as a going concern, (c) limit the losses suffered by the Counterparties to the Contracts, and (d) maximize the recoveries of other creditors of the Debtors by eliminating claims against the Debtors' estates that would arise from

the Debtors' rejection of the Contracts.  Any Counterparty to any Contract that has not actually filed with the Court and served on the Objection Notice Parties (as defined in the Bidding Procedures) an objection to the Debtors' assumption and assignment of such Contract, or to the applicable Cure Costs, as of the date specified in the Bidding Procedures Order (as such date may have been modified or extended in accordance with the terms of the Bidding Procedures Order) is deemed to have consented to the assumption and assignment of the Contract, and to the applicable Cure Costs.

Q.    <u>Compliance with Section 365 of the Bankruptcy Code</u>.  The Debtors have met all requirements of section 365(b) of the Bankruptcy Code with respect to the assumption and assignment of each of the Contracts.  The Debtors have provided adequate assurance (within the meaning of section 365(b)(1) of the Bankruptcy Code) of cure of any default existing under any of the Contracts on or before the Closing Date.  The Purchaser has demonstrated adequate assurance of future performance of and under the Contracts within the meaning of sections 365(b)(1)(C), 365(f)(2)(B) and 365(b)(3) (to the extent applicable) of the Bankruptcy Code.  Pursuant to section 365(f) of the Bankruptcy Code, the Contracts shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in the Contracts or other restrictions prohibiting their assignment or transfer.

R.    <u>Modifications to Contracts</u>.  Pursuant to section 5.3 of the Asset Purchase Agreement, the Purchaser may, in consultation with the Sellers and upon provision of written notice to the Sellers, modify the list of the Contracts after the date of this Order until the earlier of (a) 30 days following the Closing Date, (b) the entry of an order confirming a chapter 11 plan of reorganization or liquidation of the Debtors, or (c) such time that the Chapter 11 Cases are closed or dismissed.  Such modification rights include, but are not limited to, the right of the Purchaser

to designate a Contract for assumption by the Debtors and assignment to the Purchaser, as well as for exclusion from the Sale as an Excluded Contract, Excluded Asset, and/or Excluded Liability. The Purchaser would not have agreed to the Sale Transaction without such modification rights. The notice and opportunity to object provided to Counterparties to such Contracts and to other parties in interest, as set forth in the Bidding Procedures Order and in this Order, fairly and reasonably protect any rights that such Counterparties and other parties in interest may have with respect to such Contracts.

S.     <u>Property of the Estates</u>.  The Transferred Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

T.     <u>Validity of the Sale Transaction</u>.  The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) and all of the applicable requirements of such sections have been complied with in all respects in connection with the Sale Transaction.  As of the Closing, the sale and assignment of the Transferred Assets and the Contracts to the Purchaser will be a legal, valid, and effective transfer of the Transferred Assets and the Contracts, and will vest the Purchaser with all right, title, and interest of the Debtors in and to the Transferred Assets and the Contracts free and clear of all Interests (other than any Interests expressly assumed under, or expressly permitted by, the Asset Purchase Agreement).  The Debtors have full corporate or other applicable authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate action of the Debtors.  Upon entry of this Order, other than any consents identified in the Asset Purchase Agreement, no consent or approval from any other person, entity, or legal authority is required to consummate the Sale Transaction.  None of the

Transferred Assets as of the Closing will incorporate, use or be derived from any Qorvo Trade Secret Information (as defined in the Asset Purchase Agreement). Notwithstanding anything to the contrary in the Bidding Procedures Order, certain "machinery and equipment" (as described in the Bidding Procedures Order) included as part of the Transferred Assets do not include Qorvo Trade Secret Information (the "Clean Machinery & Equipment"), and as such, the Clean Machinery & Equipment will not be subjected to a "factory reset" process prior to the transfer thereof to Purchaser. Transferred Assets that consist of "machinery and equipment" other than the Clean Machinery & Equipment will be subjected to a "factory reset" process as described in the Bidding Procedures Order. The Sale Transaction, including, without limitation the post-sale use of the Transferred Assets by Purchaser or any subsequent owners or users, does not violate that certain Permanent Injunction issued by the United States District Court for the District of Delaware on October 15, 2024, in the matter of *Qorvo, Inc. v. Akoustis Technologies and Akoustis, Inc.* (Case No. 1:21-cv-01417), or any modification thereto and such Permanent Injunction, therefore, shall not attach to any of the Transferred Assets at Closing.

U.    No *Sub Rosa* Plan. Neither the Sale Transaction nor the Asset Purchase Agreement impermissibly restructures the rights of any of the Debtors' creditors or impermissibly dictates the terms of a liquidating plan of reorganization of the Debtors. Neither the Sale Transaction nor the Asset Purchase Agreement constitutes a *sub rosa* or *de facto* plan of reorganization or liquidation, as neither proposes to (a) impair or restructure any existing debt of, or equity interests in, the Debtors; (b) impair or circumvent voting rights with respect to any plan proposed by the Debtors; (c) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (d) classify claims or equity interests or extend debt maturities.

V.    <u>No Stay of Order</u>.    Time is of the essence to implement the Asset Purchase Agreement and consummate the Sale Transaction.  The Sale Transaction must be approved and consummated promptly in order to preserve the value of the Transferred Assets and to maximize the value to the Debtors, their estates, their creditors, and all other parties in interest.  The Debtors have demonstrated compelling circumstances and sound business justifications for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement.  Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d), 7062, or any applicable provisions of the Local Rules, and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Order shall not be stayed and shall be effective and enforceable immediately upon entry.

W.    <u>Time is of the Essence</u>.  The Sale Transaction must be approved and consummated promptly in order to preserve the value of the Debtors' assets, as there is substantial risk of deterioration of the value of the Transferred Assets if the Transactions are not consummated quickly.  Accordingly, there is good cause to waive the stay contemplated by Bankruptcy Rules 4001, 6004, 6006, and 7062.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    <u>Sale Motion Granted</u>.  The Sale Motion and the relief requested therein (to the extent not previously granted by the Court pursuant to the Bidding Procedures Order or otherwise) are GRANTED and approved as set forth herein.

2.    <u>Objections Overruled</u>.  Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled and all reservations of rights included in such objections are hereby overruled on the merits with prejudice.  All persons and entities given notice of the Sale Motion that failed timely to object thereto or that withdrew their objections

thereto are deemed to consent to the relief granted herein for all purposes, including, without limitation, section 363(f)(2) of the Bankruptcy Code.

3.    <u>Sale Transaction Approved</u>.  The Asset Purchase Agreement and all transactions contemplated thereby are APPROVED.

4.    <u>Prior Findings of Fact and Conclusions of Law</u>.  The Court's findings of fact and conclusions of law in the Bidding Procedures Order, including the record of the Bidding Procedures Hearing and the findings of fact recited above are incorporated herein by reference.

5.    <u>Debtors' Performance Authorized</u>.  The Debtors are hereby authorized to enter into and perform their obligations under the Asset Purchase Agreement, and to take such other actions as may be necessary or desirable to effectuate the terms of the Asset Purchase Agreement and other instruments or documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Asset Purchase Agreement, the Sale Transaction, or this Order, including, without limitation, deeds, assignments, stock powers, transfers of membership interests, and any other instruments of transfer, without further order of the Court.  The Debtors are hereby further authorized to take all other actions as may reasonably be requested by the Purchaser or otherwise for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to the Purchaser's possession any or all of the Transferred Assets and the Contracts, as may be necessary or appropriate for the Debtors to perform their obligations under the Asset Purchase Agreement and consummate the Sale Transaction, without further order of the Court.

6.    Debtors are hereby authorized, but not directed, to enter into Separation Agreements and remit Severance Payments to Severance Eligible Employees in accordance with

the terms of the Separation Agreements, in each case, pursuant to Section 6.9 of the Asset Purchase Agreement.

7.      The Debtors are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases, and other documents with respect to the Transferred Assets that are necessary or appropriate to effectuate the Asset Purchase Agreement, the Sale Transaction, or this Order, including, as applicable, amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors may determine are necessary or appropriate.

8.      <u>Valid Transfer</u>.  Effective as of the Closing Date, the sale and assignment of the Transferred Assets and the Contracts by the Debtors to the Purchaser shall constitute a legal, valid, and effective transfer of the Transferred Assets and the Contracts, notwithstanding any requirement for approval or consent by any person, and will vest the Purchaser with all right, title, and interest of the Debtors in and to the Transferred Assets and the Contracts, free and clear of all Interests (other than any Interests expressly assumed under, or expressly permitted by, the Asset Purchase Agreement), pursuant to section 363(f) of the Bankruptcy Code.

9.      <u>Free and Clear Sale</u>.  Except to the extent specifically provided in the Asset Purchase Agreement, upon the Closing Date, the Debtors shall be, and hereby are, authorized and empowered, pursuant to sections 105, 363(b) and 363(f) of the Bankruptcy Code, to sell and transfer to the Purchaser the Transferred Assets.  The sale and transfer of the Transferred Assets to the Purchaser shall vest the Purchaser with all right, title, and interest of the Debtor in and to the Transferred Assets free and clear of any and all Interests of any person or entity (other than

any Interests expressly assumed under, or expressly permitted by, the Asset Purchase Agreement), with all such Interests to attach solely to the net proceeds of the Sale Transaction ultimately attributable to the sale of the property on which such holders have an Interest, in the same order of priority, and with the same validity, force, and effect that such Interests had prior to the consummation of the Sale Transaction, subject to any rights, claims, or defenses of the Debtors or their estates. Following the Closing, no holder of any Interest on any of the Transferred Assets shall interfere with the Purchaser's use or enjoyment of any of the Transferred Assets based on or related to such Interest or any actions that the Debtors have taken or may take in their Chapter 11 Cases and no interested party may take any action to prevent, interfere with or otherwise enjoin consummation of the Sale Transaction.

10.    The provisions of this Order authorizing the sale and transfer of the Transferred Assets free and clear of Interests shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, or implement the provisions of this Order. For the avoidance of doubt, on or after the Closing Date, the Debtors and/or the Purchaser shall be authorized, but not directed, to file any such releases, termination statements, assignments, consents, or other instruments in any jurisdiction to record the release, discharge, and termination of Interests on the Transferred Assets pursuant to the terms of this Order.

11.    <u>Direction to Creditors</u>. This Order shall be (a) effective as a determination that, as of the Closing Date, all Interests on the Transferred Assets (except as otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement) shall be unconditionally released, discharged, and terminated as to the Purchaser and the Transferred Assets; and (b) binding upon all persons and entities, including all the Debtors' creditors and any holder of an

Interest on any of the Transferred Assets, and all such persons and entities are hereby authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release their respective Interests on the Transferred Assets, if any.  If any person or entity that has filed a financing statement, mortgage, mechanics lien, *lis pendens*, or other document, instrument, notice, or agreement evidencing any Interest on the Transferred Assets has not delivered to the Debtors on or before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, releases, or instruments of satisfaction that the person or entity has with respect to the Transferred Assets, the Debtors and/or the Purchaser are authorized to (x) execute and file such termination statements, releases, instruments of satisfaction, or other documents with respect to the Transferred Assets on behalf of the applicable person or entity; and (y) file, register, or otherwise record a certified copy of this Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests on the Transferred Assets.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, local, tribal, or foreign government agency, department, or office.

12.    <u>Direction to Recording Officers</u>.  This Order shall be binding upon all persons and entities, including filing agents or officers, title agents or companies, recorders of mortgages or deeds, registrars, administrative agencies, governmental units or departments, secretaries of state, governmental officials, and all other persons or entities that may be required by operation of law, the duties of their office or contract to accept, file, register, or otherwise record or release any documents or instruments regarding the Transferred Assets or who may be required to report or insure any title or state of title in or to the Transferred Assets, (collectively, the "<u>Recording Officers</u>").  All Recording Officers are hereby authorized and directed to (a) accept any and all

documents or instruments necessary and appropriate to consummate the Sale Transaction or to record and reflect that the Purchaser is the owner of the Transferred Assets free and clear of all Interests (unless otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement) and (b) strike all recorded Interests on the Transferred Assets from their records.

13.    <u>Direction to Surrender the Transferred Assets</u>.  All persons or entities in possession or control of any of the Transferred Assets, either presently or on or before the Closing Date, are directed to surrender possession or control of the Transferred Assets to the Purchaser on the Closing Date.

14.    <u>No Successor Liability</u>.  The Purchaser and its affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals, and shareholders (or the equivalent thereof) are not and shall not be (a) deemed a "successor" in any respect to any of the Debtors or any of their estates as a result of the consummation of the Sale Transaction or any other event occurring in the Debtors' Chapter 11 Cases under any theory of law or equity; (b) deemed to have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors or any of their estates; (c) deemed to be an alter ego of or have a common identity with any of the Debtors; (d) deemed to have a continuity of enterprise with any of the Debtors; or (e) deemed to be a continuation or substantial continuation of any of the Debtors or any enterprise of any of the Debtors, including (with respect to clause (a) through (e) of this paragraph) within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, environmental (including, without limitation, any Environmental Law), products liability or other law, doctrine, rule, or regulation (including any filing requirements under any such laws, rules or regulations) with respect to the Debtors' liability under such law, doctrine, rule, or regulation.

15.     The Purchaser shall not assume, nor be deemed to have assumed or in any way be responsible for any liability or obligation, of any of the Debtors or any of their estates including, but not limited to, any Excluded Liabilities, any bulk sales law, successor or vicarious liability, liability, or responsibility for any claim against any of the Debtors or against any insider of any of the Debtors or similar liability, except as otherwise expressly provided in the Asset Purchase Agreement, and the Sale Motion, Sale Notice and Notice of Auction Results contain sufficient notice of such limitation in accordance with applicable law.  Except for the Assumed Liabilities, the transfer of the Transferred Assets and the Contracts to the Purchaser under the Asset Purchase Agreement will not result in (a) the Purchaser, its affiliates, or any of their respective predecessors, successors, assigns, members, partners, officers, directors, principals, or shareholders (or the equivalent thereof) or any of the Transferred Assets having any liability or responsibility for any claim against any of the Debtors or against any insider of any of the Debtors (including, without limitation, Excluded Liabilities); (b) the Purchaser, its affiliates, or any of their respective predecessors, successors, assigns, members, partners, officers, directors, principals, or shareholders (or the equivalent thereof) or any of the Transferred Assets having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, recoupment, or otherwise, directly or indirectly, any Interests or Excluded Liabilities; or (c) the Purchaser, its affiliates, or any of their respective predecessors, successors, assigns, members, partners, officers, directors, principals, or shareholders (or the equivalent thereof) or any of the Transferred Assets having any liability or responsibility to any of the Debtors except as is expressly set forth in the Asset Purchase Agreement.

16.     Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether

in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser, its assets (including the Transferred Assets) or its successors or assigns, with respect to any (a) Interest on the Transferred Assets or (b) successor, transferee, vicarious, or other similar liability or theory of liability, including (i) commencing or continuing any action or other proceeding pending or threatened, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of the Court or the agreements or actions contemplated or taken in respect hereof or thereof; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Interest; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; or (v) revoking, terminating, or failing or refusing to renew any license, permit, or authorization to operate any of the Transferred Assets or conduct any of the businesses operated with the Transferred Assets.

17.    <u>Assumption and Assignment of Contracts</u>.  Under sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale Transaction, the Debtors' assumption and assignment of the Contracts to the Purchaser free and clear of all Interests pursuant to the terms of the Asset Purchase Agreement, as modified by the terms of any amendments reached by the Purchaser and the respective Counterparty, is hereby approved, and the requirements of sections 365(b)(1), 365(f)(2) and 365(b)(3) (to the extent applicable) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Upon the Debtors' assumption and assignment of the Contracts to the Purchaser, each applicable Counterparty shall be forever barred, estopped, and permanently enjoined from raising or asserting against the Debtors, the Purchaser, or their respective property, any assignment fee, default, breach, claim, pecuniary loss, liability, or obligation (whether legal or equitable, secured or unsecured, matured or unmatured,

contingent or non-contingent, known or unknown, liquidated or unliquidated, senior or subordinate), counterclaim, defense, setoff, or any other matter arising under or out of, in connection with, or in any way related to, the Contracts existing as of the Closing Date or arising by reason of the Closing.  Upon the Debtors' assumption and assignment of the Contracts to the Purchaser, the Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and to the Contracts and the Contracts shall be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms.  The Debtors' assumption and assignment of the Contracts to the Purchaser shall not constitute a default under or a termination of any Contract.

18.    <u>The Debtors Shall Not Retain Liability for the Contracts and Assumed Liabilities</u>. Effective as of the Closing Date, (a) the assumption of the Contracts and the Assumed Liabilities by the Purchaser constitutes a legal, valid, effective, complete, and absolute sale, conveyance, and transfer from the Debtors to the Purchaser of any and all Liabilities relating to, in connection with, or arising under the Contracts and Assumed Liabilities; and (b) the Debtors shall have no liability to Purchaser or any other Person for any Liabilities with respect to the Contracts and Assumed Liabilities.  Further, it is the Parties' express intention that the Sale Transaction be, and be treated for all purposes, as an absolute sale, conveyance, and transfer of all Liabilities relating to, in connection with, or arising under the Contracts and Assumed Liabilities.

19.    <u>Cure Obligations</u>.  Any defaults or other obligations under the Contracts shall be deemed cured by the Purchaser's payment or other satisfaction of the cure amounts, if any, associated with the Contracts (the "<u>Cure Costs</u>"), and such Cure Costs shall constitute the only liabilities the Purchaser must satisfy to cure any defaults or satisfy any other existing obligations under the Contracts.

20.    <u>Cure Objections</u>.    Except as provided herein, all objections to the Debtors' calculation of Cure Costs with respect to any of the Contracts (each such objection, a "<u>Cure Objection</u>") have been overruled, withdrawn, waived, settled, or otherwise resolved.  Any Cure Objections as to applicable Cure Costs that have not been resolved by the parties may be heard at a later date as set by the Court.  The pendency of a dispute relating to a particular Contract shall not prevent or delay the assumption or assignment of any other Contract or the closing of the Sale Transaction.

21.    <u>Adequate Assurance</u>.    The Purchaser has provided adequate assurance of future performance under the Contracts within the meaning of sections 365(b)(1)(C), 365(f)(2)(B) and 365(365(b)(3) (to the extent applicable) of the Bankruptcy Code.  Any Adequate Assurance Objections that have not been withdrawn, waived, or settled and all reservations of rights included in such objections are hereby overruled on the merits with prejudice.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the Debtors' assumption and assignment of the Contracts to the Purchaser have been satisfied.

22.    <u>Anti-Assignment Provisions Unenforceable</u>.    No section or provision of any Contract that purports to (a) prohibit, restrict, or condition the assignment of a Contract, including, but not limited to, the conditioning of such assignment on the consent of any Counterparty to such Contract; (b) authorize the termination, cancellation, or modification of a Contract based on the filing of a bankruptcy case, the financial condition of the Debtors, or similar circumstances; (c) declare a breach or default as a result of a change in control in respect of the Debtors; or (d) provide for additional payments, profit sharing, penalties, conditions, renewals, extensions, charges, or other financial accommodations in favor of the Counterparty to a Contract, or modification of any term or condition upon the assignment of a Contract or the occurrence of

the conditions set forth in subsection (b) above, shall have any force or effect, and any such section or provision constitutes an unenforceable anti-assignment provision under section 365(f) of the Bankruptcy Code and/or is otherwise unenforceable under section 365(e) of the Bankruptcy Code.

23.     <u>No Fees for Assumption and Assignment</u>.  There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Purchaser, its successors or assigns, or the Debtors as a result of the assumption and assignment of the Contracts.

24.     <u>Direction to Contract Counterparties</u>.  All Counterparties to Contracts assigned to the Purchaser in accordance with the terms of this Order and the Asset Purchase Agreement shall cooperate with, and expeditiously execute and deliver upon, any reasonable request of the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents, or other documents that may be required or requested by any governmental unit or other public or quasi-public authority or other party to effectuate the applicable transfers in connection with the Debtors' assumption and assignment of the Contracts to the Purchaser.

25.     <u>Modification of Contracts List</u>.  The rights of the Purchaser to modify the list of Contracts in accordance with Section 5.3 of the Asset Purchase Agreement after the date of this Order are approved.  Pursuant to section 5.3 of the Asset Purchase Agreement, the Purchaser may, in consultation with the Sellers and upon provision of written notice to the Sellers, modify the list of the Contracts after the date of this Order until the earlier of (a) 30 days following the Closing Date, (b) the entry of an order confirming a chapter 11 plan of reorganization or liquidation of the Debtors, or (c) such time that the Chapter 11 Cases are closed or dismissed.  If the Purchaser identifies a Contract it does not seek to be assumed and assigned, then such Contract shall, upon written notice to the Sellers, be automatically deemed removed from the list of Designated Contracts pursuant to section 5.3 of the Asset Purchase Agreement and deemed an Excluded

Contract, Excluded Asset, and/or Excluded Liability.  If the Purchaser identifies an executory contract or unexpired lease previously excluded from the list of Designated Contracts that the Purchaser seeks to be assumed and assigned, then (a) such contract or lease shall, upon written notice to the Sellers, and provided that such contract or lease has not been rejected pursuant to an Order of the Bankruptcy Court, be automatically deemed a Contract and added to the list of Designated Contracts, and (b) to the extent not already served with an Assumption and Assignment Notice, the Debtors shall file and serve a notice (the "Previously Omitted Contract Notice") on the Counterparties to such Contract notifying such Counterparties of the Debtors' intention to assign and the Purchaser's intention to assume such Contract, including the proposed Cure Costs (if any). The Counterparties to such Contract shall have fourteen (14) calendar days from the date of such Previously Omitted Contract Notice to file and serve on the Debtors and the Purchaser an objection to the assumption of its Contract.  If the Counterparties, Debtors, and the Purchaser are unable to reach a consensual resolution with respect to a timely served objection to a Previously Omitted Contract Notice, the Debtors will seek, at Purchaser's expense, an expedited hearing before this Court to seek approval of the assumption and assignment of such Contract.  If no objection is timely served on the Debtors and the Purchaser, then such Contract shall be deemed assumed by the applicable Debtor and assigned to the Purchaser, or transferred by the applicable Debtor to the Purchaser, as applicable, pursuant to this Order.

26. Licenses and Permits.  To the extent provided in the Asset Purchase Agreement and available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and any other governmental authorization or approval of the Debtors with respect to the Transferred Assets and the Contracts, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby

are, directed to be transferred to the Purchaser as of the Closing Date. To the extent any license or permit necessary for the operation of the Transferred Assets is determined not to be an executory contract that may be assumed and assigned under section 365 of the Bankruptcy Code, the Purchaser shall apply for and obtain any necessary license or permit promptly after the Closing Date, and such license or permit of the Debtors shall remain in place for the Purchaser's benefit until a new license or permit is obtained.

27.    To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Transferred Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale Transaction.

28.    <u>Good-Faith Purchaser</u>. The Purchaser is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded thereby. Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity or enforceability of any sale, transfer, or assignment under the Asset Purchase Agreement or obligation or right granted pursuant to the terms of this Order (unless duly stayed pending appeal prior to the Closing Date) and, notwithstanding any reversal, modification, or vacatur, any sale, transfer, or assignment under the Asset Purchase Agreement, shall be governed in all respects by the original provisions of this Order or the Asset Purchase Agreement, as applicable.

29.    <u>No Avoidance</u>. Neither the Sale Transaction nor the Asset Purchase Agreement is subject to avoidance, and no party is entitled to any damages or other recovery in connection therewith under section 363(n) of the Bankruptcy Code.

30.    <u>Bulk Sales</u>.  No bulk sales law, bulk transfer law, or similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction.

31.    <u>Amendments</u>.  The Asset Purchase Agreement, the Related Documents and any other agreements, documents or instruments related thereto may be amended, supplemented, or otherwise modified by the parties thereto and in accordance with the terms thereof, without further action or order of the Court; *provided*, *that*, any such amendment, supplement, or modification shall not have a material adverse effect on the Debtors' estates.

32.    <u>Binding Order</u>.  This Order and the Asset Purchase Agreement shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtors and the Purchaser, their respective successors, and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case of any of the Debtors if any of these Chapter 11 Cases is converted from a case under chapter 11 to a case under chapter 7, all creditors of any and all of the Debtors (whether known or unknown), all Counterparties to any Contracts, and all Recording Officers.  Neither the Sale Transaction nor the Asset Purchase Agreement shall be subject to rejection or avoidance under any circumstances.  This Order and the Asset Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser, and its respective successors and assigns.

33.    <u>Allocation of Consideration</u>.  Except as provided in the Asset Purchase Agreement, all rights of the respective Debtors' estates with respect to the allocation of consideration received from the Purchaser in connection with the Sale Transaction (including, without limitation, the value of the assumption of the Assumed Liabilities) are expressly reserved for later determination by the Court and, to the extent consideration is received by any Debtor that is determined to be allocable to another Debtor, the recipient Debtor shall be liable to such other Debtor for a claim

with the status of an expense of administration in the case of the recipient Debtor under section 503(b) of the Bankruptcy Code.

34.    <u>Failure to Specify Provisions; Conflicts</u>.   The failure specifically to include or mention any particular provision of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors, and the Purchaser that the Asset Purchase Agreement be authorized and approved in its entirety, including any amendments thereto as may be made by the parties thereto in accordance with the terms thereof and this Order.   Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

35.    <u>Further Assurances</u>.   From time to time, as and when requested, all parties to the Sale Transaction shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the requesting party may reasonably deem necessary or desirable to consummate the Sale Transaction, including such actions as may be necessary to vest, perfect, confirm, record, or otherwise transfer to the Purchaser its right, title, and interest in and to the Transferred Assets and the assigned Contracts.

36.    <u>Automatic Stay</u>.   The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified to the extent necessary, without further order of the Court, to allow the Purchaser to deliver any notice provided for in the Asset Purchase Agreement and to take any and all actions permitted or required under the Asset Purchase Agreement in accordance with the terms and conditions thereof.

37.    <u>No Stay of Order</u>.   Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and any applicable Local Rules, this Order shall not be stayed and shall be effective

and enforceable immediately upon entry.  The provisions of this Order shall be self-executing. Time is of the essence in implementing the Asset Purchase Agreements and closing the Sale Transaction.  Any party objecting to this Order or any of the relief granted herein must exercise due diligence in filing an appeal and obtaining a stay prior to the Closing of the Sale Transaction or risk its appeal being foreclosed as moot.

38.    Governing Terms.  To the extent this Order is inconsistent with any prior order or pleading in these Chapter 11 Cases, the terms of this Order shall govern, and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale Transaction.  To the extent there is any inconsistency between the terms of this Order and the terms of the Asset Purchase Agreement, the terms of this Order shall govern.

39.    No Modification by Subsequent Orders or Plan Provisions.  Nothing contained in any chapter 11 plan confirmed in these Chapter 11 Cases, any order confirming any such plan, or in any other order entered in these Chapter 11 Cases (including, without limitation, any order entered after any conversion of any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code) or any related proceeding subsequent to entry of this Order shall modify, alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement, the Related Documents any other agreements, documents or other instruments related thereto, or this Order.

40.    Retention of Jurisdiction.  This Court shall retain exclusive jurisdiction to (a) interpret, implement, and enforce the terms and provisions of this Order and the Asset Purchase Agreement, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith; and (b) decide any issues or disputes concerning this Order, the Asset Purchase Agreement, or the rights and duties of the parties

hereunder or thereunder, including the interpretation of the terms, conditions, and provisions hereof and thereof, and the status, nature, and extent of the Transferred Assets and the Contracts.

41.    <u>Authorization</u>.    The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

# EXHIBIT A

**ASSET PURCHASE AGREEMENT**

**by and among**

**TUNE HOLDINGS CORP.,**

**as Purchaser,**

**AKOUSTIS TECHNOLOGIES, INC., AKOUSTIS, INC. AND RFM INTEGRATED DEVICE INC.,**

**as Sellers**

**and**

**SPACE EXPLORATION TECHNOLOGIES CORP.,**
**solely for purposes of <u>Section 10.18</u>**

**Dated as of April 25, 2025**

## Table of Contents

**Page**

ARTICLE 1 DEFINED TERMS ........................................................................ 2

    1.1    Defined Terms .......................................................................... 2

    1.2    Other Definitional and Interpretive Matters ....................... 18

ARTICLE 2 THE PURCHASE AND SALE; CLOSING ............................. 21

    2.1    Purchase and Sale .................................................................. 21

    2.2    Excluded Assets ..................................................................... 22

    2.3    Assumption of Liabilities ..................................................... 22

    2.4    Excluded Liabilities .............................................................. 23

    2.5    Reserved ................................................................................. 24

    2.6    Closing .................................................................................... 24

    2.7    Closing Deliveries of the Parties .......................................... 24

    2.8    Purchase Price; Assumed Liabilities; Deposit .................... 25

    2.9    Transfer Taxes ....................................................................... 26

    2.10  Non-Assignability of Government Contract Assets ............. 27

    2.11  Escrow Account ..................................................................... 27

    2.12  Further Assurances ................................................................ 28

    2.13  Prorations .............................................................................. 28

    2.14  Withholding ........................................................................... 28

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLERS ............................. 29

    3.1    Organization, Good Standing and Other Matters ............... 29

    3.2    Authority and Enforceability ................................................ 29

    3.3    No Conflict; Required Filings and Consents ....................... 29

    3.4    Financial Statements ............................................................. 30

    3.5    Reserved ................................................................................. 30

    3.6    Customers; Suppliers and Vendors ...................................... 30

    3.7    Absence of Changes .............................................................. 30

    3.8    Compliance With Laws; Permits .......................................... 32

    3.9    Transferred Assets ................................................................. 32

    3.10  Insurance ............................................................................... 33

    3.11  Taxes ...................................................................................... 33

    3.12  Contracts ............................................................................... 34

3.13    Employee Benefit Matters .................................................................. 37

3.14    Employee Matters .............................................................................. 38

3.15    Litigation ........................................................................................... 39

3.16    Real Property ..................................................................................... 39

3.17    Environmental .................................................................................... 41

3.18    Intellectual Property .......................................................................... 41

3.19    No Other Representations or Warranties ........................................... 43

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 44

4.1    Organization, Good Standing and Other Matters ............................... 44

4.2    Authority and Enforceability ............................................................. 44

4.3    No Conflict: Required Filings and Consents ..................................... 44

4.4    Financing ............................................................................................ 45

4.5    Solvency ............................................................................................. 45

4.6    Litigation ........................................................................................... 45

4.7    Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other
Representations and Warranties .......................................................... 45

4.8    No Other Representations or Warranties ............................................ 46

ARTICLE 5 BANKRUPTCY COURT MATTERS ................................................... 46

5.1    Competing Transaction ....................................................................... 46

5.2    Bankruptcy Court Filings ................................................................... 46

5.3    Assumption of Assigned Contracts ..................................................... 48

5.4    No Successor Liability ........................................................................ 49

5.5    Sale Free and Clear ............................................................................. 50

ARTICLE 6 PRE-CLOSING COVENANTS ............................................................ 50

6.1    Conduct of Business ........................................................................... 50

6.2    Access; Confidentiality ....................................................................... 52

6.3    Efforts to Consummate ........................................................................ 53

6.4    Notices and Consents; Pre-Closing Novation Efforts ........................ 54

6.5    Regulatory Matters and Approvals ..................................................... 54

6.6    Public Announcements ........................................................................ 55

6.7    Update of Schedules ............................................................................ 55

6.8    Notification of Certain Matters ........................................................... 55

6.9    Employee Matters ............................................................................... 55

ARTICLE 7 POST-CLOSING COVENANTS ....................................................... 57

   7.1     Post-Closing Operation of Sellers ....................................................... 57

   7.2     Post-Closing Receipt and Possession of Assets ................................ 57

   7.3     Insurance ............................................................................................. 58

   7.4     Wrong Pockets .................................................................................... 58

   7.5     Tax Matters ......................................................................................... 59

   7.6     IT Network Systems ........................................................................... 60

   7.7     Trimmed Inventory ............................................................................. 60

   7.8     Post-Closing Novation Efforts ........................................................... 60

   7.9     Post-Closing Transition Services ....................................................... 62

   7.10   Copied Business Records ................................................................... 63

ARTICLE 8 CONDITIONS PRECEDENT .......................................................... 64

   8.1     Conditions to Each Party's Obligation .............................................. 64

   8.2     Conditions to Obligation of Purchaser .............................................. 64

   8.3     Conditions to Obligations of Sellers ................................................. 65

ARTICLE 9 TERMINATION .............................................................................. 66

   9.1     Events of Termination ........................................................................ 66

   9.2     Effect of Termination ......................................................................... 67

ARTICLE 10 GENERAL PROVISIONS .............................................................. 68

   10.1   Survival of Representations, Warranties and Covenants ................... 68

   10.2   Entire Agreement ............................................................................... 68

   10.3   Amendment; No Waiver ..................................................................... 68

   10.4   Severability; Specific Versus General Provisions ............................. 68

   10.5   Expenses and Obligations .................................................................. 69

   10.6   Notices ................................................................................................ 69

   10.7   Counterparts ....................................................................................... 70

   10.8   Governing Law ................................................................................... 70

   10.9   Submission to Jurisdiction; Consent to Service of Process .............. 70

   10.10  Waiver of Jury Trial .......................................................................... 71

   10.11  Rights Cumulative ............................................................................. 71

   10.12  Assignment ........................................................................................ 71

   10.13  Specific Enforcement; Remedies ...................................................... 72

   10.14  No Third-Party Beneficiaries ............................................................ 72

10.15  No Personal Liability of Directors, Officers and Owners ................................... 72

10.16  General Release ........................................................................................... 73

10.17  Legal Representation ..................................................................................... 74

10.18  Purchaser Guarantee ..................................................................................... 75

## EXHIBITS

Exhibit A    Form of Bill of Sale and Assignment and Assumption Agreement
Exhibit B    Form of Subcontract Pending Novation Agreement
Exhibit C    Form of Intellectual Property Assignment Agreement
Exhibit D    Sale Order

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*"), dated as of April 25, 2025, is entered into by and among Tune Holdings Corp., a Texas corporation ("*Purchaser*"), Akoustis Technologies, Inc., a Delaware corporation ("*Akoustis Technologies*"), Akoustis, Inc., a Delaware corporation ("*Akoustis*"), RFM Integrated Device Inc., a Texas corporation ("*RFMI*," and collectively with Akoustis Technologies and Akoustis, "*Sellers*") and solely for purposes of Section 10.18, SpaceX Exploration Technologies Corp., a Texas corporation ("*Purchaser Guarantor*"). Purchaser and Sellers are collectively referred to as the "*Parties*" and each individually as a "*Party*".

## RECITALS

**WHEREAS**, Sellers are engaged in the Business and collectively own all of the Transferred Assets;

**WHEREAS**, on December 16, 2024 (the "*Petition Date*"), each of Sellers and Grinding and Dicing Services, Inc., a California corporation ("*GDSI*" and together with Sellers, the "*Debtors*"), commenced a voluntary case under Chapter 11 of the Bankruptcy Code by filing a petition for relief in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"), which cases are jointly administered for procedural purposes under Case No. 24-12796 (LSS) (each, a "*Bankruptcy Case*" and collectively, the "*Bankruptcy Cases*");

**WHEREAS**, on January 13, 2025, the Bankruptcy Court entered the Bid Procedures Order approving the Bid Procedures;

**WHEREAS**, subject to approval of the Bankruptcy Court, Purchaser will purchase, and Sellers will sell, Free and Clear, all of Sellers' right, title and interest in and to the Transferred Assets, and Purchaser will assume the Assumed Liabilities, in each case, on the terms and subject to the conditions set forth in this Agreement, pursuant to, among other provisions thereof, Sections 105, 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, and in accordance with the Bid Procedures and subject to entry of the Sale Order by the Bankruptcy Court; and

**WHEREAS**, in accordance with the Bid Procedures and subject to the terms and conditions of this Agreement and the Escrow Agreement, concurrently with the execution and delivery of this Agreement by Purchaser, Purchaser has deposited (or caused to be deposited) in accordance with written instructions provided to Purchaser an aggregate amount equal to the Deposit Escrow Amount into an escrow account (the "*Deposit Escrow Account*") to be established and maintained by Escrow Agent pursuant to the Escrow Agreement.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

# ARTICLE 1
# DEFINED TERMS

1.1    **Defined Terms**.  The following terms shall have the following meanings in this Agreement:

"**Action**" means any action, claim, investigation, audit, proceeding, grievance, arbitration, suit or litigation (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator, including any cancellation, opposition, inter parties review, or similar proceeding.

"**Affiliate**" means, with respect to any Person, any other Person, directly or indirectly, controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made.  For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means (a) the beneficial ownership of more than fifty percent (50%) of the equity or voting securities of any other Person or (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Alternative Transaction**" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction resulting from the Auction, of a material portion of the Transferred Assets, in a transaction or series of transactions with one or more Persons other than Purchaser; *provided*, that for the avoidance of doubt, any sale, transfer or other disposition of all or any portion of the GDSI Assets to a Person other than Purchaser shall not constitute an Alternative Transaction.

"**Appraisal**" means that certain appraisal of the Transferred Assets dated as of November 4, 2024.

"**Assigned Contracts**" means those Designated Contracts that the applicable Seller shall transfer and assign to Purchaser pursuant to and in accordance with Section 5.3.

"**Assumed Liabilities**" has the meaning set forth in Section 2.3.

"**Assumption Notices**" has the meaning set forth in Section 5.3(a).

"**Attorney-Client Information**" has the meaning set forth in Section 10.17.

"**Auction**" has the meaning set forth in the Bid Procedures.

"**Backup Bid Expiration Date**" has the meaning set forth in the Bid Procedures.

"**Backup Bidder**" has the meaning set forth in the Bid Procedures.

"**Balance Sheet Date**" has the meaning set forth in Section 3.4.

"***Balance Sheet Financials***" has the meaning set forth in <u>Section 3.4</u>.

"***Bankruptcy Cases***" has the meaning set forth in the Recitals.

"***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. § 101 et seq.

"***Bankruptcy Court***" has the meaning set forth in the Recitals.

"***Base Amount***" equals $30,200,000.

"***Benefit Plan***" means each (i) "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA, (ii) end of service or severance, termination protection, retirement, pension, profit sharing, deferred compensation, phantom, equity or equity-based, health or welfare, employment, independent contractor, vacation, change in control, transaction, retention, bonus or other incentive, fringe benefit, paid time off or similar plan, agreement, arrangement, program or policy, or (iii) other plan, Contract, policy or arrangement providing compensation or benefits, in each case whether or not written, that is sponsored, maintained, administered, contributed to, required to be contributed to, or entered into by any Seller or any Subsidiary of any Seller, for the benefit of any of current or former Service Providers or with respect to which Sellers have any Liability or obligation.

"***Bid Procedures***" means those certain bidding procedures attached as Exhibit 1 to the Bid Procedures Order.

"***Bid Procedures Order***" means the Order entered by the Bankruptcy Court in the Bankruptcy Cases on January 13, 2025, at Docket No. 176, as amended by the Order entered by the Bankruptcy Court in the Bankruptcy Cases on March 25, 2025, at Docket No. 384.

"***Bill of Sale and Assignment and Assumption Agreement***" means the bill of sale and assignment and assumption agreement in respect of the Transferred Assets and any Assumed Liabilities, dated as of the Closing Date, by and between Sellers and Purchaser, substantially in the form attached hereto as <u>Exhibit A</u>.

"***Business***" means the business of Sellers immediately prior to Closing, excluding, for the avoidance of doubt, the business of GDSI.

"***Business Day***" means any day other than (a) a Saturday, Sunday or federal holiday or (b) a day on which commercial banks in the State of New York are authorized or required to be closed.

"***Business Records***" means all books, records, ledgers and files or other similar information of each Seller (in any form or medium, including all information in electronic form and whether stored on discs, tapes, drives, servers or other, and including e-mail communications) to the extent related to, used or held for use in connection with the Business, including all client lists, vendor lists, correspondence, mailing lists, revenue records, invoices, advertising materials, brochures, records of operation, standard forms of documents, manuals of operations or business procedures, photographs, blueprints, research files and materials, data books, Intellectual Property disclosures and information, media materials and plates, accounting records and litigation files (but excluding the organization documents, minute and stock record books and corporate seal of Sellers).

"***CARES Act***" has the meaning set forth in the definition of Seller Taxes.

"***CDA***" has the meaning set forth in Section 7.8(b)(ii).

"***CERCLA***" has the meaning set forth in the definition of Environmental Claim.

"***Claim***" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"***Cleanse Process***" means the "cleansing" process and dispute resolution process described in Part D of the Bid Procedures Order, including any reset of manufacturing equipment contemplated by such Order.

"***Cleansed Business Records***" mean those Business Records that have undergone the Cleanse Process and been found in the Order entered by the Bankruptcy Court following the hearing on any Qorvo Trade Secret Objections (as defined in the Bid Procedures Order) scheduled for April 17, 2025, to be "cleansed".

"***Closing***" has the meaning set forth in Section 2.6.

"***Closing Date***" has the meaning set forth in Section 2.6.

"***Code***" means the Internal Revenue Code of 1986, or any successor law, and regulations issued by the IRS pursuant thereto.

"***Competing Bid***" has the meaning set forth in Section 5.1.

"***Copyrights***" has the meaning set forth in the definition of Intellectual Property.

"***Confidentiality Agreement***" means that certain Confidentiality Agreement, dated as of March 12, 2025, by and between Akoustis Technologies and Space Exploration Technologies Corp.

"***Consent***" means any consent, approval, authorization, waiver or license.

"***Contract***" means any written or oral agreement, mortgage, indenture, lease (whether for real or personal property), license, commitment, sale and purchase order, contract or subcontract, and any other written or oral instrument, arrangement or understanding of any kind that is or purports to be legally binding, and any amendments, modifications, or supplements thereto.

"***Contracting Parties***" has the meaning set forth in Section 10.15.

"***Cure Costs***" means the monetary amounts that are required to be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption of any Designated Contract and assignment to Purchaser as provided hereunder, as such amounts are agreed upon by the Parties and the applicable counterparty to such Designated Contract or determined by the Bankruptcy Court pursuant to the procedures in the Bid Procedures Order.

"***Deposit Escrow Account***" has the meaning set forth in the Recitals.

"***Deposit Escrow Amount***" means $2,300,000.

"***Designated Contracts***" has the meaning set forth in <u>Section 5.3(c)</u>.

"***Domain Names and Social Media Accounts***" has the meaning set forth in the definition of Intellectual Property.

"***Effect***" has the meaning set forth in the definition of Material Adverse Change.

"***Enforceability Exceptions***" means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar Laws affecting the enforcement of creditors' rights generally and general equitable principles.

"***Environmental Claim***" shall mean any Action, Claim, complaint, notice of violation, notice of "potentially responsible party" liability, enforcement proceeding, information request, governmental Order or decree, Lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging Liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from:  (a) the presence, Release of, or exposure to, any Hazardous Substances; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"***Environmental Law***" means all Laws relating to Hazardous Substances, public health (with respect to exposure to Hazardous Substances), or protecting worker health or safety, or the environment, including: (i) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.), as amended ("***CERCLA***"); (ii) the Solid Waste Disposal Act (42 U.S.C. §§ 6901 et seq.), as amended; (iii) the Clean Air Act (42 U.S.C. §§ 7401 et seq.), as amended; (iv) the Clean Water Act (33 U.S.C. § 1251), as amended; (v) the Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 et seq.), as amended; (vi) the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.), as amended; (vii) the Safe Drinking Water Act (41 U.S.C. § 300f et seq.), as amended; (viii) the Federal Water Pollution Control Act (33 U.S.C. § 125, et seq.), (ix) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), and (x) the Environmental Management Act, SBC 2003, c.53 and regulations thereunder, as amended.

"***Environmental Notice***" shall mean any written directive or notice with respect to any Environmental Claim.

"***Environmental Permits***" means all Permits required under any Environmental Law.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended, and regulations issued pursuant thereto.

"***ERISA Affiliate***" means any entity which is a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (c) an affiliated service group (as defined under Section 414(m) of the Code) or (d) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included any Seller.

"**Escrow Agent**" means Citizens Bank, N.A.

"**Escrow Agreement**" means the escrow agreement, dated as of April 16, 2025, by and between Akoustis Technologies and the Escrow Agent.

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Contracts**" means Contracts other than the Assigned Contracts.

"**Excluded IT Network Systems**" has the meaning set forth in Section 2.2(b).

"**Excluded Liabilities**" has the meaning set forth in Section 2.4.

"**Excluded Rights**" means any claims, causes of action, rights of recovery or rights of set-off of a Seller against any director or officer of any Seller in his or her capacity as such.

"**Excluded Trimmed Inventory**" has the meaning set forth in Section 7.7.

"**Extended Transition Period**" has the meaning set forth in Section 7.9.

"**Extended Transition Services**" has the meaning set forth in Section 7.9.

"**False Claims Act**" has the meaning set forth in Section 3.12(d)(ii).

"**FAR**" has the meaning set forth in Section 2.10.

"**Final Order**" means an Order (a) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing, or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal thereon), (b) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for a new trial shall have expired (in cases in which such time period is capable of expiring), and (c) as to which no stay is in effect.

"**Financials**" has the meaning set forth in Section 3.4.

"**First Amended Assumption Notice**" has the meaning set forth in Section 5.3(b).

"**Fraud**" means actual and intentional common law fraud by a Party or its representatives, as determined in accordance with the Laws of the State of Delaware, with respect to the making of any representation or warranty by such Party set forth in this Agreement.

"**Free and Clear**" means free and clear of all Liens (other than Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

"**GAAP**" means then-current generally accepted accounting principles in the United States.

"**GDSI**" has the meaning set forth in the Recitals.

6

"***GDSI Assets***" means all properties, rights, interests and other tangible and intangible assets of GDSI.

"***GDSI Buyer***" means any purchaser approved pursuant to an Order of the Bankruptcy Court in accordance with the Bid Procedures of substantially all the GDSI Assets that intends to operate the business of GDSI as a going concern.

"***Government Bid***" means any offer quotation, bid (whether or not subject to protest) or proposal related to the Business submitted by Seller to any Governmental Authority or any Prime Contractor which is outstanding and, if accepted and awarded, would result in a Government Contract.

"***Government Contract***" means any Contract between a Seller on the one hand, and (a) any Governmental Authority, (b) any prime contractor to a Governmental Authority in its capacity as a prime contractor or (c) any subcontractor with respect to any Contract described in clause (a) or clause (b) above, on the other hand.  Unless otherwise indicated, any task, purchase, change or delivery order under a Government Contract shall not constitute a separate Government Contract for purposes of this definition, but shall be part of the Government Contract under which it was issued.

"***Governmental Authority***" means any domestic or foreign national, provincial, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, any court (including the Bankruptcy Court) or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS).

"***Hazardous Substances***" means (a) those substances defined in or regulated under the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, CERCLA, the Clean Water Act, the Safe Drinking Water Act, the Atomic Energy Act, the Toxic Substances Control Act, the Federal Insecticide, Fungicide, and Rodenticide Act and the Clean Air Act, and their state counterparts, as each may be amended from time to time, and all regulations thereunder; (b) petroleum and petroleum products, including crude oil and any fractions thereof; (c) natural gas, synthetic gas, and any mixtures thereof; (d) lead, polychlorinated biphenyls, perfluoroalkyl and polyfluoroalkyl substances, asbestos and radon; (e) any other pollutant or contaminant; and (f) any substance, material or waste regulated by any Governmental Authority pursuant to any Environmental Law.

"***Income Statement Financials***" has the meaning set forth in <u>Section 3.4</u>.

"***Indebtedness***" of Sellers shall mean, without duplication, (a) the principal of and premium (if any) in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds, or other similar instruments for the payment of which such Person is responsible or liable; (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person, and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the ordinary course of business); (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance, or similar credit transaction; (e) obligations under any interest rate, currency swap or

other hedging agreement or arrangement; (f) all obligations with respect to vendor advances or any other similar advances; (g) all unpaid management or other fees owing or obligations of any Seller or any Affiliate of such Seller; (h) all deferred compensation and all accrued but unpaid wages, incentive or retention bonuses, commissions or other compensation (including the employer portion of any Taxes thereon); (i) all outstanding severance payments as of the Closing (including the employer portion of any Taxes thereon); (j) all prepayments relating to the Business; (k) all obligations for unfunded liabilities relating to any employee benefit plan, pension plan or similar arrangement; (l) deferred rent; (m) any amounts owed to Affiliates (including intercompany trade and accounts payable); (n) obligations associated with factoring or discounting of accounts receivables; (o) all "cut" but uncashed checks issued by any Seller that are outstanding as of the Closing Date; (p) all obligations of the type referred to in clauses (a) through (o) of any Person for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety, or otherwise, including guarantees of such obligations, and (q) all obligations of the type referred to in clauses (a) through (n) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"***Initial Assumption Notice***" has the meaning set forth in <u>Section 5.3(b)</u>.

"***Injunction***" means that certain Permanent Injunction issued by the United States District Court for the District of Delaware on October 15, 2024 in the matter of *Qorvo, Inc. v. Akoustis Technologies and Akoustis, Inc.* (Case No. 1:21-cv-01417), or any modification thereto.

"***Insurance Policies***" means all primary, excess and umbrella insurance policies, bond and other forms of insurance owned or held by or on behalf, or providing insurance coverage to the Business, any Seller or any of their respective operations, properties and assets, including any self-insurance programs or arrangements.

"***Intellectual Property***" means any and all intellectual property or proprietary rights in any jurisdiction throughout the world, including all U.S. and non-U.S.: (i) patents, patent applications, statutory invention registrations, registered designs, and similar or equivalent rights in inventions and designs, including all amendments, certificates of correction, counterparts, non-provisionals, provisionals, reviews, substitutions, reissues, continuations, continuations-in-part, divisionals, revisions, extensions, renewal applications, or reexaminations thereof (collectively, "***Patents***"); (ii) trademarks, service marks, trade dress, service names, trade names, brand names, logos, business names, corporate names and other indicia of origin or source, all registrations and applications for registration thereof, including all extensions, modifications and renewals thereof, and, in each case, together with all of the goodwill associated therewith and symbolized thereby (collectively, "***Trademarks***"); (iii) published and unpublished works of authorship (including Software, hardware design, manufacturing files, technical documentation, instructions, user manuals, and training materials related to hardware, and in configuration, implementation, service and maintenance instructions, and records related to Software or hardware, and mask works (including mask designs and physical mask designs)), copyrights therein and thereto, and all registrations, applications for registration, renewals, extensions, restorations, and reversions thereof (collectively, "***Copyrights***"); (iv) trade secrets, industrial secret rights, data, database rights, know-how, inventions, discoveries, layouts, ideas, confidential or proprietary information, unpublished Software, hardware design, manufacturing files, technical documentation, instructions, user manuals, and training materials related to hardware, configuration,

implementation, service and maintenance instructions, records related to Software or hardware, financial, business, scientific, technical, economic and engineering information, patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, codes, schematics, databases, drawings, models, methodologies, customer lists, unfiled invention disclosures, in each case whether tangible or intangible and whether stored, compiled or memorialized physically, electronically, graphically, photographically or in writing; (collectively, "*Trade Secrets*") (v) internet domain name registrations and social media accounts and handles (collectively, "***Domain Names and Social Media Accounts***"); (vi) moral rights and rights of attribution and integrity, (vii) all other intellectual property or proprietary rights anywhere in the world; (vii) the right to sue and recover for past, present, and future infringement, misappropriation, breach or other violation of any of the foregoing; and (viii) all rights to collect any fees, revenues, and royalties on any of the foregoing.

"***Intellectual Property Assignment Agreement***" means the intellectual property assignment agreement, dated as of the Closing Date, by and between Sellers and Purchaser, substantially in the form attached hereto as Exhibit C.

"*Inventory*" means all inventory, including raw and packing materials, work-in-progress, finished goods, supplies, parts and similar items related to, used or held for use in connection with the Business, excluding any Excluded Trimmed Inventory.

"*IRS*" means the United States Internal Revenue Service.

"*IT Network Systems*" means computer hardware, servers, networks, networking equipment, routers and switches.

"*IT Systems*" means IT Network Systems, platforms, firmware, applications, databases, peripherals, data communication lines, and other information technology equipment and related systems, including any outsourced systems and processes and Internet websites and related content.

"*Knowledge of Sellers*" means the actual knowledge, after reasonable inquiry, of Mark Podgainy and Kamran Cheema.

"*Law*" means any federal, national, provincial, state, local or municipal law, ordinance, principle of common law, code, regulation or statute enacted, adopted, issued or promulgated by any Governmental Authority.

"*Law Firm*" means K&L Gates LLP and its successors.

"*Leased Real Property*" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property of Sellers.

"*Leases*" shall mean all leases, subleases, licenses, concessions, and other agreements, including all amendments, extensions, renewals, guaranties, and other agreements with respect thereto, in each case pursuant to which a Seller holds or has any interest in Leased Real Property, but excluding Contracts.

"*Liabilities*" means debts, liabilities, duties, obligations or commitments of any nature whatsoever, whether direct or indirect, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, whenever or however arising (including whether arising out of any Contract or in a tort claim based on negligence or strict liability).

"*Lien*" means any "interest" as that term is used in Section 363(f) of the Bankruptcy Code, all forms of lien (including mechanic's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Transferred Assets, and liens issued pursuant to Section 361, 363 or 364 of the Bankruptcy Code), Claim, encumbrance, license, covenant not to sue, assessment, sublease, defect or irregularity in title, pledge, hypothecation, mortgage, deed of trust, deed to secure debt, security interest, charge, transfer restriction or similar agreement or encumbrance, including any dedication under any gathering, transportation, treating, processing, fractionating, purchase, sale or similar agreements, or any other rights granted or consensual as or against any Transferred Assets including easements, encroachments, right of use or possession, right of first offer or first refusal, restrictive covenant, right of way, preemptive rights, options, servitude, conditional sale or installment agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise), third party interest or other restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property) or any other interest or right in property that constitutes a lien or interest within the definition or adjudication of such terms under the Bankruptcy Code, whether imposed by Contract, Law, equity or otherwise, and including all costs and expenses relating thereto.

"*Losses*" means, with respect to any Person, all losses, Liabilities, claims, demands, judgments, damages, fines, suits, actions, out-of-pocket costs and expenses (including reasonable attorneys' fees) of any kind against or affecting such Person.

"*Material Adverse Change*" means any state of facts, event, change, effect, condition, circumstance, occurrence or development (each, an "*Effect*") that is, individually or in the aggregate, materially adverse to (a) the results of operations or condition (financial or otherwise) of (1) the Business or (2) the assets of Sellers, in either case, taken as a whole, or (b) the ability of Sellers to consummate the transactions contemplated hereby on a timely basis. Notwithstanding anything to the contrary contained in this paragraph, none of the following shall be deemed, individually or in the aggregate, to constitute a Material Adverse Change: any Effect resulting from or relating to (directly or indirectly) any of the following: (i) general political, business, economic, financial, or capital market conditions (including interest rates and tariffs); (ii) changes after the date of this Agreement in Laws or Orders or interpretations thereof and any increase (or decrease) after the date of this Agreement in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing or changes after the date of this Agreement in accounting standards, requirements or principles (including GAAP) or the interpretation thereof; (iii) changes, occurrences, or developments in the industries, markets or geographical areas in which Sellers operate in general; (iv) any natural disaster, other acts of God or any acts of terrorism, sabotage, civil unrest, military action or war (whether or not declared), epidemic, pandemic or similar health outbreak (including but not limited to, COVID-19) or any escalation or worsening thereof or any quarantine or trade restrictions related thereto or any other *force majeure*; (v) (A) the taking of any action at the written request of Purchaser or its Affiliates or (B) the disclosure or announcement of the identity, nature, or ownership of Purchaser or Purchaser's

plans with respect to the Business, including the impact thereof on the relationships, contractual or otherwise, of the Business with employees, customers, lessors, suppliers, vendors, or other commercial partners (vi) any action taken by Purchaser or its Affiliates with respect to the transactions contemplated by this Agreement or the financing thereof; or (vii) (A) the commencement or pendency of the Bankruptcy Cases or (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby, (2) the Bid Procedures Order, liquidation or restructuring of a Seller, or their respective Affiliates or (3) the assumption or rejection of any Contract *provided*, that any Effect resulting from or relating to (directly or indirectly) the matters described in clauses (i) through (iv) may be taken into account in determining whether there has been a Material Adverse Change to the extent, and only to the extent, that they have a materially disproportionate adverse impact on the Business in the aggregate, relative to other similarly situated businesses in the industry in which the Business operates.

"*Material Contracts*" has the meaning set forth in <u>Section 3.12(a)</u>.

"*Material Customers*" has the meaning set forth in <u>Section 3.6(a)</u>.

"*Material Suppliers*" has the meaning set forth in <u>Section 3.6(a)</u>.

"*Nonparty Affiliates*" has the meaning set forth in <u>Section 10.15</u>.

"*Novation*" has the meaning set forth in <u>Section 2.10</u>.

"*Novation Period*" has the meaning set forth in <u>Section 7.8(b)</u>.

"*Order*" means any award, decision, injunction, order, judgment, ruling, decree, writ, subpoena, settlement, verdict, or assessment or arbitration award entered, issued, made or rendered by any court, administrative agency, or other Governmental Authority or by any arbitrator.

"*Organizational Documents*" means (a) the article or certificate of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation or organization or articles of organization of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in clauses "(a)" through "(d)," and (f) any amendment to or equivalent of any of the foregoing.

"*Outside Date*" has the meaning set forth in <u>Section 9.1(f)</u>.

"*Owned Intellectual Property*" means the Intellectual Property owned or purported to be owned, in whole or in part, by Sellers, excluding (a) those items set forth in clauses (iii), (iv), (vi) and (vii) of the definition of Intellectual Property that are sequestered in connection with the Cleanse Process and (b) mask works (including mask designs and physical mask designs).

"*Owned Real Property*" means all real property owned by Sellers together with all buildings, fixtures and improvements erected thereon and all appurtenant easements and other rights and

interests appurtenant thereto, including all of Sellers' right, title and interest, if any, in and to (a) any unpaid award for any taking by condemnation or any damages to the premises by reason of a change of grade of any street or highway, (b) all minerals, oils, gas and other hydrocarbon substances on and under such real property and (c) all mineral rights, development rights, air rights and water rights relating to such real property.

"*Pandemic Response Law*" means the CARES Act, the Families First Coronavirus Response Act, Pub. L. No. 116-127 (116th Cong.) (Mar. 18, 2020), the Payroll Tax Executive Order, the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (116th Cong. (Dec. 27, 2020)), the American Rescue Plan Act Pub. L. No. 117-2 (117th Cong. (Mar. 11, 2021)), and any other similar or additional federal, state, local, or foreign law, or administrative guidance intended to benefit taxpayers in response to the COVID-19 pandemic and associated economic downturn and in each case, as amended.

"*Party*" and "*Parties*" have the meaning set forth in the Preamble.

"*Patents*" has the meaning set forth in the definition of Intellectual Property.

"*Permit*" means all permits, authorizations, licenses, registrations, certificates, franchises, clearances, qualifications, exemptions, waivers, variances, privileges, consents and other approvals issued by or from any Governmental Authority.

"*Permitted Liens*" means (a) statutory or common law liens of landlords', mechanics', materialmens', workmens', warehousemens' and other similar Persons arising or incurred in the ordinary course of business and for amounts which are not delinquent, (b) easements, rights-of-way, restrictions, covenants and other similar charges and encumbrances of record not interfering materially with the ordinary conduct of the Business or detracting materially from the use, occupancy, value or marketability of title of the assets subject thereto, (c) Permitted Tax Liens or assessments or other governmental charges not yet due and payable, in each case, the nonpayment of which is required by the Bankruptcy Code, (d) liens identified on title policies or preliminary title reports and other documents or instruments included in the public records and identified on title policies or preliminary title reports, each to the extent made available to Purchaser, which are not interfering materially with the ordinary conduct of the Business or detracting materially from the use, occupancy, value or marketability of title of the assets subject thereto, (e) zoning, building codes and other land use Laws regulating the use or occupancy of Owned Real Property or Leased Real Property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such Owned Real Property or Leased Real Property, which are not interfering materially with the ordinary conduct of the Business or detracting materially from the use, occupancy, value or marketability of title of the assets subject thereto, (f) liens on the Leased Real Property in favor of the landlord of such Leased Real Property, whether contractual, statutory or otherwise, to the extent such liens do not affect tenant's use and occupancy of the Leased Real Property, and which are not interfering materially with the ordinary conduct of the Business, (g) non-exclusive licenses of Intellectual Property granted in the ordinary course of business, (h) any rights of the United States government (including, licenses, march-in rights, domestic manufacturing restrictions) set forth on Schedule 3.18(f)(i), (i) any rights of joint inventors with respect to the Intellectual Property set forth on Schedule 3.18(a)(ii), and (j) solely

prior to the Closing, any Liens that will be removed by operation of the Bid Procedures Order and/or Sale Order.

"***Permitted Tax Lien***" means any Lien for Taxes not yet due and payable.

"***Person***" means any individual, corporation (including any non-profit corporation), partnership (general or limited), limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

"***Personal Information***" means any Transferred Asset that constitutes "personal data," "personal information," "personally identifiable information," or other equivalent terms under applicable Privacy Requirements.

"***Personal Property***" means all machinery, equipment, racking, material handling, furniture, furnishings, rolling stock, tools, office supplies, vehicles, computer hardware, IT Network Systems and other IT equipment that has not been sequestered in connection with, or following completion of, the Cleanse Process, spare parts, shop equipment, manufacturing supplies, fixtures, scrap materials, mechanical equipment, waste water systems and reverse osmosis systems and other tangible personal property other than Business Records owned or leased by a Seller and primarily related to, used or held for use in connection with the Business; *provided*, that "Personal Property" shall exclude Excluded Trimmed Inventory.

"***Petition Date***" means December 16, 2024.

"***Post-Closing Tax Period***" means any taxable period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"***Potential Assigned Contracts***" means those Contracts of Sellers listed on <u>Schedule 1.1(a)(i)</u>.

"***Pre-Closing Tax Period***" means any taxable period ending on or before the Closing Date.

"***Pre-Paid Expenses***" means all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, pre-paid or deferred charges and expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent) to the extent related to the Business, except professional fee retainers.

"***Prime Contracts***" has the meaning set forth in <u>Section 6.4(b)</u>.

"***Privacy Requirements***" means all applicable Laws governing data protection and privacy with respect to the collection, use and processing of Personal Information.

"***Public Health Measures***" means any (a) closures, "shelter-in-place," "stay at home," workforce reduction, social distancing, shut down, closure, curfew or other restrictions or any other Laws, orders, decrees, directives, guidelines or recommendations issued by any Governmental Authority, the Centers for Disease Control and Prevention, the World Health Organization or any industry group in connection with any pandemic or disease, outbreak of

disease or other public health emergency (including COVID-19), or (b) commercially reasonable actions taken in good faith by any Party as a result of any pandemic or disease, outbreak of disease or other public health emergency (including COVID-19).

"*Purchase Price*" has the meaning set forth in <u>Section 2.8(a)</u>.

"*Purchased Government Bid*" has the meaning set forth in <u>Section 3.12(c)</u>.

"*Purchased Government Contract*" has the meaning set forth in <u>Section 3.12(c)</u>.

"*Purchaser*" has the meaning set forth in the preamble.

"*Purchaser Guarantor*" has the meaning set forth in the preamble.

"*Purchaser Group Members*" has the meaning set forth in <u>Section 10.17</u>.

"*Purchaser Releasing Party*" has the meaning set forth in <u>Section 10.16(b)</u>.

"*Purchaser Selected Employees*" has the meaning set forth in <u>Section 6.9(a)</u>.

"*Qorvo*" means Qorvo, Inc., a Delaware corporation.

"*Qorvo Trade Secret Information*" means, collectively, (a) the "Qorvo Trade Secret Information" identified in the seventh paragraph of the Permanent Injunction entered on the docket in the matter of Qorvo Inc. vs. Akoustis Technologies, Inc. DE Case 1:21-cv-01417-JPM on October 15, 2024, by the U.S. District Court for the District of Delaware and (b) all other documents that contain confidential Qorvo information (either indicated as Qorvo-confidential by the information itself or otherwise known to be Qorvo-confidential by Sellers) obtained or received by a Seller without Qorvo's authorization or in violation of any obligation to maintain the confidentiality of that information.

"*Real Property*" means, collectively, the Owned Real Property and Leased Real Property.

"*Registered Intellectual Property*" has the meaning set forth in <u>Section 3.18(a)</u>.

"*Reimbursable Amounts*" has the meaning set forth in Section <u>7.9</u>.

"*Related Claims*" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents and any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

"*Related Documents*" means the Bill of Sale and Assignment and Assumption Agreement, the Intellectual Property Assignment Agreement, the Subcontract Pending Novation Agreement and

any other document, agreement, certificate or instrument entered into in connection with this Agreement.

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, leaching, migration, releasing, escaping, dumping or disposing into, through or upon the environment, including but not limited to the indoor and ambient air, soil, surface water, groundwater, the sewer, septic system or storm drain.

"**Rights**" means all claims, causes of action, rights of recovery and rights of set-off against any Person arising from or related to the Business, the Transferred Assets or the Assumed Liabilities, including: (a) all rights under any Assigned Contract, including all rights to receive payment for products sold and services rendered thereunder, to receive goods and services thereunder, to assert claims and to take other rightful actions in respect of breaches, defaults and other violations thereof; (b) all rights under or arising out of all insurance policies (other than director and officer insurance policies), including third party property and casualty insurance proceeds (to the extent receivable in respect of the Business or the Transferred Assets) and other insurance proceeds, relating to the Business or the Transferred Assets; (c) all rights under or in respect of any Owned Intellectual Property, including all rights to sue and recover damages for past, present and future infringement, dilution, misappropriation, violation, unlawful imitation or breach thereof, and all rights of priority and protection of interests therein under the laws of any jurisdiction; and (d) all rights under all guarantees, warranties, indemnities and insurance policies arising from or related to the Business, the Transferred Assets or the Assumed Liabilities; *provided, however*, that "Rights" shall not include the Excluded Rights.

"**Sale Motion**" means the motion filed by Sellers in the Bankruptcy Cases on the Petition Date pursuant to, inter alia, Sections 105, 363, and 365 of the Bankruptcy Code to obtain the Bid Procedures Order and the Sale Order and approve the Transactions.

"**Sale Notice**" has the meaning set forth in Section 7.7.

"**Sale Order**" means an Order of the Bankruptcy Court approving and authorizing this Agreement and all of the terms and conditions hereof (including approving and authorizing Sellers' assumption and assignment, pursuant to Section 365 of the Bankruptcy Code, of the Assigned Contracts, and approving and authorizing Sellers to consummate the Transactions contemplated hereby Free and Clear to the full extent permitted pursuant to Section 363(f) of the Bankruptcy Code, and containing a finding that Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code), in form and substance acceptable to Purchaser and Sellers. The Sale Order shall be appended to this Agreement as Exhibit D prior to the Closing Date.

"**Sale Terms**" has the meaning set forth in Section 7.7.

"**Schedules**" has the meaning set forth in Article 3.

"**Seller Employees**" means all employees of Sellers, including those on disability or a leave of absence, whether paid or unpaid.

"**Seller Group Members**" has the meaning set forth in Section 10.17.

"***Seller Intellectual Property***" has the meaning set forth in <u>Section 3.18(b)</u>.

"***Seller IT Systems***" has the meaning set forth in <u>Section 3.18(g)</u>.

"***Seller Releasing Party***" has the meaning set forth in <u>Section 10.16(a)</u>.

"***Seller Taxes***" means any (a) Liability of Sellers for Taxes, (b) any Liability for Taxes related to the Business or Transferred Assets attributable to any Pre-Closing Tax Period and the portion of a Straddle Period ending on the Closing Date allocated to Sellers pursuant to <u>Section 7.5(c)</u>, (c) any Liability of Sellers for the unpaid Taxes of any Person under Section 1.1502-6 of U.S. Treasury Regulations (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract (other than Taxes pursuant to a contract entered into in the ordinary course of business the primary purpose of which is not related to Taxes that are for a Post-Closing Tax Period), or otherwise by operation of Law, (d) all "applicable employment taxes" (as defined in Section 2302(d)(1) of the Coronavirus Aid, Relief, and Economic Security Act, Pub.L. 116–136 (116th Cong.) (Mar. 27, 2020), as amended, and the Consolidated Appropriations Act, 2021 (the "***CARES Act***")) that any Seller elected to defer pursuant to Section 2302 of the CARES Act and any other Taxes deferred under any Pandemic Response Law and (e) any Transfer Taxes allocated to Sellers pursuant to <u>Section 2.9</u>.

"***Seller Trade Secrets***" has the meaning set forth in <u>Section 3.18(e)</u>.

"***Sellers***" has the meaning set forth in the preamble.

"***Separation Agreement***" has the meaning set forth in <u>Section 6.9(b)</u>.

"***Service Provider***" means a director, officer, employee or individual independent contractor.

"***Severance Eligible Employee***" has the meaning set forth in <u>Section 6.9(b)</u>.

"***Severance Payment***" has the meaning set forth in <u>Section 6.9(b)</u>.

"***Software***" shall mean computer software programs, routines, scripts, algorithms, instructions, libraries, and software systems, including technical databases, compilations, tool sets, compilers, applications, interfaces, higher level "proprietary" languages and related technical, training, programmer, maintenance, specification, flowchart, and user manuals, flowcharts, descriptions, records, files, documentation and materials, whether in source code, object code or human readable form.

"***Straddle Period***" means a taxable period that begins on or before the Closing Date and ends after the Closing Date.

"***Subcontract Pending Novation Agreement***" means that certain Subcontract Pending Novation Agreement, by and among Purchaser and the applicable Seller(s), the form of which is attached hereto as <u>Exhibit B</u>.

"***Subsidiary***" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the

total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member or general partner of such business entity (other than a corporation).  The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"***Successful Bidder***" has the meaning set forth in the Bid Procedures.

"***Tax***" means any United States federal, state, local or foreign tax, custom, duty, or other like assessment or charge in the nature of a tax (including any income, franchise, branch profits, capital gains, value-added, sales, use, property, transfer, payroll, social security windfall profit, production, excise, stamp, environmental, gross receipts, employment or withholding or backup withholding tax), and any related fine, penalty, interest, or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority, whether disputed or not.

"***Tax Return***" means any return (including any information return), report, statement, schedule, notice, form, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection, or payment, of any Tax, or any extension of time to file or pay any of the foregoing.

"***Termination Fee***" has the meaning set forth in <u>Section 9.2(a)</u>.

"***Title Company***" means the title company selected by Purchaser in its sole discretion.

"***Title Policy***" means an owner's title insurance policy issued by the Title Company on the most current form of ALTA fee owner's title insurance policy, with extended coverage over the standard exceptions, insuring the good and marketable fee simple title of Purchaser, subject only to Permitted Liens, and with such affirmative coverages and endorsements at Purchaser's expense as Purchaser shall reasonably require and which the Title Company agrees to issue.

"***Trade Secrets***" has the meaning set forth in the definition of Intellectual Property.

"***Trademarks***" has the meaning set forth in the definition of Intellectual Property.

"***Transaction Expenses***" means the aggregate amount of any and all fees and expenses incurred by or on behalf of, or paid or to be paid directly by, a Seller or any Person that Seller pays or reimburses or is otherwise legally obligated to pay or reimburse in connection with Sellers' Bankruptcy Cases or negotiating, preparing, closing and carrying out this Agreement and the

Transactions, including (a) all fees and expenses of counsel, advisors, consultants, investment bankers, accountants, auditors and any other experts in connection with the Transactions; (b) any fees and expenses associated with obtaining necessary or appropriate waivers, consents, or approvals of any Governmental Authority or third parties on behalf of Sellers in connection with the Transactions; (c) any fees or expenses associated with obtaining the release and termination of any Liens in connection with the Transactions; (d) all brokers', finders' or similar fees in connection with the Transactions; and (e) any change of control payments, bonuses, severance, termination, or retention obligations or similar amounts payable in the future or due by a Seller in connection with the Transactions contemplated hereby (including the employer portion of any payroll, social security, unemployment or similar Taxes related thereto).

"***Transactions***" means the transactions contemplated by this Agreement and the Related Documents.

"***Transfer Taxes***" has the meaning set forth in <u>Section 2.9</u>.

"***Transferred Assets***" has the meaning set forth in <u>Section 2.1</u>.

"***Transferred Employees***" has the meaning set forth in <u>Section 6.9(a)</u>.

"***Transition Employees***" has the meaning set forth in Section <u>7.9</u>.

"***Transition Fees***" has the meaning set forth in Section <u>7.9</u>.

"***Transition Period***" has the meaning set forth in Section <u>7.9</u>.

"***Transition Services***" has the meaning set forth in Section <u>7.9</u>.

"***Trim Process***" means the portion of Sellers' manufacturing process by which a semiconductor wafer containing acoustic wave resonators is measured and has material removed on or near the acoustic wave resonator to adjust the frequency response of the acoustic wave resonator.

"***Trimmed Inventory***" means the portion of Sellers' inventory that has begun to undergo or has undergone the Trim Process.

"***WARN Act***" means the United States Worker Adjustment and Retraining Notification Act, as amended, and including any similar state or local Law, or any similar Law applicable outside of the United States regarding the termination or layoff of employees, as applicable.

"***Warming Requirements***" has the meaning set forth on <u>Schedule 1.1(a)(ii)</u> hereto.

> 1.2     ***Other Definitional and Interpretive Matters***.

> (a)     Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

> (i)     <u>Calculation of Time Period</u>.  All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically

provided.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.

(ii)    Dollars.  Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents.

(iii)    Exhibits/Schedules.  The Exhibits and Schedules to this Agreement are an integral part of this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent that the relevance of such disclosure to such other Schedule is reasonably apparent on its face to a reader of such disclosure without reference to the underlying matter or item that is disclosed.  Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or that the included items or actions are not in the ordinary course of business.  No disclosure on a Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    Amendments.  Reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof.

(v)    Gender and Number.  Any reference to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(vi)    Headings.  The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or any Related Document, as applicable.  Unless otherwise specified, all references in this Agreement to any "Section" or other subdivision are to the corresponding section or subdivision of this Agreement, and all references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vii)    Herein.  The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(viii)   Or. The word "or" shall be construed in the inclusive sense of "and/or" unless otherwise specified.

(ix)   Including. The word "including," or any variation thereof, means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)   To the Extent. The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends and such phrase shall not mean simply "if".

(xi)   Successors. A reference to any Party to this Agreement, any Related Document or any other agreement or document shall include such Party's successors and permitted assigns.

(xii)   Laws. A reference to laws or legislation are references to such laws and legislation as they may be amended or supplemented from time to time, and references to laws and legislation include references to any succeeding law, modification or re-enactment thereof, any legislative provision substituted therefor, and to the implementing rules or regulations promulgated pursuant thereto.

(xiii)   Reflected On or Set Forth In. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (a) there is a specific reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that relates to the subject matter of such representation, (b) such item is otherwise specifically set forth on such balance sheet or financial statements or (c) such item is set forth in the notes to such financial statements.

(xiv)   Made Available. Any reference in this Agreement to "made available" means only a document or other item of information that was (1) provided, delivered or made available to Purchaser and its representatives in the electronic data room maintained by SecureDocs under the name "Project Tune", and to which Purchaser and its representatives have access, or (2) publicly filed and available on the SEC's "EDGAR" database, in the case of each of the foregoing clauses "(1)" and "(2)", as of 5:00 p.m. (prevailing Eastern Time) on the date that is two Business Days prior to the date hereof.

(b)   All representations and warranties set forth in this Agreement or the Related Documents are contractual in nature only and subject to the sole and exclusive remedies set forth herein, except as otherwise set forth herein. The phrase "to the Knowledge of Sellers" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c)   The Parties have participated jointly in the negotiation and drafting of this Agreement and the Related Documents, and in the event an ambiguity or question of intent or

interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement and the Related Documents. The Parties agree that changes from earlier drafts to the final version of this Agreement do not necessarily imply that the Party agreeing to such change is agreeing to a change in meaning (as the Party agreeing to such change may believe the change is stylistic and non-substantive); consequently, no presumption should exist by virtue of a change from a prior draft.

# ARTICLE 2
## THE PURCHASE AND SALE; CLOSING

2.1     ***Purchase and Sale***.  Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall purchase, assume and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear, all of Sellers' rights, title and interests in, to or under all of Sellers' assets, properties and rights (other than the Excluded Assets) of every kind and description (wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased or licensed) used, held for use in, or useful in, or intended to be used in, or that arise in any way out of, the Business, whether or not reflected on the books and records of Sellers, as the same shall exist on the Closing Date (collectively, the "***Transferred Assets***").  Without limiting the generality of the prior sentence, the Transferred Assets shall include all of Sellers' rights, title and interests in, to and under the following:

(a)     all Personal Property;

(b)     all Inventory;

(c)     all Owned Real Property and all rights in respect of all Leased Real Property subject to Leases that constitute Assigned Contracts;

(d)     all Owned Intellectual Property;

(e)     all Cleansed Business Records;

(f)     all Assigned Contracts;

(g)     all Permits that relate to the Business or the Transferred Assets, to the extent transferable (the "***Transferred Permits***");

(h)     reserved;

(i)     all Pre-Paid Expenses;

(j)     all Rights;

(k)    any Tax benefits relating to the Business or the Transferred Assets for any taxable period (or portion thereof), other than a tax period (or portion thereof) ending on or prior to the Closing Date; and

(l)    the goodwill and going concern value and other intangible assets, if any, primarily arising from or related to the Business.

2.2    ***Excluded Assets***.  Notwithstanding the provisions of <u>Section 2.1</u> or anything to the contrary herein, Sellers shall not sell, transfer and assign to Purchaser, and Purchaser shall not acquire from Sellers (and the Transferred Assets shall not include), the following assets, properties or rights, whether owned by, held by or relating to Sellers or the Business (collectively, the "***Excluded Assets***"):

(a)    the assets set forth on <u>Schedule 2.2(a)</u>;

(b)    Excluded Contracts, including those Contracts designated as Excluded Contracts on <u>Schedule 2.2(b)</u>;

(c)    all of Sellers' cash and cash equivalents;

(d)    all Benefit Plans and all assets thereof;

(e)    all Qorvo Trade Secret Information;

(f)    all Business Records except for the Cleansed Business Records;

(g)    the IT Network Systems set forth on <u>Schedule 2.2(g)</u> (the "***Excluded IT Network Systems***");

(h)    the GDSI Assets;

(i)    the Excluded Rights; and

(j)    the equity interests of Sellers and any Subsidiary of a Seller.

2.3    ***Assumption of Liabilities***.  On the terms and subject to the conditions set forth in this Agreement, Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms (or as otherwise provided herein) the following Liabilities of Sellers, as such Liabilities relate to the Transferred Assets or the Transactions (all such liabilities being assumed herein, collectively, the "***Assumed Liabilities***"):

(a)    all Liabilities arising under the Assigned Contracts incurred or arising exclusively with respect to the period after the Closing;

(b)    all Cure Costs;

(c)    all Liabilities with respect to Transferred Employees in connection with or arising on or after the date they commence employment with Purchaser;

(d)    the post-petition accounts payable set forth on <u>Schedule 2.3(d)</u>, the aggregate amount of which shall not exceed $3,000,000;

(e)    all Taxes for which Purchaser is liable pursuant to this Agreement, including the Transfer Taxes as set forth in <u>Section 2.9</u>; and

(f)    the Liabilities set forth on <u>Schedule 2.3(f)</u>.

2.4    ***Excluded Liabilities***.    Notwithstanding <u>Section 2.3</u> or anything to the contrary herein, Purchaser will not assume or be liable for, and Sellers shall remain fully and solely responsible for, all Liabilities of Sellers that are not listed in <u>Section 2.3</u> as Assumed Liabilities, including the following Liabilities (all such Liabilities being excluded, the "***Excluded Liabilities***"):

(a)    all Liabilities of Sellers relating to or arising under any Excluded Asset, including any Excluded Contract;

(b)    all Seller Taxes;

(c)    all Liabilities of Sellers under this Agreement;

(d)    any Liability in respect of any Indebtedness or Transaction Expenses of Sellers;

(e)    all Liabilities of Sellers arising from or related to any compliance or noncompliance on or prior to the Closing Date with any Law applicable to a Seller, the Business or the Transferred Assets;

(f)    all Liabilities of Sellers pursuant to any Environmental Law arising from or related to any action, event, circumstance or condition occurring or existing on or prior the Closing Date;

(g)    all Liabilities of Sellers arising from or related to any breach, failure to perform, torts related to the performance of, violations of Law, infringements or indemnities under, guaranties pursuant to and overcharges or underpayments under, any Contract prior to the Closing Date;

(h)    all Liabilities of Sellers arising from or related to any Action against a Seller, the Business or the Transferred Assets pending as of the Closing Date or based upon any action, event, circumstance or condition arising as of or prior to the Closing Date;

(i)    all Liabilities of Sellers arising out of, relating to or with respect to the employment, engagement or termination of any current or former Seller Employee or other Service Provider of Sellers for periods on or prior to Closing, as well as all Liabilities arising out of, relating to or with respect to any Seller Employee who does not become a Transferred Employee; and

(j)      any Liability to any (i) owner or former owner of equity interests of Sellers, (ii) current or former officer or director of Sellers or (iii) Subsidiary of any Seller, in each case in their capacity as such.

2.5    *Reserved*.

2.6    *Closing*.  The closing of the Transactions (the "*Closing*") will take place remotely by electronic exchange of documents on the date (the "*Closing Date*") that is the later of (a) May 7, 2025, and (b) two Business Days after the date on which all of the conditions set forth in Article 8 (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the Party entitled to the benefit of the same, unless another time or date is agreed to in writing by the Parties.  Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all Parties at the Closing will be deemed to have been taken and executed simultaneously.  For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 a.m. (prevailing Eastern Time) on the Closing Date.

2.7    *Closing Deliveries of the Parties*.  At or prior to the Closing:

(a)      Purchaser and Sellers, as applicable, shall execute and deliver the Bill of Sale and Assignment and Assumption Agreement, Intellectual Property Assignment Agreement and the Subcontract Pending Novation Agreement.

(b)      Purchaser shall deliver, or cause to be delivered, to Sellers or the applicable Person, each of the following:

(i)      a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in Section 8.3(a) and Section 8.3(b); and

(ii)      payment of the closing payment pursuant to Section 2.8(a) and payment of any Cure Costs pursuant to Section 5.3(d).

(c)      Sellers shall deliver, or cause to be delivered, to Purchaser or the applicable Person each of the following:

(i)      a certificate, dated as of the Closing Date, executed by or on behalf of Sellers as to the satisfaction of the conditions set forth in Section 8.2(a) and Section 8.2(b);

(ii)      an IRS Form W-9 with respect to each Seller, duly completed and executed;

(iii)      with respect to the Owned Real Property:

(1)      a duly completed, executed and registrable transfer/covenant deed for each parcel of Owned Real Property, in form and substance

24

reasonably satisfactory to Purchaser, transferring the Owned Real Property to Purchaser;

(2)    all other certificates, assignments, agreements and other instruments as, in the reasonable discretion of Purchaser and its counsel, are deemed reasonably necessary or appropriate to vest in Purchaser all of Sellers' right, title, and interest in, to and under the Owned Real Property;

(3)    a duly executed reliance letter agreement, in form and substance reasonably satisfactory to Purchaser, entitling Purchaser to rely on the information set forth in the Phase I Environmental Site Assessment, dated February 11, 2025, prepared by AEI Consultants with respect to the Owned Real Property;

(iv)    with respect to the Leased Real Property:

(1)    an assignment and assumption for each Lease that is an Assigned Contract, duly executed by the applicable Seller, in form and substance reasonably satisfactory to Purchaser;

(2)    all Consents or, as applicable, evidence of any advanced notices, in each case, required pursuant to each Lease that is an Assigned Contract in connection with the consummation of the Transactions;

(3)    to the extent any Lease requires the respective landlord, lessor, sublessor or licensor, to execute and deliver an estoppel certificates, an estoppel certificate, from each landlord, lessor, sublessor or licensor of each Lease that is an Assigned Contract, confirming, among other things, that no defaults exist thereunder (other than with respect to any defaults resulting from the Bankruptcy Cases), and the status of all payments of rent associated therewith; and

(v)    a copy of the Sale Order as entered by the Bankruptcy Court, vesting the Transferred Assets in Purchaser Free and Clear.

2.8    ***Purchase Price; Assumed Liabilities; Deposit***.

(a)    Upon the terms and subject to the conditions set forth herein, in full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser, Purchaser shall pay to an account designated in writing by Sellers an aggregate purchase price equal to (A) the Base Amount, *minus* (B) the Deposit Escrow Amount, and the Deposit Escrow Amount shall be released to Akoustis Technologies (on behalf of all Sellers) by the Escrow Agent pursuant to Section 2.8(c) (collectively, including the Deposit Escrow Amount, the "***Purchase Price***").  At the Closing, the Purchase Price shall be paid to Sellers, by irrevocable wire transfer of immediately available funds in accordance with payment instructions delivered by Sellers to Purchaser at least three Business Days prior to the Closing.

25

(b)    At the Closing, on the terms and subject to the conditions set forth in this Agreement, Purchaser will assume and become responsible for the Assumed Liabilities.

(c)    Concurrently with the execution and delivery of this Agreement, Purchaser shall deposit (or cause to be deposited) in accordance with written instructions provided to Purchaser an aggregate amount equal to the Deposit Escrow Amount into the Deposit Escrow Account to be established and maintained by Escrow Agent pursuant to the Escrow Agreement. The Deposit Escrow Amount shall be distributed as follows:

(i)    if the Closing occurs, (A) Akoustis Technologies shall deliver a written instruction to the Escrow Agent in accordance with the Escrow Agreement instructing the Escrow Agent to release from the Deposit Escrow Account the entire Deposit Escrow Amount to Akoustis Technologies (on behalf of all Sellers), by irrevocable wire transfer of immediately available funds, to an account designated by Akoustis Technologies to the Escrow Agent, and (B) the Deposit Escrow Amount shall be delivered to Akoustis Technologies (on behalf of all Sellers) at Closing and credited against the amount required to be paid by Purchaser to Sellers at Closing in accordance with Section 2.8(a);

(ii)    if this Agreement is terminated by Sellers in accordance with the terms of this Agreement pursuant to Section 9.1(d), (A) Akoustis Technologies shall deliver a written instruction to the Escrow Agent in accordance with the Escrow Agreement instructing the Escrow Agent to release from the Deposit Escrow Account the entire Deposit Escrow Amount to Akoustis Technologies (on behalf of all Sellers), by irrevocable wire transfer of immediately available funds, to an account designated by Akoustis Technologies to the Escrow Agent, and (B) the Deposit Escrow Amount, which shall constitute liquidated damages (and not a penalty) shall be delivered to Akoustis Technologies (on behalf of all Sellers) within two Business Days following delivery of such joint written instruction; or

(iii)    if this Agreement is terminated in accordance with its terms for any reason other than by Sellers pursuant to Section 9.1(d), (A) Akoustis Technologies shall deliver a written instruction to the Escrow Agent in accordance with the Escrow Agreement instructing the Escrow Agent to release from the Deposit Escrow Account the entire Deposit Escrow Amount to Purchaser, by irrevocable wire transfer of immediately available funds, to an account designated by Purchaser, and (B) the Deposit Escrow Amount shall be delivered to Purchaser within two Business Days following delivery of such joint written instruction.

2.9    *Transfer Taxes*.  It is the intention of Purchaser and Sellers that any Transactions closing after the Petition Date be exempt from all transfer (including any real property transfer Tax), documentary, sales, use, excise, stock transfer, stamp, recording, registration and other similar Taxes, levies and fees (including any penalties, fines and interest), together with any conveyance fees, recording charges and other similar fees and charges, incurred in connection with this Agreement and the Transactions (collectively, "***Transfer Taxes***") pursuant to Section 1146(a) of the Bankruptcy Code.  Purchaser and Sellers shall cooperate in good faith to minimize, to the extent permissible under applicable Law, the amount of any Transfer Taxes due with respect to

26

the Transactions. In the event any Transfer Taxes are required to be paid with respect to the Transactions, Purchaser shall be responsible and liable for such Transfer Taxes and shall indemnify, defend and hold harmless Sellers against any such Transfer Taxes. The party required by applicable Law to file a Tax Return with respect to any such Transfer Taxes shall prepare and timely file, or cause to be prepared and timely filed, any such Tax Return. Sellers and Purchaser shall, and shall cause their respective Affiliates to, cooperate to timely prepare and file any Tax Returns or other filings relating to such Transfer Taxes. To the extent any Seller is required to remit any such Transfer Tax, at least three Business Days before the due date for the payment of any such Transfer Tax, Purchaser shall wire in immediately available funds such Transfer Taxes to such Seller to ensure timely payment.

2.10 ***Non-Assignability of Government Contract Assets***. Notwithstanding anything to the contrary contained in this Agreement, to the extent that the sale, transfer, assignment, conveyance or delivery or attempted sale, transfer, assignment, conveyance or delivery to Purchaser of any Purchased Government Contract or any Right arising thereunder or resulting therefrom (a) is prohibited by any applicable Law or (b) without a novation completed in accordance with Federal Acquisition Regulation ("***FAR***") Part 42, Subpart 42.12 or as otherwise required under a Government Contract (a "***Novation***"), would (i) constitute a breach or other contravention thereof, (ii) subject Sellers, Purchaser or any of their respective officers, directors, agents or Affiliates, to civil or criminal liability, (iii) be ineffective, void or voidable or (iv) adversely affect the rights thereunder of Sellers, Purchaser or any of their respective officers, directors, agents or Affiliates, and in any event such Novation has not been obtained or completed prior to the Closing, then in each case, the Closing shall proceed without the transfer of such Government Contract. Until the earlier of (A) 12 months after the Closing, (B) the date on which all claims reconciliation in the Bankruptcy Cases has been completed, and all distributions have been made, pursuant to a chapter 11 plan confirmed by the Bankruptcy Court, and (C) such time that the Bankruptcy Cases are closed or dismissed, the Parties shall use such efforts in accordance with Section 7.8 in promptly obtaining such Novation; *provided*, Sellers and Purchaser shall not be required to grant any guarantee or other additional consideration to any third party, incur additional costs or expenses, or make any out-of-pocket payments to third parties, commence any litigation or make any material concessions in connection with its obligations under this Section 2.10. Pending obtaining such Novation, Sellers and Purchaser shall use their commercially reasonable efforts to cooperate with each other to agree to any reasonable and lawful arrangements designed to provide Purchaser with the economic claims, rights and benefits under such asset and assume the economic burdens and obligations (including the Assumed Liabilities and any burdens or obligations associated with the operation and ownership of such assets following the Closing, in each case, other than any Excluded Liabilities) with respect thereto in accordance with this Agreement, including by subcontracting to Purchaser to the extent contractually permissible.

2.11 ***Escrow Account***. The Deposit Escrow Amount shall be (a) used to satisfy a portion of the payment obligations of Purchaser pursuant to Section 2.8(c) or (b) released to Purchaser or Sellers pursuant to Section 2.8(c). Upon the final release of all of the Deposit Escrow Amount pursuant to the terms of this Agreement and the Escrow Agreement, the Escrow Agreement shall automatically terminate. Any fees owed to the Escrow Agent shall be the responsibility of Sellers. Prior to its release pursuant to the terms of this Agreement and the Escrow Agreement, the Deposit Escrow Amount shall be held in trust for the benefit of Sellers and shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of any Party and shall be

held and disbursed solely for the purposes of and in accordance with the terms of this Agreement and the Escrow Agreement.

2.12    ***Further Assurances***.  From time to time following the Closing, the Parties will execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions as may be reasonably necessary or appropriate to assure fully to Purchaser and its successors and assigns of all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure to Sellers and their successors and assigns of the assumption of the Assumed Liabilities intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Transactions.

2.13    ***Prorations***.  The following prorations shall be made between Sellers and Purchaser at the Closing, computed as of the Closing Date.

(a)    Except as provided in Section 2.9, all real property, personal property, sales, use and ad valorem taxes and similar recurring taxes and fees imposed on a periodic basis on the Transferred Assets for taxable periods beginning before, and ending after, the Closing Date, shall be prorated between Purchaser and Sellers as of the Closing Date. Sellers shall be responsible for all such Taxes and fees on the Owned Real Property accruing during any period up to the Closing Date. Purchaser shall be responsible for all such taxes and fees on the Transferred Assets and transferred Real Property assets accruing during any period commencing on or after the Closing Date.

(b)    Except as otherwise specifically provided below, all expenses and obligations relating to the operation of Leases shall be prorated on a per diem basis to the Closing Date using a calendar year and adjusted between Sellers and Purchaser as of 11:59 p.m. (Eastern Standard Time) on the day immediately preceding the Closing Date, and for purposes of these prorations and adjustments, Sellers shall be deemed the lessee under each Lease in each case, on the day immediately preceding the Closing Date, and Purchaser shall be deemed the lessee under the Lease in each case, on and after the Closing Date. To the extent that the amounts of the items to be adjusted are not reasonably ascertainable as of the Closing, they shall be re-adjusted and paid as promptly thereafter as the amounts thereof can be ascertained.

(c)    In the event that any prorations, apportionments or computations made under this Section 2.13 require final adjustment, then the Parties shall use good faith and diligent efforts to make the appropriate adjustments promptly when accurate information becomes available and either Party shall be entitled to an adjustment to correct the same, provided that, it makes written demand on the Party from whom it is entitled to such adjustment within six months of the Closing Date (or prior to the end of any applicable tax period).

2.14    ***Withholding***.  Purchaser (and any Affiliate thereof) shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as Purchaser determines in good faith it (or any Affiliate thereof) is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment; *provided*, that Purchaser and its Affiliates shall provide advance notice of any such intent by them to deduct or withhold to Sellers, and Purchaser and its Affiliates shall cooperate in good faith with Sellers to

reduce or eliminate any such deduction or withholding.  To the extent that amounts are so withheld and paid to the applicable Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (a) set forth in the SEC Reports prior to the date hereof (excluding, in each case, any disclosures set forth in any risk factor section or in any other section to the extent they are forward-looking statements or cautionary, predictive or forward-looking in nature) or (b) set forth in the schedules delivered by Sellers concurrently herewith (each, a "*Schedule*" and collectively, the "*Schedules*"), Sellers hereby make the representations and warranties contained in this <u>Article 3</u> to Purchaser:

3.1    ***Organization, Good Standing and Other Matters***.  Each Seller is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.  Pursuant to the authority granted to them by the Bankruptcy Court, Sellers have the requisite corporate power and authority to operate the Business and necessary to own, lease or operate the properties and assets owned, leased or operated by it to carry on the Business as now being conducted.  Each Seller is duly qualified to do business as a foreign corporation or limited liability company and in good standing in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, be material to the Transferred Assets or the ability of Sellers to consummate the Transactions.

3.2    ***Authority and Enforceability***.  Each Seller has all requisite corporate power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions.  The execution, delivery and performance of this Agreement and each of the Related Documents to which Sellers is (or at Closing, will be) a party, and the consummation by Sellers of the Transactions, have been duly authorized and approved by all necessary corporate action on the part of Sellers and the Bankruptcy Court.  This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by Sellers, assuming the due execution and delivery by Purchaser, and subject to the approval of the Bankruptcy Court, constitutes a valid and binding obligation of Sellers, enforceable against them in accordance with its respective terms.

3.3    ***No Conflict; Required Filings and Consents***.  Other than with respect to Excluded Contracts and except such filings as may be required in connection with (a) the Transfer Taxes described in <u>Section 2.9</u> and (b) Consents to Novation of the Purchased Government Contracts by the applicable Governmental Authority under FAR Subpart 42.12 or as otherwise required by a Government Contract, the execution and delivery of this Agreement by Sellers does not and the execution and delivery of the Related Documents by Sellers will not, and the consummation of the Transactions hereby and thereby will not (i) violate the provisions of the Organizational Documents of Sellers, (ii) subject to the entry of the Sale Order or any other Order required by the Bankruptcy Court in connection with the Transactions, violate or conflict with any Law or Order

29

to which Sellers, the Business and the Transferred Assets are subject, (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel or require any notice under any Contract or any Lease to which a Seller is a party or by which it is bound or to which any of the Transferred Assets is subject, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice (A) as individually or in the aggregate, are not material or (B) that would not prevent the Transferred Assets from being sold Free and Clear pursuant to the Sale Order, (iv) require Sellers to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority, or (v) subject to the entry of the Sale Order or any other Order required by the Bankruptcy Court in connection with the Transactions, result in the imposition or creation of any Lien upon or with respect to any of the assets or properties of Sellers with respect to the Business.

3.4    **Financial Statements**.  Attached <u>Schedule 3.4</u> are true and complete copies of (a) Sellers' audited consolidated statements of income and cash flows for the fiscal year ended June 30, 2024 and unaudited consolidated statements of income and cash flows for the nine month period ended March 31, 2025 (the "**Income Statement Financials**"), (b) Sellers' audited consolidated balance sheet as of June 30, 2024 and (c) the unaudited consolidated balance sheet of Sellers, as of the period ended March 31, 2025 (such date, the "**Balance Sheet Date**") (such balance sheets in clauses (b) and (c), the "**Balance Sheet Financials**") (the Income Statement Financials and Balance Sheet Financials, including the notes thereto, are collectively referred to as the "**Financial Statements**").  The Financial Statements (x) were prepared from the books and records of Sellers in accordance with GAAP, unless otherwise noted therein and (y) present fairly in all material respects the financial position of Sellers as of the date thereof and the results of their operations for the periods then ended (except with respect to the Balance Sheet Financials, subject to normal year-end adjustments and any other adjustments expressly described therein or in the Schedules).

3.5    **Reserved**.

3.6    **Customers; Suppliers and Vendors**.

(a)    <u>Schedule 3.6(a)</u> sets forth a list of (x) customers of the Business (the "**Material Customers**") and (y) suppliers and vendors of the Business (the "**Material Vendors**"), in each case to which Sellers have received or made payments in respect of the Business aggregating $200,000 or more for the fiscal year ended June 30, 2023, or for the fiscal year ended June 30, 2024.  <u>Section 3.6(a)</u> shows, with respect to each, the name and dollar volume involved. Sellers have not experienced and there does not exist any material quality control or similar problems with the goods or services currently being supplied to any of the Material Customers or on order from any of the Material Vendors.

(b)    Within the last three years, no Material Customer has filed a claim or, to the Knowledge of Sellers, threatened to file a claim for an amount in excess of $200,000.

3.7    **Absence of Changes**.  Except as set forth on <u>Schedule 3.7</u>, since the Balance Sheet Date, other than in connection with the Bankruptcy Cases or the Injunction, Sellers have operated in the ordinary course of business and there is no Effect that has occurred since the Balance Sheet

Date that (when taken together with all other Effects) has had or is reasonably likely to have, a Material Adverse Change and, since the Balance Sheet Date, no Seller has:

(a)    (i) sold, licensed, abandoned, conveyed, transferred, assigned, divested, or otherwise disposed of any asset, Personal Property or Real Property that would otherwise constitute Transferred Assets other than, in each case, Inventory, scrap material, and obsolete assets sold or otherwise disposed of in the ordinary course of business consistent with past practice or sequestered in connection with the Cleanse Process, or (ii) effected any sale (whether by merger, consolidation, acquisition of stock or assets or otherwise) of any portion of the Business;

(b)    created or assumed any mortgage or pledge, or imposed any Lien on, or in any other way encumbered, any asset, Personal Property or Real Property constituting Transferred Assets, except as required by applicable Law;

(c)    acquired by merging or consolidating with, or by purchasing a substantial portion of the assets of any Person or otherwise acquired any assets that, as of the Closing, would constitute Transferred Assets, except for the acquisition of assets and Inventory in the ordinary course of business consistent with past practice;

(d)    (i) except as ordered by the Bankruptcy Court, amended, modified, terminated or permitted the lapse of any Material Contract or waived, released or assigned any material rights or material claims thereunder, or (ii) take any action, or omit to take any action, that would reasonably be expected to result in a default under or material breach of any Material Contract;

(e)    terminated, amended, restated, supplemented or waived any material rights of the Business, including those under any Permit;

(f)    entered into any Contract that materially limits or otherwise restricts the use or saleability of the Transferred Assets or that would reasonably be expected to, after the Closing Date, limit or restrict in any material respect Purchaser's use of the Transferred Assets;

(g)    liquidated, dissolved, recapitalized or otherwise wound up its operations related to the Transferred Assets;

(h)    cancelled or altered any insurance coverage with respect to the Transferred Assets;

(i)    (i) sold, assigned or transferred all or any portion of its Intellectual Property, (ii) granted any licenses of Intellectual Property except for non-exclusive licenses granted in the ordinary course of business, (iii) abandoned or ceased to prosecute or maintain any of the Registered Intellectual Property or (iv) disclosed any Trade Secrets to any Person that is not subject to a legally-binding confidentiality obligation with respect thereto;

(j)    (i) increased in any manner the base compensation, cash incentive or bonus opportunity, severance or termination pay of any Seller Employee, (ii) became a party to, established, adopted, amended, commenced participation in or terminated any Benefit Plan or any arrangement that would have been a Benefit Plan had it been entered into (other than in connection

31

with updates to broad-based health and welfare and similar plans or arrangements in connection with annual compensation and benefit review), (iii) granted any new awards, or amended or modified the terms of any outstanding awards, under any Benefit Plan, (iv) taken any action to accelerate the vesting or lapsing of restrictions or payment, or funded or in any other way secured the payment, of material compensation or benefits under any Benefit Plan, (v) hired any employee or engaged any individual independent contractor with annual base compensation in excess of $100,000 or (vi) terminated the employment of any Seller Employee (other than (x) terminations for cause, (y) terminations of employees with annual base compensation of less than $100,000 for any reason, and (z) voluntary resignations);

(k)    made any loan or advance to any Person or otherwise purchased or acquired any Indebtedness, debt securities or equity securities of any Person, or made any loans, advances or capital contributions to, or investments in, any other Person or incur any Indebtedness;

(l)    changed its methods of accounting, except as required by concurrent changes in GAAP;

(m)    settled any material Action;

(n)    filed, commenced, pursued, consented to or encouraged any material Action or any other claim or cause of action;

(o)    made or committed to make any capital expenditure (or series of related capital expenditures) for additions to property or equipment except for expenditures made in the ordinary course of business and involving no more than $50,000;

(p)    other than in the ordinary course of business consistent with past practices, (i) incurred any Indebtedness in excess of $50,000, or (ii) assumed or guaranteed any Indebtedness or other Liability of any third party; or

(q)    entered into a binding agreement or agreed to do any of the foregoing.

3.8    ***Compliance With Laws; Permits***.    Schedule 3.8 sets forth a true, correct and complete list of all Permits that each Seller holds in connection with the operations of the Business. Sellers hold all Permits necessary to enable it to conduct the Business in the manner in which such business is currently being conducted and to perform all of its obligations under the Contracts to which it is a party.  The Business, products and output of the Sellers have been and are operated in compliance in all material respects with all applicable Laws and Orders.  No Seller has received written notice from any Governmental Authority alleging that Sellers are in material violation of any Law or Order.  No Seller has received written notice of any material violation with respect to a Permit that remains uncured or unaddressed.

3.9    ***Transferred Assets***.    Sellers have good and marketable title to all of the Transferred Assets.  Other than assets and properties to which Sellers do not have good and marketable title to as a result of the Cleanse Process, the Transferred Assets constitute all of the assets and properties used or needed to conduct the Business as currently conducted.   Other than as a result of the Cleanse Process, the Transferred Assets are in good working order, normal wear excepted and are in a condition to operate as intended in accordance with applicable Laws.  Sellers have cleaned all

of the Transferred Assets, or will do so prior to the Closing Date, to ensure the Transferred Assets do not contain any information in violation of the Injunction and the sale of the Transferred Assets pursuant to this Agreement does not violate the Injunction.  Sellers have taken all necessary steps to comply with, and have complied with, the Warming Requirements.  The transfer of ownership of the Transferred Assets contemplated by the Agreement pursuant to the Sale Order and Section 363 of the Bankruptcy Code will transfer good and marketable title to the Transferred Assets to the Purchaser, Free and Clear.

3.10    *Insurance*.  Sellers are, and will be through the Closing Date, insured with insurers pursuant to the Insurance Policies set forth on <u>Schedule 3.10</u>, which schedule lists the insurance coverage carried by Sellers and which insurance will remain in full force and effect with respect to all events occurring prior to the Closing Date.  Except for notices of cancellation or non-renewal received for policies or binders expiring pursuant to their terms, Sellers have not received notice of cancellation or non-renewal of any such policy or binder and are not aware of any threatened or proposed cancellation or non-renewal of any such policy or binder.

3.11    *Taxes*.

(a)    Sellers have properly and timely filed (taking into account any extensions of time for such filings that have been properly and timely requested) all material Tax Returns that were required to be filed by Sellers with respect to the Transferred Assets and all such Tax Returns are complete and accurate in all material respects.  All material Taxes owed by Sellers (whether or not shown on any Tax Return and including Taxes withheld or required to be withheld by Sellers) with respect to the Transferred Assets have been timely paid.  No material written claim has been made (which remains unresolved) by a Governmental Authority in a jurisdiction in which Sellers do not file Tax Returns with respect to the Transferred Assets that Sellers are or may be subject to taxation by that jurisdiction.

(b)    Except as set forth on <u>Schedule 3.11(b)</u>, there are no audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any Liability for any material Taxes of Sellers with respect to the Transferred Assets that are pending or threatened in writing.  No adjustment relating to any Tax Return of Sellers with respect to the Transferred Assets has been proposed in writing by any Governmental Authority.  No Seller has waived any statute of limitations in respect of Taxes that remain unpaid or agreed to any extension of time with respect to an open Tax assessment or deficiency with respect to the Transferred Assets, other that any extensions granted in the ordinary course of business.

(c)    There are no Liens for Taxes on any of the Transferred Assets other than Permitted Tax Liens.

(d)    No Transferred Asset is subject to any tax partnership agreement or provision requiring a partnership income Tax Return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code or any similar state statute.

(e)    To the Knowledge of Sellers, there is no unclaimed property or escheat obligation with respect to the Transferred Assets under any applicable escheatment, unclaimed property or similar Law.

3.12    *Contracts*.

(a)    Schedule 3.12(a) sets forth a true, correct and complete list of each of the following Contracts (x) by which any of the Transferred Assets are bound or affected or (y) to which a Seller is a party or by which a Seller is bound in connection with the Business, the Transferred Assets or the Assumed Liabilities (collectively, the "***Material Contracts***"):

(i)    any Contract with a Material Customer;

(ii)    any Contract with a Material Supplier;

(iii)    any Contract relating to Indebtedness, any guaranty or suretyship, indemnification or contribution agreement (in each case of a Person not Sellers), power of attorney, joint venture, partnership or profit-sharing agreement or evidence of Indebtedness, or letter of credit, pledge, bond or similar arrangement given by or running to the account of Sellers;

(iv)    any Contract obligating any Seller: (1) to refrain from competing with any business, (2) to refrain from conducting business in any particular jurisdiction or (3) that otherwise restrains or prevents a Seller from carrying on any lawful business;

(v)    any Contract relating to the development, ownership, use, registration, or enforcement of, or exercise of any rights under, any Intellectual Property, excluding (1) licenses of commercially available off-the-shelf Software having a replacement cost of less than $25,000 that is not incorporated in, linked to, distributed with or used to host or provide any goods or services of the Business or owned Software and (2) nonexclusive licenses granted by Sellers to their customers in the ordinary course of business consistent with past practice;

(vi)    any Lease and any Contract that involves the lease of real property or that obligates any Seller to purchase or sell real property;

(vii)    any Contract granting to any Person an option or a first refusal, first-offer, or similar preferential right to purchase or acquire any of the Transferred Assets;

(viii)    any Contract for the purchase or sale of equipment, supplies, products or other Personal Property, the performance of which will extend over a period of more than six months after the Closing Date or involves consideration in excess of $50,000 per annum;

(ix)    any Contract granting any Person a Lien on all or any part of any of the Transferred Assets;

(x)    any Contract that creates or governs a partnership, joint venture, strategic alliance, or similar arrangement;

(xi) all Contracts that provide for the assumption of any Tax (excluding any Contract entered into in the ordinary course of business, the primary subject matter of which is not Tax), environmental or other Liability of any Person;

(xii) all Contracts that relate to the acquisition or disposition of any business, stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(xiii) all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts;

(xiv) all employment agreements and Contracts with independent contractors or consultants (or similar arrangements) that are not terminable at will or that provide for annual base compensation in excess of $100,000;

(xv) any Government Contract;

(xvi) all Contracts for the sale of any of the Transferred Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Transferred Assets;

(xvii) any staffing agency agreements, temporary employment agreements, or similar agreements for leased employees and temporary labor; and

(xviii) all other Contracts that are material to the Transferred Assets or the operation of the Business and not previously disclosed pursuant to this Section 3.12.

(b) Sellers have made true and correct copies of all Material Contracts that are in writing available to Purchaser in the Dataroom and have included in the applicable section of Schedule 3.12 a complete description of all Material Contracts which are not in writing. All Material Contracts are in full force and effect and enforceable in accordance with their terms, except to the extent that the enforceability thereof may be subject to Enforceability Exceptions. Except as set forth on Schedule 3.12(b), each other party thereto has materially performed all the obligations required to be performed by it. Sellers have not received in writing notice of default under the Material Contracts and, to the Knowledge of Sellers, Sellers are not in default under the Material Contracts except for (i) any events of default caused by the Bankruptcy Cases and (ii) Enforceability Exceptions. Following entry of the Bid Procedures Order, Sellers properly served the Assumption Notices in accordance with the procedures set forth therein and applicable Law.

(c) Schedule 3.12(c) sets forth (A) each Government Contract that constitutes a Transferred Asset (a "**Purchased Government Contract**") and (B) each Government Bid that constitutes a Transferred Asset (a "**Purchased Government Bid**").

(d) With respect to each Purchased Government Contract and Purchased Government Bid:

(i)    Since January 1, 2020 or, if later, the effective date of any Purchased Government Contract or the submission date of any Purchased Government Bid, (A) all representations and certifications executed, acknowledged or set forth in or pertaining to such Purchased Government Contract or Purchased Government Bid were current, complete and correct in all material respects as of their effective date, and Sellers have complied in all material respects with all such representations and certifications; (B) Sellers have complied in all material respects with each certification, representation, clause, provision or requirement pertaining to such Purchased Government Contract; (C) Sellers have not received written notice of any termination for convenience, termination for default, cure notice or show-cause notice pertaining to any Purchased Government Contract; and (D) no Purchased Government Contract or Purchased Government Bid is (x) currently the subject of bid or award protest proceedings or (y) has incurred or currently projects to incur losses or cost overruns on an annual basis.

(ii)    Since January 1, 2020, (A) Sellers have not received any written notice of any pending or threatened investigation, prosecution or administrative proceeding related to any Purchased Government Contract or Purchased Government Bid; (B) Sellers have not conducted or initiated any internal investigation with respect to any alleged irregularity, misstatement or omission arising under or relating to a Purchased Government Contract, and, to the Knowledge of Sellers, do not have any credible evidence of any violation of federal criminal Law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. 3729-3733) (the "*False Claims Act*") or of any significant overpayment(s) on such Purchased Government Contracts, other than overpayments resulting from contract financing payments as defined in FAR 32.001; (C) Sellers have not made any voluntary or mandatory disclosures to any Governmental Authority with respect to any material irregularity, material misstatement, significant overpayment or material violation of applicable Law arising under or relating to any Purchased Government Contract or Purchased Government Bid, nor has any material violation of applicable Law occurred for which a Seller is required under applicable Law to make any such disclosure to a Governmental Authority; (D) Sellers have not received a Contractor Performance Assessment Reports System rating of "unsatisfactory" relating to any Purchased Government Contract; and (E) to the Knowledge of Sellers, no circumstances exist that would reasonably be expected to give rise to any material Action, brought by any Governmental Authority, Prime Contractor, subcontractor or vendor relating to performance under any Purchased Government Contract or submission of any Purchased Government Bid.

(e)    Except as described in Schedule 3.12(e), none of the Purchased Government Contracts have been awarded, nor any Purchased Government Bids have been submitted, based in part on any representation that a Seller was a small business, a small disadvantaged business, a woman-owned business, a veteran-owned small business, a service-disabled veteran-owned small business, a historically under-utilized business zone small business, or a Small Business Administration Section 8(a) program participant, and no Seller is making any such representation with respect to any Government Bid. None of the Sellers, nor any of their principals as defined by FAR 52.209-5 or other applicable agency regulations, has been debarred, suspended, or proposed for suspension or debarment in connection with the performance of any Purchased Government

36

Contract or Purchased Government Bid, nor has any Seller or any of Sellers' principals proposed for, or been subject to, suspension or debarment or threatened in writing with suspension or debarment in connection with the performance of any Purchased Government Contract or Purchased Government Bid. To the Knowledge of Sellers, no circumstances exist that would reasonably be expected to lead to the institution of suspension or debarment proceedings against a Seller or Sellers' principals in connection with the performance of any Purchased Government Contract or Purchased Government Bid. No facility security clearances or personnel security clearances are necessary or required to perform any of the Purchased Government Contracts or Purchased Government Bids.

3.13    ***Employee Benefit Matters***.

(a)    Schedule 3.13(a)(i) contains a true, correct and complete list of all material Benefit Plans (other than any Benefit Plan that is an employment, consulting or advisory offer letter or agreement that is terminable at will or provides for annual base compensation of $100,000 or less. Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter, or is entitled to rely on an opinion letter, from the Internal Revenue Service, and, to the Knowledge of Sellers, no event or circumstance exists that has affected or is likely to adversely affect the qualified status of any such Benefit Plan. Sellers have previously made available to Purchaser a true and complete copy of the following documents, to the extent applicable to any Benefit Plan: (i) any written plan documents and all amendments thereto, (ii) the most recent Forms 5500 (or similar report) and all schedules thereto and the most recent actuarial report, if any, (iii) the most recent IRS or Governmental Authority determination letter, and (iv) any material, non-routine correspondence with any Governmental Authority received in the past 36 months regarding the operation or the administration of any Benefit Plan. Sellers have separately identified on Schedule 3.13(a)(ii) each Benefit Plan that contains a change in control provision.

(b)    There is no Action pending against or involving or, to the Knowledge of Sellers, threatened against or involving any Benefit Plan before any Governmental Authority (other than routine benefit claims made in the ordinary course under a Benefit Plan). Each Benefit Plan has been maintained, registered (if required), funded, operated and administered in compliance, with its terms and applicable Laws, including, but not limited to, ERISA, the Code, and the Health Insurance Portability and Accountability Act of 1996 (including all rules and regulations thereunder), as amended.

(c)    Except as described in Schedule 3.13(c), no Benefit Plan is, and none of Sellers nor any of their ERISA Affiliates has now or has at any time in the past six years contributed to (or incurred any Liability in respect of) any employee benefit plan that is: (i) subject to Title IV of ERISA, Section 302 or 303 of ERISA or Section 412 or 430 of the Code, (ii) a multiemployer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA), (iii) a "multiple employer plan" as defined in Section 413(e) of the Code, (iv) a "welfare benefit trust" or "voluntary employees beneficiary association" within the meaning of Sections 419, 419A or 501(a)(9) of the Code, or (v) a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA).

(d)    Except as described in Schedule 3.13(d), neither the execution and delivery of this Agreement nor the consummation of the Transactions will (either alone or in conjunction

with any other event) result in, accelerate the vesting, funding, or delivery of, or increase the amount or value of, any payment, severance, or benefit to any current or former Service Provider. No amount paid or payable by the Sellers or their Affiliates in connection with the Transactions will, either alone or in combination with another event, be an "excess parachute payment" within the meaning of Section 280G of the Code (determined without regarding the exceptions provided for in Section 280G(b)(5) of the Code). Sellers and their Affiliates are not party to any plan, program, agreement, or arrangement that provides for a gross-up or reimbursement of Taxes imposed under Section 4999 or Section 409A of the Code to any employee, director, officer, or other Service Provider.

3.14    *Employee Matters*.

(a)    No Seller is a party to or bound by any collective bargaining agreement, labor contract, labor representative agreement, letter of understanding, letter of intent, voluntary recognition agreement, legally binding commitment to any labor or trade union or bargaining relationship covering the employees of Sellers or their Affiliates. Sellers have provided to Purchaser a true, complete and accurate list of each current Seller Employee and other Service Provider, together with each such individual's (i) name or employee identification number, (ii) job title or position, (iii) current annual salary or hourly wage rate, (iv) part-time, full-time, temporary or other status, (v) employment classification (exempt or non-exempt or entitlement to overtime in accordance with applicable Laws), (vi) work location, (vii) annual incentive entitlements, (viii) whether such individual is actively at work or on an approved leave of absence, and if on a leave of absence, such individual's anticipated return to work date, (ix) whether such individual has a work visa, and if such individual has a work visa, the type of work visa and expiration date, and (x) employing or engaging entity. All Seller Employees are, and have been for the past five years, in all material respects, properly classified as exempt or non-exempt under the Fair Labor Standards Act or similar Laws. Currently and for the past five years, Sellers and their Affiliates, as applicable, have not misclassified or mischaracterized any Service Provider and do not have any Liability with respect to any leased worker providing services through a third party.

(b)    There is no effort currently being made or, to the Knowledge of Sellers, threatened by, or on behalf of, any union to organize any Seller Employee, and there has been no such effort during the last five years. There have been no strikes, work stoppages, work slowdowns, or lockouts involving any employees during the past five years, and there are no strikes, work stoppages, work slowdowns, or lockouts pending, or to the Knowledge of Sellers, threatened against Sellers or any of their Affiliates.

(c)    Sellers and their Affiliates, as applicable, are and for the past five years have been in material compliance with all applicable Laws relating to compensation, human rights, accessibility, immigration, employment, discrimination, harassment, the payment and withholding of Social Security, privacy, pay equity and workers' minimum wage and overtime compensation, labor relations, collective bargaining, and workers' compensation. Sellers and their Affiliates, as applicable, have confirmed each Seller Employee's identity and eligibility to work in the United States and retained a properly completed Form I-9 for each Seller Employee. Sellers and their Affiliates, as applicable, are and for the past five years have been in material compliance with all applicable Laws relating to occupational safety and health, including the Occupational Safety and Health Act of 1970, as amended. There is no Action pending against or involving or, to the

Knowledge of Sellers, threatened against Sellers or their Affiliates, as applicable, brought by or related to any current or former Service Provider, candidate for employment, or leased worker.

(d)     Except as set forth on Schedule 3.14(d), within the last five years, no Seller nor any Affiliate of Seller, as applicable, has effectuated (i) a "plant closing" (as defined in the WARN Act) affecting any single site of employment or one or more facilities or operating units within any single site of employment or as defined in accordance with similar Laws, (ii) a "mass layoff" (as defined in the WARN Act) affecting any single site of employment, or (iii) any other employment action for which notice was required under the WARN Act.  Seller has no outstanding Liability with respect to any violation of the WARN Act.

(e)     Except as set forth on Schedule 3.14(e), no allegation of sexual or other unlawful harassment has been made in the past three years against any current officer or supervisory employee of Sellers.  Sellers have reasonably investigated any sexual or other harassment or discrimination allegations against officers, directors and employees of any Seller which have been reported to a Seller or with respect to which a Seller otherwise had knowledge in the past three years.  With respect to each such allegation (except those a Seller reasonably deemed to not have merit), Sellers have taken corrective action reasonably calculated to prevent further improper action, and Sellers do not reasonably expect any material liability with respect to any such allegations.

3.15     *Litigation*.  Except as set forth on Schedule 3.15, there is no (i) claim, action, litigation, inquiry, proceeding (arbitral, administrative, legal or otherwise, including any informal proceeding), cause of action, audit, suit, settlement, stipulation, hearing, investigation, charge, complaint, demand or similar matter or other Action pending or threatened against or affecting the Transferred Assets, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign; (ii) arbitration proceeding pending relating to the Transferred Assets; or (iii) pending or threatened governmental inquiry involving the Transferred Assets.  There are no outstanding orders, writs, judgments, injunctions or decrees served upon Sellers related to the Transferred Assets by any court, governmental agency or arbitration tribunal against Sellers related to the Transferred Assets.  Sellers are not in default with respect to any order, writ, injunction or decree related to the Transferred Assets known to or served upon it from any court or of any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

3.16     *Real Property*.

(a)     Schedule 3.16(a) sets forth a true, correct and complete list of the addresses of each Owned Real Property.  Sellers have made available to Purchaser copies of all deeds and, to the extent in a Seller's control or possession, other instruments by which the applicable Seller acquired the Owned Real Property and, to the extent in such Seller's control or possession, copies of all title insurance policies, certificates of occupancy, assessments, zoning reports and surveys, in each case to the extent in the possession or under the control of Sellers relating to the Owned Real Property.  With respect to the Owned Real Property: (i) Sellers have good and marketable fee simple title to the Owned Real Property, Free and Clear other than the Permitted Liens; (ii) Sellers have not assigned, transferred, conveyed, mortgaged, leased, licensed, deeded in trust or

encumbered any interest in the Owned Real Property other than the Permitted Liens, nor has an agreement (other than this Agreement) been entered into to do any of the foregoing; (iii) Sellers are not in receipt of any notice of default (beyond all applicable notice and cure periods) pursuant to any Lien, nor does any condition exist that is or could be a default by any party under any Lien; (iv) there is no pending or, to the Knowledge of Sellers, threatened expropriation or condemnation Actions relating to the Owned Real Property; (v) Sellers have not received written notice of any breach of any municipal or other governmental requirements relating to the Owned Real Property or the requirements of insurers of the Owned Real Property; (vi) except as reflected in any Contract or document shown as an exception on any of the title insurance policies delivered to Purchaser, neither the Owned Real Property nor any part thereof are subject to any purchase options or other similar rights in favor of third parties; (vii) except as shown on any survey of any Owned Real Property delivered to Purchaser, there are no material encroachments on Owned Real Property and the improvements thereon do not encroach upon any easement or any adjoining land or adjoining street; and (viii) there is no special proceeding pending, or, to the Knowledge of Sellers, threatened, in which any taxing authority having jurisdiction over any of the Owned Real Property is seeking to increase the assessed value thereof. Without limiting the generality of the foregoing, but rather in furtherance and confirmation thereof, the Owned Real Property is not subject to any ongoing license, lease or tenancy of any kind and to the Knowledge of Sellers, and except as set forth on Schedule 3.16(a), there are no parties, other than Sellers occupying or with a right to occupy the Owned Real Property. The respective Seller's title to the Owned Real Property is insured under valid and collectible title insurance policies.

(b)    Schedule 3.16(b) sets forth a true, correct and complete list of the addresses of each Leased Real Property, and a true, correct and complete list of all the Leases. With regards to Leased Real Property, Sellers have made available to Purchaser true and complete copy of each such Lease in Sellers' possession or control, as amended. With respect to each of the Leases: (i) each such Lease is legal, valid, binding, enforceable and in full force and effect and the applicable Seller has a valid and enforceable leasehold interest under each of the Leases and is entitled to the full benefit and advantage of each Lease in accordance with its terms; (ii) no Seller has assigned, sublet, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest or estate created thereby, except as previously disclosed to Purchaser; (iii) the applicable Seller is not in monetary or material nonmonetary breach or default under such Lease (other than as a result of the Bankruptcy Cases) and, to Knowledge of Sellers, no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a monetary or material nonmonetary breach or default, and, to the Knowledge of Sellers, no other party is in default thereof, and no Seller has received written notice that any counterparty to any of the Leases has exercised any termination rights with respect thereto; and (iv) to the Knowledge of Sellers, there are no other Persons occupying, or having a right to occupy the Leased Real Property.

(c)    All of the Real Property, and all components of all improvements included within such Real Property, including the roofs and structural elements thereof and the sprinkler and fire protection, heating, ventilation, air conditioning, plumbing, electrical, mechanical, sewer, waste water, storm water, paving and parking equipment, systems and facilities included therein, are in good condition, working order and repair and do not require material repair or replacement in order to serve their intended purposes, including use and operation consistent with their present use and operation, except for scheduled maintenance, repairs and replacements conducted or required in the ordinary course with respect to the operation of the Real Property. Sellers have

40

made all material repairs and replacements that, to the Knowledge of Sellers, are required to be made under the Leases or as required under applicable Laws.

(d)     There is no pending, or, to the Knowledge of Sellers, contemplated zoning or rezoning of any Real Property.

(e)     There are no Actions which are pending, or to the Knowledge of Sellers, threatened in writing against the Real Property or Sellers with respect to the Real Property.

3.17   *Environmental*.  The operations of Sellers and the Transferred Assets are currently in, and for the last five years, have been in compliance in all material respects with all Environmental Laws and no material Liability related to the Business or Transferred Assets has arisen under Environmental Laws.  No Seller has received from any Person any: (i) Environmental Notice or (ii) written request for information pursuant to any Environmental Law, which, in each case, either remains pending or unresolved, or is the source of any ongoing obligations or requirements as of the Closing Date.  There is no Environmental Claim pending or, to the Knowledge of Sellers, threatened against Seller.  Sellers have timely obtained, maintained in full force and effect and are in, and for the last five years, have been in material compliance with the Environmental Permits used to conduct the Business as currently conducted.  The Environmental Permits are disclosed on Schedule 3.17.  There has been no Release of Hazardous Substances with respect to any real property currently or formerly owned, leased or operated by a Seller.  To the Knowledge of Sellers, there are no Hazardous Substances present in, on or under any real property currently owned, leased or operated by Sellers at levels that may reasonably be expected to result in a Material Adverse Change.  Sellers have provided to Purchaser any and all environmental reports, including Phase I environmental site assessments, Phase II reports, and environmental and health safety audits conducted in the last five years, sampling data, site assessments, risk assessments, economic models and other similar documents with respect to the Business or the Transferred Assets or any real property formerly owned, leased or operated by Sellers which are in the possession or control of Sellers related to compliance with or Liability arising under Environmental Laws, Environmental Claims, an Environmental Notice or the Release of Hazardous Substances.

3.18   *Intellectual Property*.

(a)     Schedule 3.18(a)(i) sets forth a list of all issued, registered, renewed or applied-for (i) Patents, (ii) Trademarks, (iii) Copyrights and (iv) Domain Names and Social Media Accounts, in each case included in the Owned Intellectual Property (collectively, the "***Registered Intellectual Property***"), including, for each item, the record owner, jurisdiction and issuance, registration or application number and date, as applicable.  Except as set forth on Schedule 3.18(a)(ii), a Seller is the sole and exclusive record owner of all Registered Intellectual Property. No Seller has taken any action or failed to take any action that could reasonably be expected to result in the abandonment, cancellation, forfeiture, relinquishment, invalidation or unenforceability of any Registered Intellectual Property in the United States, including the failure to pay any filing, examination, issuance, post registration and maintenance fees, annuities and the like and the failure to disclose any known material prior art in connection with the prosecution of Patent applications.

(b)    The Owned Intellectual Property, other than any Registered Intellectual Property outside the United States, is valid, subsisting and enforceable.  No Registered Intellectual Property in the United States has been abandoned, cancelled or adjudicated invalid, or is subject to any outstanding order, writ, injunction, judgment, stipulation or decree restricting its use or adversely affecting or reflecting a Seller's rights thereto.  A Seller (i) exclusively owns, Free and Clear, all of the Owned Intellectual Property, except as set forth on Schedules 3.18(a)(ii) and 3.18(f)(i) and (ii) has sufficient rights to use pursuant to a written contract all other Intellectual Property used in or necessary for the operation of the Business but excluding any Intellectual Property sequestered in connection with the Cleanse Process (together with the Owned Intellectual Property, the "***Seller Intellectual Property***").  Except as set forth on Schedule 3.18(b), the Seller Intellectual Property is fully assignable by Sellers to any Person, without payment, consent of any Person or other condition or restriction and shall be available for use by Purchaser immediately after the Closing on identical terms and conditions to those under which Sellers owned or were permitted to use the Seller Intellectual Property immediately prior to the Bankruptcy Cases.

(c)    Excluding any infringement or misappropriation to which reference is made in the Injunction, the development, manufacture, sale, distribution or other commercial exploitation of products (including the manner in which Sellers currently are performing trimming and reliability testing with respect to BAW filters), and the provision of any services, by or on behalf of any Seller, and the operation of the Business, in each case, has not infringed, misappropriated, diluted or otherwise violated, and does not infringe, misappropriate, dilute or otherwise violate, any Intellectual Property of any third party.  Without limiting the generality of the foregoing, none of '018 Patent Enjoined Products or '755 Patent Enjoined Products (as each such term is defined in the Injunction), nor the use, making, sale, offering for sale or importation of any of the foregoing, as re-designed by Sellers prior to the issuance of the Injunction, infringe U.S. Patent No. 7,522,018 or U.S. Patent No. 9,735,755.  No valid basis for any claim of such infringement, misappropriation, dilution or other violation exists for the product designs and manufacturing information included in the Transferred Assets.  Sellers have complied in all material respects with the "cleansing" procedures contemplated by Part D of the Bid Procedures Order.  As a result of the Cleanse Process, none of the Transferred Assets as of the Closing will incorporate, use or be derived from any Qorvo Trade Secret Information and the Sale Order shall specifically find that all of the Transferred Assets are "cleansed" assets that do not incorporate or use, and are not derived from, any Qorvo Trade Secret Information.  The Injunction does not attach to any of the Transferred Assets following consummation of the Closing.  To the Knowledge of Sellers, no Person is infringing, misappropriating, diluting or otherwise violating any Owned Intellectual Property.

(d)    No Seller has (i) except as set forth on Schedule 3.18(d)(i), made any notice or claim to a Person alleging that such Person has infringed, misappropriated, diluted or otherwise violated any Seller Intellectual Property or (ii) except as set forth on Schedule 3.18(d)(ii), received any written notice or claim, including invitations to license, from a Person alleging that a Seller has infringed, misappropriated, diluted or otherwise violated any Intellectual Property.  Except as set forth on Schedule 3.18(d)(iii), no suit, action, reissue, reexamination, inter-party review, public protest, interference, arbitration, mediation, opposition, cancellation, internet domain name dispute resolution or other proceeding has been threatened (including in the form of offers or invitations to obtain a license), asserted, decided or is pending concerning any claim or position that a Seller has violated any Intellectual Property.

(e)  Sellers use and have used commercially reasonable efforts to protect the secrecy, confidentiality and value of all Trade Secrets included in the Owned Intellectual Property or otherwise possessed by Sellers (collectively, the "***Seller Trade Secrets***"), including by entering into appropriate confidentiality or non-disclosure contracts with all Persons with access to the Seller Trade Secrets.  None of the Seller Trade Secrets has been disclosed or authorized to be disclosed to any Person other than (i) in connection with the Bankruptcy Cases or (ii) to employees or agents of Sellers for use solely in connection with the Business, in each case pursuant to a confidentiality or non-disclosure contract that protects the interests of Sellers in and to such matters.

(f)  Except as set forth on Schedule 3.18(a)(ii), each Person that has contributed to, developed, or conceived any Intellectual Property for or on behalf of Sellers, in whole or in part, has irrevocably assigned to Sellers all Intellectual Property in such contributions, developments and conceptions, except to the extent authorship of such Intellectual Property vested solely and exclusively in Sellers by operation of law.  No such Person was or is under any conflicting obligation to any Governmental Authority, academic institution or other third party that would affect the title or right of Sellers to use any such Intellectual Property.  Except as set forth on Schedule 3.18(f)(i), no funding from any Governmental Authority was used in the development of any Owned Intellectual Property and no Governmental Authority has any claim or right to claim any right in any Owned Intellectual Property.  Except as set forth on Schedule 3.18(f)(ii), no Person has asserted, and no Person other than Sellers has, any right, title, interest or other claim in, or the right to receive any royalties or other consideration with respect to, any Owned Intellectual Property.  No Seller is party to any agreement that confers upon any Person, other than Sellers, any ownership interest or exclusive right with respect to any Owned Intellectual Property.  Except as set forth on Schedules 3.18(a)(ii) and 3.18(f)(i), no Person has any right to use any Owned Intellectual Property other than pursuant to a written, non-exclusive license granted by Sellers for use in connection with the Business or a non-exclusive implied license implied by the purchase of Seller products.

(g)  Sellers own or have sufficient rights pursuant to a written contract to access and use all IT Systems (other than Excluded IT Network Systems) used in connection with the Business or otherwise necessary for the conduct of the Business (collectively, the "***Seller IT Systems***").  Sellers have taken all reasonable steps in accordance with industry standards to secure the Seller IT Systems from unauthorized access or use by any Person, and to ensure the continued, uninterrupted and error-free operation of the Seller IT Systems.  Except as a result of the Cleanse Process, the Seller IT Systems are adequate in all material respects for their intended use and for the operation of the Business as currently operated and as currently contemplated to be operated by Sellers, and are in good working condition (normal wear and tear excepted), and are free of all viruses, worms, Trojan horses and other known contaminants and do not contain any bugs, errors or problems of a nature that would materially disrupt their operation or have a material adverse impact on the operation of the Seller IT Systems.  There has not been any malfunction or vulnerability with respect to any of the Seller IT Systems that has not been remedied or replaced in all material respects.  No capital expenditures are necessary with respect to the use of the Seller IT Systems other than capital expenditures in the ordinary course of business.

3.19  ***No Other Representations or Warranties***.  Except for the representations and warranties contained in this Article 3 or in any certificate delivered pursuant to this Agreement,

Sellers do not, nor do any other Persons on behalf of Sellers, make any other express or implied representation or warranty with respect to itself, the Business, the Transferred Assets or the Assumed Liabilities, or with respect to any other information provided to Purchaser or its representatives, and Sellers disclaim any other representations or warranties, whether made by or on behalf of Sellers or any other Person.  Sellers will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives.  Notwithstanding anything to the contrary herein, the foregoing shall not limit, in any way, the specific representations and warranties made by Sellers in this Agreement or in any certificate delivered pursuant to this Agreement and nothing in this Agreement shall be deemed to be a waiver of any claim for Fraud.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby makes the representations and warranties contained in this <u>Article 4</u> to Sellers:

4.1     ***Organization, Good Standing and Other Matters***.  Purchaser is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.

4.2     ***Authority and Enforceability***.  Purchaser has all requisite corporate or other entity power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions.  The execution, delivery and performance of this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized by all necessary corporate or other entity action.  This Agreement has been, and each Related Document will be, at or prior to Closing, duly executed and delivered by Purchaser, and assuming the due execution and delivery by the other parties hereto or thereto, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

4.3     ***No Conflict: Required Filings and Consents***.  Except such filings as may be required in connection with the Transfer Taxes described in <u>Section 2.9</u>, the execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (i) violate the provisions of its Organizational Documents, (ii) violate any Law or Order to which it is subject or by which any of its properties or assets are bound, (iii) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date, (iv) result in a material breach of or constitute a default (with or without due notice or lapse of time or both), give rise to any right of termination, cancellation or acceleration under, or require the Consent of any third party to, any material Contract to which it is a party, or (v) result in the imposition or creation of any Lien upon or with respect to any of its assets or properties; excluding from the foregoing clauses "(ii)" through "(v)" Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the

aggregate, prevent or materially impair or delay Purchaser's performance of its obligations under this Agreement or the Related Documents or the consummation of the Transactions.

4.4     *Financing*.  Purchaser has, and at the Closing will have, (i) sufficient cash on hand or other sources of funds immediately available to pay the Purchase Price in accordance with the terms hereof and any other payments required hereunder and any expenses incurred or required to be paid by Purchaser in connection with the Transactions, and (ii) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Documents.

4.5     *Solvency*.  Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors of Sellers.  Immediately after giving effect to all of the Transactions, including the making of the payments contemplated by Section 2.8, and assuming satisfaction of the conditions to Purchaser's obligation to consummate the Transactions as set forth herein, the accuracy of the representations and warranties of Purchaser set forth herein and the performance by Purchaser of its obligations hereunder in all material respects, Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code.

4.6     *Litigation*.  There is no Action pending, or to Purchaser's knowledge, formally threatened against Purchaser that would be reasonably be expected to prevent or materially impair or delay Purchaser's performance of its obligations under this Agreement or the Related Documents or the consummation of the Transactions.

4.7     *Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties*.

(a)     Purchaser acknowledges that it and its representatives have received access to certain books and records, facilities, equipment, contracts and other assets of the Business. Purchaser acknowledges and agrees that it has made its own inquiry and investigation into, and based thereon, has formed an independent judgment concerning Sellers, the Business, the Transferred Assets and the Assumed Liabilities.

(b)     Except for the representations and warranties expressly made by Sellers in Article 3 or in any certificate delivered pursuant to this Agreement, Purchaser acknowledges and agrees that (i) Sellers are not making and have not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Business, the Transferred Assets, the Assumed Liabilities, or any of its operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, stockholder, agent, Affiliate, advisor, representative or employee of Sellers has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in Article 3 or in any certificate delivered pursuant to this Agreement.

(c)     Other than the representations and warranties expressly set forth in <u>Article 3</u> or in any certificate delivered pursuant to this Agreement, Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that Sellers and their Affiliates have specifically disclaimed and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance on any such other representation or warranty made by any Person.  Purchaser specifically waives any obligation or duty by Sellers and their Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties expressly set forth in <u>Article 3</u> and disclaims reliance on any information not specifically required to be provided or disclosed pursuant to the specific representations and warranties set forth in <u>Article 3</u>.

(d)     Notwithstanding the foregoing, nothing in this <u>Section 4.7</u> or elsewhere in this Agreement shall limit Purchaser's recovery rights in the event of Fraud.

4.8     ***No Other Representations or Warranties.***  Except for the representations and warranties contained in this <u>Article 4</u> or in any certificate delivered pursuant to this Agreement, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers or their representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Affiliates, officers, directors, employees, agents or representatives.  Purchaser acknowledges and agrees that the enforceability of this Agreement against Sellers is subject to entry of the Sale Order.

# ARTICLE 5
# BANKRUPTCY COURT MATTERS

5.1     ***Competing Transaction***.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of Sellers or otherwise) submitted pursuant to the Bid Procedures (each, a "***Competing Bid***").  From and after the date hereof and until the entry of the Sale Order, Sellers are permitted to, and to cause their representatives to, initiate contact with, solicit or encourage submission of any Competing Bids, inquiries, proposals or offers by, any Person in connection with any sale or other disposition of the Transferred Assets in compliance with the Bid Procedures.  Sellers shall have the authority to respond to any inquiries or offers to purchase all or any part of the Transferred Assets (whether in combination with other assets of Sellers or otherwise) pursuant to the Bid Procedures and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bid Procedures Order, the Sale Order or other applicable Law, including supplying information relating to the Business and the assets of Sellers to prospective purchasers.

5.2     ***Bankruptcy Court Filings***.

(a)     ***The Sale Order.***  Sellers shall use their best efforts to obtain entry of the Sale Order (provided Purchaser is the Successful Bidder) in form and substance acceptable to Purchaser as more fully set forth in <u>Exhibit D</u> within four Business Days after Purchaser is determined to be the Successful Bidder.  Purchaser agrees that it will promptly take such actions

as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order, including a finding of adequate assurance of future performance by Purchaser, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)    ***Bankruptcy Court Filings.***  The Sale Order shall be agreed upon by Sellers and Purchaser prior to the presentation of such Order to the Bankruptcy Court.  Sellers shall obtain Purchaser's approval with respect to any other pleadings or proposed Orders to be presented to the Bankruptcy Court relating to the Transactions, and the bankruptcy proceedings in connection therewith, and provide Purchaser with copies of applications, pleadings, notices, proposed Orders and other documents to be filed by Sellers in the Bankruptcy Cases that relate in any way to this Agreement, the Transactions, the Bid Procedures, the Bid Procedures Order or the Sale Order prior to the making of any such filing with or submission to the Bankruptcy Court.

(c)    ***Bankruptcy Actions.***  Each of Sellers and Purchaser shall appear formally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and keep the other reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Sellers from the Bankruptcy Court or any third party and/or any Governmental Authority with respect to the Transactions.

(d)    ***Approval.***  Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of the Sale Order, and to the terms of the Sale Order and any other Orders of the Bankruptcy Court applicable to the Transactions.  Nothing in this Agreement shall require any Seller or any of their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

(e)    ***Appeals.***  If the Sale Order, or any other Orders of the Bankruptcy Court relating to this Agreement or the Transactions are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bid Procedures Order or the Sale Order, or such other Order), subject to rights otherwise arising from this Agreement, Sellers shall use their best efforts to take all commercially reasonable actions as may be necessary to prosecute and defend such appeal, petition or motion and obtain an expedited resolution thereof.

(f)    ***Backup Bidder.***  If an Auction is conducted pursuant to the Bid Procedures Order and Purchaser is not the Successful Bidder, Purchaser shall, in accordance with and subject to the Bid Procedures Order, serve as the Backup Bidder if Purchaser is the next highest or otherwise best bidder for the Transferred Assets at Auction.  If Purchaser is chosen as the Backup Bidder, Purchaser will be required to keep its bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as may be amended with Sellers' written consent prior to or at the Auction) open and irrevocable until the Backup Bid Expiration Date.  If the agreement with the Successful Bidder (other than Purchaser) is terminated prior to closing under such agreement and Purchaser has been designated as the Backup Bidder, Purchaser will be deemed to

be the Successful Bidder and Purchaser will forthwith consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be amended with Sellers' written consent prior to or at the Auction), subject to the right of Purchaser to elect to not serve as the Backup Bidder at any time after the Backup Bid Expiration Date.

      5.3    ***Assumption of Assigned Contracts.***

      (a)    Sellers shall assign to Purchaser, and Purchaser shall assume upon the terms set forth in this Agreement, the Assigned Contracts at the Closing pursuant to the Sale Order, which shall provide for the assignment, to the extent legally capable of being assigned, by Sellers to Purchaser, of each Assigned Contract.

      (b)    On January 16, 2025, Sellers filed a notice of potential assumption at Docket No. 208 (the "***Initial Assumption Notice***") with the Bankruptcy Court, and on March 27, 2025, Sellers filed an amended notice of potential assumption at Docket No. 388 (the "***First Amended Assumption Notice***," and together with the Initial Assumption Notice, the "***Assumption Notices***") with the Bankruptcy Court, and served such Assumption Notices on each counterparty to a Potential Assigned Contract listed thereon.  The Assumption Notices identify all Potential Assigned Contracts that Sellers believe may be assumed and assigned in connection with the sale of the Transferred Assets and sets forth Sellers' good faith estimate of the amount of Cure Costs applicable to each such Potential Assigned Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Potential Assigned Contract, the amount of such Cure Cost designated for such Potential Assigned Contract shall be "$0.00").  In accordance with the Bid Procedures Order, Purchaser reserves the right to supplement and/or modify such list of Potential Assigned Contracts and have Sellers provide additional notice thereof, as applicable, and to remove a Potential Assigned Contract from, or add a Contract to, the list of Potential Assigned Contracts in accordance with clause (c) of this Section 5.3.  Any such removed Contract shall be deemed to no longer be a Designated Contract, and for the avoidance of doubt, Purchaser shall not be responsible for any Cure Costs related thereto.

      (c)    On or before the date that is one Business Day after the Auction or the cancellation thereof, Purchaser shall provide to Sellers a list of those Potential Assigned Contracts and any other of Sellers' Contracts that it intends to be assumed by Sellers and assigned to Purchaser at the Closing (the "***Designated Contracts***").  Purchaser shall be entitled, in its sole discretion, to add any Potential Assigned Contract or any other of Sellers' Contracts to the list of Designated Contracts or to remove any Contract from the list of Designated Contracts by providing Sellers written notice of such addition or removal, as applicable.  Sellers shall file such motions or pleadings as may be appropriate or necessary and shall take such actions reasonably requested by Purchaser to assume and assign the Designated Contracts and to determine the amount of any Cure Costs.  At the Closing, Sellers shall assume and assign to Purchaser the Assigned Contracts, in each case, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to provision by Purchaser of adequate assurance and payment of Cure Costs as may be required under Section 365 of the Bankruptcy Code and the terms of the Sale Order.  Until the earlier of (w) 30 days following the Closing Date, (x) the entry of an order confirming a plan of reorganization or liquidation for the Debtors, (y) such time that the Bankruptcy Cases are closed or (z) dismissal of the Bankruptcy Cases, Purchaser shall have the right, in consultation with Sellers, to provide written notice to Sellers of Purchaser's election to:

(i)    designate a Potential Assigned Contract as a Designated Contract, and upon such designation such Potential Assigned Contract will constitute a Transferred Asset and Assigned Contract and will be (or will be deemed to have been) conveyed to Purchaser under this Agreement at Closing (and, if applicable, will cease to constitute an Excluded Asset and/or an Excluded Contract), so long as (1) such Potential Assigned Contract is added to the Designated Contracts prior to the entry of any Order of the Bankruptcy Court approving the rejection of such Contract, and (2) the third party to such Potential Assigned Contract has received notice and had an opportunity to object within such period of time set forth in an Order of the Bankruptcy Court; and

(ii)    designate a Contract (including any Contract that is a Designated Contract immediately before such designation) as an Excluded Contract, Excluded Asset and Excluded Liability, and/or upon such designation, such Contract will constitute an Excluded Contract, Excluded Asset and/or Excluded Liability.

(d)    Purchaser shall make provision for the payment in cash of any Cure Costs at Closing in accordance with the Sale Order.

(e)    On or prior to the date that is two Business Days prior to the Closing Date, Sellers shall have made available to Purchaser true and complete copies of all Designated Contracts, or otherwise provide Purchaser with access to such true and complete copies of such Designated Contracts. Sellers shall, at Purchaser's request, use commercially reasonable efforts to facilitate introductions to the counterparties to any Contract pertaining to the Transferred Assets, and Purchaser may (during the period between the date hereof and Closing) discuss with each such counterparty the terms on which Purchaser is willing to assume such Contract. Upon an agreement between Purchaser and the applicable counterparty to any Designated Contract on any Cure Costs that shall be payable in connection with assignment and assumption of such Designated Contract, which agreement is binding on the counterparty pursuant to an order of the Bankruptcy Court, such amount shall be deemed to be the Cure Costs applicable to such Designated Contract for all purposes hereunder.

(f)    If Purchaser exercises its rights in this Section 5.3 to add or remove a Potential Assigned Contract as a Designated Contract, then the Parties acknowledge and agree that (i) there will be no increase or reduction in the Purchase Price as a result of such designation or change in designation, nor will there be any delay to the Closing as a result thereof and (ii) the applicable Exhibits and Schedules to this Agreement will be deemed to have automatically been updated (without action of any Party or Person) to reflect such designation.

5.4    *No Successor Liability*. The Parties intend that, except where expressly prohibited under applicable Law, upon the Closing, Purchaser shall not be deemed to: (a) be the successor of Sellers, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers, or (d) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Transferred Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that (x) Purchaser shall not be liable for any Liability or Liens (other than the Assumed Liabilities) against any Seller or any of such Seller's predecessors or Affiliates, and (y) Purchaser shall have no successor or vicarious

49

liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Transferred Assets or any Liabilities of Sellers arising on or prior to the Closing Date.  The Parties agree that provisions substantially in the form of this <u>Section 5.4</u> shall be reflected in the Sale Order.

5.5    ***Sale Free and Clear***.  Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Liens (including, for the avoidance of doubt, all successor liability) of, against or created by Sellers or their bankruptcy estates, shall be fully released from and with respect to the Transferred Assets.  On the Closing Date, the Transferred Assets shall be transferred to Purchaser and/or one or more of its designees, as applicable, Free and Clear.

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1    ***Conduct of Business***.  Except (i) as set forth on <u>Schedule 6.1</u>, (ii) with the prior written consent of Purchaser (which consent will not be unreasonably withheld, delayed or conditioned), (iii) as is expressly contemplated by this Agreement, or (iv) as is required by applicable Law, including in connection with public reporting Laws and obligations (including the Securities Exchange Act of 1934, as amended) or applicable stock exchange rule or policy, or by Order of the Bankruptcy Court or the Injunction (including the Cleanse Process), from the date hereof through the earlier of the Closing Date or the termination of this Agreement in accordance with its terms:

(a)    Sellers shall maintain and preserve their respective assets and properties constituting Transferred Assets in good working order, condition and repair consistent with past practice, and comply with all applicable Laws and Orders applicable to the Transferred Assets;

(b)    Sellers shall continue to keep the Transferred Assets in compliance with the Warming Requirements;

(c)    Sellers shall use commercially reasonable efforts to produce products and Inventory in respect of customer orders in the manner consistent with current practice (subject to, for the avoidance of doubt, the Cleanse Process and the Injunction).

(d)    Sellers shall use commercially reasonable efforts to preserve relationships with their (i) Material Suppliers, (ii) Material Customers, (iii) the Seller Employees and (iv) others doing business with them and maintain customer service at current levels in all material respects; and

(e)    Sellers shall not:

(i)    reserved;

(ii)    (A) sell, license, abandon, convey, transfer, assign, divest, or otherwise dispose of any asset, Personal Property or Real Property constituting Transferred Assets other than, in each case, (i) Inventory, scrap material and obsolete assets sold or

otherwise disposed of in the ordinary course of business consistent with past practice and (ii) and the surrender of any Leased Real Property due to the expiration of the applicable Lease, or (B) effect any sale (whether by merger, consolidation, acquisition of stock or assets or otherwise) of the Business;

(iii)    create or assume any mortgage or pledge, or impose any Lien on, or in any other way encumber, any asset, Personal Property or Real Property constituting Transferred Assets, except as required by applicable Law;

(iv)    acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of any Person or otherwise acquire any assets that, as of the Closing, would constitute Transferred Assets, except for the acquisition of assets and Inventory in the ordinary course of business consistent with past practice;

(v)    (A) except as ordered by the Bankruptcy Court, amend, modify, or terminate any Material Contract or waive, release or assign any material rights or material claims thereunder, or (B) take any action, or omit to take any action, that would reasonably be expected to result in a default under or material breach of any Material Contract;

(vi)    terminate, amend, restate, supplement or waive any rights related to the Business, including those under any Permit;

(vii)    enter into any Contract that materially limits or otherwise restricts the use or saleability of the Transferred Assets or that would reasonably be expected to, after the Closing Date, limit or restrict in any material respect Purchaser's use of the Transferred Assets;

(viii)    liquidate, dissolve, recapitalize or otherwise wind up its operations related to the Transferred Assets;

(ix)    reject any Potential Assigned Contract;

(x)    cancel or alter any insurance coverage with respect to the Transferred Assets;

(xi)    (A) sell, assign or transfer all or any portion of its Intellectual Property, (B) grant any licenses of Intellectual Property except for non-exclusive licenses granted in the ordinary course of business, (C) abandon or cease to prosecute or maintain any of the Registered Intellectual Property or any other Owned Intellectual Property that is material to the conduct of the Business, other than material sequestered in connection with Cleanse Process or (D) disclose any Trade Secrets to any Person that is not subject to a legally-binding confidentiality obligation with respect thereto;

(xii)    except as required pursuant to the terms of any Benefit Plan in effect as of the date of this Agreement or as approved by the Bankruptcy Court, (A) increase in any manner the base compensation, cash incentive or bonus opportunity, severance or termination pay of any Seller Employee, (B) become a party to, establish, adopt, amend, commence participation in or terminate any Benefit Plan or any arrangement that would

have been a Benefit Plan had it been entered into prior to the date of this Agreement (other than in connection with updates to broad-based health and welfare and similar plans or arrangements in connection with annual compensation and benefit review), (C) grant any new awards, or amend or modify the terms of any outstanding awards, under any Benefit Plan, (D) take any action to accelerate the vesting or lapsing of restrictions or payment, or fund or in any other way secure the payment, of material compensation or benefits under any Benefit Plan, (E) hire any employee or engage any individual independent contractor with annual base compensation in excess of $100,000 or (F) terminate the employment of any Seller Employee (other than terminations for cause or terminations of employees with annual base compensation of less than $100,000 for any reason);

(xiii)   make any loan or advance to any Person or otherwise purchase or acquire any Indebtedness, debt securities or equity securities of any Person, or make any loans, advances or capital contributions to, or investments in, any other Person or incur any Indebtedness;

(xiv)   change their methods of accounting, except as required by concurrent changes in GAAP;

(xv)    settle any material Action;

(xvi)   file, commence, pursue, consent to or encourage any Action or any other claim or cause of action (except for claims or causes of action based upon a breach of this Agreement);

(xvii)  make or commit to make any capital expenditure (or series of related capital expenditures) for additions to property or equipment except for expenditures made in the ordinary course of business and involving no more than $50,000;

(xviii) other than in the ordinary course of business consistent with past practices, (1) incur any Indebtedness in excess of $50,000, or (2) assume or guaranty any Indebtedness or other Liability of any third party; or

(xix)   enter into a binding agreement or agree, whether in writing or otherwise, to do any of the foregoing.

(f)     Notwithstanding anything to the contrary, nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the Business, assets and operations prior to the Closing.  Prior to the Closing, Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its Business, assets and operations.

6.2   *Access; Confidentiality*.

(a)     From the date hereof until the earlier of the Closing Date and the termination of this Agreement, Sellers shall grant Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon reasonable notice (and in the event of a facility visit request, at least two Business Days' prior notice), and subject to any

reasonable limitations resulting from any Public Health Measures, (x) to the personnel, employees, properties, offices, plants, facilities, and books and records of Sellers related to the Transferred Assets and (y) to the Real Property to inspect the Transferred Assets and to monitor Sellers' compliance with its covenants herein, including the covenants set forth in Section 6.1; *provided*, *however*, that (i) all requests for access shall be directed to Mark Podgainy (mpodgainy@getzlerhenrich.com) or such other person as Sellers may designate in writing from time to time, (ii) such activities shall not unreasonably interfere with the ongoing business or operations of Sellers, (iii) Sellers shall have the right to have one or more of its representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.2(a), (iv) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any soil, water, air or vapor sampling or analysis of environmental media, including any Phase II environmental site assessments, (v) such access or related activities shall not cause a violation of any agreement to which a Seller is a party, (vi) no Personal Information shall be disclosed or used other than in compliance with Privacy Requirements, and (vii) nothing herein shall require Sellers or their representatives to furnish to Purchaser, or provide Purchaser with access to, information that (A) is subject to an attorney-client or solicitor-client privilege or an attorney or solicitor work-product privilege, or (B) legal counsel for Sellers reasonably concludes may give rise to antitrust or competition law issues or violate a protective order or otherwise may not be disclosed pursuant to applicable Law or applicable stock exchange rule or policy.

(b)     Any information provided by Sellers or their representatives to Purchaser or its representatives pursuant to this Section 6.2 is confidential information and subject to the terms and conditions of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference.  Effective upon (and only upon) the Closing and subject to the terms thereof, the Confidentiality Agreement shall automatically terminate and none of the parties thereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained by Purchaser or its representatives concerning Sellers (and not the Business), which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

(c)     Notwithstanding anything to the contrary contained herein, nothing in this Section 6.2 shall limit the ability of the Parties or any of their respective Affiliates to make any disclosure to their respective tax advisors or any taxing authority or other Governmental Authority.

6.3     ***Efforts to Consummate***.    Except as otherwise provided in this Agreement (including Section 5.1), each of the Parties agrees to use its reasonable best efforts to cause the Closing to occur as promptly as practicable, including satisfying the conditions precedent set forth in Article 8 applicable to such Party and executing any additional instruments reasonably requested by the other Party (without cost or expense to the executing Party) necessary to carry out the Transactions and to fully carry out the purposes of this Agreement; *provided*, *however*, that, for purposes of the "reasonable best efforts" standard as required by this Section 6.3, Section 6.4 or Section 6.5, neither Party nor its any of its respective Affiliates or representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party, to waive or surrender any right, to modify any agreement (including any Assigned Contract or

Potential Assigned Contract) or to provide financing to Purchaser for the consummation of the Transactions.

6.4    *Notices and Consents; Pre-Closing Novation Efforts*.

(a)    Reasonably promptly following the execution of this Agreement, Sellers will give, or cause to be given, applicable notices to third parties and thereafter will use their commercially reasonable efforts (as limited by Section 6.3) to obtain the third-party consents set forth on Schedule 6.4(a); *provided*, *however*, that no representation, warranty or covenant of Sellers shall be breached or deemed breached as a result of (i) the failure to obtain any such third-party consent, provided Sellers are otherwise in compliance with the terms of this Section 6.4(a), (ii) any termination of a Contract as a result of the failure to, or Purchaser's election not to, obtain such third-party consent or (iii) any Action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such consent or any such termination.

(b)    The Parties recognize that, in accordance with the FAR Part 42, Subpart 42.12 or other contractual provisions, Novation of the Purchased Government Contracts for which a U.S. Governmental Authority is a counterparty ("***Prime Contracts***") will be necessary for the transfer and assignment of the Prime Contracts to Purchaser and that application for Novation cannot be made until after the Closing and may take a substantial amount of processing time. Promptly following the execution of this Agreement, Purchaser and Sellers shall prepare their respective portion of the documentation required for Novation of each such Prime Contract, to the extent practicable prior to the Closing.

6.5    *Regulatory Matters and Approvals*.

(a)    Each of Purchaser and Sellers will provide any notices to and make any filings with any Governmental Authority that are necessary to consummate the Transactions, including to assign or transfer the Permits to Purchaser or its designated Affiliate. Without limiting the generality of the foregoing, Sellers and Purchaser shall prepare and file as promptly as practicable all documentation to effect any necessary notices, reports and other filings and to obtain as promptly as practicable all Consents, clearances, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any Governmental Authority in order to consummate the Transactions.

(b)    Each Party will promptly notify the other Party of any written or oral communication made to or received by such Party from any Governmental Authority regarding the Transactions, and subject to applicable Law and applicable stock exchange rules and policies, (i) permit the other Party to review in advance any proposed written communication to any such Governmental Authority and incorporate the other Party's reasonable comments, (ii) not agree to participate in any substantive meeting or discussion with any such Governmental Authority in respect of any filing, investigation or inquiry concerning this Agreement or the Transactions unless, to the extent reasonably practicable, it consults with the other Party in advance, and to the extent permitted by such Governmental Authority, gives the other Party the opportunity to attend, and (iii) subject to Section 6.2, furnish the other Party with copies of all correspondence, filings and written communications between them and their Affiliates and their respective representatives, on the one hand, and any such Governmental Authority or its staff, on the other hand, with respect

to this Agreement and the Transactions; *provided*, *however*, that this Agreement shall not obligate either Party to disclose to the other Party such portions of any proposed or final correspondence, filing or other written communication with a Governmental Authority or its staff as the Party to such correspondence, filing or communication may reasonably deem competitively-sensitive, privileged or confidential vis-à-vis the other Party, except that it shall disclose matters to the external counsel of the other Party to the extent reasonably necessary in order to enable the Party to fulfill its cooperation obligations in this <u>Section 6.5</u>.

6.6    ***Public Announcements***.  Between the date of this Agreement and the Closing Date, neither Purchaser nor Sellers shall, and Purchaser and Sellers shall cause their respective Affiliates and representatives not to, directly or indirectly, issue any press release or public announcement of any kind without the prior written consent of Purchaser (in the case of a press release or public announcement by Sellers) and Sellers (in the case of a press release or public announcement by Purchaser); *provided*, *however*, that nothing herein shall prohibit any Party from issuing or causing publication of any such press release or public announcement to the extent that it determines in good faith, based on consultation with counsel, that such disclosure is required by Law, Order or stock exchange rule, policy or listing agreement (including any filings required to be made by any of the Parties or their respective Affiliates on Form 8-K, Schedule 13D or otherwise pursuant to securities Laws), in which case the Party making such determination shall, if practicable under the circumstances, use reasonable efforts to allow the other Party reasonable time to comment on such release or announcement in advance of its issuance or publication (it being understood and hereby agreed that the final form and content of any such release or announcement, as well as the timing of any such release or announcement shall be at the final discretion of the disclosing party). Purchaser and Sellers shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the Parties and approval to which shall not be unreasonably withheld.

6.7    ***Update of Schedules***.  From time to time prior to the date that is five Business Days prior to the Closing Date, Sellers may supplement or amend the Schedules to <u>Article 3</u> with respect to any matter, other than any Tax matter, hereafter first arising or discovered in the ordinary course of business and in accordance with <u>Section 6.1</u> which, if existing or known by Sellers at the date of this Agreement, would have been required to be set forth or described in such Schedules.  Any such supplemental or amended disclosure shall not be deemed to have cured any such breach of representation or warranty for purposes of determining whether or not the conditions set forth in <u>Section 8.2(a)</u> have been satisfied.  From time to time prior to the date that is one Business Day prior to the Closing Date, Sellers may supplement or update the post-petition accounts payable set forth on <u>Schedule 2.3(d)</u>; *provided*, that the aggregate amount of post-petition accounts payable set forth on <u>Schedule 2.3(d)</u> may not exceed $3,000,000.  From and after the Closing, references to the Schedules shall be references to the Schedules as supplemented, modified or updated in accordance with <u>Section 5.3</u> or <u>Section 6.7</u>.

6.8    ***Notification of Certain Matters***.  Until the Closing, each Party shall promptly notify the other Party in writing of any Effect of which it is aware that will or is reasonably likely to result in the failure of any of the conditions set forth in <u>Article 8</u> to be satisfied.

6.9    ***Employee Matters***.

(a)        Prior to the Closing Date, Purchaser shall make offers of employment to a majority of the Seller Employees set forth on the list provided by Sellers to Purchaser pursuant to Section 3.14(a) (including through an Affiliate of Purchaser or a professional employer organization, which shall be considered an "Affiliate" of Purchaser solely for purposes of this Section 6.9). Any such offers shall be subject to Purchaser's customary pre-employment screening procedures and hiring practices and shall become effective contingent upon Closing effective as of 12:01 a.m. local time on the Closing Date. At least three Business Days prior to the Closing, Purchaser shall provide Sellers with a list of the Seller Employees (collectively, the "***Purchaser Selected Employees***") to whom Purchaser or an Affiliate of Purchaser would like to make offers of employment.   Purchaser Selected Employees who accept an offer of employment with Purchaser or an Affiliate of Purchaser and commence employment on the Closing Date are referred to as "***Transferred Employees***."    Sellers or their Affiliates shall terminate each Transferred Employee as of the date immediately preceding the Closing Date and, to the extent applicable, shall not enforce against any such Transferred Employee any non-compete or similar contractual obligations in connection with his or her employment by any Seller or its Affiliates, or otherwise assert with respect to any such Transferred Employee any claims that would otherwise prohibit or place conditions on such Transferred Employee's acceptance of an offer of employment or thereafter the continuing employment of the Transferred Employee by Purchaser or any of its Affiliates.

(b)        To the extent the Sale Order expressly permits Sellers to enter into a Separation Agreement with each Severance Eligible Employee and make a Severance Payment thereunder in accordance with this Section 6.9(b), on or before the 60-day anniversary of the Closing Date, Purchaser shall pay to an account designated in writing by Sellers an aggregate amount equal to the sum of the severance obligations payable under each effective and irrevocable separation and release agreements (each agreement, a "***Separation Agreement***", and each severance payment obligation thereunder, a "***Severance Payment***") that (i) is in form and substance satisfactory to Purchaser, (ii) has been duly executed by the applicable Seller and by each Seller Employee who is not a Purchaser Selected Employee (each a "***Severance Eligible Employee***") and (iii) has been delivered to Purchaser within 52 days following the Closing Date; *provided*, that, in no event shall the amount Purchaser is required to pay pursuant to this Section 6.9(b) exceed $216,382.53.   For the avoidance of doubt, Sellers shall be solely responsible for making each Severance Payment to each Severance Eligible Employee and for the employer portion of any payroll, social security, unemployment or similar Taxes related to each Severance Payment; *provided, however*, that Sellers shall have no such responsibility in the event that (1) Purchaser does not timely pay to Sellers the aggregate amount of Severance Payments under this Section 6.9(b) or (2) the Sale Order does not expressly permit Sellers to enter into Separation Agreements with the Severance Eligible Employees and make the Severance Payments thereunder.

(c)        On or before the Closing Date, Sellers shall provide a list of the names and sites of employment of any and all employees of Sellers who have experienced an employment loss or layoff (as defined by the WARN Act) within 90 days prior to the Closing Date. Sellers shall update this list as reasonably requested up to and including the Closing Date. Except with respect to any Transferred Employee who is terminated by Sellers pursuant to Section 6.9(a) or by Purchaser or an Affiliate of Purchaser following the Closing Date, (i) Sellers shall be solely responsible for any and all Liabilities arising under the WARN Act relating to any Seller Employees whose employment is terminated by Sellers prior to, upon, or following the Closing

and (ii) each Seller shall be solely responsible for any and all Liabilities arising under the WARN Act and relating to any Seller Employee whose employment is terminated by such Seller following the Closing; *provided*, Purchaser shall be solely responsible for any and all Liabilities arising under the WARN Act at any time to the extent caused by Purchaser's failure to comply with the covenants set forth in this <u>Section 6.9</u>.

(d)     Purchaser shall be solely responsible for satisfying the requirements of Section 4980B of the Code for all individuals who are "M&A qualified beneficiaries" as such term is defined in Treasury Regulation Section 54.4980B-9 prior to or in connection with the Closing, whether such obligation to providing continuing benefits or coverage under any Benefit Plan, COBRA, or similar state Law arise prior to, on, or after the Closing Date.

(e)     Sellers and Purchaser each will, and each will cause its respective Affiliates as necessary to, cooperate in carrying out the provisions of this <u>Section 6.9</u>.  The provisions of this <u>Section 6.9</u> are solely for the benefit of the Parties, and no current or former Service Providers of Sellers, Purchaser or any other Person associated therewith shall be regarded as a third-party beneficiary of this <u>Section 6.9</u>.  No provision of this Agreement shall be construed as amending or establishing any Benefit Plan or other or any employee benefit of Purchaser or Purchaser's Affiliates.  Nothing herein shall provide any employee with any rights to continued employment or require Purchaser or any Affiliate of Purchaser to continue any employee benefit plan, program, policy, or arrangement.

## ARTICLE 7
## POST-CLOSING COVENANTS

7.1     ***Post-Closing Operation of Sellers***.  Sellers hereby acknowledge and agree that upon the consummation of the Transactions, Purchaser shall have the sole right to the use of the name "Akoustis Technologies", "Akoustis" or similar or other relevant names or Trademarks containing or comprising the foregoing, including any name or mark confusingly similar thereto. After the Closing Date, none of Sellers nor any of their respective Affiliates shall use the name or mark "Akoustis Technologies", "Akoustis" or any derivatives thereof or other relevant names or service marks.  The Parties shall seek entry of an Order (which may be the Sale Order), modifying the caption as of the Closing Date in the proceedings before the Bankruptcy Court to reflect the change in the name of Sellers, except that during the pendency of such proceedings, any Seller shall be permitted to use the name "Akoustis Technologies", "Akoustis"  or similar or other relevant names or derivatives thereof solely as a former name for legal and noticing purposes in connection with matters relating to Sellers' Bankruptcy Cases.  Within 30 days after the Closing, Sellers and their respective Affiliates shall promptly file with the applicable Governmental Authorities all documents reasonably necessary to delete from their names the words "Akoustis Technologies", "Akoustis" or any derivatives thereof, other relevant names or Trademarks and shall do or cause to be done all other acts, including the payment of any fees required in connection therewith, to cause such documents to become effective as promptly as reasonably practicable.

7.2     ***Post-Closing Receipt and Possession of Assets***.  In the event that, after the Closing Date, Purchaser receives or otherwise is in possession of any Excluded Asset, Purchaser shall promptly notify Sellers of its receipt or possession of such Excluded Asset and transfer, if so requested by Sellers, at Sellers' expense, such Excluded Asset to Sellers.  In the event that, after

the Closing Date, Sellers receive or otherwise are in possession of any other Transferred Asset, Sellers shall promptly notify Purchaser of their receipt or possession of such other Transferred Asset and transfer, at Purchaser's expense (unless Sellers were required to transfer such Transferred Asset to Purchaser at Closing, in which case, and without limitation of any other remedies available to Purchaser, such transfer will be at Sellers' expense), such Transferred Asset to Purchaser.

7.3     **Insurance**.  From and after the Closing, Purchaser shall be responsible for securing all insurance it considers appropriate for the Business and the operations and assets and liabilities in respect thereof.  Notwithstanding the foregoing, if any claims are actually made with respect to events or circumstances that occurred or existed prior to the Closing Date under any Insurance Policies with respect to any Transferred Asset, then Sellers will, and will cause their Affiliates to, cooperate with, and take all actions reasonably requested by, Purchaser to file, notice and otherwise pursue (or continue to pursue) such claims and recover proceeds under the terms of such Insurance Policies, and Sellers will, or will cause their applicable Affiliates to, promptly pay over to Purchaser any proceeds of any insurance recovery payable under any such Insurance Policies other than any recovery to any individual insured under any directors and officers insurance policy (in each case at the sole expense of Purchaser); *provided*, that such Insurance Policies have not (i) been terminated by the insurer or (ii) expired in accordance with their terms.

7.4     **Wrong Pockets**.

(a)     As of the Closing Date, each Seller hereby (i) authorizes Purchaser to open any and all mail addressed to such Seller relating to the Business or the Transferred Assets (or which Purchaser believes may be related to the Business or the Transferred Assets prior to opening) and delivered to the offices of the Business or otherwise to Purchaser if received on or after the Closing Date and (ii) appoints Purchaser as its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Purchaser after the Closing Date with respect to accounts receivable relating to work performed by Purchaser after the Closing made payable or endorsed to such Seller or such Seller's order, for Purchaser's own accounts.

(b)     As of the Closing Date, each Seller agrees that any cash, monies, checks, or negotiable instruments received by such Seller after the Closing Date with respect to (i) reserved, (ii) other Transferred Assets or (iii) cash, monies, checks, negotiable instruments or accounts receivable relating to the period after the Closing, shall be held in trust by such Seller for Purchaser's benefit and account, and promptly upon receipt by such Seller of any such payment (but in any event within five Business Days of such receipt), such Seller shall pay over to Purchaser the amount of such payments with appropriate endorsements.  In addition, each Seller agrees that, after the Closing Date, it shall hold in trust and shall promptly transfer and deliver to Purchaser, from time to time as and when received by such Seller, any other property that such Seller may receive on or after the Closing Date which properly belongs to Purchaser hereunder.  Purchaser agrees that, after the Closing Date, it shall hold and shall promptly transfer and deliver to the applicable Seller, from time to time as and when received by Purchaser or its Affiliates, any Excluded Assets that Purchaser or its Affiliates may receive on or after the Closing.

(c)     As of the Closing Date, Purchaser shall have the sole authority to bill and collect accounts receivable relating to work performed by Purchaser after the Closing.

7.5     *Tax Matters*.

(a)     Sellers shall be responsible for timely and properly preparing or causing to be prepared all Tax Returns required by applicable Law for the Business and the Transferred Assets for the Pre-Closing Tax Periods that are required to be filed after the Closing.  After the Closing, Purchaser will reasonably cooperate with Sellers in preparing such Tax Returns.

(b)     Purchaser shall prepare and timely file or cause to be prepared and timely filed (taking into account all extensions properly obtained) all Tax Returns related to the Business and the Transferred Assets (other than any Tax Return legally required to be filed by any Seller) that are required to be filed for any Straddle Period, if any.

(c)     Sellers shall be liable for all Seller Taxes, and Purchaser shall be liable for any Taxes with respect to the Transferred Assets for any Post-Closing Tax Period.  For purposes of this Agreement, in the case of any Straddle Period, (i) except as provided in Section 2.9, Taxes based on or measured by sales or use, employment, or withholding or otherwise imposed on a transactional basis allocated to the portion of such Straddle Period ending on the Closing Date shall be determined based on an interim closing of the books as of the end of the day on the Closing Date, and (ii) any real property, personal property, sales, use and ad valorem Taxes and similar recurring Taxes and fees imposed on a periodic basis on the Transferred Assets shall be allocated to the portion of such Straddle Period ending on the Closing Date by prorating the amount of such Tax for the entire taxable period per diem.  For the avoidance of doubt, to the extent Sellers have prepaid or deposited any amounts of any Taxes prior to the Closing, Sellers shall receive credit for such amounts (but solely against the liability with respect to the specific Tax for which the prepayment or deposit was made) in determining the net amount of Taxes that Sellers continue to be liable for pursuant to this Agreement.

(d)     After the Closing, each of Sellers and Purchaser shall (and shall cause their respective Affiliates to), at the expense of the requesting party:

(i)     reasonably assist and reasonably cooperate in good faith with the requesting party in the payment of any Taxes to the applicable Governmental Authority due on any Tax Return for the Business and the Transferred Assets that is required to be filed for a Straddle Period and for which such non-requesting party is a liable for pursuant to Section 7.5(c) (provided that, for the avoidance of doubt, the payment of any Taxes by a non-requesting party pursuant to this Section 7.5(d)(i) shall be at the expense of such non-requesting party);

(ii)     reasonably cooperate in preparing for and defending any audits or proceedings of or disputes with Governmental Authorities regarding any Tax Returns required to be filed by Sellers for any Pre-Closing Tax Period or Straddle Period;

(iii)     maintain and preserve until the expiration of the applicable statutes of limitations, and make available to the other Party as reasonably requested and to any Governmental Authority as reasonably required, all information, records and documents relating to Taxes related to the Business or the Transferred Assets for any Pre-Closing Tax Period or Straddle Period; and

(iv)    furnish the other Party with copies of all correspondence received from any Governmental Authority in connection with any Tax audit, proceeding, assessment or information request relating to Taxes related to the Business or the Transferred Assets for a Pre-Closing Tax Period or Straddle Period.

7.6    *IT Network Systems*.   To the extent any Excluded IT Network Systems are sequestered in connection with the Cleanse Process and, upon Sellers' election, later cleansed and determined by Sellers to be able to be transferred notwithstanding such initial sequestration, upon Sellers' election, Sellers shall provide to Purchaser notice of such determination, and upon Purchaser's request, shall transfer, assign, convey and deliver (or shall cause the transfer, assignment, conveyance and delivery thereof) to Purchaser, to the extent reasonably practicable, and without further payment to Sellers, Free and Clear, all of Sellers' right, title and interest in such Excluded IT Network Systems.

7.7    *Trimmed Inventory*.  All finished Inventory, all works in progress, and all Trimmed Inventory is not included in the Transferred Assets (such finished Inventory, works in progress, and Trimmed Inventory, the "*Excluded Trimmed Inventory*").  To the extent Sellers desire to sell any Excluded Trimmed Inventory following the Closing, Purchaser shall have a right of first refusal if and when Sellers propose to sell any Excluded Trimmed Inventory to a third party (other than with respect to Excluded Trimmed Inventory that is subject to any third party's pre-existing contractual right to purchase such inventory).  Sellers shall provide Purchaser with 30 days' (or, if less than 30 days, as soon as reasonably practicable) written notice of any such proposed sale, including the proposed price and other terms and conditions of such sale in reasonable detail (the "*Sale Terms*"), and any and all information regarding the Excluded Trimmed Inventory that Sellers intend to share with a third party who is interested in purchasing the Excluded Trimmed Inventory (collectively, the "*Sale Notice*").  Purchaser shall notify Sellers in writing, within 10 Business Days (or such shorter time period as reasonably necessary to comply with any Bankruptcy Court Orders) after receipt of the Sale Notice, whether it desires to purchase the Excluded Trimmed Inventory pursuant to the Sale Terms.  If Purchaser so notifies Sellers that it does desire to purchase the Excluded Trimmed Inventory, Purchaser and Sellers shall prepare a purchase order for the purchase of the Excluded Trimmed Inventory on the Sale Terms on Purchaser's standard form of purchase order.  If (i) Purchaser fails to respond to the Sale Notice within 10 Business Days (or such shorter time period as reasonably necessary to comply with any Bankruptcy Court Orders) after receipt thereof or (ii) Purchaser notifies Sellers that it does not desire to purchase the Excluded Trimmed Inventory, or (iii) in the case that Purchaser notifies Sellers that Purchaser desires to purchase the Excluded Trimmed Inventory, but Purchaser and Sellers, despite using good faith effort, fail to finalize and execute a purchase order within 10 Business Days (or such shorter time period as reasonably necessary to comply with any Bankruptcy Court Orders) after Sellers' receipt of Purchaser's notice, Sellers shall have the right, within 120 days, to offer and sell the Excluded Trimmed Inventory to a third party on terms and conditions no more favorable to such third party than the Sale Terms specified in the Sale Notice. In the event that Sellers do not consummate the sale of Excluded Trimmed Inventory within the 120-day period, the rights provided under this Section 7.7 shall be revived and the Excluded Trimmed Inventory shall not be sold to any third party unless first re-offered to Purchaser.

7.8    *Post-Closing Novation Efforts*.

60

(a)    Promptly following the Closing, Purchaser and Sellers shall each complete their respective portion of the documentation required for Novation of each Prime Contract that is a Purchased Government Contract, and Purchaser shall deliver its portion to Sellers (unless Purchaser determines that certain information in the package contains proprietary or confidential information, in which case Purchaser will deliver a sealed package directly to the relevant contracting officer and confirm to Sellers the delivery of such information).  After the Closing, Sellers shall promptly submit the required documentation to the appropriate contracting officer and provide a copy thereof to Purchaser.  Purchaser and Sellers will thereafter, promptly and in coordination with the other parties, respond appropriately to any requests from the applicable contracting officer for additional information or documentation relating to such Novation.  Purchaser and Sellers shall keep the other fully informed, on a current and timely basis, as to the progress of the Novation process and provide each other copies of all letters, correspondence and other material documents to or from any Governmental Authority with respect thereto.

(b)    During the interim period between (i) the Closing and (ii) the earlier of (A) the Novation of each of the Prime Contracts that are a Purchased Government Contract, (B) a resolution pursuant to Section 7.8(c) and (C) final close-out and payment of the applicable Purchased Government Contract (as to each individual Prime Contract, the "*Novation Period*"), and subject to the Parties' negotiation of a mutually-agreeable remedy pursuant to Section 7.8(c) in the event any such Purchased Government Contract is not novated:

(i)    Purchaser will perform Sellers' obligations under each of the Prime Contracts that are Purchased Government Contracts in lieu of the applicable Seller, in accordance with the Subcontract Pending Novation Agreement to be executed by each of Purchaser and the applicable Seller at the Closing and shall receive all financial benefits therefrom.  Sellers, promptly following execution of this Agreement, will advise the applicable contracting officer of the intended Subcontract Pending Novation Agreement and facilitate appropriate meetings between Purchaser and the contracting officer.

(ii)    To the extent acceptable to the applicable Prime Contract customer (and except as provided in Section 7.8(b)(iii) below), any other correspondence, invoices, or other written submissions, requests for equitable adjustments, claims, contract modifications, and requests for final decisions will be prepared by Purchaser in the name of the applicable Seller, coordinated with and submitted for approval by the applicable Seller, which approval shall not unreasonably be withheld, signed by the applicable Seller if approved, and submitted by Purchaser to the Prime Contract counterparty.  Sellers shall respond promptly to any request by a Prime Contract customer or Purchaser for approval.  In this context, Sellers will designate an individual in writing prior to Closing as "Sellers' Designated Contract Representative" to receive and execute such documents for and on behalf of Sellers, and Purchaser will designate an individual in writing prior to the Closing as "Purchaser's Designated Contract Representative" for all Prime Contracts, to submit such documents to, and receive such documents from, Sellers' Designated Contract Representative.  Each of Purchaser and Sellers may change Purchaser's Designated Contract Representative or Sellers' Designated Contract Representative, as applicable, by written notice to the other, and to the extent the then-designated Sellers' Designated Contract Representative is relieved of its duties in the Bankruptcy Cases pursuant to a chapter 11 plan confirmed by the Bankruptcy Court, Sellers shall designate a successor

Sellers' Designated Contract Representative with authority to perform the Sellers' obligations under this <u>Section 7.8</u>.  In addition, if any certification is required, Purchaser shall certify to Sellers in writing that such certification is proper under the Contract Disputes Act of 1978 (the "***CDA***"), and not in violation of the False Claims Act, and upon receipt of such certification, Sellers shall review and certify the claim under the CDA for submittal to and decision by the contracting officer.  Sellers may require from Purchaser such reasonable additional documentation from Purchaser, and conduct such due diligence, as Purchaser and Seller shall reasonably agree is appropriate prior to Seller making any submission to a Federal Government Customer in reliance on information provided by Purchaser.

        (iii)     During the Novation Period for each Prime Contract that is a Purchased Government Contract, each of Purchaser and Sellers will cooperate fully at their own cost and reasonably assist the other to obtain Novation of such Prime Contract into the name of Purchaser and under substantially the same terms and conditions as in effect at the time of Closing and without materially adverse conditions upon either Sellers or Purchaser, and to facilitate performance thereof by Purchaser.  No Party will take any action intended to interfere with or delay Novation.

        (c)     Assuming Sellers and Purchaser are each in compliance with their respective obligations under this <u>Section 7.8</u>, if the appropriate contracting officer (i) refuses to allow Purchaser to perform a Prime Contract that is a Purchased Government Contract pursuant to a Subcontract Pending Novation Agreement during the Novation Period, (ii) has not acted on the request for Novation on a Purchased Government Contract by the earlier of (A) 12 months after the Closing Date, (B) the date on which all claims reconciliation in the Bankruptcy Cases has been completed, and all distributions have been made, pursuant to a chapter 11 plan confirmed by the Bankruptcy Court, and (C) such time that the Bankruptcy Cases are closed or dismissed, or (iii) refuses to permit Novation of a Prime Contract that is a Purchased Government Contract under substantially the same terms and conditions as in effect at the time of the Closing in the name of Purchaser and without material adverse conditions upon Sellers or Purchaser, then Sellers and Purchaser shall submit a request for approval to the applicable contracting officer for Purchaser to perform such Purchased Government Contract pursuant to a permanent subcontract agreement between Purchaser and the applicable Seller.  If the contracting officer for such Purchased Government Contract refuses to approve such subcontract, then Purchaser and Sellers shall work in good faith to negotiate a mutually satisfactory remedy.

        7.9     ***Post-Closing Transition Services***.

        (a)     Purchaser acknowledges that GDSI Buyer may require that a transition services agreement be entered into by one or more of Sellers and GDSI Buyer in connection with GDSI Buyer's purchase of the GDSI Assets.

        (b)     After the Closing until the three-month anniversary of the Closing Date (the "***Transition Period***"), Purchaser shall permit the Transferred Employees set forth on <u>Schedule 7.9</u> under the heading "Transition Employees" (the "***Transition Employees***") to provide the services set forth on <u>Schedule 7.9</u> under the heading "Transition Services" ("***Transition Services***") to Sellers or GDSI Buyer, as applicable, at a level of care, skill and efficiency that is reasonable with

respect to the Transition Services in exchange for Sellers paying to Purchaser as consideration for the provision of the Transition Services an amount equal to the sum of (x) the amounts set forth on Schedule 7.9 under the heading "Transition Fees" in respect of each such service (the "**Transition Fees**") and (y) all reasonable and documented out-of-pocket expenses incurred by Purchaser or its Affiliates in connection with the provision of the Transition Services (the "**Reimbursable Amounts**"); *provided*, that, the provision of the Transition Services does not (i) unreasonably interfere with the Transition Employees' services to Purchaser or its Affiliates or (ii) require any individual Transition Employee to devote more than the following percentages of such Transition Employee's working time during any calendar month of the Transition Period or the Extended Transition Period, as applicable: (w) 75% during the first calendar month of the Transition Period, (x) 50% during the second calendar month of the Transition Period, (y) 25% during the third calendar month of the Transition Period, and (z) 10% during any calendar month of an Extended Transition Period.  During the Transition Period or Extended Transition Period, as applicable, with respect to each Transition Employee, Purchaser or its Affiliate shall be solely responsible for the payment and provision of all employment obligations, including (A) payment of wages and provision of all employee benefits, (B) payment of all required federal, state and local taxes, and (C) provision of workers' compensation coverage.  Sellers shall pay to an account designated by Purchaser (1) the Transition Fees with respect to a particular calendar month of the Transition Period or Extended Transition Period, as applicable, within five Business Days following the end of such calendar month and (2) any Reimbursable Amounts set forth on an invoice delivered by Purchaser to Sellers with reasonable supporting documentation within five Business Days of Sellers receipt thereof.  The Transition Fees and Reimbursable Amounts constitute all amounts that Sellers shall be required to pay to Purchaser for or in respect of the Transition Services, and Sellers shall not be responsible or liable to Purchaser for any other fees, expenses or other costs for or with respect to the Transition Services.

(c)    Notwithstanding anything in this Section 7.9 to the contrary, (i) no Transition Employee shall be considered an employee of Sellers or GDSI Buyer (under any theory of employment, including but not limited to joint employer, single employer, agency or alter ego) in connection with the provision of the Transition Services, (ii) in no event shall Purchaser (A) have any Liabilities in connection with the Transition Services other than what is expressly contemplated by this Section 7.9 or (B) be required to incur any costs or expenses that do not constitute Reimbursable Amounts, and (iii) solely with respect to those Transition Services designated on Schedule 7.9 as "Extended Transition Services" (the "**Extended Transition Services**"), shall the Transition Period extend until the earlier of (A) the nine-month anniversary of the Closing Date and (B) the date on which such Extended Transition Service is fully performed in Sellers' sole reasonable discretion (the period referred to in clause (iii)(A) or (iii)(B) with respect to each Extended Transition Service, the "**Extended Transition Period**").

(d)    Sellers, in their sole discretion, may terminate the Transition Period or Extended Transition Period, as applicable, at any time upon at least 30 days' prior written notice to Purchaser and, effective upon such termination, Purchaser shall have no further obligation to provide Transition Services, and Sellers shall have no obligation to pay or reimburse Purchaser for any amounts for any Transition Services provided after such termination.

7.10    **Copied Business Records**.  From and after the Closing, in the event and for so long as Sellers are actively involved in, or reasonably anticipate being involved in, contesting or

defending against any Action in connection with any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, Tax matter, failure to act, or transaction involving the Business, Sellers shall retain a copy of any Business Records included in the Transferred Assets (the "***Copied Business Records***").  Sellers shall treat as confidential and shall safeguard any and all such Copied Business Records by using the same degree of care, but no less than a reasonable standard of care, to prevent the unauthorized use, dissemination, or disclosure of such Copied Business Records as Sellers used with respect thereto prior to the execution of this Agreement.  Sellers shall not use such Copied Business Records for any purpose except (i) in connection with the settlement or defense of any Action arising from or involving a third party, including in connection with the Injunction and (ii) as reasonably required for the liquidation and dissolution of Sellers following the Closing.  After Sellers are no longer are actively involved in, or reasonably anticipate being involved in, contesting or defending any Action in connection with any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, Tax matter, failure to act, or transaction involving the Business, Sellers shall promptly return or destroy, at the Purchaser's option, all Copied Business Records. If such Copied Business Records are destroyed, an authorized representative of Sellers shall certify to such destruction in writing.

## ARTICLE 8
## CONDITIONS PRECEDENT

8.1     ***Conditions to Each Party's Obligation***.  The respective obligations of the Parties to effect the Transactions are subject to the satisfaction (or to the extent permitted by applicable Law, waiver by Sellers and Purchaser), at or prior to the Closing, of each of the following conditions:

(a)     <u>No Injunctions or Restraints</u>.    No Law or Order preventing the consummation of the Transactions shall be in effect.

(b)     <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order.

(c)     <u>Trade Secret Order</u>.  The Bankruptcy Court shall have entered an Order resolving any Qorvo Trade Secret Objections (as defined in the Bid Procedures Order).

8.2     ***Conditions to Obligation of Purchaser***.  The obligation of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by Purchaser), at or prior to the Closing, of each of the following conditions:

(a)     <u>Representations and Warranties</u>.    (i) Each of the representations and warranties of Sellers set forth in <u>Article 3</u> that are qualified by materiality or "Material Adverse Change" shall be true and correct in all respects as of the date hereof and as of the Closing as though made at and as of such time (other than such representations and warranties that relate to an earlier date, which shall be true and correct in all respects as of such date), and (ii) each of the other representations and warranties of Sellers set forth in <u>Article 3</u> shall be true and correct in all material respects as of the date hereof and as of the Closing as though made at and as of such time (other than such representations and warranties that relate to an earlier date, which shall be true and correct in all material respects as of such date).

(b)    <u>Performance of Covenants and Obligations</u>.  Sellers shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by them under this Agreement at or prior to the Closing.

(c)    <u>Closing Deliverables</u>.  Sellers shall have delivered to Purchaser the closing deliverables required to be delivered by Sellers pursuant to <u>Section 2.7(a)</u> and <u>Section 2.7(c)</u>.

(d)    <u>Title Policy</u>.  With respect to each parcel of Owned Real Property, Purchasers shall have received the Title Policy issued by the Title Company at Purchaser's sole cost and expense, for each such Owned Real Property.

(e)    <u>Bid Procedures</u>.  Unless otherwise expressly agreed to in writing by Purchaser, the Bid Procedures and Bid Procedures Order shall not have been materially modified.

(f)    <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order in form and substance acceptable to Purchaser and, unless otherwise expressly agreed to in writing by Purchaser, such Order shall have become a Final Order.

(g)    <u>Trade Secret Order</u>.  The Bankruptcy Court shall have entered an Order (that may be the Saler Order) in form and substance acceptable to Purchaser resolving any Qorvo Trade Secret Objections (as defined in the Bid Procedures Order) in a manner acceptable to Purchaser and, unless otherwise expressly agreed to in writing by Purchaser, such Order shall have become a Final Order.

(h)    <u>No Material Adverse Change</u>.  Since the date hereof, there shall have been no Material Adverse Change or Effect that could reasonably be expected to result in a Material Adverse Change.

8.3    ***Conditions to Obligations of Sellers***.  The obligation of Sellers to effect the Transactions is subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by Sellers), at or prior to the Closing, of each of the following conditions:

(a)    <u>Representations and Warranties</u>.  (i) Each of the representations and warranties of Purchaser set forth in <u>Article 4</u> that are qualified by materiality shall be true and correct in all respects as of the date hereof and as of the Closing as though made at and as of such time, and (ii) each of the other representations and warranties of Purchaser set forth in <u>Article 4</u> shall be true and correct in all material respects as of the date hereof and as of the Closing as though made at and as of such time.

(b)    <u>Performance of Covenants and Obligations</u>.  Purchaser shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c)    <u>Closing Deliverables</u>.  Purchaser shall have delivered to Sellers the closing deliverables required to be delivered by Purchaser pursuant to <u>Section 2.7(a)</u> and <u>Section 2.7(b)</u>.

# ARTICLE 9
# TERMINATION

9.1     ***Events of Termination***.  Notwithstanding anything to the contrary, this Agreement may be terminated, and the Transactions may be abandoned, at any time prior to the Closing as follows:

(a)     by mutual written consent of Purchaser and Sellers;

(b)     by Purchaser, if (i) Sellers withdraw the Sale Motion or the Sale Motion is denied, (ii) Sellers move to voluntarily dismiss the Bankruptcy Cases or the Bankruptcy Court otherwise orders, (iii) Sellers move for conversion of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code or the Bankruptcy Court otherwise orders, (iv) Sellers move for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Cases or the Bankruptcy Court otherwise orders, (v) Purchaser is not selected as the Successful Bidder or the Backup Bidder at the conclusion of the Auction or (vi) the Sale Order is not entered on or prior to May 14, 2025, unless otherwise agreed by Purchaser;

(c)     by Purchaser, by written notice from Purchaser to Sellers, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Sellers in this Agreement, and such breach or inaccuracy would result in a failure of any of the conditions in Section 8.1 or Section 8.2 to be satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Sellers prior to the earlier of (i) 20 Business Days after receipt of written notice from Purchaser requesting such breach or inaccuracy be cured or (ii) the Outside Date; *provided*, *however*, that the right to terminate this Agreement pursuant to this Section 9.1(b) shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach or inaccuracy, or if the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(d)     by Sellers, by written notice from Sellers to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, and such breach or inaccuracy would result in a failure of any of the conditions in Section 8.1 or Section 8.3 to be satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) 20 Business Days after receipt of written notice from Sellers requesting such breach or inaccuracy be cured or (ii) the Outside Date; *provided*, *however*, that the right to terminate this Agreement pursuant to this Section 9.1(d) shall not be available to Sellers if the failure of Sellers to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach or inaccuracy, or if the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Sellers in this Agreement;

(e)     by Purchaser or Sellers, by written notice from Purchaser or Sellers to the other, if (i) any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Law or taken any other action restraining, enjoining or otherwise prohibiting the

consummation of the Transactions, and in the case of Orders and other actions, such Order or other action shall have become a Final Order, or (ii) the Bankruptcy Court rules that it does not approve this Agreement for any reason; *provided*, *however*, that the right to terminate this Agreement pursuant to this <u>Section 9.1(e)</u> shall not be available to the Party seeking to terminate if any action of such Party or any failure of such Party to act has contributed to such Order or other action and such action or failure constitutes a breach of this Agreement;

(f)    by Purchaser or Sellers, by written notice from Purchaser or Sellers to the other, if the Closing has not occurred on or prior to May 16, 2025 (the "***Outside Date***"); *provided*, *however*, that the Party exercising the right to terminate this Agreement pursuant to this <u>Section 9.1(f)</u> shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement; or

(g)    by Purchaser or Sellers, by written notice to the other, if Sellers seek Bankruptcy Court approval of an Alternative Transaction.

9.2    ***Effect of Termination***.

(a)    In the event that this Agreement shall be terminated pursuant to <u>Section 9.1</u>, all further obligations of the Parties under this Agreement shall terminate without further Liability or obligation to the other Party; *provided*, *however*, that, notwithstanding the foregoing, (i) the Liabilities and obligations under (A) the Confidentiality Agreement, and (B) <u>Section 2.8(c)</u>, <u>Section 6.2(b)</u>, this <u>Section 9.2</u> and <u>Article 10</u> shall continue in full force and effect, and (ii) nothing in this <u>Section 9.2</u> shall relieve any Party from Liability for any breach of this Agreement occurring prior to any such termination.  In the event of a termination of this Agreement pursuant to <u>Section 9.1(d)</u>, the Deposit Escrow Amount shall be forfeited by Purchaser to Sellers (the "***Termination Fee***").  Notwithstanding the foregoing, if Purchaser or Sellers have the right to terminate this Agreement pursuant to <u>Section 9.1(c)</u> or 9.1(d), as applicable, and Purchaser or Sellers have performed or are ready, willing, and able to perform all of their respective agreements and covenants contained herein which are to be performed or observed at or prior to Closing, Purchaser's and Sellers' respective rights to pursue all legal rights and remedies hereunder and under applicable Law will survive such termination unimpaired.

(b)    Each of the Parties acknowledges that (i) the agreements contained in this <u>Section 9.2</u> are an integral part of the Transactions; (ii) the damages resulting from termination of this Agreement under circumstances where the Termination Fee is payable are uncertain and incapable of accurate calculation and therefore, the Termination Fee payable pursuant to <u>Section 9.2(a)</u> is not a penalty, but rather is a reasonable amount that will compensate Sellers for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision; and (iii) without the agreements contained in this <u>Section 9.2</u>, the Parties would not have entered into this Agreement.

## ARTICLE 10
## GENERAL PROVISIONS

10.1 *Survival of Representations, Warranties and Covenants*.  All covenants and agreements contained in this Agreement that by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to Closing, survive the Closing in accordance with their terms until fully performed or satisfied.  All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive Closing and shall therefor terminate, including any Action for damages in respect of any breach or inaccuracy thereof other than Fraud.  Notwithstanding the foregoing, the provisions of Section 2.8(c), Section 6.2, Section 9.2, this Article 10 and the Confidentiality Agreement shall survive the Closing.

10.2 *Entire Agreement*.  This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the Parties with respect to the subject matter contained herein and therein and supersede all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the Parties with respect to such subject matter or any prior course of dealings.  The Parties have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the Parties expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents.  Furthermore, the Parties each hereby acknowledge that this Agreement, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all parties to this Agreement, the Confidentiality Agreement and the Related Documents specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction.

10.3 *Amendment; No Waiver*.  This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and if applicable, the Related Documents) executed by, in the case of an amendment, supplement or change, Sellers and Purchaser, and in the case of a waiver, the party against whom enforcement of any such waiver is sought.  The waiver by any party of a breach of any provision of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.4 *Severability; Specific Versus General Provisions*.  Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under applicable Law, but if any term or other provision of this Agreement

68

or the Related Documents is held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the Parties to the greatest extent consistent with being valid and enforceable under applicable Law. No Party shall assert, and each Party shall cause its respective Affiliates or related parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable.

10.5    ***Expenses and Obligations***.  Except as otherwise provided in this Agreement, including as set forth in <u>Section 2.9</u>, all costs and expenses incurred by the Parties in connection with the Transactions, including the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the Party that has incurred such expenses.

10.6    ***Notices***.  All notices, consents, waivers, and other communications under this Agreement or the Related Documents must be in writing and will be deemed to have been duly given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing for next day delivery (with charges prepaid), on the Business Day following the date of delivery to such courier service, and (c) if delivered by electronic mail on the date of transmission, if sent on a Business Day before 5:00 p.m. local time of the business address of the recipient party (otherwise on the next succeeding Business Day), in each case to the appropriate addresses or email addresses set forth below (or to such other addresses as a Party may designate by notice to the other Party in accordance with this <u>Section 10.16</u>):

If to Purchaser or Purchaser Guarantor:

Tune Holdings Corp.
c/o Space Exploration Technologies Corp.
1 Rocket Road
Hawthorne, California 90250
Attention: David Finlay and Michael Smith
Email: <u>David.Finlay@spacex.com</u> and <u>Michael.Smith@spacex.com</u>

with a copy to (which will not constitute notice):

Gibson, Dunn & Crutcher LLP
2001 Ross Ave., Suite 2100
Dallas, Texas 75201
Attention: Robert Little and Jeffrey Krause
Email: <u>RLittle@gibsondunn.com</u> and <u>JKrause@gibsondunn.com</u>

If to Sellers:

Akoustis, Inc.
9805 Northcross Center Court, Suite A
Huntersville, North Carolina 28078

Attention: Mark Podgainy
Email: mpodgainy@getzlerhenrich.com

with a copy to (which will not constitute notice):

Raymond James & Associates
320 Park Avenue
New York, New York 10022
Attention: Michael Pokrassa; Alec Haesler
Email: Michael.Pokrassa@RaymondJames.com;
Alec.Haesler@RaymondJames.com

with a copy to (which will not constitute notice):

K&L Gates LLP
Southeast Financial Center, Suite 3900
200 South Biscayne Blvd.
Miami, Florida 33131
Attention: Jeffrey T. Kucera
Email: jeffrey.kucera@klgates.com

*and*

K&L Gates LLP
301 Hillsborough Street, Suite 1200
Raleigh, North Carolina 27603
Attention: Margaret R. Westbrook
Email: margaret.westbrook@klgates.com

10.7    ***Counterparts***.  This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument.  The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format, or other agreed format shall be sufficient to bind the Parties to the terms and conditions of this Agreement.  Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining any Party's intent or the effectiveness of such signature.

10.8    ***Governing Law.***  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, the Related Documents and all Related Claims shall be governed by the internal laws of the State of Delaware (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

10.9    ***Submission to Jurisdiction; Consent to Service of Process***.

(a)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be

connected with, this Agreement, any Related Document, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 10.16</u>, and each Party hereby irrevocably agrees that all Related Claims may be heard and determined in such court.  The Parties hereby irrevocably and unconditionally waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in the Bankruptcy Court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agree that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereby consents to process being served by any Party to this Agreement in any Related Claim by the delivery of a copy thereof in accordance with the provisions of <u>Section 10.16</u> (other than by email) along with a notification that service of process is being served in conformance with this <u>Section 10.9(b)</u>.  Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

10.10  ***Waiver of Jury Trial***.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE, IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS.

10.11  ***Rights Cumulative***.  All rights and remedies of each of the Parties under this Agreement and the Related Documents will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement, the Related Documents or applicable Law.

10.12  ***Assignment***.  Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the Parties.  No assignment of this Agreement or any of the rights, interests or obligations under this Agreement may be made by any Party at any time, whether or not by operation of law, without the prior written consent of Sellers and Purchaser, and any attempted assignment without the required consent shall be void; *provided*, *however*, that (a) Purchaser may assign any of its rights or delegate any of its duties under this Agreement to any of its Affiliates or to any successor entity, in whole or from time to time in part, including to purchase any or all of the Transferred Assets, and (b) Sellers may assign any of their rights or delegate any of their duties under this Agreement to any of their Affiliates or to any successor entity (including any liquidating trust) pursuant to a chapter 11 plan confirmed by the Bankruptcy Court; *provided*, *further*, *however*, that, in each case, such assignment shall not release the Parties from their obligations under this Agreement.  Upon any such permitted assignment, the references in this Agreement to a Seller or Purchaser will also apply to such assignee unless the context requires otherwise.

10.13  **Specific Enforcement; Remedies**.  The Parties agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the Parties in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that (i) Purchaser, on the one hand, and Sellers, on the other hand, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of Sellers or Purchaser, as applicable, to cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (ii) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Sellers nor Purchaser would have entered into this Agreement.  Remedies shall be cumulative and not exclusive and shall be in addition to any other remedies which any Party may have under this Agreement.  Each of the Parties hereby (A) waives any defenses in any action for specific performance, including the defense that a remedy at law would be adequate, (B) waives any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief and (C) agrees not to assert that a remedy of specific performance or other equitable relief is unenforceable, invalid, contrary to law or inequitable for any reason, and not to assert that a remedy of monetary damages would provide an adequate remedy or that the Parties otherwise have an adequate remedy at law.  Notwithstanding anything to the contrary, in no event shall this Section 10.13 be used, alone or together with any other provision of this Agreement, to require Sellers to remedy any breach of any representation or warranty of Sellers.

10.14  **No Third-Party Beneficiaries**.  Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Parties any rights or remedies of any nature whatsoever under or by reason of this Agreement.  The representations and warranties in this Agreement are the product of negotiations among the Parties and are for the sole benefit of the Parties.  Any inaccuracies in such representations and warranties are subject to waiver by the Parties in accordance with this Agreement without notice or Liability to any other Person.  In some instances, the representations and warranties in this Agreement may represent an allocation among the Parties of risks associated with particular matters regardless of the knowledge of any Party.  Consequently, Persons other than the Parties may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

10.15  **No Personal Liability of Directors, Officers and Owners**.  Except with respect to any claim for Fraud, (a) all Related Claims may be made only against (and are those solely of) the entities that are expressly identified as Parties in the preamble to this Agreement (the "**Contracting Parties**") and (b) no Person who is not a Contracting Party, including any current, former or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, or any financial advisor or lender to, any Contracting Party, or any current, former or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, or any financial advisor or lender to, any of the foregoing (collectively, "**Nonparty Affiliates**"), shall have any Liability pursuant to any Related Claim, and to the maximum extent permitted by Law, except with respect to any claim for Fraud, (a) each Contracting Party hereby waives and releases all such Liabilities, rights, claims, demands, or causes of action against any such Nonparty Affiliates, and

(b) each Contracting Party disclaims any reliance upon any Nonparty Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Documents.

10.16   ***General Release***.

(a)     Effective as of the Closing, Sellers, on behalf of themselves, their Affiliates and each of their respective past, present and/or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other representatives, or any heir, executor, administrator, successor or assign of any of the foregoing (each of the foregoing, a "***Seller Releasing Party***"), hereby fully, irrevocably and unconditionally releases and forever discharges Purchaser, any subsidiary of Purchaser, and their respective Affiliates and each of the foregoing's respective past, present and/or future directors (and Persons in similar positions), managers, officers, employees, agents, general or limited partners, management companies, stockholders, members, equity holders, controlling Persons, other representatives and Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing, from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, any and all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity with respect to the Transferred Assets and Assumed Liabilities, whether existing as of the Closing or arising thereafter, that a Seller Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date, except to the extent such actions or omissions constitute Fraud or willful misconduct.  The foregoing sentence shall not be deemed to be a release or waiver by a Seller Releasing Party of any Action it may have under this Agreement or any of the other Related Documents.

(b)     Effective as of the Closing, Purchaser, on behalf of itself, its Affiliates and each of their respective past, present and/or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other representatives, or any heir, executor, administrator, successor or assign of any of the foregoing (each of the foregoing, a "***Purchaser Releasing Party***"), hereby fully, irrevocably and unconditionally releases and forever discharges Sellers and their respective Affiliates and each of the foregoing's respective past, present and/or future directors (and Persons in similar positions), managers, officers, employees, agents, general or limited partners, management companies, stockholders, members, equity holders, controlling Persons, other representatives and Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing, from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity with respect to the Excluded Assets and Excluded Liabilities, whether existing as of the Closing or arising thereafter, that a Purchaser Releasing Party has or may have, now or in the future, arising

out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date, except to the extent such actions or omissions constitute Fraud or willful misconduct.  The foregoing sentence shall not be deemed to be a release or waiver by a Purchaser Releasing Party of any Action it may have under this Agreement or any of the other Related Documents.

10.17  ***Legal Representation***.  Purchaser and Sellers acknowledge and agree that the Law Firm has represented Sellers and their Affiliates in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the Related Documents and the consummation of the Transactions, and that Sellers, their Affiliates and their respective partners, officers, directors and representatives (the "***Seller Group Members***") have a reasonable expectation that the Law Firm will represent them in connection with any Action involving any Seller Group Member, on the one hand, and Purchaser or any of its Affiliates and representatives (the "***Purchaser Group Members***"), on the other hand, arising under this Agreement, the Related Documents or the Transactions.  Purchaser hereby, on behalf of itself and the other Purchaser Group Members, irrevocably: (a) acknowledges and agrees that any attorney-client privilege, solicitor-client privilege, work product or other attorney-client or solicitor-client confidential information arising from communications prior to the Closing between Sellers (including any one or more officers, directors or stockholders of Sellers), on the one hand, and the Law Firm or any other legal counsel of Sellers, on the other hand, relating (i) to the negotiation, preparation, execution or delivery of this Agreement or any Related Document or the consummation of the Transactions, (ii) to work performed in anticipation of or in connection with the preparation or administration of the Bankruptcy Cases or (iii) solely with respect to an Excluded Asset or Excluded Liability, in each case, that is, immediately prior to the Closing, subject to attorney-client privilege, evidentiary privileges (including the work product doctrine), or attorney-client confidence under applicable Law ("***Attorney-Client Information***"), are not included in the property, rights, privileges, powers, franchises and other interests that are possessed by or vested in the Business or the Transferred Assets, that any such Attorney-Client Information shall be deemed property of, and controlled solely by, Sellers for the benefit and on behalf of the Seller Group Members, and upon request, it shall convey and transfer any Attorney-Client Information to Sellers; (b) acknowledges and agrees that the Seller Group Members shall have the right to retain, or cause the Law Firm to retain, any such Attorney-Client Information in the possession of the Law Firm or the Seller Group Members at the Closing; (c) agrees not to access, retain or use any documentation or information constituting Attorney-Client Information and that no Purchaser Group Member shall have any right to waive any attorney-client privilege or other right to confidentiality with respect to such Attorney-Client Information; (d) disclaims the right to assert a waiver by any Seller Group Member with regard to the attorney-client privilege, solicitor-client privilege or other right to confidentiality with respect to such Attorney-Client Information solely due to the fact that such documentation or information is physically in the possession of Purchaser after the Closing; and (e) consents to the Law Firm's representation after the Closing of any Seller Group Member in any Action to the extent relating to the Transactions and consents to and waives any conflict of interest arising therefrom without the need for any future waiver or consent.  In the event that any Action arises after the Closing between any Purchaser Group Member and a Person other than a Seller Group Member, such Purchaser Group Member shall not disclose any documentation or information that is subject to an attorney-client privilege or other rights of confidentiality referenced in this <u>Section 10.17</u> without the prior written consent of Sellers; *provided*, *however*, that if such Purchaser Group Member is required by judicial order or other

legal process to make such disclosure, such Purchaser Group Member shall promptly notify Sellers in writing of such requirement (without making disclosure) and shall provide Sellers with such commercially reasonable cooperation and assistance to enable Sellers to prevent disclosure by reason of such attorney-client privilege, solicitor-client privilege or other rights of confidentiality.

10.18  ***Purchaser Guarantee***.

(a)     In consideration of Sellers entering into this Agreement, Purchaser Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Sellers, as a primary obligor and not merely as a surety, as a continuing obligation, the due and punctual performance and discharge of Purchaser's payment obligations (i) set forth in Section 2.7(b)(ii) and (ii) in the event that this Agreement is terminated pursuant to Section 9.1(d), in respect of damages relating to the termination of this Agreement, and should Purchaser fail to perform such obligations when due pursuant to and in accordance with the terms and conditions of this Agreement, Purchaser Guarantor promises to pay on demand the applicable amount that Purchaser is liable to pay under this Agreement.

(b)     Purchaser Guarantor represents and warrants to Sellers as of the date hereof and as of the Closing Date as follows:

(i)     Purchaser Guarantor is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.

(ii)     The execution, delivery and performance by Purchaser Guarantor of this Agreement have been and the consummation of its obligations hereunder have been duly authorized by all necessary corporate or other entity action.

(iii)     This Agreement has been duly executed and delivered by Purchaser Guarantor, and assuming the due execution and delivery by Sellers, constitutes a valid and binding obligation of Purchaser Guarantor enforceable against it in accordance with its terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

(c)     Purchaser Guarantor's liability to Sellers under this Section 10.18 shall not be discharged or impaired by: (i) any amendment, variation or assignment of this Agreement or any waiver of its terms; (ii) any release of, or granting of time or other indulgence to, Purchaser or any of its Affiliates (other than Purchaser Guarantor) by any third party; or (iii) any winding up, dissolution, reconstruction, legal limitation, incapacity or lack of corporate power or authority or other circumstance affecting Purchaser or any of its Affiliates (other than Purchaser Guarantor).

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as of the date first written above.

**PURCHASER:**

TUNE HOLDINGS CORP.

By:_____
    Name: Bret Johnsen
    Title: President

**PURCHASER GUARANTOR:**

SPACEX EXPLORATION TECHNOLOGIES
CORP., solely for purposes of <u>Section 10.18</u>

By:_____
    Name: Bret Johnsen
    Title: Chief Financial Officer

*Signature Page to Asset Purchase Agreement*

**SELLERS:**

AKOUSTIS TECHNOLOGIES, INC.

By: _Kenneth Boller_
DocuSigned by:
1365E8FCE49B449...
Name: Kenneth Boller
Title: Chief Financial Officer


AKOUSTIS, INC.

By: _Kenneth Boller_
DocuSigned by:
1365E8FCE49B449...
Name: Kenneth Boller
Title: Chief Financial Officer


RFM INTEGRATED DEVICE INC.

By: _Kenneth Boller_
DocuSigned by:
1365E8FCE49B449...
Name: Kenneth Boller
Title: Chief Financial Officer

*Signature Page to Asset Purchase Agreement*

**EXHIBIT A**

**Form of Bill of Sale and Assignment and Assumption Agreement**

(*See attached.*)

## FORM OF BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT, dated as of [●], 2025 (this "***Agreement***"), is made and entered into by and among Akoustis Technologies, Inc., a Delaware corporation ("***Akoustis Technologies***"), Akoustis, Inc., a Delaware corporation ("***Akoustis***"), RFM Integrated Device Inc., a Texas corporation ("***RFMI***" and collectively with Akoustis Technologies and Akoustis, "***Sellers***" and each individually, a "***Seller***"), and Tune Holdings Corp., a Texas corporation ("***Purchaser***"). Sellers and Purchaser are collectively referred to as the "***Parties***" and each individually as a "***Party***".

## W I T N E S S E T H

**WHEREAS**, Purchaser and Sellers have entered into an Asset Purchase Agreement, dated as of April 25, 2025 (the "***Purchase Agreement***");

**WHEREAS**, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Purchase Agreement;

**WHEREAS**, pursuant to the Purchase Agreement, Sellers have agreed to sell, transfer, assign, convey and deliver the Transferred Assets to Purchaser, and Purchaser has agreed to purchase, assume and accept the Transferred Assets from Sellers, all upon the terms and subject to the conditions of the Purchase Agreement;

**WHEREAS**, pursuant to the Purchase Agreement, Purchaser has agreed to assume from Sellers the Assumed Liabilities upon the terms and subject to the conditions of the Purchase Agreement; and

**WHEREAS**, the Parties desire to carry out the intent and purpose of the Purchase Agreement by Sellers' execution and delivery to Purchaser of this instrument evidencing the vesting in Purchaser of certain Transferred Assets, subject to the provisions of the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

Section 1. Effective as of the Closing, Sellers, pursuant to the Purchase Agreement and on the same terms and conditions as stated therein, hereby sell, transfer, assign, convey and deliver to Purchaser and its respective successors and permitted assigns forever all of Sellers' right, title and interest in, to or under all of the Transferred Assets, Free and Clear, subject to the provisions of the Purchase Agreement.

Section 2.  Effective as of the Closing, Purchaser, pursuant to, in the manner and to the extent set forth in Section 2.3 of the Purchase Agreement, hereby assumes and shall hereafter pay, discharge and perform when due the Assumed Liabilities, subject to the provisions of the Purchase Agreement and on the same terms and conditions as stated therein. For the avoidance of doubt, other than Assumed Liabilities, Purchaser will not and does not assume any Liability

of any nature or kind whatsoever of Sellers, including, for the avoidance of doubt any Excluded Liability.

Section 3.   This Agreement (including any other documents specifically referred to herein), together with the Purchase Agreement and the other Related Documents, constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof. Nothing contained in this Agreement shall change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Purchase Agreement in any manner whatsoever. This Agreement does not create or establish liabilities or obligations not otherwise created or existing under or pursuant to the Purchase Agreement with respect to the Transferred Assets and the Assumed Liabilities. In the event of any conflict or other difference between the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall control.

Section 4.   From time to time after the Closing, upon the reasonable request of Purchaser, Sellers shall execute and deliver, or cause to be executed and delivered, such additional documents, instruments, conveyances and assurances, and shall take or cause to be taken such further actions, as Purchaser may reasonably request in order to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

Section 5.   No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.

Section 6.   This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that (i) Purchaser shall be permitted to assign any of its rights or delegate any of its duties hereunder to any of its Affiliates or to any successor entity, as designated by Purchaser in writing to Sellers; (ii) Sellers shall be permitted to assign any of their rights or delegate any of their duties hereunder to any of their Affiliates or to any successor entity (including any liquidating trust) pursuant to a chapter 11 plan confirmed by the Bankruptcy Court or pursuant to an order of the Bankruptcy Court; and (iii) in each case, such assignment shall not release the Parties from their obligations under this Agreement.

Section 7.   Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by the internal laws of the State of Delaware (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Laws of any jurisdiction other than the State of Delaware. Any action or proceeding arising under this Agreement shall be subject to Section 10.9 of the Purchase Agreement.

Section 8.   EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN

RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.

Section 9. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any Party. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to find a suitable and equitable provision that shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 10.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.,* www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[*Signature Pages Follow*]

3

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed by the signature of their respective duly authorized representatives as of the date above first written.

**PURCHASER:**

**TUNE HOLDINGS CORP.**

By:_____
Name:
Title:

**SELLERS:**

**AKOUSTIS TECHNOLOGIES, INC.**

By:_____
Name:
Title:

**AKOUSTIS, INC.**

By:_____
Name:
Title:

**RFM INTEGRATED DEVICE INC.**

By:_____
Name:
Title:

**EXHIBIT B**

**Form of Subcontract Pending Novation Agreement**

(*See attached.*)

**FORM OF SUBCONTRACT PENDING NOVATION**

This Subcontract Pending Novation Agreement (together with <u>Exhibit A</u> attached hereto, this "***Agreement***"), is entered into as of [●], 2025, by and among Akoustis Technologies, Inc., a Delaware corporation ("***Akoustis Technologies***"), Akoustis, Inc., a Delaware corporation ("***Akoustis***"), RFM Integrated Device Inc., a Texas corporation ("***RFM***" and together with Akoustis Technologies and Akoustis, each a "***Seller***" and collectively, "***Sellers***") and Tune Holdings Corp., a Delaware corporation ("***Purchaser***"). Each of Sellers and Purchaser are sometimes referred to individually in this Agreement as a "***Party***" and collectively as the "***Parties***".

**W I T N E S S E T H :**

**WHEREAS**, Purchaser and Sellers are parties to that certain Asset Purchase Agreement, dated as of April 25, 2025 (the "***Purchase Agreement***"), pursuant to which, among other things, Purchaser agreed to assume and accept from Sellers all of Sellers' right, title and interest in, to or under the Transferred Assets, and Purchaser agreed to assume the Assumed Liabilities, in each case, on the terms and subject to the conditions set forth in this Agreement, pursuant to, among other provisions thereof, Sections 105, 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, and in accordance with the Bid Procedures and subject to entry of the Sale Order by the Bankruptcy Court;

**WHEREAS**, the Transferred Assets include the Government Contracts identified on <u>Exhibit A</u> attached hereto (the "***Subject Contracts***"), and the Assumed Liabilities include certain obligations and liabilities associated with the Subject Contracts;

**WHEREAS**, Purchaser and Sellers, in connection with the transactions contemplated by the Purchase Agreement (the "***Transaction***"), and subject to applicable Law, intend to enter into a novation agreement with the applicable United States Governmental Authority concerning the Subject Contracts, in the form contemplated by Federal Acquisition Regulation ("***FAR***") 48 C.F.R. § 42.1204, or as otherwise required by the Subject Contracts ("***Novation Agreement***");

**WHEREAS**, during the time between the Closing Date and the execution of the Novation Agreement by the applicable United States Governmental Authority and receipt of any required consents for novation, with respect to the Subject Contracts to Purchaser, Sellers shall remain party to the Subject Contracts and Purchaser will, to the extent permitted by applicable Law and this Agreement, perform all work required of Sellers under the Subject Contracts; and

**WHEREAS**, the Parties desire to enter into this Agreement in connection with the Transaction to effect a subcontracting of the rights and obligations under the Subject Contracts to the Purchaser, during the time between the Closing Date and the execution of the Novation Agreement and receipt of any required consents for novation, as applicable, of the Subject Contracts.

**NOW, THEREFORE**, in consideration of the foregoing and of the representations, warranties, covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

Section 1.　　　<u>Definitions</u>. Capitalized terms used in this Agreement but not defined herein shall have the meanings given to them in the Purchase Agreement.

Section 2.　　　<u>Mutual Covenants</u>. The Parties hereby mutually covenant and agree that, to the extent permitted by the Subject Contracts and applicable Law:

(a)     Sellers hereby award this Agreement to Purchaser, and Purchaser shall perform all of the obligations of Sellers under this Agreement and the Subject Contracts, including all statements of work and task and delivery orders issued under the Subject Contracts, to the extent the Subject Contracts have not yet been fully performed by Sellers, and Purchaser hereby accepts this award subject to the terms of this Agreement.

(b)     Purchaser shall assume full responsibility and liability for all performance and other obligations under the Subject Contracts and inure to all rights and benefits conferred or accruing under the Subject Contracts, including all payments to be made under the Subject Contracts, whether such rights and benefits are conferred or accrue before, on or after the date hereof.

(c)     Sellers shall use reasonable efforts to provide all notices and to obtain all consents and approvals needed from Governmental Authorities in connection with this Agreement, and Purchaser shall cooperate to obtain such consents and approvals as may be reasonably requested by Sellers. To the extent such consents or approvals are not received, the Parties shall cooperate to reach and implement an alternative arrangement that will effect a full and equitable assignment of Sellers' right, title and interest in and to the Subject Contracts, and all of Sellers' obligations and liabilities under the Subject Contracts to Purchaser, to the maximum extent permitted by applicable Law and the terms of the Subject Contracts.

Section 3.     Sellers' Covenants. Sellers hereby covenant and agree with Purchaser that:

(a)     Until such time the applicable United States Governmental Authority approves the novation of the Subject Contracts and makes payments directly to Purchaser, or to financial institutions designated by such Purchaser, in the event Sellers receive any payments relating to the Subject Contracts, Sellers shall hold such payments on behalf of Purchaser and shall transfer such payments to Purchaser.

(b)     In connection with Purchaser's obligations under Section 4(a) below, and provided such actions are not prohibited by the terms of the Subject Contracts or applicable Law and to the extent contractual privity is not required and subject to Section 4(b), Sellers authorize Purchaser to (i) act on behalf of Sellers for purposes of performing and administering the Subject Contracts to the maximum extent possible, including executing documents, discussing matters with customers and taking all other actions Purchaser deems reasonably necessary in connection with its performance of the Subject Contracts, (ii) make such changes and amendments in the terms of the Subject Contracts, as may be necessary or desirable in order to ensure that Purchaser receives all economic benefits of the Subject Contracts, (iii) prepare, submit, negotiate and agree on any claims, disputes, requests for equitable adjustment or other pricing adjustment proposals under the Subject Contracts, (iv) file, prosecute, or intervene in any bid protest arising from or related to the Subject Contracts, and (v) bring a lawsuit, seek arbitration or file an appeal or complaint from a government contracting officer's final decision to a Board of Contract Appeals or the U.S. Court of Federal Claims in accordance with the Contract Disputes Act of 1978 under the Subject Contracts. Subject to Section 4(b) below, Sellers shall in each of the preceding clauses (i)-(v) sponsor, execute and/or cause to be executed all documents provided by Purchaser where contractual privity is a condition to pursuing such actions. If any Governmental Authority properly deems an action taken or to be taken by Purchaser pursuant to this paragraph to be impermissible or ineffective (as evidenced in writing) on the basis that such action must be taken by Sellers, Sellers shall, upon Purchaser's written request, promptly take such action on behalf of Purchaser, subject to Section 4(b) below. Notwithstanding anything to the contrary in the foregoing, (x) Sellers may take such measures as Sellers shall determine, in their reasonable discretion (after consultation with legal counsel), are necessary to satisfy their obligations under the terms of the Subject Contracts or applicable Law prior to taking any of the actions set forth in subparagraphs (ii) through (v) of this paragraph in a Seller's name and (y) Purchaser shall promptly provide such information as Sellers request in connection with the actions contemplated in the preceding sentence.

2

(c)     Subject to <u>Section 4(b)</u> below, within five Business Days of receiving an invoice from Purchaser that is accurate, compliant and properly documented under the terms of the Subject Contracts, or earlier if required by the terms of the Subject Contracts, Sellers shall submit the invoice pursuant to the terms of the Subject Contracts.

(d)     Sellers shall not voluntarily take any action or fail to take any action with respect to the Subject Contracts that would detrimentally affect or diminish, in any significant way, any of Purchaser's rights or obligations thereunder or the rights or obligations of Purchaser under this Agreement without the prior written consent of Purchaser. Sellers shall not voluntarily terminate, waive any provision, or enter into any amendment or modification of the Subject Contracts without Purchaser's prior written consent, which shall not be unreasonably withheld or delayed.

(e)     To the extent not already in Purchaser's possession, Sellers shall deliver to Purchaser complete copies of the books and records maintained by Sellers specifically for the Subject Contracts.

(f)     Sellers shall use reasonable efforts to cause the Subject Contracts to be novated or assigned to Purchaser in accordance with the terms and conditions of the Purchase Agreement, including preparing and executing all documents required from the contract transferor pursuant to FAR § 42.1204 or as may be required from the counterparty to the Subject Contracts. Sellers shall provide to Purchaser reasonably prompt notice and copies of any communications from customers or the prime contractor and, if applicable, under the Subject Contracts relating to or arising under the Subject Contracts and, at the sole expense of Purchaser, shall cooperate and take such actions as Purchaser may reasonably request to promptly respond to and/or resolve any such issues arising under the Subject Contracts.

Section 4.     <u>Purchaser Covenants</u>. Purchaser hereby covenants and agrees with Sellers that:

(a)     Purchaser shall take such timely action to enable Sellers to perform the Subject Contracts and to protect any rights of Sellers that may exist or accrue under the Subject Contracts. Purchaser hereby acknowledges and agrees that Sellers will continue to have certain obligations under the Subject Contracts and will provide certain administrative services. Purchaser shall be responsible for all liabilities, payables, costs and expenses relating to the Subject Contracts arising from Purchaser's acts or omissions and shall reimburse and indemnify Sellers for any such liabilities, payables, costs or expenses incurred or paid by Sellers.

(b)     Purchaser shall perform on behalf of Sellers, all the requirements, responsibilities and obligations of the Subject Contracts in strict compliance with the terms of the Subject Contracts and applicable Law, in accordance with all terms and conditions in or incorporated by reference into, and all applicable Laws and regulations applicable to, the Subject Contracts. To the extent Purchaser seeks to have Sellers take any action in the name of Sellers as contemplated by <u>Section 3</u> of this Agreement, Purchaser shall contemporaneously provide supporting information to Sellers that is in the recipient's reasonable judgment, accurate and compliant and properly documented in accordance with the terms of the Subject Contracts and applicable Law.

(c)     Until such time as the applicable United States Governmental Authority approves the novation of the Subject Contracts, Purchaser shall prepare all invoices in accordance with <u>Section 4(b)</u> and submit all such invoices in the name of Purchaser to Sellers. Invoices shall be processed and submitted to the other party to the Subject Contracts in accordance with <u>Section 3(c)</u>.

Section 5.     <u>Waiver</u>. EXCEPT TO THE EXTENT OTHERWISE PROVIDED IN THE PURCHASE AGREEMENT OR AS OTHERWISE REQUIRED BY APPLICABLE LAW, PURCHASER AGREES THAT UNDER NO CIRCUMSTANCES WILL SELLERS OR THEIR AFFILIATES BE

3

RESPONSIBLE OR LIABLE FOR THE PERFORMANCE BY PURCHASER IN ANY RESPECT OF THE SUBJECT CONTRACTS OR TO ANY SUBSEQUENT PURCHASER FOR ANY LOSS OR DAMAGE ARISING OUT OF OR RELATED TO PURCHASER'S PERFORMANCE OF THE SUBJECT CONTRACTS AFTER THE EFFECTIVE DATE OF THIS AGREEMENT. PURCHASER, ON BEHALF OF ITSELF, PURCHASER AND ANY OTHER SUBSEQUENT PURCHASER, FOREVER WAIVES, RELEASES AND DISCHARGES SELLERS AND THEIR AFFILIATES FROM ANY AND ALL CAUSES OF ACTION WHATSOEVER AT LAW OR IN EQUITY THAT MAY ARISE FROM OR IN CONNECTION WITH PURCHASER'S PERFORMANCE OF THE SUBJECT CONTRACTS AFTER THE EFFECTIVE DATE OF THIS AGREEMENT, EXCEPT TO THE EXTENT OTHERWISE PROVIDED IN THE PURCHASE AGREEMENT.

Section 6.        Term. This Agreement is effective as of the date first above written and shall continue in effect with respect to the Subject Contracts until the earlier to occur of (i) novation or completed assignment of rights and obligations under the Subject Contracts to Purchaser, and (ii) the satisfaction of all of Sellers' obligations under, and the receipt of final payment of amounts payable under, the Subject Contracts; provided, however, that the provisions of Section 8 (Miscellaneous) shall survive any termination of this Agreement.

Section 7.        Disclaimer of Agency. The relationship established hereunder shall be solely that of contractor and subcontractor. Except as otherwise provided in this Agreement, nothing in this Agreement shall be deemed in any way or for any purpose to constitute either Party an agent of the other Party in the conduct of such Party's business or to create a partnership or joint venture between the Parties.

Section 8.        Miscellaneous. Section 1.2 (Other Definitional and Interpretative Matters), Section 10.3 (Amendment; No Waiver), Section 10.4 (Severability; Specific Versus General Provisions), Section 10.6 (Notices), Section 10.7 (Counterparts), Section 10.8 (Governing Law), Section 10.9 (Submission to Jurisdiction; Consent to Service of Process); Section 10.10 (Waiver of Jury Trial) Section 10.12 (Assignment) and Section 10.14 (No Third-Party Beneficiaries) of the Purchase Agreement shall apply *mutatis mutandis* to this Agreement.

*[Signature pages follow]*

4

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized representatives on the day and year first written above.

**SELLERS:**

AKOUSTIS TECHNOLOGIES, INC.

By:_____
    Name:
    Title:

AKOUSTIS, INC.

By:_____
    Name:
    Title:

RFM INTEGRATED DEVICE INC.

By:_____
    Name:
    Title:

**PURCHASER:**

TUNE HOLDINGS CORP.

By:_____
    Name:
    Title:

**EXHIBIT C**

**Form of Intellectual Property Assignment Agreement**

(*See attached.*)

*Exhibit C to Asset Purchase Agreement*

**FORM OF ASSIGNMENT OF INTELLECTUAL PROPERTY AGREEMENT**

This ASSIGNMENT OF INTELLECTUAL PROPERTY AGREEMENT (this "***Agreement***") is entered into as of [●], 2025 (the "***Effective Date***"), by and between Tune Holdings Corp., a Texas corporation ("***Purchaser***"), Akoustis Technologies, Inc., a Delaware corporation ("***Akoustis Technologies***"), Akoustis, Inc., a Delaware corporation ("***Akoustis***"), and RFM Integrated Device Inc., a Texas corporation ("***RFMi***" and collectively with Akoustis Technologies and Akoustis, "***Sellers***").

**RECITALS**

A.      Reference is made to that certain Asset Purchase Agreement, among Purchaser Sellers and solely for purposes of Section 10.18 therein, SpaceX Exploration Technologies Corp., a Texas corporation, dated as of  April 25, 2025 (as may be amended, restated, supplemented or modified from time to time in accordance with the terms thereof, the "***Purchase Agreement***").

B.      In connection with the Purchase Agreement and as condition to consummating the transactions contemplated thereunder, the parties have agreed to enter into this Agreement.

C.      Capitalized terms used but not otherwise defined in this Agreement shall have the respective meanings assigned to such terms in the Purchase Agreement.

D.      In consideration of the premises and the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**ARTICLE I**
INTELLECTUAL PROPERTY ASSIGNMENT

Section 1.1      Intellectual Property Assignment.  Sellers hereby irrevocably and unconditionally sell, assign, transfer, convey and deliver to Purchaser, and Purchaser hereby acquires from the Sellers, all of Sellers' right, title, entitlement and interest in, to and under all Owned Intellectual Property, including, without limitation, the patents and patent applications, trademarks and trademark applications (together with all goodwill associated therewith and symbolized thereby in each case), copyrights and copyright applications and domain names identified on Exhibit A attached hereto, together with all rights to collect royalties, products and proceeds in connection with any of the foregoing, all rights to sue and bring other claims for, and recover damages in connection with, past, present and future infringement, misappropriation or other violation thereof and all other claims relating to any such Intellectual Property (regardless of whether arising prior to, as of, or after the Effective Date or known or unknown), and all associated rights in, to or under any of the foregoing in any jurisdiction throughout the world, whether now or hereafter existing.

Section 1.2      Further Assurances.  From time to time after the Effective Date, Sellers shall take or cause to be taken such actions as may be reasonably requested by Purchaser (or any of its successors or assigns) to carry out the purposes of this Agreement (including the execution and delivery of affidavits, declarations, oaths, exhibits, assignments, powers of attorney and/or other agreements or documentation as may be reasonably required) and as may be reasonably requested by Purchaser (or any of their respective successors or assigns) to confirm, effect, record, perfect, register, patent or maintain, protect and enforce the rights assigned herein.  If Purchaser is unable, after reasonable effort, to secure a Seller's signature on any such documentation for any reason whatsoever, each Seller hereby irrevocably designates and appoints Purchaser and its duly authorized officers and agents as such Seller's agent and attorney-in-fact, to act for and in such Seller's behalf and stead to execute and file any such documents and to do all other lawfully

permitted acts to further the prosecution, issuance and perfection of patent, trademark, copyright or other intellectual property registrations or any other legal protection thereon with the same legal force and effect as if executed by such Seller.  Purchaser may record this Agreement with the United States Patent and Trademark Office and with comparable offices in other jurisdictions throughout the world, as well as with any other United States or foreign government office as may be necessary or appropriate.

## ARTICLE II
### MISCELLANEOUS

Section 2.1    Entire Agreement.  This Agreement, together with the documents referenced herein (including the Purchase Agreement), constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.

Section 2.2    Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  Sellers may not assign, delegate or otherwise transfer (whether by operation of law or otherwise) any of their rights, interests or obligations in this Agreement without the prior written approval of Purchaser.

Section 2.3    Amendment; Waivers.  No amendment, supplement or other modification of any provision of this Agreement will be valid unless it is in writing and signed by the parties.  No waiver of any provision of this Agreement will be valid unless the waiver is in writing and signed by the waiving party.  The failure of any party at any time to require performance of any provision of this Agreement will not affect such party's rights at a later time to enforce such provision.  No waiver by any party of any breach of this Agreement will be deemed to extend to any other breach hereunder or affect in any way any rights arising by virtue of any other breach.

Section 2.4    Counterparts.  This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument.  The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format, or other agreed format shall be sufficient to bind the Parties to the terms and conditions of this Agreement.  Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining any party's intent or the effectiveness of such signature.

Section 2.5    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any term or other provision of this Agreement is held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions pursuant hereto is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the parties to the greatest extent consistent with being valid and enforceable under applicable Law. No party shall assert, and each party shall cause its respective Affiliates or related parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable.

Section 2.6    Governing Law.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by the internal laws of the State of Delaware (including its

2

statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

Section 2.7    <u>Submission to Jurisdiction; Consent to Service of Process</u>.    Any action or proceeding arising under this Agreement shall be subject to Section 10.9 of the Purchase Agreement.

Section 2.8    <u>Performance</u>.    Each party shall cause to be performed, and hereby guarantees the performance of, all actions, agreements and obligations set forth herein to be performed by any Affiliate of such party.

Section 2.9    <u>Relationship of Parties</u>.    This Agreement does not create a fiduciary relationship, partnership, joint venture or relationship of trust or agency between the parties.    The parties hereto agree that the Sellers will be considered independent contractors in the performance of this Agreement.

Section 2.10    <u>Construction</u>.    This Agreement shall be construed as if jointly drafted by the parties hereto and no rule of construction or strict interpretation shall be applied against either party.    The headings of Articles or Sections contained in this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of or to affect the meaning or interpretation of this Agreement.    The rules of interpretation set forth in Section 1.2 of the Purchase Agreement shall apply to this Agreement.    No summary of this Agreement prepared by either party shall affect the meaning or interpretation of this Agreement.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the Effective Date.

**Sellers**:

AKOUSTIS TECHNOLOGIES, INC.

By: _____
Name:  [●]
Title:  [●]

AKOUSTIS, INC.

By: _____
Name:  [●]
Title:  [●]

RFM INTEGRATED DEVICE INC.

By: _____
Name:  [●]
Title:  [●]

**<u>Purchaser</u>:**

TUNE HOLDINGS CORP.

By: _____
Name:  [●]
Title:  [●]

[Signature Page to Assignment of Intellectual Property Agreement]

**Exhibit A**

**Subject Contracts**

[To be added to Subcontract Pending Novation Agreement at Closing.]

# EXHIBIT D

## Sale Order

(*To be appended prior to the Closing Date.*)

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AKOUSTIS TECHNOLOGIES, INC., *et al.*,[1] | Case No. 24-12796 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 14, 15, 115, 121, 124, 125, 176, 208, 384, 388, 452, 453, 469, 474, 479 & 480** |

### ORDER (I) APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH AND (III) GRANTING RELATED RELIEF

This matter coming before the Court on the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into the Stalking Horse Purchase Agreements and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 14] (the "Sale Motion"),[2] filed by the debtors (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Akoustis Technologies, Inc. (9046), Akoustis, Inc. (5617), Grinding and Dicing Services, Inc. (7929), and RFM Integrated Device Inc. (1138).  The Debtors' corporate headquarters is located at 9805 Northcross Center Court, Suite A, Huntsville, NC 28078.

[2]  Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Sale Motion or the Asset Purchase Agreement (as hereinafter defined), as applicable.

Cases"), seeking entry of an order (this "Order"), pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and the Court having previously entered the *Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter into Stalking Horse Agreement and to Provide Bidding Protections Thereunder, (III) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (IV) Approving Assumption and Assignment Procedures, (V) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (VI) Granting Related Relief* [Docket No. 176], as amended on March 25, 2025 [Docket No. 384] (the "Bidding Procedures Order"); and an auction (the "Auction") having been held on April 25, 2025 at 11:00 a.m. (prevailing Eastern Time) in accordance with the Bidding Procedures Order; and Tune Holdings Corp. (the "Purchaser"), a wholly-owned subsidiary of Space Exploration Technologies Corp. ("SpaceX"), having submitted the highest or otherwise best bid for the Transferred Assets, as reflected in that certain Asset Purchase Agreement, dated as of April 25, 2025, by and among Purchaser, SpaceX (as guarantor), Akoustis Technologies, Inc., Akoustis, Inc., and RFM Integrated Device Inc. (as amended, supplemented, or modified from time to time prior to entry of this Order, the "Asset Purchase Agreement"), a copy of which is attached hereto as Exhibit 1; and the Court having conducted a hearing to consider certain relief requested in the Sale Motion on April 30, 2025 (the "Sale Hearing"), at which time all objecting and interested parties were offered an opportunity to be heard with respect to the Sale Motion; and the Court having reviewed and considered (i) the Sale Motion, (ii) the Asset Purchase Agreement, (iii) the

Bidding Procedures, (iv) the Bidding Procedures Order, (v) the record of the Bidding Procedures Hearing, (vi) the *Declaration of Michael Pokrassa in Support of Motion of the Debtors for Entry of Orders (I) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. [●]], (vii) the *Declaration of Mark D. Podgainy in Support of Motion of the Debtors for Entry of Orders (I) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. [●]], (viii) all Qorvo Trade Secret Objections (such Qorvo Trade Secret Objections having been overruled or otherwise resolved in a manner acceptable to Purchaser) and Orders thereon; and (ix) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and after due deliberation the Court having determined that the legal and factual bases set forth in the Sale Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Sale Motion is in the best interest of the Debtors, their estates and their creditors, and the Debtors having demonstrated good, sufficient, and sound business justifications for the relief granted herein;

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction to consider the Sale Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of

---

[3]  The findings and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings also shall include any oral findings of fact and conclusions of law made by the Court during the Sale Hearing.

February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

       B.     <u>Final Order</u>.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

       C.     <u>Statutory Predicates</u>.  The statutory and other legal predicates for the relief sought in the Sale Motion and granted herein are sections 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 4001, 6004, 6006, 9007, 9008 and 9014 of the Bankruptcy Rules and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules.

       D.     <u>Notice and Opportunity to Be Heard</u>.  As evidenced with the certificates of service filed with the Court [Docket Nos. 85, 137, 207, 218, 247, 396, 415, 460, 470], the Debtors have provided proper, timely, adequate, and sufficient notice of, and a fair and reasonable opportunity to object and be heard with respect to, the Sale Motion, the Bidding Procedures, the Bidding Procedures Order, the Auction, the Sale Hearing, the sale of the Transferred Assets pursuant to the Asset Purchase Agreement (the "<u>Sale Transaction</u>") free and clear of any Interests (as hereinafter defined) within the meaning of section 363(f) of the Bankruptcy Code, the Notice of Auction Results [Docket No. 479], the Assumption and Assignment Notices [Docket Nos. 208, 388, 452, 474], and the assumption and assignment of the executory contracts and unexpired leases to be assumed and assigned to the Purchaser at Closing pursuant to this Order and the terms of the Asset Purchase Agreement (collectively, the "<u>Contracts</u>"), in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, 9007 and 9014, Local Rules 2002-1, 6004-1 and 9006-1 and the Bidding Procedures Order, to all persons and entities entitled to such notice, including the Sale Notice Parties (as defined in the Bidding Procedures) and all other persons and entities as directed by the Court.  Such notice was good, sufficient, and

4

appropriate under the circumstances, including but not limited to providing each Counterparty a full and fair opportunity to object to the assumption and assignment of its Contract and its proposed Cure Cost; and no other or further notice of any of the foregoing is required.  With respect to parties in interest whose identities could not be reasonably ascertained by the Debtors, the Publication Notice published in the national edition of the Wall Street Journal on January 17, 2025 and in the Local Publications on January 17, 2025 was sufficient and reasonably calculated to provide notice to such parties under the circumstances.  The Debtors published the Sale Motion, Bidding Procedures Order, the Bidding Procedures, the Stalking Horse Agreement (and all exhibits and schedules thereto), the Sale Notice, the Assumption and Assignment Notices, the Asset Purchase Agreement, and certain other documents relevant to the Sale on the Stretto Website.

E.      Disclosures.  The disclosures made by the Debtors in the Sale Motion, the Sale Notice, the Assumption and Assignment Notices, the Notice of Auction Results, and all other related notices and documents filed with the Court concerning the Asset Purchase Agreement and Sale Transaction were complete and adequate.

F.      Sound Business Purpose.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of the Sale Motion, and the approval of and entry into the Sale Transaction, the Asset Purchase Agreement, the Related Documents and any other ancillary agreements thereto, including, but not limited to, the Separation Agreements, (a) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (b) provide value and are beneficial to the Debtors' estates, and are in the best interests of the Debtors, their estates, and their stakeholders; and (c) are reasonable and appropriate under the circumstances.   Business

justifications for entry into the Sale Transaction and the Asset Purchase Agreement include, without limitation, the following: (a) the Asset Purchase Agreement constitutes the highest or otherwise best bid received for the Transferred Assets; (b) the Asset Purchase Agreement presents the best opportunity to maximize the value of the Transferred Assets on a going-concern basis and to avoid decline and devaluation as a result of delay or liquidation; (c) failure to consummate the Sale Transaction expeditiously, as provided under the Asset Purchase Agreement, could materially diminish creditor recoveries; and (d) the immediate consummation of the Sale Transaction is necessary to maximize the value of the Debtors' estates.

G.  <u>Compliance with Bidding Procedures</u>.  The Debtors conducted an open and fair sale process.  The sale process was non-collusive in all respects, and all interested parties were provided a full, fair, and reasonable opportunity to make an offer to purchase the Transferred Assets. The Debtors, the Purchaser, SpaceX and their respective counsel and other advisors have complied with the Bidding Procedures and the Bidding Procedures Order.

H.  <u>Highest or Otherwise Best Bid</u>.  The Debtors determined, in their reasonable business judgment, in a manner consistent with their fiduciary duties and, in consultation with the Consultation Parties, that the Purchaser's Qualified Bid, as documented in the Asset Purchase Agreement, was the highest or otherwise best Qualified Bid for the Transferred Assets. Consummating the Sale Transaction will yield greater value to the Debtors' estates than would have been provided by any other available alternative transaction.

I.  <u>Fair Consideration</u>.  The consideration the Purchaser will pay under the Asset Purchase Agreement constitutes (a) fair and reasonable consideration for the Transferred Assets; and (b) reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable

Transactions Act, and other laws of the United States, any state, territory, possession thereof, or the District of Columbia.

J.      Free and Clear Sale.  The Debtors may sell the Transferred Assets free and clear of all Interests (unless otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement), because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Any holders of Interests that objected to the Sale Transaction or the Sale Motion and that have an Interest on the Transferred Assets could be compelled in a legal or equitable proceeding to accept money in satisfaction of such Interest pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f)—including, with respect to any Interest that is a Lien, that the price at which the Transferred Assets will be sold is greater than the aggregate value of all Liens on the Transferred Assets pursuant to section 363(f)(3)–and, therefore, are adequately protected by having their Interests on the Transferred Assets attach solely to the proceeds of the Sale Transaction ultimately attributable to the sale of the property on which such holders have an Interest, in the same order of priority, and with the same validity, force and effect that such Interests had prior to the consummation of the Sale Transaction, subject to any rights, claims or defenses of the Debtors and their estates.  Any Interest holders that did not object, or that withdrew their objections, to the Sale Motion or the Sale Transaction, are deemed to have consented to the sale of the Transferred Assets free and clear of their respective Interests on the Transferred Assets pursuant to section 363(f)(2) of the Bankruptcy Code.

K.      Purchaser's Reliance on Free and Clear Sale.  The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction or the other transactions contemplated thereby if the sale of the Transferred Assets were not free and

clear of all Interests, or if the Purchaser would, or in the future could, be liable for any such Interests.  A sale of the Transferred Assets other than one free and clear of all Interests would adversely impact the Debtors, their estates, and their creditors, and would yield substantially less value for the Transferred Assets and the Debtors' estates, with less certainty than provided by the Sale Transaction.  The total consideration to be provided under the Asset Purchase Agreement reflects the Purchaser's reliance on this Order, as a good-faith purchaser pursuant to section 363(m) of the Bankruptcy Code, to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to, and possession of, the Transferred Assets free and clear of all Interests, including, without limitation, any potential derivative, vicarious, transferee or successor liability Interests.

L.    Interests.  As used in this Order, the term "Interest" includes, in each case to the extent against or with respect to any of the Debtors or in, on, or against or with respect to any of the Transferred Assets: Liens, claims (as defined in section 101(5) of the Bankruptcy Code), debts (as defined in section 101(12) of the Bankruptcy Code), encumbrances, obligations, Liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights, or interests of any kind or nature whatsoever, whether known or unknown, inchoate or not, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, (a) mortgages, deeds of trust, pledges, charges, security interests, hypothecations, encumbrances, easements, servitudes, leases,

8

subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, rights of use or possession, subleases, leases, condition sale arrangements, or any similar rights, (b) all claims, including, without limitation, all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise; (c) all debts, liabilities, obligations, contractual rights and claims, and labor, employment, and pension claims; (d) any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors' or the Purchaser's interest in the Transferred Assets, or any similar rights; (e) any rights under labor or employment agreements; (f) any rights under pension, multiemployer plan (as such term is defined in section 3(37), or section 4001(a)(3) of the Employment Retirement Income Security Act of 1974 (as amended, "ERISA")), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (g) any other employee claims related to worker's compensation, occupation disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of

the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, each as amended, (vii) the Americans with Disabilities Act of 1990, (viii) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code of any similar state law, (ix) state discrimination laws, (x) state unemployment compensation laws or any other similar state laws, (xi) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (xii) the WARN Act (29 U.S.C. §§ 2101, *et seq.*) or any state or other laws of similar effect; (h) any bulk sales or similar law; (i) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the assets or businesses of the Debtors prior to the Closing; (j) any unexpired and executory contract or unexpired lease to which a Debtor is a party that is not an Assigned Contract; (k) any other Excluded Liabilities under the Asset Purchase Agreement; and (l) Interests arising under or in connection with any acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors, affiliates, or Subsidiaries, including, but not limited to, Interests arising under any doctrines of successor, transferee, or vicarious liability, violation of the Securities Act, the Exchange Act, or other applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of fiduciary duty, or any similar theories under applicable Law or otherwise.

M.    <u>No Successor or Other Derivative Liability</u>.    By consummating the Sale Transaction pursuant to the Asset Purchase Agreement, the Purchaser is not a mere continuation of any of the Debtors or any Debtor's estate, and there is no continuity of enterprise or otherwise

or common identity between the Purchaser and any Debtor.  The Purchaser is not holding itself

out as a continuation of any Debtor.  The Purchaser is not a successor to any Debtor or any Debtor's

estate by reason of any theory of law or equity, and the Sale Transaction does not amount to a

consolidation, merger, or *de facto* merger of the Purchaser and the Debtors or any of the Debtors'

estates.  Neither the Purchaser nor any of its affiliates or their respective successors, assigns,

members, partners, principals, or shareholders (or the equivalent thereof) shall assume or in any

way be responsible for any obligation or liability of any Debtor (or any affiliate of any Debtor) or

any Debtor's estate, except as expressly provided in the Asset Purchase Agreement.  The sale and

transfer of the Transferred Assets to the Purchaser, including the assumption by the Debtors and

assignment, transfer, and/or sale to the Purchaser of any of the Contracts, will not subject the

Purchaser to any liability with respect to the operation of the Debtors' businesses prior to the

Closing or by reason of such transfer, except that, upon the Closing, the Purchaser shall remain

liable for the applicable Assumed Liabilities.

N.      <u>Good Faith</u>.  The Debtors, the Purchaser and their respective counsel and other

advisors have negotiated and entered into the Asset Purchase Agreement and each of the

transactions contemplated thereby in good faith, without collusion and from arms'-length

bargaining positions.  The Purchaser is a good-faith purchaser, and is acting in good faith within

the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all of the

protections afforded thereby.  The Debtors were free to deal with any other party interested in

acquiring all or some of the Transferred Assets.  Neither the Debtors nor the Purchaser have

engaged in any conduct that would cause or permit the Sale Transaction, the Asset Purchase

Agreement, or any of the transactions contemplated thereby to be avoided or subject to monetary

damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of

sections 363(m) of the Bankruptcy Code. The Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction. Specifically, the Purchaser has not acted in a collusive manner with any person or entity, and the Purchaser's participation in and bidding at the Auction were not controlled by any agreement among bidders. All payments to be made by the Purchaser and all agreements entered into by the Purchaser and the Debtors under the Asset Purchase Agreement in connection with the Sale Transaction have been disclosed and are appropriate. The Asset Purchase Agreement was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors under laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Purchaser have entered into the Asset Purchase Agreement or are consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

O.    <u>Insider Status</u>. The Purchaser is not an "insider" of any Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. No common identity of directors or controlling stockholders (or the equivalent thereof) exists between the Purchaser and any of the Debtors.

P.    <u>Assumption and Assignment of Contracts</u>. The assumption and assignment of the Contracts are an integral part of the Sale Transaction, are in the best interests of the Debtors and their estates and represent the valid and reasonable exercise of the Debtors' sound business judgment. Specifically, the assumption and assignment of the Contracts (a) are necessary to sell the Transferred Assets to the Purchaser as contemplated by the Asset Purchase Agreement, (b) allow the Debtors to sell the Transferred Assets to the Purchaser as a going concern, (c) limit the losses suffered by the Counterparties to the Contracts, and (d) maximize the recoveries of other creditors of the Debtors by eliminating claims against the Debtors' estates that would arise from

the Debtors' rejection of the Contracts.  Any Counterparty to any Contract that has not actually filed with the Court and served on the Objection Notice Parties (as defined in the Bidding Procedures) an objection to the Debtors' assumption and assignment of such Contract, or to the applicable Cure Costs, as of the date specified in the Bidding Procedures Order (as such date may have been modified or extended in accordance with the terms of the Bidding Procedures Order) is deemed to have consented to the assumption and assignment of the Contract, and to the applicable Cure Costs.

Q.    <u>Compliance with Section 365 of the Bankruptcy Code</u>.  The Debtors have met all requirements of section 365(b) of the Bankruptcy Code with respect to the assumption and assignment of each of the Contracts.  The Debtors have provided adequate assurance (within the meaning of section 365(b)(1) of the Bankruptcy Code) of cure of any default existing under any of the Contracts on or before the Closing Date.  The Purchaser has demonstrated adequate assurance of future performance of and under the Contracts within the meaning of sections 365(b)(1)(C), 365(f)(2)(B) and 365(b)(3) (to the extent applicable) of the Bankruptcy Code. Pursuant to section 365(f) of the Bankruptcy Code, the Contracts shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in the Contracts or other restrictions prohibiting their assignment or transfer.

R.    <u>Modifications to Contracts</u>.    Pursuant to section 5.3 of the Asset Purchase Agreement, the Purchaser may, in consultation with the Sellers and upon provision of written notice to the Sellers, modify the list of the Contracts after the date of this Order until the earlier of (a) 30 days following the Closing Date, (b) the entry of an order confirming a chapter 11 plan of reorganization or liquidation of the Debtors, or (c) such time that the Chapter 11 Cases are closed or dismissed.  Such modification rights include, but are not limited to, the right of the Purchaser

to designate a Contract for assumption by the Debtors and assignment to the Purchaser, as well as for exclusion from the Sale as an Excluded Contract, Excluded Asset, and/or Excluded Liability. The Purchaser would not have agreed to the Sale Transaction without such modification rights. The notice and opportunity to object provided to Counterparties to such Contracts and to other parties in interest, as set forth in the Bidding Procedures Order and in this Order, fairly and reasonably protect any rights that such Counterparties and other parties in interest may have with respect to such Contracts.

S.    <u>Property of the Estates</u>.  The Transferred Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

T.    <u>Validity of the Sale Transaction</u>.  The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) and all of the applicable requirements of such sections have been complied with in all respects in connection with the Sale Transaction.  As of the Closing, the sale and assignment of the Transferred Assets and the Contracts to the Purchaser will be a legal, valid, and effective transfer of the Transferred Assets and the Contracts, and will vest the Purchaser with all right, title, and interest of the Debtors in and to the Transferred Assets and the Contracts free and clear of all Interests (other than any Interests expressly assumed under, or expressly permitted by, the Asset Purchase Agreement).  The Debtors have full corporate or other applicable authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate action of the Debtors.  Upon entry of this Order, other than any consents identified in the Asset Purchase Agreement, no consent or approval from any other person, entity, or legal authority is required to consummate the Sale Transaction.  None of the

Transferred Assets as of the Closing will incorporate, use or be derived from any Qorvo Trade Secret Information (as defined in the Asset Purchase Agreement).  Notwithstanding anything to the contrary in the Bidding Procedures Order, certain "machinery and equipment" (as described in the Bidding Procedures Order) included as part of the Transferred Assets do not include Qorvo Trade Secret Information (the "Clean Machinery & Equipment"), and as such, the Clean Machinery & Equipment will not be subjected to a "factory reset" process prior to the transfer thereof to Purchaser.  Transferred Assets that consist of "machinery and equipment" other than the Clean Machinery & Equipment will be subjected to a "factory reset" process as described in the Bidding Procedures Order.  The Sale Transaction, including, without limitation the post-sale use of the Transferred Assets by Purchaser or any subsequent owners or users, does not violate that certain Permanent Injunction issued by the United States District Court for the District of Delaware on October 15, 2024, in the matter of *Qorvo, Inc. v. Akoustis Technologies and Akoustis, Inc.* (Case No. 1:21-cv-01417), or any modification thereto and such Permanent Injunction, therefore, shall not attach to any of the Transferred Assets at Closing.

U.      No *Sub Rosa* Plan.  Neither the Sale Transaction nor the Asset Purchase Agreement impermissibly restructures the rights of any of the Debtors' creditors or impermissibly dictates the terms of a liquidating plan of reorganization of the Debtors.  Neither the Sale Transaction nor the Asset Purchase Agreement constitutes a *sub rosa* or *de facto* plan of reorganization or liquidation, as neither proposes to (a) impair or restructure any existing debt of, or equity interests in, the Debtors; (b) impair or circumvent voting rights with respect to any plan proposed by the Debtors; (c) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (d) classify claims or equity interests or extend debt maturities.

V.      <u>No Stay of Order</u>.   Time is of the essence to implement the Asset Purchase Agreement and consummate the Sale Transaction.  The Sale Transaction must be approved and consummated promptly in order to preserve the value of the Transferred Assets and to maximize the value to the Debtors, their estates, their creditors, and all other parties in interest.  The Debtors have demonstrated compelling circumstances and sound business justifications for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement.  Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d), 7062, or any applicable provisions of the Local Rules, and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Order shall not be stayed and shall be effective and enforceable immediately upon entry.

W.      <u>Time is of the Essence</u>.   The Sale Transaction must be approved and consummated promptly in order to preserve the value of the Debtors' assets, as there is substantial risk of deterioration of the value of the Transferred Assets if the Transactions are not consummated quickly.  Accordingly, there is good cause to waive the stay contemplated by Bankruptcy Rules 4001, 6004, 6006, and 7062.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      <u>Sale Motion Granted</u>.   The Sale Motion and the relief requested therein (to the extent not previously granted by the Court pursuant to the Bidding Procedures Order or otherwise) are GRANTED and approved as set forth herein.

2.      <u>Objections Overruled</u>.   Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled and all reservations of rights included in such objections are hereby overruled on the merits with prejudice.  All persons and entities given notice of the Sale Motion that failed timely to object thereto or that withdrew their objections

thereto are deemed to consent to the relief granted herein for all purposes, including, without limitation, section 363(f)(2) of the Bankruptcy Code.

3.      <u>Sale Transaction Approved</u>.  The Asset Purchase Agreement and all transactions contemplated thereby are APPROVED.

4.      <u>Prior Findings of Fact and Conclusions of Law</u>.  The Court's findings of fact and conclusions of law in the Bidding Procedures Order, including the record of the Bidding Procedures Hearing and the findings of fact recited above are incorporated herein by reference.

5.      <u>Debtors' Performance Authorized</u>.  The Debtors are hereby authorized to enter into and perform their obligations under the Asset Purchase Agreement, and to take such other actions as may be necessary or desirable to effectuate the terms of the Asset Purchase Agreement and other instruments or documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Asset Purchase Agreement, the Sale Transaction, or this Order, including, without limitation, deeds, assignments, stock powers, transfers of membership interests, and any other instruments of transfer, without further order of the Court.  The Debtors are hereby further authorized to take all other actions as may reasonably be requested by the Purchaser or otherwise for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to the Purchaser's possession any or all of the Transferred Assets and the Contracts, as may be necessary or appropriate for the Debtors to perform their obligations under the Asset Purchase Agreement and consummate the Sale Transaction, without further order of the Court.

6.      Debtors are hereby authorized, but not directed, to enter into Separation Agreements and remit Severance Payments to Severance Eligible Employees in accordance with

the terms of the Separation Agreements, in each case, pursuant to Section 6.9 of the Asset Purchase Agreement.

7.      The Debtors are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases, and other documents with respect to the Transferred Assets that are necessary or appropriate to effectuate the Asset Purchase Agreement, the Sale Transaction, or this Order, including, as applicable, amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors may determine are necessary or appropriate.

8.      <u>Valid Transfer</u>.  Effective as of the Closing Date, the sale and assignment of the Transferred Assets and the Contracts by the Debtors to the Purchaser shall constitute a legal, valid, and effective transfer of the Transferred Assets and the Contracts, notwithstanding any requirement for approval or consent by any person, and will vest the Purchaser with all right, title, and interest of the Debtors in and to the Transferred Assets and the Contracts, free and clear of all Interests (other than any Interests expressly assumed under, or expressly permitted by, the Asset Purchase Agreement), pursuant to section 363(f) of the Bankruptcy Code.

9.      <u>Free and Clear Sale</u>.  Except to the extent specifically provided in the Asset Purchase Agreement, upon the Closing Date, the Debtors shall be, and hereby are, authorized and empowered, pursuant to sections 105, 363(b) and 363(f) of the Bankruptcy Code, to sell and transfer to the Purchaser the Transferred Assets.  The sale and transfer of the Transferred Assets to the Purchaser shall vest the Purchaser with all right, title, and interest of the Debtor in and to the Transferred Assets free and clear of any and all Interests of any person or entity (other than

any Interests expressly assumed under, or expressly permitted by, the Asset Purchase Agreement), with all such Interests to attach solely to the net proceeds of the Sale Transaction ultimately attributable to the sale of the property on which such holders have an Interest, in the same order of priority, and with the same validity, force, and effect that such Interests had prior to the consummation of the Sale Transaction, subject to any rights, claims, or defenses of the Debtors or their estates.  Following the Closing, no holder of any Interest on any of the Transferred Assets shall interfere with the Purchaser's use or enjoyment of any of the Transferred Assets based on or related to such Interest or any actions that the Debtors have taken or may take in their Chapter 11 Cases and no interested party may take any action to prevent, interfere with or otherwise enjoin consummation of the Sale Transaction.

10.     The provisions of this Order authorizing the sale and transfer of the Transferred Assets free and clear of Interests shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, or implement the provisions of this Order.  For the avoidance of doubt, on or after the Closing Date, the Debtors and/or the Purchaser shall be authorized, but not directed, to file any such releases, termination statements, assignments, consents, or other instruments in any jurisdiction to record the release, discharge, and termination of Interests on the Transferred Assets pursuant to the terms of this Order.

11.     <u>Direction to Creditors</u>.  This Order shall be (a) effective as a determination that, as of the Closing Date, all Interests on the Transferred Assets (except as otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement) shall be unconditionally released, discharged, and terminated as to the Purchaser and the Transferred Assets; and (b) binding upon all persons and entities, including all the Debtors' creditors and any holder of an

19

Interest on any of the Transferred Assets, and all such persons and entities are hereby authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release their respective Interests on the Transferred Assets, if any.  If any person or entity that has filed a financing statement, mortgage, mechanics lien, *lis pendens*, or other document, instrument, notice, or agreement evidencing any Interest on the Transferred Assets has not delivered to the Debtors on or before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, releases, or instruments of satisfaction that the person or entity has with respect to the Transferred Assets, the Debtors and/or the Purchaser are authorized to (x) execute and file such termination statements, releases, instruments of satisfaction, or other documents with respect to the Transferred Assets on behalf of the applicable person or entity; and (y) file, register, or otherwise record a certified copy of this Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests on the Transferred Assets.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, local, tribal, or foreign government agency, department, or office.

12. <u>Direction to Recording Officers</u>.  This Order shall be binding upon all persons and entities, including filing agents or officers, title agents or companies, recorders of mortgages or deeds, registrars, administrative agencies, governmental units or departments, secretaries of state, governmental officials, and all other persons or entities that may be required by operation of law, the duties of their office or contract to accept, file, register, or otherwise record or release any documents or instruments regarding the Transferred Assets or who may be required to report or insure any title or state of title in or to the Transferred Assets, (collectively, the "<u>Recording Officers</u>").  All Recording Officers are hereby authorized and directed to (a) accept any and all

documents or instruments necessary and appropriate to consummate the Sale Transaction or to record and reflect that the Purchaser is the owner of the Transferred Assets free and clear of all Interests (unless otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement) and (b) strike all recorded Interests on the Transferred Assets from their records.

13.    <u>Direction to Surrender the Transferred Assets</u>.  All persons or entities in possession or control of any of the Transferred Assets, either presently or on or before the Closing Date, are directed to surrender possession or control of the Transferred Assets to the Purchaser on the Closing Date.

14.    <u>No Successor Liability</u>.  The Purchaser and its affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals, and shareholders (or the equivalent thereof) are not and shall not be (a) deemed a "successor" in any respect to any of the Debtors or any of their estates as a result of the consummation of the Sale Transaction or any other event occurring in the Debtors' Chapter 11 Cases under any theory of law or equity; (b) deemed to have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors or any of their estates; (c) deemed to be an alter ego of or have a common identity with any of the Debtors; (d) deemed to have a continuity of enterprise with any of the Debtors; or (e) deemed to be a continuation or substantial continuation of any of the Debtors or any enterprise of any of the Debtors, including (with respect to clause (a) through (e) of this paragraph) within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, environmental (including, without limitation, any Environmental Law), products liability or other law, doctrine, rule, or regulation (including any filing requirements under any such laws, rules or regulations) with respect to the Debtors' liability under such law, doctrine, rule, or regulation.

15.     The Purchaser shall not assume, nor be deemed to have assumed or in any way be responsible for any liability or obligation, of any of the Debtors or any of their estates including, but not limited to, any Excluded Liabilities, any bulk sales law, successor or vicarious liability, liability, or responsibility for any claim against any of the Debtors or against any insider of any of the Debtors or similar liability, except as otherwise expressly provided in the Asset Purchase Agreement, and the Sale Motion, Sale Notice and Notice of Auction Results contain sufficient notice of such limitation in accordance with applicable law.  Except for the Assumed Liabilities, the transfer of the Transferred Assets and the Contracts to the Purchaser under the Asset Purchase Agreement will not result in (a) the Purchaser, its affiliates, or any of their respective predecessors, successors, assigns, members, partners, officers, directors, principals, or shareholders (or the equivalent thereof) or any of the Transferred Assets having any liability or responsibility for any claim against any of the Debtors or against any insider of any of the Debtors (including, without limitation, Excluded Liabilities); (b) the Purchaser, its affiliates, or any of their respective predecessors, successors, assigns, members, partners, officers, directors, principals, or shareholders (or the equivalent thereof) or any of the Transferred Assets having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, recoupment, or otherwise, directly or indirectly, any Interests or Excluded Liabilities; or (c) the Purchaser, its affiliates, or any of their respective predecessors, successors, assigns, members, partners, officers, directors, principals, or shareholders (or the equivalent thereof) or any of the Transferred Assets having any liability or responsibility to any of the Debtors except as is expressly set forth in the Asset Purchase Agreement.

16.     Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether

22

in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser, its assets (including the Transferred Assets) or its successors or assigns, with respect to any (a) Interest on the Transferred Assets or (b) successor, transferee, vicarious, or other similar liability or theory of liability, including (i) commencing or continuing any action or other proceeding pending or threatened, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of the Court or the agreements or actions contemplated or taken in respect hereof or thereof; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Interest; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; or (v) revoking, terminating, or failing or refusing to renew any license, permit, or authorization to operate any of the Transferred Assets or conduct any of the businesses operated with the Transferred Assets.

17.    <u>Assumption and Assignment of Contracts</u>.  Under sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale Transaction, the Debtors' assumption and assignment of the Contracts to the Purchaser free and clear of all Interests pursuant to the terms of the Asset Purchase Agreement, as modified by the terms of any amendments reached by the Purchaser and the respective Counterparty, is hereby approved, and the requirements of sections 365(b)(1), 365(f)(2) and 365(b)(3) (to the extent applicable) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Upon the Debtors' assumption and assignment of the Contracts to the Purchaser, each applicable Counterparty shall be forever barred, estopped, and permanently enjoined from raising or asserting against the Debtors, the Purchaser, or their respective property, any assignment fee, default, breach, claim, pecuniary loss, liability, or obligation (whether legal or equitable, secured or unsecured, matured or unmatured,

contingent or non-contingent, known or unknown, liquidated or unliquidated, senior or subordinate), counterclaim, defense, setoff, or any other matter arising under or out of, in connection with, or in any way related to, the Contracts existing as of the Closing Date or arising by reason of the Closing. Upon the Debtors' assumption and assignment of the Contracts to the Purchaser, the Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and to the Contracts and the Contracts shall be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms. The Debtors' assumption and assignment of the Contracts to the Purchaser shall not constitute a default under or a termination of any Contract.

18.     <u>The Debtors Shall Not Retain Liability for the Contracts and Assumed Liabilities</u>. Effective as of the Closing Date, (a) the assumption of the Contracts and the Assumed Liabilities by the Purchaser constitutes a legal, valid, effective, complete, and absolute sale, conveyance, and transfer from the Debtors to the Purchaser of any and all Liabilities relating to, in connection with, or arising under the Contracts and Assumed Liabilities; and (b) the Debtors shall have no liability to Purchaser or any other Person for any Liabilities with respect to the Contracts and Assumed Liabilities. Further, it is the Parties' express intention that the Sale Transaction be, and be treated for all purposes, as an absolute sale, conveyance, and transfer of all Liabilities relating to, in connection with, or arising under the Contracts and Assumed Liabilities.

19.     <u>Cure Obligations</u>. Any defaults or other obligations under the Contracts shall be deemed cured by the Purchaser's payment or other satisfaction of the cure amounts, if any, associated with the Contracts (the "<u>Cure Costs</u>"), and such Cure Costs shall constitute the only liabilities the Purchaser must satisfy to cure any defaults or satisfy any other existing obligations under the Contracts.

20.    <u>Cure Objections</u>.    Except as provided herein, all objections to the Debtors' calculation of Cure Costs with respect to any of the Contracts (each such objection, a "<u>Cure Objection</u>") have been overruled, withdrawn, waived, settled, or otherwise resolved.    Any Cure Objections as to applicable Cure Costs that have not been resolved by the parties may be heard at a later date as set by the Court.    The pendency of a dispute relating to a particular Contract shall not prevent or delay the assumption or assignment of any other Contract or the closing of the Sale Transaction.

21.    <u>Adequate Assurance</u>.    The Purchaser has provided adequate assurance of future performance under the Contracts within the meaning of sections 365(b)(1)(C), 365(f)(2)(B) and 365(365(b)(3) (to the extent applicable) of the Bankruptcy Code.    Any Adequate Assurance Objections that have not been withdrawn, waived, or settled and all reservations of rights included in such objections are hereby overruled on the merits with prejudice.    All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the Debtors' assumption and assignment of the Contracts to the Purchaser have been satisfied.

22.    <u>Anti-Assignment Provisions Unenforceable</u>.    No section or provision of any Contract that purports to (a) prohibit, restrict, or condition the assignment of a Contract, including, but not limited to, the conditioning of such assignment on the consent of any Counterparty to such Contract; (b) authorize the termination, cancellation, or modification of a Contract based on the filing of a bankruptcy case, the financial condition of the Debtors, or similar circumstances; (c) declare a breach or default as a result of a change in control in respect of the Debtors; or (d) provide for additional payments, profit sharing, penalties, conditions, renewals, extensions, charges, or other financial accommodations in favor of the Counterparty to a Contract, or modification of any term or condition upon the assignment of a Contract or the occurrence of

25

the conditions set forth in subsection (b) above, shall have any force or effect, and any such section or provision constitutes an unenforceable anti-assignment provision under section 365(f) of the Bankruptcy Code and/or is otherwise unenforceable under section 365(e) of the Bankruptcy Code.

23.     No Fees for Assumption and Assignment.  There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Purchaser, its successors or assigns, or the Debtors as a result of the assumption and assignment of the Contracts.

24.     Direction to Contract Counterparties.  All Counterparties to Contracts assigned to the Purchaser in accordance with the terms of this Order and the Asset Purchase Agreement shall cooperate with, and expeditiously execute and deliver upon, any reasonable request of the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents, or other documents that may be required or requested by any governmental unit or other public or quasi-public authority or other party to effectuate the applicable transfers in connection with the Debtors' assumption and assignment of the Contracts to the Purchaser.

25.     Modification of Contracts List.  The rights of the Purchaser to modify the list of Contracts in accordance with Section 5.3 of the Asset Purchase Agreement after the date of this Order are approved.  Pursuant to section 5.3 of the Asset Purchase Agreement, the Purchaser may, in consultation with the Sellers and upon provision of written notice to the Sellers, modify the list of the Contracts after the date of this Order until the earlier of (a) 30 days following the Closing Date, (b) the entry of an order confirming a chapter 11 plan of reorganization or liquidation of the Debtors, or (c) such time that the Chapter 11 Cases are closed or dismissed.  If the Purchaser identifies a Contract it does not seek to be assumed and assigned, then such Contract shall, upon written notice to the Sellers, be automatically deemed removed from the list of Designated Contracts pursuant to section 5.3 of the Asset Purchase Agreement and deemed an Excluded

Contract, Excluded Asset, and/or Excluded Liability.  If the Purchaser identifies an executory contract or unexpired lease previously excluded from the list of Designated Contracts that the Purchaser seeks to be assumed and assigned, then (a) such contract or lease shall, upon written notice to the Sellers, and provided that such contract or lease has not been rejected pursuant to an Order of the Bankruptcy Court, be automatically deemed a Contract and added to the list of Designated Contracts, and (b) to the extent not already served with an Assumption and Assignment Notice, the Debtors shall file and serve a notice (the "Previously Omitted Contract Notice") on the Counterparties to such Contract notifying such Counterparties of the Debtors' intention to assign and the Purchaser's intention to assume such Contract, including the proposed Cure Costs (if any). The Counterparties to such Contract shall have fourteen (14) calendar days from the date of such Previously Omitted Contract Notice to file and serve on the Debtors and the Purchaser an objection to the assumption of its Contract.  If the Counterparties, Debtors, and the Purchaser are unable to reach a consensual resolution with respect to a timely served objection to a Previously Omitted Contract Notice, the Debtors will seek, at Purchaser's expense, an expedited hearing before this Court to seek approval of the assumption and assignment of such Contract.  If no objection is timely served on the Debtors and the Purchaser, then such Contract shall be deemed assumed by the applicable Debtor and assigned to the Purchaser, or transferred by the applicable Debtor to the Purchaser, as applicable, pursuant to this Order.

26.    Licenses and Permits.  To the extent provided in the Asset Purchase Agreement and available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and any other governmental authorization or approval of the Debtors with respect to the Transferred Assets and the Contracts, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby

are, directed to be transferred to the Purchaser as of the Closing Date. To the extent any license or permit necessary for the operation of the Transferred Assets is determined not to be an executory contract that may be assumed and assigned under section 365 of the Bankruptcy Code, the Purchaser shall apply for and obtain any necessary license or permit promptly after the Closing Date, and such license or permit of the Debtors shall remain in place for the Purchaser's benefit until a new license or permit is obtained.

27.    To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Transferred Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale Transaction.

28.    <u>Good-Faith Purchaser</u>. The Purchaser is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded thereby. Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity or enforceability of any sale, transfer, or assignment under the Asset Purchase Agreement or obligation or right granted pursuant to the terms of this Order (unless duly stayed pending appeal prior to the Closing Date) and, notwithstanding any reversal, modification, or vacatur, any sale, transfer, or assignment under the Asset Purchase Agreement, shall be governed in all respects by the original provisions of this Order or the Asset Purchase Agreement, as applicable.

29.    <u>No Avoidance</u>. Neither the Sale Transaction nor the Asset Purchase Agreement is subject to avoidance, and no party is entitled to any damages or other recovery in connection therewith under section 363(n) of the Bankruptcy Code.

30.    <u>Bulk Sales</u>.  No bulk sales law, bulk transfer law, or similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction.

31.    <u>Amendments</u>.  The Asset Purchase Agreement, the Related Documents and any other agreements, documents or instruments related thereto may be amended, supplemented, or otherwise modified by the parties thereto and in accordance with the terms thereof, without further action or order of the Court; *provided*, *that*, any such amendment, supplement, or modification shall not have a material adverse effect on the Debtors' estates.

32.    <u>Binding Order</u>.  This Order and the Asset Purchase Agreement shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtors and the Purchaser, their respective successors, and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case of any of the Debtors if any of these Chapter 11 Cases is converted from a case under chapter 11 to a case under chapter 7, all creditors of any and all of the Debtors (whether known or unknown), all Counterparties to any Contracts, and all Recording Officers.  Neither the Sale Transaction nor the Asset Purchase Agreement shall be subject to rejection or avoidance under any circumstances.  This Order and the Asset Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser, and its respective successors and assigns.

33.    <u>Allocation of Consideration</u>.  Except as provided in the Asset Purchase Agreement, all rights of the respective Debtors' estates with respect to the allocation of consideration received from the Purchaser in connection with the Sale Transaction (including, without limitation, the value of the assumption of the Assumed Liabilities) are expressly reserved for later determination by the Court and, to the extent consideration is received by any Debtor that is determined to be allocable to another Debtor, the recipient Debtor shall be liable to such other Debtor for a claim

with the status of an expense of administration in the case of the recipient Debtor under section 503(b) of the Bankruptcy Code.

34.    <u>Failure to Specify Provisions; Conflicts</u>.    The failure specifically to include or mention any particular provision of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors, and the Purchaser that the Asset Purchase Agreement be authorized and approved in its entirety, including any amendments thereto as may be made by the parties thereto in accordance with the terms thereof and this Order.    Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

35.    <u>Further Assurances</u>.    From time to time, as and when requested, all parties to the Sale Transaction shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the requesting party may reasonably deem necessary or desirable to consummate the Sale Transaction, including such actions as may be necessary to vest, perfect, confirm, record, or otherwise transfer to the Purchaser its right, title, and interest in and to the Transferred Assets and the assigned Contracts.

36.    <u>Automatic Stay</u>.    The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified to the extent necessary, without further order of the Court, to allow the Purchaser to deliver any notice provided for in the Asset Purchase Agreement and to take any and all actions permitted or required under the Asset Purchase Agreement in accordance with the terms and conditions thereof.

37.    <u>No Stay of Order</u>.    Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and any applicable Local Rules, this Order shall not be stayed and shall be effective

and enforceable immediately upon entry.  The provisions of this Order shall be self-executing. Time is of the essence in implementing the Asset Purchase Agreements and closing the Sale Transaction.  Any party objecting to this Order or any of the relief granted herein must exercise due diligence in filing an appeal and obtaining a stay prior to the Closing of the Sale Transaction or risk its appeal being foreclosed as moot.

38.    <u>Governing Terms</u>.  To the extent this Order is inconsistent with any prior order or pleading in these Chapter 11 Cases, the terms of this Order shall govern, and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale Transaction.  To the extent there is any inconsistency between the terms of this Order and the terms of the Asset Purchase Agreement, the terms of this Order shall govern.

39.    <u>No Modification by Subsequent Orders or Plan Provisions</u>.  Nothing contained in any chapter 11 plan confirmed in these Chapter 11 Cases, any order confirming any such plan, or in any other order entered in these Chapter 11 Cases (including, without limitation, any order entered after any conversion of any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code) or any related proceeding subsequent to entry of this Order shall modify, alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement, the Related Documents any other agreements, documents or other instruments related thereto, or this Order.

40.    <u>Retention of Jurisdiction</u>.  This Court shall retain exclusive jurisdiction to (a) interpret, implement, and enforce the terms and provisions of this Order and the Asset Purchase Agreement, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith; and (b) decide any issues or disputes concerning this Order, the Asset Purchase Agreement, or the rights and duties of the parties

hereunder or thereunder, including the interpretation of the terms, conditions, and provisions hereof and thereof, and the status, nature, and extent of the Transferred Assets and the Contracts.

41.    <u>Authorization</u>.   The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.