**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AKOUSTIS TECHNOLOGIES, INC., *et al.*,[1] | Case No. 24-12796 (LSS) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF MARK D. PODGAINY IN SUPPORT OF
MOTION OF THE DEBTORS FOR ENTRY OF ORDERS
(I) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

I, Mark D. Podgainy, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

1.      I am a Senior Managing Director with Getzler Henrich & Associates, LLC ("GH") and the Finance Transformation Officer ("FTO") for Akoustis Technologies, Inc.  I am over the age of eighteen and have personal knowledge of the facts in this matter, and if called upon to testify, could and would do so.

2.      I submit this declaration (the "Declaration") in support of *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into the Stalking Horse Agreement and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Akoustis Technologies, Inc. (9046), Akoustis, Inc. (5617), Grinding and Dicing Services, Inc. (7929), and RFM Integrated Device Inc. (1138).  The Debtors' corporate headquarters is located at 9805 Northcross Center Court, Suite A, Huntersville, NC 28078.

*(F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (including all exhibits thereto, the "Motion")[2] and, specifically, the Sale of the Akoustis Assets (as defined below) to Tune Holdings (as defined below).[3]

3.     Except as otherwise indicated, all facts in this Declaration are based upon: (i) my personal knowledge; (ii) information provided to me by the Debtors' management team, other members of the GH team, and the Debtors' other advisors; (iii) my review of relevant documents; and/or (iv) my opinion based upon my experience.  I have been involved in the Debtors' restructuring and marketing and sale process from the date of GH's engagement (together with the postpetition marketing and sale efforts, the "Sale Process").  I have reviewed and am familiar with the terms of the Bidding Procedures and the Tune Holdings Bid (as defined below). I am not being compensated specifically for this testimony other than through payments made in accordance with the terms of the postpetition engagement of GH approved by the Court.  I am authorized to submit this Declaration in support of the Debtors and the Motion.  If called upon to testify, I could and would competently testify to the facts and opinions set forth herein.

### GH's Qualifications

4.     GH is a middle-market corporate turnaround and restructuring firm that provides strategic financial services in large-scale corporate restructuring transactions, including turnarounds, workouts, crisis management, interim management, corporate restructuring,

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

[3] Although the Auction also included bids for the GDSI Assets (as defined below), the Debtors plan to continue the hearing with respect to the sale of the GDSI Assets to a date in the future.  At such time, I will submit an additional declaration in support thereof.

bankruptcy advisory, and distressed mergers and acquisitions.  GH assists companies in achieving operational efficiency through process improvement, the implementation of supply chain solutions, sales and marketing effectiveness, technology advisory, and transaction advisory services.

5.      GH is one of the oldest and most respected names in middle-market corporate restructuring, assisting companies all over the world with their unique approach that emphasizes rapid and pragmatic decision making.  Since its founding in 1968, GH has developed a strong track record, assisting both underperforming and healthy companies.  GH has demonstrated its ability to implement realistic solutions to complex challenges confronting businesses and their creditors, and to helping companies improve their operations.  GH's engagements have spanned a broad spectrum of industries.  GH executes solutions with unmatched competency and stark integrity and adapts its approach to the specific needs of each individual client to ensure the most practical proposals prevail.

6.      GH has been retained to provide financial advisory and other related services in connection with the restructuring of the following companies, among others, in jurisdictions around the country: *In re Urban Commons 2 West LLC, et al.*, Case No. 22-11509 (Bankr. S.D.N.Y. Dec. 1, 2022); *In re SC Healthcare Holdings, LLC*, Case No. 24-10443 (Bankr. D. Del. April 23, 2024); *In re Presperse Corp.*, Case No. 24-18921(Bankr. D.N.J. Oct. 10, 2024); *In re Aztec Fund Holding Inc.* (Bankr. S.D. Tex. Sep. 27, 2024); *In re Hamon Holdings Corp., et al.*, Case No. 22-10375 (Bankr. D. Del. June 10, 2022); *In re Duro Dyne National Corp, et al.*, Case No. 18-27963 (Bankr. D.N.J. Oct. 10, 2019); and *In re ConnectEdu, Inc., et al.*, Case No. 14-11238 (Bankr. S.D.N.Y. June 16, 2024).

7.    I have over 25 years of experience in operational roles and turnaround consulting. My expertise includes operations restructuring, business plan analysis, performance improvement, cash and vendor management, workouts, bankruptcy consulting, and interim management.  I have assisted clients with restructurings both inside and outside of court, assisted and advised on the design and evaluation of financial packages and presentations to various types of lenders and equity investors, and acted as financial advisor to boards of directors and/or principal shareholders in the purchase or sale of numerous businesses.  I have advised companies, lenders, and investors in a variety of industries and acted as financial advisor and chief restructuring officer in a number of industries, including manufacturing, real estate and hospitality, education, food and beverage, apparel, and retail.

**The Debtors' Prepetition Marketing and Sale Process**

8.    As more fully set forth in the *Declaration of Mark D. Podgainy in Support of Chapter 11 Petitions and First Day Motions* [D.I. 2], in the months leading up to the filing of the Chapter 11 Cases, the Debtors began exploring strategic options to resolve and/or ameliorate their legal issues with Qorvo and stabilize their financial condition after the issuance of the Jury Award. This process dated back to late-2023, but it began in earnest in June 2024, when the Debtors engaged GH as an advisor to assist in exploring and assessing such options with the Debtors and understanding the Debtors' overall financial condition.  Thereafter, in August 2024, the Debtors retained Raymond James & Associates, Inc. ("RJA") to serve as investment banker for purposes of exploring and assessing strategic options.

9.    Beginning in August 2024 and continuing through the Petition Date, I understand that RJA conducted an all-inclusive marketing process for both (a) financing proposals that would enable the Debtors either (i) to post a bond allowing the Debtors to appeal the Jury Award or (ii) to

execute on their business plan and potentially pay down all or a portion of the Damages Award and (b) obtaining bids for the sale of all or a portion of the Debtors' assets. RJA regularly reported on the marketing process to the Debtors and their other professionals, including me. I understand that, while the Debtors received some interest from parties to provide additional financing, no such offers would provide complete resolution to the issues facing the Debtors.

10.     The Debtors, in consultation with GH, RJA, Stretto, Inc. ("Stretto"), and K&L Gates, determined that a sale process though the Chapter 11 Cases was the most viable option for the Debtors. Accordingly, the Debtors and their advisors engaged with the parties that had submitted the strongest indications of interest. Ultimately, only one party decided to move forward with the sale process, provide the Debtors with a letter of intent, and negotiate an asset purchase agreement. The Debtors accepted the bid of Gordon Brothers Commercial & Industrial, LLC (the "Stalking Horse") as the stalking horse bid for the sale of the Debtors' assets (the "Stalking Horse Bid").

11.     On January 13, 2025, the Court entered the *Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into the Stalking Horse Agreement and to Provide Bidding Protections Thereunder, (III) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (IV) Approving Assumption and Assignment Procedures, (V) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (VI) Granting Related Relief* [D.I. 176] (as amended, the "Bidding Procedures Order"). In accordance with the Bidding Procedures Order, the Stalking Horse was deemed a Qualified Bidder and the Stalking Horse Bid was deemed a Qualified Bid. The Bidding Procedures Order also established the dates for the Bid Deadline, Auction, and Sale Hearing.

12.     With the Stalking Horse Bid in hand, the Debtors and RJA reached out to approximately 152 prospective buyers, including a number of buyers who had been contacted prior to the Chapter 11 Cases by the Debtors but did not engage in the sale process at that time.  In doing so, the Debtors worked with interested parties over the past several months to develop their bids, including by responding to information requests, discussing the sale process and timing, describing the circumstances leading up to these Chapter 11 Cases and the events that have occurred postpetition, and many other topics of interest to such bidders' in order to keep them apprised of and engaged in the Sale Process.

**Qualified Bids, the Auction, and the Sale of the Debtors' Assets**

13.     On or prior to the Bid Deadline and in addition to the bids from the Stalking Horse Purchasers, the Debtors received seven (7) Qualified Bids for the Debtors' assets—contemplating various bid configurations.  The seven Qualified Bids covered five separate auction packages of the Debtors' assets.  Consistent with the Bidding Procedures Order, the Debtors, in their business judgment, assessed each of the Qualified Bids received and designated Baseline Bids for each of the five auction packages.  This process was designed to allow the Debtors to determine the combination of highest and best bids that would maximize the value of the Debtors' assets.  Each Qualified Bid contained an allocation of value for the various assets the relevant Qualified Bidder sought to purchase.

14.     The Debtors commenced the Auction at approximately 5:00 p.m. (ET) on April 25, 2025, and it concluded at approximately 10:00 p.m. (ET) that same day.  I believe that the Auction was conducted in accordance with the terms of the Bidding Procedures Order and in a reasonable and appropriate manner intended to maximize the value of the Debtors' Assets.  I believe that all Qualified Bidders were provided with a fair, reasonable, and equal opportunity to submit competing bids for the Akoustis Assets and meaningfully participate in the Auction.

15.     During the Auction, one Qualified Bidder participated by submitting a bid for only the Akoustis Assets (as defined below); four Qualified Bidders participated by submitting bids for only the GDSI Assets (as defined below); and three Qualified Bidders submitted bids for various combinations of GDSI Assets and Akoustis Assets.  After the various Qualified Bids were compared, the Debtors designated the bid of Tune Holdings Corp. ("Tune Holdings") as the Baseline Bid with respect to substantially all of the Debtors' Assets other than those owned by Debtor GDSI (such Assets, the "Akoustis Assets").[4]  The Auction[5] included multiple rounds of bidding for the Akoustis Assets, including thirteen overbids submitted in total for such assets.

16.     Throughout the Auction, the Debtors and their advisors spent significant time working to improve the Qualified Bids with representatives of the Qualified Bidders, each of whom attended the auction in person.  The Consultation Parties' advisors were also active participants during the Auction, and the Debtors and their advisors conferred with the Consultation Parties and their advisors frequently throughout each step of the Auction.

17.     Upon the conclusion of the Auction, the Debtors, consistent with their business judgment and the Bidding Procedures Order, and in consultation with their advisors and the Consultation Parties, selected the bid of Tune Holdings (the "Tune Holdings Bid") as the Successful Bid with respect to the Akoustis Assets.  The Backup Bidder is Skyworks Solutions, Inc.

---

[4] For the avoidance of doubt, the term "Akoustis Assets" shall mean the "Transferred Assets" as defined in the Tune Holdings APA (as defined below).  The Debtors propose to sell the Akoustis Assets in strict compliance with the requirements outlined by the Court in the Letter Ruling dated April 18, 2025 [D.I. 453] (the "Letter Ruling").

[5] At the Auction, the Debtors also designated the bid of Silitronics Solutions Inc. ("Silitronics") as the Baseline Bid with respect to substantially all of the assets owned by Debtor GDSI (such Assets, the "GDSI Assets"), which ultimately became the Successful Bid for the GDSI Assets.  As noted above, however, the Debtors are continuing the Sale Hearing with respect to the GDSI Assets to a future date, so this Declaration will not go into further detail about the Auction with respect to the GDSI Assets.

18.     The Tune Holdings Bid included a purchase price of $30.2 million in cash and contemplated a going-concern transaction, with Tune Holdings covenanting to offer employment to at least 50% of the selling Akoustis Entities' workforce.  Additionally, the Tune Holdings Bid excludes from the Akoustis Assets certain of the Akoustis Entities' accounts receivable, while including the assumption by Tune Holdings of cure costs and separately certain accounts payable in an amount not to exceed $3,000,000.

19.     On April 26, 2025, as required by the Bidding Procedures Order, the Debtors filed and served the Notice of Successful Bids.  *See* [D.I. 479].

20.     The Debtors have determined, and I, too, believe, that the Tune Holdings Bid represents the highest and best offer for the Akoustis Assets.  I also believe that the terms of the Tune Holdings Bid provide a greater recovery for the Debtors' estates than would be provided by any other available alternatives and represent fair and reasonable offers to purchase the Akoustis Assets. Given all of the circumstances of the Chapter 11 Cases, I believe that the consummation of the Sale, in accordance with the Tune Holdings Bid, is a reasonable and sound exercise of the Debtors' business judgment, is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, and should be approved.

21.     In my opinion, the Debtors, as well as Tune Holdings, have acted at all times in good faith in connection with the marketing and sale process, and, among other things: (i) the Debtors were free to deal with any other parties interested in acquiring the Akoustis Assets; (ii) Tune Holdings complied with the provisions of the Bidding Procedures; (iii) Tune Holdings was subject to the bid procedures set forth in the Bidding Procedures Order; and (iv) the Asset Purchase Agreement in connection with the Tune Holdings Bid (the "Tune Holdings APA") was negotiated at arm's length and in good faith.

22.    In my opinion, there has been no insider influence or improper conduct by Tune Holdings or any of its affiliates in connection with the negotiation of the Tune Holdings Bid and Tune Holdings APA with the Debtors.  At all times, the Debtors and Tune Holdings were each represented by separate counsel.

23.    The Debtors are seeking the Sale free and clear of all liens, claims, encumbrances, and other interests, including, without limitation, successor liability on the terms set forth in the Sale Order.  I believe that Tune Holdings would not have agreed to purchase the Akoustis Assets on the terms set forth in the Tune Holdings APA if the Sale was not free and clear of such interests. Moreover, I believe that selling the Akoustis Assets subject to such liens, claims, encumbrances, and other interests would result in significantly reduced purchase price consideration for the Akoustis Assets, which would adversely impact the Debtors' efforts to maximize the value of their estates.

24.    The assumption and assignment of the executory contracts and unexpired leases is an integral part of the Sale, as the Tune Holdings Bid contemplates a going concern transaction, necessitating the assumption of the Debtors' existing business relationships.  Specifically, the assumption and assignment of the executory contracts and unexpired leases (i) is necessary to sell the Akoustis Assets to Tune Holdings as contemplated by the APAs, (b) allows the Debtors to sell the Akoustis Assets to Tune Holdings as a going concern, (c) limits the losses suffered by the Counterparties to the executory contracts and unexpired leases, and (d) maximizes the recoveries of other creditors of the Debtors by eliminating claims against the Debtors' estates that would arise from the Debtors' rejection of the executory contracts and unexpired leases.  Nevertheless, Tune Holdings requires the ability to modify its list of assumed executory contracts and unexpired leases in order to close the Sale, as Tune Holdings is continuing its diligence efforts and may determine some relationships are not necessary for its purposes.

25.     In my opinion, under the circumstances, the Sale pursuant to the terms of the Tune Holdings Bid is the best way to maximize the value of the Akoustis Assets for the Debtors' estates.

## CONCLUSION

26.     Based on my experience and personal knowledge of the Debtors' robust marketing efforts and the terms of the Tune Holdings Bid, as well as my knowledge and experience in distressed sales generally, I believe the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the approval of the Tune Holdings Bid, entry into the Tune Holdings APA, and approval of the Sale thereunder.  I believe that approval of the Tune Holdings Bid and consummation of the Sale constitutes a sound and reasonable exercise of the Debtors' business judgment, consistent with their fiduciary duties, because, among other things: (i) the terms of the Tune Holdings Bid embodies the highest and best offer received by the Debtors during the bidding process for the Akoustis Assets, (ii) the Tune Holdings Bid presents the best opportunity to maximize the value of the Akoustis Assets, and (iii) the Sale will provide a greater recovery for the Debtors' estates on the Akoustis Assets than would any other available alternative.

27.     I further believe the Sale as contemplated by the Tune Holdings Bid is in the best interest of the Debtors, their estates, their creditors, and other parties in interest and is necessary and appropriate to maximize the value of the Debtors' estates.  Accordingly, I believe that the Court should enter the Sale Order and approve the Sale.


Dated:     April 29, 2025                 /s/ Mark D. Podgainy
           Wilmington, Delaware           Mark D. Podgainy
                                          Getzler Henrich & Associates, LLC