# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AKOUSTIS TECHNOLOGIES, INC., *et al.*,[1] | Case No. 24-12796 (LSS) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF MICHAEL POKRASSA IN SUPPORT OF
MOTION OF THE DEBTORS FOR ENTRY OF ORDERS
(I) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

I, Michael Pokrassa, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

1.  I am a Managing Director at Raymond James & Associates, Inc. ("RJA"), an investment bank that provides strategic financial services in distressed sale and restructuring transactions. Prior to joining RJA in 2009, I spent two years in the portfolio/workout group for illiquid debt and equity investments at Silver Point Capital. Before Silver Point Capital, I provided restructuring advisory services at FTI Consulting, Inc. and PricewaterhouseCoopers on behalf of distressed companies and their creditors. I graduated with distinction from the BBA program at the University of Michigan's Ross School of Business.

2.  I submit this declaration (the "Declaration") in support of *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into the Stalking Horse Agreement and to*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Akoustis Technologies, Inc. (9046), Akoustis, Inc. (5617), Grinding and Dicing Services, Inc. (7929), and RFM Integrated Device Inc. (1138). The Debtors' corporate headquarters is located at 9805 Northcross Center Court, Suite A, Huntersville, NC 28078.

*Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (including all exhibits thereto, the "<u>Motion</u>")[2] and, specifically, the Sale of the Akoustis Assets (as defined below) to Tune Holdings (as defined below).[3]

3. Except as otherwise indicated, all facts in this Declaration are based upon: (a) my personal knowledge; (b) information provided to me by the Debtors' management team, other members of the RJA team, and the Debtors' other advisors; (c) my review of relevant documents; and/or (d) my opinion based upon my experience. I have been involved in the Debtors' restructuring and marketing and sale process from the date of RJA's engagement (together with the postpetition marketing and sale efforts, the "<u>Sale Process</u>"). I have reviewed and am familiar with the terms of the Bidding Procedures and the Tune Holdings Bid (as defined below). I am not being compensated specifically for this testimony other than through payments that RJA will receive in accordance with the terms of the Debtors' prepetition engagement of RJA for work performed prepetition and payments made in accordance with the terms of any postpetition engagement of RJA approved by the Court. I am authorized to submit this Declaration in support

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

[3] Although the Auction also included bids for the GDSI Assets (as defined below), the Debtors plan to continue the hearing with respect to the sale of the GDSI Assets to a date in the future. At such time, I will submit an additional declaration in support thereof.

of the Debtors and the Motion.  If called upon to testify, I could and would competently testify to the facts and opinions set forth herein.

### RJA's Qualification

4.      RJA is an investment bank that provides strategic financial services in distressed sale and restructuring transactions.  RJA is a subsidiary of Raymond James Financial, Inc. ("RJF"), a publicly traded (NYSE:RJF) full-service global investment banking firm offering investment banking, equity research, wealth management, institutional and private brokerage, and other service offerings to individual and institutional clients.  RJF and its subsidiaries employ over 17,000 individuals in the United States, of which over 650 provide investment banking advisory services to firm clients.  Since 2019, RJA has participated in over 1,555 capital raises for its corporate clients and completed more than 965 M&A buy-side or sell-side advisory assignments.

5.      RJA has a dedicated restructuring investment banking group of approximately 25 bankers with extensive experience advising companies, creditors' committees, and other constituents in complex situations involving underperforming or unsuitably capitalized businesses facing difficult financial conditions, liquidities crises, out-of-court restructurings, and/or bankruptcy proceedings.  Investment bankers at RJA have advised on, or been involved with, numerous restructuring-related or distressed transactions, both out-of-court and in chapter 11 cases, including, without limitation, sale, restructuring, reorganization, financing, financial opinion, and special advisory transactions.

6.      RJA has been retained to provide investment banking and other services in connection with the restructuring of the following companies, among others, in jurisdictions around the country: American Eagle Energy Corporation; American IronHorse Motorcycles, Inc.; ATLS Acquisition, LLC; BI-LO, LLC; BJ Services, LLC; Bluestem Brands, Inc.; Buccaneer Energy; Calpine Energy; CB Holding Corp.; CCNG Energy Partners; Clarus Therapeutics

Holdings, Inc.; ColorSpot Holdings, Inc.; Dakota Plains Holdings, Inc.; Diamond Comic Distributors, Inc.; Diamond Glass Companies, Inc.; Gateway Ethanol, LLC; Giordano's Enterprises, Inc.; Gritstone Bio, Inc.; Gulf Fleet Holdings, Inc.; Halt Medical, Inc.; Hipcricket, Inc.; HMX Acquisition Corp.; Hooper Holmes, Inc.; International Garden Products, Inc.; Just One More Restaurant Corp.; KeyLime Cove Waterpark, Inc.; Landmark Holdings of Florida, LLC; Loehmann's, Inc.; Lutheran Home and Services for the Aged, Inc.; LVI Intermediate Holdings, Inc.; Max & Erma's, Inc.; National Envelope Corporation; Nostrum Laboratories, Inc.; Novan, Inc.; Personal Communication Devices, LLC; Phoenix Payment Systems, Inc.; Proteus Digital Health, Inc.; Quanergy Systems, Inc.; Renew Energy, Inc.; Response Genetics, Inc.; Robbins Bros. Corporation; Santa Fe Gold Corporation; SynCardia Systems, Inc.; SP Newsprint Holding LLC; Teligent, Inc.; and The Palm Restaurant Group, Inc.

7. Since RJA was engaged on August 15, 2024, RJA has provided financial advisory and investment banking services to the Debtors, including with respect to the Debtors' evaluation of strategic alternatives, including a sale of substantially all of their assets. During this time, I have worked with the Debtors and their other retained professionals in furtherance of these efforts.

**The Debtors' Prepetition Marketing and Sale Process**

8. On May 17, 2024, the jury in the Qorvo Litigation entered the Jury Award in Qorvo's favor for over $38 million. Though it is my understanding that the Debtors believed they had certain strong defenses to pursue through post-trial litigation, the Jury Award prompted them to conduct a comprehensive review of all of their strategic options, including assessing the potential to conclude one or more sale(s) of the Debtors' Assets.

9. In 2023, the Debtors engaged B. Riley Financial, Inc. ("B. Riley") to conduct marketing efforts (the "2023 Marketing Process") for a range of transaction alternatives. Between

October 2023 and May 2024, it is the Debtors' understanding that B. Riley contacted twenty-nine (29) prospective parties and executed nine (9) NDAs. While the 2023 Marketing Process yielded one (1) letter of intent, it was ultimately not actionable and the marketing efforts were unavailing.

10. On August 15, 2024, the Debtors engaged RJA as their investment banker to renew these efforts (such efforts, the "Sale Process"). In short order, the Debtors and RJA prepared extensive diligence materials to support a marketing effort, including an initial 98 document, 156-megabyte virtual data room, a four (4) page non-confidential investment overview, and a 48-page confidential information memorandum (collectively, the "Investment Material").

11. RJA spearheaded an all-inclusive prepetition marketing process (the "RJA Marketing Process"), which began with soliciting interest from potential financial and strategic investors for (a) financing proposals that would enable the Debtors to execute on their business plan and potentially pay all or a portion of the Damages Award (as defined in the First Day Declaration), (b) strategic partnerships and joint ventures to provide operational flexibility to the Debtors, and (c) bids for the sale of all or a portion of the Debtors' assets, on both a going concern and liquidating basis. Beginning on September 9, 2024, the Debtors and RJA contacted 162 potential investors, 133 of which were not part of the 2023 Marketing Process. The investor mix included 110 prospective acquirers and 52 prospective capital providers. Of those parties contacted, 31 signed non-disclosure agreements. Additionally, RJA reengaged with nine (9) parties previously under a non-disclosure agreement from the 2023 Marketing Process and reviewed the Investment Material.

12. Throughout the RJA Marketing Process, RJA solicited offers from parties specifying the desire to consummate a sale transaction, including by allowing interested bidders to bid on a configuration of the Debtors' Assets.

13. These prepetition marketing efforts were met with tepid enthusiasm due in large part to uncertainty with respect to the Litigation—on the one hand, the District Court could overturn or reduce the Jury Award, but on the other, the District Court could also enter an injunction against the Debtors. The District Court ultimately denied all of the Debtors' requests for post-trial relief. On October 15, 2024, the District Court issued the Injunction, finding that certain of Qorvo's trade secrets were embedded into certain of the Debtors' processes and products. The Injunction granted Qorvo the right to audit the databases of the Debtors and certain third parties; this created a cloud over the title of substantial portions of the Debtors' assets and made strategic financing, partnerships, and acquisitions risky for interested parties. Accordingly, RJA transitioned its efforts to focusing primarily on pursuing a sale of the Debtors' Assets.

14. Ultimately, the RJA prepetition Marketing Process yielded six (6) non-binding offers for various bid configurations; two (2) parties contemplated a purchase of going concern operations of the business, while the other four (4) were for specific assets of the business. After extensive negotiations by RJA, reviewing all of the bid proposals, the Debtors, in consultation with their advisors, determined that the offer from Gordon Brothers Commercial & Industrial, LLC (the "<u>Stalking Horse Bidder</u>") was the most attractive at this time, in view of the consideration offered thereby and in comparison to other bids. Multiple parties had expressed interest in acquiring the Debtors' Assets with an intention of continuing the business as a going concern, so long as the Litigation with Qorvo had been resolved and would not implicate their operations in the future.

15. On December 15, 2024, the Debtors entered into the Stalking Horse Agreement with GBCI for the sale of all of the Debtors' machinery and equipment, including their tool and tool related equipment, as well as other assets such as racking, material handling, certain IT

equipment, spare parts, shop equipment, manufacturing supplies, furniture, fixtures, scrap materials, and mechanical equipment.

16.  Postpetition, with the Stalking Horse Bid in hand, the Debtors and RJA reached out to approximately 152 prospective buyers, including a number of buyers who had been contacted prior to the Chapter 11 Cases by the Debtors but did not move ahead at that time, as well as new prospective buyers who had not been contacted prepetition.  Including the prepetition marketing efforts and postpetition marketing efforts, 60 prospective interested parties executed non-disclosure agreements ("NDAs") so that they could secure access to the VDR and the CIM to continue their diligence processes.  RJA worked with these interested parties over the past several months to develop their bids, including by responding to information and diligence requests, discussing the sale, the happenings of these Chapter 11 Cases, the timing of several matters, attending virtual and in-person meetings, and many other topics relevant to such bidders' interests in order to keep them apprised of the Sale Process.

## Qualified Bids, the Auction, and the Sale of the Debtors' Assets

17.  Ultimately, the Debtors received eight (8) Qualified Bids for the Debtors' assets, including the Stalking Horse Bid—contemplating various bid configurations.  The eight Qualified Bids covered five separate auction packages of the Debtors' assets.  Consistent with the Bidding Procedures Order, the Debtors, in their business judgment, assessed each of the Qualified Bids received and designated Baseline Bids for each of the five auction packages.  This process was designed to allow the Debtors to review the different combinations of potential sales and determine the most valuable combination of the highest and best bids.  Each Qualified Bid contained an allocation of value for the various assets the relevant Bidder sought to purchase.

18.  I attended the Auction, which began at approximately 5:00 p.m. (ET) on April 25, 2025, and concluded at approximately 10:00 p.m. (ET) the same day.  A stenographic record was

made of the Auction proceedings. In addition, the Debtors and their advisors engaged in negotiations and discussions with all Qualified Bidders before and throughout the Auction in an effort to harmonize disparate Qualified Bids and to promote the highest or best outcome for the Debtors and their estates. I participated in a number of these meetings.

19. During the Auction, one Qualified Bidder participated by submitting a bid with respect to only the Akoustis Assets (as defined below); four Qualified Bidders participated by submitting bids with respect to only the GDSI Assets (as defined below); and three Qualified Bidders submitted bids with respect to various combinations of GDSI Assets and Akoustis Assets. After the various Qualified Bids were compared, the Debtors designated the bid of Tune Holdings Corp. ("Tune Holdings") as the Baseline Bid with respect to substantially all of the Debtors' Assets other than those owned by Debtor GDSI (such Assets, the "Akoustis Assets").[4] The Auction[5] included multiple rounds of bidding for the Akoustis Assets, including thirteen overbids submitted in total for such assets.

20. Throughout the Auction, the Debtors and their advisors spent significant time working to improve the Qualified Bids with representatives of the Qualified Bidders, each of whom attended the auction in person. The Consultation Parties' advisors were also active participants during the Auction, and the Debtors and their advisors conferred with the Consultation Parties and their advisors frequently throughout the Auction.

---

[4] For the avoidance of Doubt, the term "Akoustis Assets" shall mean the "Transferred Assets" as defined in the Tune Holdings APA (as defined below). The Debtors propose to sell the Akoustis Assets in strict compliance with the requirements outlined by the Court in the Letter Ruling dated April 18, 2025 [D.I. 453] (the "Letter Ruling").

[5] At the Auction, the Debtors also designated the bid of Silitronics Solutions Inc. ("Silitronics") as the Baseline Bid with respect to substantially all of the assets owned by Debtor GDSI (such Assets, the "GDSI Assets"), which ultimately became the Successful Bid for the GDSI Assets. As noted above, however, the Debtors are continuing the Sale Hearing with respect to the GDSI Assets to a future date, so this Declaration will not go into further detail about the Auction with respect to the GDSI Assets.

21. Upon the conclusion of the Auction, the Debtors, consistent with their business judgment and the Bidding Procedures Order, and in consultation with their advisors and the Consultation Parties, selected the bid of Tune Holdings (the "Tune Holdings Bid") as the Successful Bid with respect to the Akoustis Assets. The Backup Bidder is Skyworks Solutions, Inc.

22. In selecting the Tune Holdings Bid as the Successful Bid, the Debtors and their advisors evaluated, among other things, (i) total consideration to be received by the Debtors' estates, (ii) anticipated time to close the transaction, (iii) closing risks, (iv) the need for transition services, (v) the viability of the Backup Bid, (vi) general litigation risk, and (vii) the potential for any particular bid to violate the Permanent Injunction.

A. The Akoustis Sale

23. With respect to the Akoustis Assets, the Debtors have concluded in the exercise of their business judgment that the terms of the Tune Holdings Bid as set forth in that certain *Asset Purchase Agreement* (the "Tune Holdings APA") by and among (i) Tune Holdings, as buyer, (ii) Space Exploration Technologies Corp., as guarantor, and (iii) Debtors Akoustis Technologies, Inc., Akoustis, Inc., and RFM Integrated Device Inc. (collectively, the "Akoustis Entities"), are fair and reasonable, constitute full, fair and adequate consideration and provide reasonably equivalent value for the Akoustis Assets. The Tune Holdings Bid includes a purchase price of $30.2 million in cash and contemplated a going-concern transaction, with Tune Holdings covenanting to offer employment to at least 50% of the selling Akoustis Entities' workforce. Additionally, the Tune Holdings Bid excludes from the Akoustis Assets certain of the Akoustis Entities' accounts receivable, while including the assumption by Tune Holdings of cure costs and separately certain accounts payable in an amount not to exceed $3,000,000.

24. Conversely, the Skyworks Bid included an offer only to purchase a subset of the Akoustis Entities' Assets, including intellectual property and machinery and equipment for $30.0 million, and contemplated a liquidation of the Akoustis Entities thereafter. Comparing the Tune Holdings Bid and the Skyworks Bid—including by assessing the liquidation value of the assets that would remain with the estates under the framework of the Skyworks Bid and the Tune Holdings Bid—the Debtors determined that the Tune Holdings Bid would generate the most proceeds for the estates. Moreover, by continuing the Akoustis Entities' businesses as a going concern, the Tune Holdings Bid provides a substantially better outcome for the Akoustis Entities' employees, customers, and suppliers. As such, the Debtors, in their reasonable business judgment, determined that the Tune Holdings Bid constitutes the highest or otherwise best offer for the Akoustis Assets and will provide a greater overall recovery for the Debtors' estates than would be provided by any other available alternative.

25. It is my understanding that Tune Holdings would not have entered into the Tune Holdings APA and any agreements, documents, or other instruments entered into pursuant thereto or in connection therewith and would not want to consummate the proposed Sale Transaction (the "Akoustis Sale"), thus adversely affecting the Debtors and their estates and their creditors, if the Akoustis Assets were not sold free and clear of all claims, liens and encumbrances, or if Tune Holdings would or could be liable for any such claims, liens, and encumbrances now or in the future. A sale of the Akoustis Assets other than free and clear of all claims, liens, and encumbrances would yield substantially less value for the Debtors' estates. This is my testimony not only based on conversations among Tune Holdings (and the many other parties with whom I spoke during the sale process), but it is also my opinion based on having been involved in, having designed, and having taken a lead role in many other distressed sales over the course of my career. I believe that the

consideration provided under the Tune Holdings Bid reflects Tune Holdings' reliance on the relevant Sale Order to provide it with title to and possession of the Akoustis Assets free and clear of all claims pursuant to Bankruptcy Code sections 105(a) and 363(f).

26. The sale of the Akoustis Assets has been duly and validly authorized by all necessary corporate authority of the Debtors to consummate the transaction contemplated by the Tune Holdings APA. No consents or approvals, other than as may be expressly provided for in the Tune Holdings APA, are required by the Debtors to consummate the sale of the Akoustis Assets. Moreover, to maximize the value of the Akoustis Assets and minimize the accrual of further administrative expenses against the Debtors' estates, it is essential that the Akoustis Sale occur within the timeframe set forth in the Tune Holdings APA and that time is of the essence in consummating the sale transaction contemplated therein.

27. To the best of my knowledge, (i) the Tune Holdings APA was the product of good faith, arm's-length negotiations between the Tune Holdings and the Debtors, (ii) Tune Holdings has not engaged in any collusion with regard to the Akoustis Sale; (iii) Tune Holdings is not related to or an affiliate of the Debtors or any of their insiders or former insiders; (iv) Tune Holdings is not a successor to nor has it merged or consolidated with the Debtors; and (iv) no non-debtor affiliate or current or former officer, director, employee, managing member or affiliate of any of the Debtors (other than as the seller) is a party to, or broker in connection with, the Akoustis Sale.

28. The Tune Holdings APA was not entered into and the Akoustis Sale is not being consummated for the purpose of hindering, delaying, or defrauding present or future creditors of the Debtors. All payments to be made by Tune Holdings in connection with the Akoustis Sale have been disclosed in the Tune Holdings APA. Neither the Debtors nor Tune Holdings entered the Tune Holdings APA or is proposing to consummate the Akoustis Sale fraudulently.

## **CONCLUSION**

29. Based on my experience and personal knowledge of the Debtors' robust marketing efforts and the terms of the Successful Bids, as well as my knowledge and experience in distressed sales generally, I believe the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the approval of and entry into the Tune Holdings APA and approval of the Akoustis Sale. I believe that entry into the Tune Holdings APA and consummation of the Akoustis Sale constitutes a sound and reasonable exercise of the Debtors' business judgment, consistent with their fiduciary duties, because, among other things: (a) the terms of the Tune Holdings Bid and Tune Holdings APA embodies the highest and best offer received by the Debtors during the bidding process for the Akoustis Assets, (b) the Tune Holdings Bid presents the best opportunity to maximize the value of the Akoustis Assets, (c) Tune Holdings Bid provides for rehiring of employees; and (d) the Akoustis Sale will provide a greater recovery for the Debtors' estates on the Akoustis Assets than would any other available alternative.

30. I further believe the Akoustis Sale as contemplated by the Tune Holdings Bid is in the best interest of the Debtors, their estates, their creditors, and other parties in interest and is necessary and appropriate to maximize the value of the Debtors' estates. Accordingly, I believe that the Court should enter the Sale Order and approve the Akoustis Sale.

Dated:  April 29, 2025         */s/ Michael Pokrassa*
         Wilmington, Delaware   Michael Pokrassa
                                Raymond James & Associates, LLC