*SOLICITATION VERSION*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ATECH (PARENT) RESOLUTION CORP, *et al.*,[1] | Case No. 24-12796 (LSS) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF
## ATECH (PARENT) RESOLUTION CORP. AND ITS DEBTOR AFFILIATES

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT ON AN INTERIM BASIS AND THE HEARING ON FINAL APPROVAL WILL BE AT THE CONFIRMATION HEARING.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES NOR IS IT SOLICITING AN OFFER TO BUY ANY SECURITIES.  INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AN AUDIT.

**K&L GATES LLP**
Jeffrey T. Kucera
Southeast Financial Center, Suite 3900
200 South Biscayne Blvd.
Miami, Florida 33131
Telephone:      (305) 539-3300
Email:          jeffrey.kucera@klgates.com


- and -

Margaret R. Westbrook
301 Hillsborough Street, Suite 1200
Raleigh, North Carolina 27603
Telephone:      (919) 743-7300
Email:          margaret.westbrook@klgates.com

**LANDIS RATH & COBB LLP**
Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5946)
Joshua B. Brooks (No. 6765)
919 Market Street
Suite 1800
Wilmington, Delaware 19801
Telephone:      (302) 467-4410
Facsimile:      (302) 467-4450
Email:          mcguire@lrclaw.com
                pierce@lrclaw.com
                brooks@lrclaw.com

*Counsel to the Debtors and Debtors-In-Possession*

Dated:  September 30, 2025

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: ATech (Parent) Resolution Corp. (9046), ATech Resolution Corp. (5617), GD Chips Resolution Corp. (f/k/a Grinding and Dicing Services, Inc.) (7929), and RF Chips Resolution Corp. (1138).  The Debtors' mailing address is c/o Getzler Henrich & Associates LLC, 295 Madison Avenue, 20th Floor, New York, NY 10017, Attn: Mark D. Podgainy.

## DISCLAIMER

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT (THIS "<u>DISCLOSURE STATEMENT</u>") TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' JOINT CHAPTER 11 PLAN OF ATECH PARENT (RESOLUTION) CORP. AND ITS DEBTOR AFFILIATES (THE "<u>PLAN</u>"). NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND ALL OF THE ACTIONS NECESSARY TO EFFECTUATE THE PLAN. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS

PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTORS' EXPECTATIONS WITH RESPECT TO FUTURE EVENTS. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS AND/OR THE PLAN ADMINISTRATOR MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND

EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED AMENDED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH THEIR OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.   FURTHERMORE, THE BANKRUPTCY COURT'S INTERIM APPROVAL OF THE ADEQUACY OF THE DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE XI OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED.  YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING BUT NOT LIMITED TO THE PLAN AND ARTICLE IX OF THIS DISCLOSURE STATEMENT ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.   THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND ANY TRANSACTIONS CONTEMPLATED THEREBY.

THE DEBTORS AND THE CREDITORS' COMMITTEE SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

## TABLE OF CONTENTS

Page

**ARTICLE I. INTRODUCTION**........................................................................................**1**
    A.    Overview of the Plan ...............................................................................1
    B.    The Plan Structure..................................................................................2
    C.    The Adequacy of this Disclosure Statement ...........................................4

**ARTICLE II. TREATMENT OF CLAIMS AND INTERESTS**...............................**5**
    A.    Classified Claims ....................................................................................6
    B.    Unclassified Claims ..............................................................................11

**ARTICLE III. VOTING AND CONFIRMATION** ................................................**13**
    A.    Classes Entitled to Vote on the Plan ....................................................13
    B.    Votes Required for Acceptance by a Class............................................14
    C.    Certain Factors to Be Considered Prior to Voting ...............................14
    D.    Classes Not Entitled to Vote on the Plan .............................................14
    E.    Solicitation Procedures .........................................................................15
    F.    Voting Procedures.................................................................................16
    G.    Disputed Claims Procedures .................................................................17
    H.    Confirmation Hearing ...........................................................................18

**ARTICLE IV. BUSINESS DESCRIPTION**...........................................................**18**
    A.    Description of the Debtors and the Debtors' Businesses........................18
    B.    Prepetition Capital Structure ...............................................................19

**ARTICLE V. EVENTS LEADING TO THE CHAPTER 11 CASES**....................**20**
    A.    Qorvo, the Damages Award, and the Injunction...................................20
    B.    Restructuring Efforts.............................................................................21

**ARTICLE VI. EVENTS OF THE CHAPTER 11 CASES** .....................................**22**
    A.    First Day Pleadings and Other Case Matters .......................................22
    B.    Sales of the Debtors' Assets .................................................................23
    C.    Executory Contracts and Unexpired Leases .........................................25
    D.    Schedules and Statements......................................................................26
    E.    Litigation Matters.................................................................................26
    F.    Claims Bar Date....................................................................................26

**ARTICLE VII. SUMMARY OF THE PLAN** .......................................................**27**
    A.    Means for Implementation of the Plan..................................................27
    B.    Settlement, Release, Injunction, and Related Provisions........................34

**ARTICLE VIII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF
THE PLAN**.............................................................................................................**39**
    A.    Confirmation Hearing ...........................................................................39
    B.    Confirmation Standards ........................................................................40
    C.    Alternative Plans..................................................................................41

D.      Acceptance by Impaired Classes ...................................................................41
E.      Confirmation Without Acceptance by All Impaired Classes................................42

**ARTICLE IX. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE
VOTING ................................................................................................................44**
A.      Risk Factors that May Affect Recoveries Available to Holders of Allowed
        Claims Under the Plan ....................................................................................44
B.      Certain Bankruptcy Law Considerations .............................................................45
C.      Disclosure Statement Disclaimer .......................................................................47
D.      Liquidation under Chapter 7 .............................................................................49

**ARTICLE X. CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES ...............................................................................................50**
A.      Certain U.S. Federal Income Tax Consequences to the Debtors............................51
B.      Certain U.S. Federal Income Tax Consequences to holders of General
        Unsecured Claims ..........................................................................................52
C.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S.
        Holders of General Unsecured Claims ...............................................................53
D.      Information Reporting and Backup Withholding ..................................................55
E.      FATCA .........................................................................................................55

**ARTICLE XI. RECOMMENDATION OF THE DEBTORS .................................................56**

## <u>EXHIBITS</u>

<u>**EXHIBIT A**</u>   **Joint Chapter 11 Plan**

<u>**EXHIBIT B**</u>   **Liquidation Analysis**

# ARTICLE I.

# INTRODUCTION

This disclosure statement (this "Disclosure Statement") provides information regarding the *Joint Chapter 11 Plan of ATech (Parent) Resolution Corp. and Its Debtor Affiliates* (as may be amended, supplemented or otherwise modified from time to time, the "Plan"),[2] which the Debtors are seeking to have confirmed by the Bankruptcy Court. A copy of the Plan is attached hereto as **Exhibit A**. The rules of interpretation set forth in Article I of the Plan shall govern the interpretation of this Disclosure Statement.

The Debtors believe that the Plan is in the best interests of the Debtors' Estates. As such, the Debtors recommend that all holders of Claims entitled to vote accept the Plan by returning their ballots (each, a "Ballot") so as to be **actually received** by the Notice, Claims, and Balloting Agent (as defined herein) no later than **December 3, 2025 at 5:00 p.m. (prevailing Eastern Time).** Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## A.  Overview of the Plan

The Debtors propose to liquidate under chapter 11 of the Bankruptcy Code. Under chapter 11, a debtor may reorganize or liquidate its business for the benefit of its stakeholders. The consummation of a chapter 11 plan of liquidation is the principal objective of these Chapter 11 Cases. A chapter 11 plan sets forth how a debtor will treat claims and equity interests.

The primary objective of the Plan is to maximize the value of recoveries to all holders of Allowed Claims and Allowed Interests and generally to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates.

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan or receives or retains any property under the plan. Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will provide for the exclusive treatment of Claims against the Debtors, terminate all of the rights and interests of pre-bankruptcy equity security holders in certain of the Debtors and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims and Interests. Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria. The Plan contemplates (i) the substantive consolidation of the Chapter 11 Cases and Estates of ATI and ATech (each as defined below) for

---

[2]   Unless otherwise specified herein, terms utilized but not otherwise defined herein have the meanings ascribed to them in the Plan.

the purposes of voting, distribution, and effectuating and implementing the Plan and (ii) the limited consolidation of all Debtors for voting purposes only.

Generally, the Plan:

- vests the Remaining Estate Assets in the Post-Effective Date Debtors for the purpose of distribution to holders of Allowed Claims and Allowed Interests;

- designates a Plan Administrator to winddown the Debtors' affairs, reconcile Claims, pay Allowed Claims, and administer the Plan in an efficacious manner; and

- provides for one hundred percent (100%) recoveries for holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims.

The Debtors believe that confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Plan classifies holders of Claims and Interests according to the type of the holder's Claim or Interest, as more fully described below. Holders of Claims in Class 4A (ATech/ATI General Unsecured Claims) are entitled to vote to accept or reject the Plan.

## B.    The Plan Structure

Pursuant to the Plan, the Debtors, the Post-Effective Date Debtors or the Plan Administrator will pay or provide for payments of Allowed Claims or Allowed Interests as follows:

- the Debtors or the Post-Effective Date Debtors shall pay Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Class 3 Other Priority Claims in full;

- the Debtors shall fund the Professional Fee Escrow Account, which Professional Fee Escrow Account shall be used to pay Allowed Professional Fee Claims;

- holders of Allowed Class 1 Secured Tax Claims shall receive, at the option of the Plan Administrator: (a) payment in full in Cash or (b) equal semi-annual Cash payments over (a) payment in full in Cash of such holder's Allowed Secured Tax Claim; or (c) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the Plan Administrator to prepay the entire amount of such Allowed Secured Tax Claim during such time period;

- holders of Allowed Class 2 Other Secured Claims shall receive from the Remaining Estate Assets of the relevant Debtor at the option of the Plan Administrator: (a) payment in full in Cash of such holder's Allowed Other Secured Claim; or (b) such other treatment rendering such holder's Allowed Other Secured Claim Unimpaired;

- holders of Allowed Class 3 Other Priority Claims shall receive from the Remaining Estate Assets of the relevant Debtor payment in full in Cash of such holder's Allowed Other Priority Claim from the Post-Effective Date Debtors or such other treatment rendering such holder's Allowed Other Priority Claim Unimpaired.

- holders of Allowed Class 4A ATech/ATI General Unsecured Claims shall receive their Pro Rata share of the ATech/ATI GUC Asset Pool, *provided*, *however*, that no holder of an Allowed ATech/ATI General Unsecured Claim shall receive a distribution in excess of the amount of its Allowed Claim;

- holders of Allowed Class 4B GD Chips General Unsecured Claim shall receive their Pro Rata share of the GD Chips GUC Asset Pool, *provided*, *however*, that no holder of an Allowed GD Chips General Unsecured Claim shall receive a distribution in excess of the amount its Allowed Claim;

- holders of Allowed Class 4C RF Chips General Unsecured Claims shall receive their Pro Rata share of the RF Chips GUC Asset Pool, *provided*, *however*, that no holder of an Allowed RF Chips General Unsecured Claim shall receive a distribution in excess of the amount of its Allowed Claim;

- each Allowed Intercompany Claim in Class 5 Intercompany Interests shall be (a) canceled, released, or discharged, or (b) otherwise set off, settled, or distributed, at the discretion of the Debtors with the consent of the Committee, or, if appointed, the Plan Administrator, in order to comply with the Unimpaired treatment for Claims in Class 4B and 4C and to maximize distribution for Claims in Class 4A;

- each Allowed Intercompany Interest shall remain issued and outstanding except to the extent a Debtor other than ATI is dissolved, liquidated and wound down under the Plan. If a Post-Effective Date Debtor has any Remaining Estate Assets after payment in full of its obligations to Classes 1 through 5, then such Remaining Estate Assets shall be transferred to the GUC Asset Pool of the Post-Effective Date Debtor that holds the Intercompany Interests of that Post-Effective Date Debtor to be treated as part of such Post-Effective Date Debtor's GUC Asset Pool for the purposes of Pro Rata distribution to the holders of General Unsecured Claims at the applicable Post-Effective Date Debtor pursuant to Article III.B of the Plan; and

- all Class 7 Interests in ATI will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and the Plan Administrator shall be deemed to own one share of stock in ATI for the benefit of the holders of such Interests in ATI consistent with their former relative priority and economic entitlements, *provided*, *further*, that the Plan Administrator shall not be entitled to exercise any voting rights appurtenant thereto in conflict with Article VII of the Plan. Each holder of Interests in ATI shall neither receive nor retain any property of the Debtors or direct interest in property of the Debtors on account of such Interests; provided, however, that in the event that all Allowed Claims in Classes 1 through 5 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of Interests in ATI may receive its share of any remaining assets of the Debtors consistent with such holder's rights of payment existing immediately prior to the Petition Date. Unless otherwise determined by the Plan Administrator, on the date that the Chapter 11 Case is closed in accordance with Article XII.L of the Plan, the share of stock issued pursuant to Article IV.J of the Plan shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' estates. The continuing rights of holders of Interests in ATI shall be nontransferable except by operation of law.

The Debtors believe that the Plan is in the best interest of the Debtors' Estates and creditors, including holders of Class 4A ATech/ATI General Unsecured Claims, and urge such holders to vote to accept the Plan.

## C.   The Adequacy of this Disclosure Statement

Before soliciting acceptances of a proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan. The Debtors submit this Disclosure Statement in accordance with such requirements. This Disclosure Statement includes, without limitation, information about:

- the Debtors' corporate history and structure, business operations, and prepetition capital structure and indebtedness (Article IV hereof);

- the events leading to the Chapter 11 Cases (Article V hereof);

- the significant pleadings Filed in the Chapter 11 Cases and certain relief granted by the Bankruptcy Court in connection therewith (Article VI hereof);

- the classification and treatment of Claims and Interests under the Plan, including identification of the holders of Claims entitled to

vote, the procedures for voting on the Plan and projected recoveries (Articles II, III, VII, and VIII hereof);

- the method of distribution of any recoveries that may be available to certain holders of Claims pursuant to the Plan, the process for resolving Disputed Claims and other significant aspects of the Plan (Article VII hereof);

- the releases contemplated by the Plan that are integral to the overall settlement of Claims pursuant to the Plan (Article VII hereof);

- the statutory requirements for confirming the Plan (Article VIII hereof);

- certain risk factors that holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article IX hereof); and

- certain United States federal income tax consequences of the Plan (Article X hereof).

In light of the foregoing, the Debtors believe that this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Plan and all documents to be executed, delivered, assumed, and/or performed in connection with consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

## ARTICLE II.

## TREATMENT OF CLAIMS AND INTERESTS

The following chart provides a summary of the anticipated recovery to holders of Classified Claims and Interests under the Plan. Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

*The recoveries available to holders of Claims and Interests are estimates and actual recoveries may materially differ based on, among other things, whether the amount of Claims and Interests actually Allowed exceeds the estimates provided below. In such an instance, the recoveries available to holders of Allowed Claims and Allowed Interests could be materially lower when compared to the estimates provided below. To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.*

Except to the extent that the Debtors and a holder of an Allowed Claim or Allowed Interest, as applicable, agree to a less favorable treatment, such holder shall receive under the Plan the

treatment described below in full and final satisfaction, compromise, settlement, and release of and in exchange for such holder's Allowed Claim or Allowed Interest. Unless otherwise indicated, each holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter, including after the completion of any necessary claims reconciliations and the prosecution of claim objections. The timing of receipt of such treatment shall be subject to the reasonable discretion of the Post-Effective Date Debtors and the Plan Administrator.

### A.    Classified Claims

| Class | Claim/Interest | Plan Treatment | Projected Amount of Allowed Claims | Projected Plan Recovery on Allowed Claims |
|---|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired and deemed to accept the Plan.<br>▪ Each holder of an Allowed Secured Tax Claim shall receive from the Remaining Estate Assets of the relevant Debtor at the option of the Plan Administrator: (a) payment in full in Cash of such holder's Allowed Secured Tax Claim; or (b) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the Plan Administrator to prepay the entire amount of such Allowed Secured Tax Claim during such time period. | $0 | 100% |
| 2 | Other Secured Claims | Unimpaired and deemed to accept the Plan. | $4,000,000 | 100% |

| Class | Claim/Interest | Plan Treatment | Projected Amount of Allowed Claims | Projected Plan Recovery on Allowed Claims |
|---|---|---|---|---|
| | | ▪ Each holder of an Allowed Other Secured Claim shall receive from the Remaining Estate Assets of the relevant Debtor  at the option of the Plan Administrator: (a) payment in full in Cash of such holder's Allowed Other Secured Claim; or (b) such other treatment rendering such holder's Allowed Other Secured Claim Unimpaired. | | |
| 3 | Other Priority Claims | Unimpaired and deemed to accept the Plan.<br><br>▪  Each holder of an Allowed Other Priority Claim shall receive from the Remaining Estate Assets of the relevant Debtor payment in full in Cash of such holder's Allowed Other Priority Claim from the Post-Effective Date Debtors or such other treatment rendering such holder's Allowed Other Priority Claim Unimpaired. | $2,388 | 100% |
| 4A | ATech/ATI General Unsecured Claims | Impaired and entitled to vote on the Plan.<br><br>▪ Except to the extent that a holder of an Allowed ATech/ATI General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed ATech/ATI General Unsecured Claim shall receive its Pro Rata share of the ATech/ATI GUC Asset Pool, *provided*, *however*, that no holder of an Allowed ATech/ATI General Unsecured Claim shall | $115,463,242 | Projected Estimated Recovery 12.3-13.8% |

| Class | Claim/Interest | Plan Treatment | Projected Amount of Allowed Claims | Projected Plan Recovery on Allowed Claims |
|---|---|---|---|---|
| | | receive a distribution in excess of the amount of its Allowed Claim. | | |
| 4B | GD Chips General Unsecured Claims | Unimpaired and deemed to accept the Plan.<br>▪ Except to the extent that a holder of an Allowed GD Chips General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed GD Chips General Unsecured Claim shall receive its Pro Rata share of the GD Chips GUC Asset Pool, *provided*, *however*, that no holder of an Allowed GD Chips General Unsecured Claim shall receive a distribution in excess of the amount its Allowed Claim. | $78,656 | 100% |
| 4C | RF Chips General Unsecured Claims | Unimpaired and deemed to accept the Plan. Each holder of Allowed Claims in this Class will receive:<br>▪ Except to the extent that a holder of an Allowed RF Chips General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed RF Chips General Unsecured Claim shall receive its Pro Rata share of the RF Chips GUC Asset Pool, *provided*, *however*, that no holder of an Allowed RF Chips General Unsecured Claim shall receive a distribution in excess of the amount of its Allowed Claim. | $3,406 | 100% |

| Class | Claim/Interest | Plan Treatment | Projected Amount of Allowed Claims | Projected Plan Recovery on Allowed Claims |
|---|---|---|---|---|
| 5 | Intercompany Claims | Unimpaired/Impaired and deemed to accept or reject the Plan.<br><br>▪ Each Allowed Intercompany Claim shall be (a) canceled, released, or discharged, or (b) otherwise set off, settled, or distributed, at the discretion of the Debtors with the consent of the Committee, or, if appointed, the Plan Administrator, in order to comply with the Unimpaired treatment for Claims in Class 4B and 4C and to maximize distribution for Claims in Class 4A. | N/A | N/A |
| 6 | Intercompany Interests | Unimpaired and deemed to accept the Plan.<br>▪ Each Allowed Intercompany Interest shall remain issued and outstanding except to the extent a Debtor other than ATI is dissolved, liquidated and wound down under the Plan. If a Post-Effective Date Debtor has any Remaining Estate Assets after payment in full of its obligations to Classes 1 through 5 above, then such Remaining Estate Assets shall be transferred to the GUC Asset Pool of the Post-Effective Date Debtor that holds the Intercompany Interests of that Post-Effective Date Debtor to be treated as part of such Post-Effective Date Debtor's GUC Asset Pool for the | N/A | N/A |

| Class | Claim/Interest | Plan Treatment | Projected Amount of Allowed Claims | Projected Plan Recovery on Allowed Claims |
|---|---|---|---|---|
| | | purposes of Pro Rata distribution to the holders of General Unsecured Claims at the applicable Post-Effective Date Debtor pursuant to Article III.B of the Plan. | | |
| 7 | Interests in ATI | Impaired and deemed to reject the Plan. Interests in ATI will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and the Plan Administrator shall be deemed to own one share of stock in ATI for the benefit of the holders of such Interests in ATI consistent with their former relative priority and economic entitlements, *provided, further*, that the Plan Administrator shall not be entitled to exercise any voting rights appurtenant thereto in conflict with Article VII of the Plan. Each holder of Interests in ATI shall neither receive nor retain any property of the Debtors or direct interest in property of the Debtors on account of such Interests; provided, however, that in the event that all Allowed Claims in Classes 1 through 5 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of Interests in ATI may receive its share of any remaining assets of the Debtors with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that the | N/A | N/A |

| Class | Claim/Interest | Plan Treatment | Projected Amount of Allowed Claims | Projected Plan Recovery on Allowed Claims |
|---|---|---|---|---|
| | | Chapter 11 Case is closed in accordance with Section IV.J of the Plan, the share of stock issued pursuant to this paragraph shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' estates. The continuing rights of holders of Interests in ATI shall be nontransferable except by operation of law. | | |

**THERE CAN BE NO ASSURANCE THAT THE ACTUAL CLAIM AMOUNTS WILL NOT BE DIFFERENT, AND PERHAPS SIGNIFICANTLY DIFFERENT, FROM THE ESTIMATES SET FORTH HEREIN. TO THE EXTENT THAT CLAIM AMOUNTS ARE MATERIALLY HIGHER THAN THE ASSUMPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT, RECOVERIES TO HOLDERS OF ALLOWED CLAIMS IN CLASS 4A COULD BE LOWER THAN CURRENTLY ANTICIPATED.**

## B.    Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan and summarized above.[3]

### 1.    Administrative Claims

Except with respect to Administrative Claims that are Professional Fee Claims and 503(b)(9) Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the Debtors agree to less favorable treatment, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Allowed Administrative Claim, payment from the Post-Effective Date Debtors on or as soon as practical after the Effective Date.

---

[3]    The Debtors estimate that the unclassified Allowed Administrative Claims and Allowed Priority Tax Claims total approximately $2,189,698 and $383,703 respectively.

Except for Professional Fee Claims, and unless previously Filed pursuant to the Bar Date Order, requests for payment of Administrative Claims must be Filed and served on the Post-Effective Date Debtors no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.  Objections to such requests must be Filed and served on the Post-Effective Date Debtors and the requesting party by the Administrative Claim Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order that becomes a Final Order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claim Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Priority Claims Reserve, the Debtors or their property and the Post-Effective Date Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Post-Effective Date Debtors or any notice to or action, order or approval of the Bankruptcy Court or any other Entity.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim that is Allowed by Final Order.

The failure to object to Confirmation by a Holder of an Allowed Administrative Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code; *provided*, *however*, that the holders of such Claims shall be deemed to consent to the treatment on account of such Claims as provided herein.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim that is Allowed by Final Order.

2.  **Professional Fee Claims**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed by the Professional Fee Bar Date, unless no final request for payment of such Professional Fee Claims is required pursuant to an order of the Bankruptcy Court.  Holders of Professional Fee Claims that are required to File a final request for payment of such Professional Fee Claims that do not File such a request by the Professional Fee Bar Date shall be forever barred, estopped and enjoined from asserting such Professional Fee Claims against the Professional Fee Escrow Account and the Debtors or their property and the Post-Effective Date Debtors or their property, and such Professional Fee Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Post-Effective Date Debtors or any notice to or action, order or approval of the Bankruptcy Court or any other Entity.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Bankruptcy Court orders.  The Post-Effective Date Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash from the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

### 3.  Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, Cash payment in the amount of the Allowed Priority Tax Claim from the from the Post-Effective Date Debtors.

## ARTICLE III.

## VOTING AND CONFIRMATION

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims and Interests in a permissible manner, (ii) the Plan complies with applicable provisions of the Bankruptcy Code, (iii) the Debtors have complied with applicable provisions of the Bankruptcy Code, (iv) the Debtors have proposed the Plan in good faith and not by any means forbidden by law, (v) the disclosure required by section 1125 of the Bankruptcy Code has been made, (vi) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, (viii) the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to such holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless the Holder has accepted the Plan, and (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

### A.  Classes Entitled to Vote on the Plan

The following is the only Class entitled to vote to accept or reject the Plan (the "Voting Class"):

| Class | Claim | Status |
|-------|-------|--------|
| 4A | ATech/ATI General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Class, you are not entitled to vote and you will not receive a Solicitation Package (as defined herein) or a Ballot.  If your Claim or Interest is included in the Voting Class, you should read your Ballot and carefully follow the instructions set forth therein.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Notice, Claims, and Balloting Agent on behalf of the Debtors, otherwise provides to you.

**B.     Votes Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Each Class of Claims entitled to vote on the Plan will have accepted the Plan if:  (a) the holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan and (b) the holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan.

**C.     Certain Factors to Be Considered Prior to Voting**

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan, including the following:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Fee Claims.

While these factors could affect distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of holders within the Voting Class or necessarily require a re-solicitation of the votes of such holders.

For a further discussion of risk factors, please refer to Article IX hereof, entitled "Certain Risk Factors to be Considered Before Voting."

**D.     Classes Not Entitled to Vote on the Plan**

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or if they will receive no property under the plan, in which case they are deemed to reject the proposed plan.  Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 4B | GD Chips General Unsecured Claims | Unimpaired | Presumed to Accept |
| 4C | RF Chips General Unsecured Claims | Unimpaired | Presumed to Accept |
| 5 | Intercompany Claims | Unimpaired/Impaired | Presumed to Accept /Deemed to Reject |
| 6 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 7 | Interests in ATI | Impaired | Deemed to Reject |

## E.     Solicitation Procedures

### 1.   *Notice, Claims, and Balloting Agent*

The Debtors retained Stretto Inc. to act, among other things, as the notice, claims, and balloting agent (the "Notice, Claims, and Balloting Agent") in connection with the solicitation of votes to accept or reject the Plan.

### 2.   *Solicitation Package*

The record date for voting purposes is October 29, 2025 (the "Record Date").  The Record Date is the date on which it will be determined which holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.  Such holders who are entitled to vote to accept or reject the Plan as of October 29, 2025 will receive appropriate solicitation materials (the "Solicitation Package"), which will include, in part, the following:

- the appropriate Ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement, including the Plan as an exhibit thereto.

### 3.   *Distribution of the Solicitation Package and Plan Supplement*

The Debtors will cause the Notice, Claims, and Balloting Agent to distribute the Solicitation Packages to holders of Claims in the Voting Class on or before October 31, 2025.

The Solicitation Package (except for the Ballots) may also be obtained:  (a) from the Notice, Claims, and Balloting Agent by (i) visiting at https://cases.stretto.com/ATech  or (ii) emailing TeamATech@stretto.com; or (b) for a fee via PACER at http://www.deb.uscourts.gov.

At least seven (7) days prior to the earlier of the deadlines (a) to vote on the Plan or (b) object to confirmation of the Plan, the Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at https://cases.stretto.com/ATech.  The Debtors will not serve paper or electronic copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement (a) from the Notice, Claims, and Balloting Agent by (i) calling the Debtors' restructuring at (855) 316-4019 (U.S./Canada, toll-free) or (714) 881-5615 (International); (ii) visiting the Debtors' restructuring website at: https://cases.stretto.com/ATech; or (iii) emailing TeamATech@stretto.com; or (b) for a fee via PACER at http://www.deb.uscourts.gov.

As described above, certain holders of Claims may not be entitled to vote because they are Unimpaired or are otherwise deemed to accept the Plan under section 1126(f) of the Bankruptcy Code.  In addition, certain holders of Claims and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote.  Such holders will receive only the Confirmation Hearing Notice, a non-voting status notice and an opt-in election form enabling such holder to opt-in to the Consensual Third Party Releases.  The Debtors are only distributing a Solicitation Package, including this Disclosure Statement and a Ballot to be used for voting to accept or reject the Plan, to the holders of Claims or Interests entitled to vote to accept or reject the Plan as of the Record Date.

## F.    Voting Procedures

Holders of Classes 4A ATech/ATI General Unsecured Claims as of the Record Date (*i.e.* October 29, 2025), are entitled to vote to accept or reject the Plan.  If you hold such a Claim, you will receive a solicitation package which shall include, among other things, a copy of (i) the Confirmation Hearing Notice, (ii) the Plan (on a disk or flash drive in PDF format), (iii) the Disclosure Statement (on a disk or flash drive in PDF format), and (iv) a ballot with instructions for how to vote on the Plan.  Failure to follow the voting instructions may disqualify your vote.

### 1.  *Voting Deadline*

**The Voting Deadline is December 3, 2025 at 5:00 p.m., prevailing Eastern Time** (the "Voting Deadline").  To be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed and delivered by (i) using the return envelope provided or by delivery by: (a) first class mail, (b) overnight courier or (c) personal delivery, or (ii) submitting it via electronic online transmission through a customized online balloting portal on the Debtors' case website, at https://cases.stretto.com/ATech, so that the Ballot is **actually received** by the Notice, Claims, and Balloting Agent no later than the Voting Deadline.

### 2.  *Voting Instructions*

As described above, the Debtors have retained Stretto Inc. to serve as the Notice, Claims, and Balloting Agent for purposes of the Plan.  The Notice, Claims, and Balloting Agent is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| **BALLOTS** |
|---|
| To be counted, all Ballots must be **actually** **received** by the Notice, Claims, and Balloting Agent by the Voting Deadline, which is December 3, 2025 at 5:00 p.m., prevailing Eastern Time, at the following address:<br><br>ATech (Parent) Resolution Corp., et al., Claims Processing<br>c/o Stretto Inc.<br>410 Exchange, Suite 100<br>Irvine, CA  92602<br><br>If you have any questions on the procedure for voting on the Plan, please call the Debtors' restructuring hotline maintained by the Notice, Claims, and Balloting Agent at: (855) 316-4019 (U.S./Canada, toll-free) or (714) 881-5615 (International) |

More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed and delivered according to their applicable voting instructions by: (i) using the return envelope provided or by delivery by: (a) first class mail, (b) overnight courier or (c) personal delivery, or (ii) submitting it via electronic online transmission through a customized online balloting portal on the Debtors' case website, https://cases.stretto.com/ATech/, so that the Ballot is **actually** **received** by Stretto no later than the Voting Deadline. Any Ballot that is properly executed by the holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in the Voting Class held by such holder. By signing and returning a Ballot, each holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked.

All Ballots will be accompanied by postage prepaid return envelopes. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

## G.    Disputed Claims Procedures

The order approving this Disclosure Statement on an interim basis and approving procedures to solicit the Plan (the "Solicitation Order") authorizes the Debtors to temporarily allow Claims against which an objection is pending as of the Record Date in an amount that the Bankruptcy Court deems appropriate for purposes of permitting the holder of such Claim to vote to accept or reject the Plan. Pursuant to the Solicitation Procedures, if a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is Filed with the Court on or prior to nine (9) days before the Voting Deadline: (i) the Debtors shall cause the applicable holder to be served with a disputed claim notice; and (ii) the applicable holder shall not be entitled to vote to accept or reject the Plan on account of such Claim unless a Resolution Event (as defined

below) occurs. The holder of a Claim in a Voting Class that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection.

If a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is filed with the Bankruptcy Court fewer than ten days before the Voting Deadline, the applicable Claim shall be deemed temporarily allowed *for voting purposes only*, without further action by the holder of such Claim and without further order of the Bankruptcy Court, unless the Bankruptcy Court orders otherwise.

A "Resolution Event" means the occurrence of one or more of the following events no later than two (2) Business Days prior to the Voting Deadline: (i) an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (ii) an order of the Bankruptcy Court is entered temporarily allowing such Claim *for voting purposes only* pursuant to Bankruptcy Rule 3018 after notice and a hearing; (iii) a stipulation or other agreement is executed between the holder of such Claim and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; or (iv) the pending objection is voluntarily withdrawn by the objecting party. No later than one (1) Business Day following the occurrence of a Resolution Event, the Debtors shall cause the Notice, Claims, and Balloting Agent to distribute via email, hand delivery or overnight courier service, at the Debtors' discretion, a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant holder.

## H.    Confirmation Hearing

Assuming the requisite acceptances are obtained for the Plan, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing. The Solicitation Order scheduled the Confirmation Hearing to commence on December 16, 2025, at 2:00 p.m. (prevailing Eastern Time), before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge, in Courtroom No. 2 of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served on the entities who have Filed objections to the Plan, without further notice to other parties in interest. The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, before, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

**ARTICLE IV.**
**BUSINESS DESCRIPTION**

## A.    *DESCRIPTION OF THE DEBTORS AND THE DEBTORS' BUSINESSES*

### 1.    *Business Operations and Corporate Structure*

ATech (Parent) Resolution Corp. (*f/k/a* Akoustis Technologies, Inc.) ("ATI") (together with its Debtor affiliates, the "Company"), was incorporated on April 10, 2013, and reincorporated in Delaware as of December 15, 2016 and was headquartered in Huntersville, North Carolina. As

of the Petition Date, the Company maintained a manufacturing facility located in Canandaigua, New York (the "Fabrication Facility") and operated various other offices around the country and throughout the world.

The Company's common stock formerly traded on the Nasdaq Capital Market ("Nasdaq") under the symbol "AKTS."  ATI serves as a holding company of its wholly owned subsidiary, ATech Resolution Corp. (*f/k/a* Akoustis, Inc.) ("ATech"), which in turn wholly owns two additional subsidiaries, RF Chips Resolution Corp. (*f/k/a* RFM Integrated Device Inc.) ("RF Chips") and GD Chips Resolution Corp. (*f/k/a* Grinding and Dicing Services, Inc.) ("GD Chips" and collectively with ATech and RF Chips, the "Operating Subsidiaries").

The Debtors developed, designed, and manufactured innovative RF filter solutions for the wireless industry, including for products such as smartphones and tablets, network infrastructure equipment, WiFi Customer Premise Equipment, and defense applications.  These filters are critical in selecting and rejecting signals, and their performance enables differentiation in the functionality of the "RF front-end."  Through the Debtors' research and development, they created a proprietary microelectromechanical system based on bulk acoustic wave technology and a unique patented transfer process flow, called XBAW™, for their filters for use in RF front-end modules.  These filters incorporate optimized high purity piezoelectric materials for high power, high frequency, and wide bandwidth operation.  Located between the device's antenna and its digital backend, the RF front-end is the circuitry that performs the analog signal processing and contains components such as amplifiers, filters, and switches.  This technology is based upon "bulk-mode acoustic resonance," which the Debtors believe is superior to "surface-mode resonance" (*i.e.*, the currently prevailing technology in this market) for high-band and ultra-high-band applications.

Through the Company's acquisition of RF Chips (of which the Company obtained full ownership in April 2023), the Debtors sold complementary surface acoustic wave resonators, RF filters, crystal resonators and oscillators, and ceramic products—addressing opportunities in multiple end markets, such as automotive and industrial applications.  In addition, GD Chips provided advanced back-end wafer processing and supply chain services to over 250 customers across multiple industries, including automotive, defense, medical, optical, and communications.  GD Chip's services included processing multiple materials such silicon, silicon carbide, silicon germanium, fused silica, quartz, alumina, ceramics, optical filers and components, gallium nitride, and PZT.  GD Chips also offered wafer-thinning services, wafer polishing services, stealth dicing for wafers, as well as coring, device pick-and-place, and automated inspection services.

## B.    Prepetition Capital Structure

As of the Petition Date, the Debtors carried no traditional secured debt for working capital; they primarily financed their operations through the sale of equity as well as an offering of certain convertible notes (as discussed further below).  The Debtors' primary liabilities relate to the convertible notes, general operating expenditures, and the Litigation (defined below) with Qorvo, Inc.

1. *Secured Debt*

As of the Petition Date, certain of the Debtors' assets are subject to a security interest in favor of Joseph Collins (the "Prepetition Secured Party"), pursuant to that certain secured promissory note in the original principal amount of $4 million (the "Secured Note"). The Secured Note does not bear interest; principal was due to be repaid in part (to reduce the principal amount to $1.3 million) on January 1, 2025, with the remainder payable in full on January 1, 2026. The Prepetition Secured Party filed a UCC financing statement asserting his secured interest (such interest, the "Prepetition Liens") in substantially all of the property of ATech and GD Chips on January 9, 2023 (amended as of May 21, 2024). Based on the Debtors' books and records, the total outstanding balance under the Secured Note is $4,000,000.

2. *Unsecured Debt*

As of the Petition Date, the Debtors estimated that their prepetition liability aggregated approximately $99,925,316.46.

On June 9, 2022, Debtor ATI issued $44 million aggregate principal amount of its 6.0% Convertible Senior Notes due 2027 (the "Convertible Notes"), which were guaranteed by ATech. The Notes bore interest at a rate of 6.0% per year until maturity on June 15, 2027, payable in semi-annual installments beginning on December 15, 2022. On May 5, 2025, The Bank of New York Mellon Trust Company, N.A. as Trustee, Registrar, Paying Agent, and Conversion Agent for the 6.0% Convertible Senior Notes due 2027 filed proofs of claim numbers 43 and 44 against Debtors ATI and ATech, respectively, for outstanding principal in the amount of $44 million, plus accrued and unpaid interest on the Notes, as of the Petition Date, in the amount of $1,327,333.33, interest on defaulted interest in the amount of $220.00, and estimated fees and expenses, as of April 15, 2025, in the amount of $63,616.50 (collectively, the "Convertible Notes Claim").

In resolution of the Convertible Notes Claim, the Convertible Notes Claim shall be an Allowed Claim in the amount of $45,477,553.33 under the Plan. Pursuant to Section II.B.4 of the Plan, the Convertible Notes Agent Fees shall be paid solely from specific distributions and monies that would otherwise be due and paid to Holders of Convertible Notes Claims in Class 4A, and the Convertible Notes Agent Fees shall not be paid from monies and distributions that would otherwise be due and paid to any other holder of an Allowed Claim (other than Class 4A).

3. *Equity*

ATI directly or indirectly owns or controls 100% of the equity in the Operating Subsidiaries.

## ARTICLE V.

## EVENTS LEADING TO THE CHAPTER 11 CASES

### A.    Qorvo, the Damages Award, and the Injunction

Since its inception, the Company has consistently incurred losses and negative cash flows, and has used the issuance of debt and equity securities to help fund operations. Notwithstanding these losses, the Debtors had sufficient resources to continue funding operations and planned

investments, with $36.8 million in total current assets (including $24.4 million in cash on hand) as of June 30, 2024. However, certain developments prior to the Petition Date rendered the Debtors' financial situation unsustainable, necessitating the commencement of these Chapter 11 Cases.

On October 4, 2021, ATI and ATech were named as defendants in a complaint filed by Qorvo, Inc. ("Qorvo"), in the United States District Court for the District of Delaware (the "District Court"), captioned as *Qorvo Inc. v. Akoustis Technologies, Inc.*, No. 1:21-cv-01417-JPM (the "Litigation"), alleging, among other things, patent infringement, false advertising, false patent marketing, and unfair competition. Qorvo sought to enjoin ATI and ATech from continuing the alleged infringement as well as monetary damages (including punitive and statutory enhanced damages).

On May 17, 2024, the jury returned a verdict in favor of Qorvo with respect to counts alleging misappropriation of certain trade secrets and patent infringement, including an award of damages in the amount of $38.6 million (the "Jury Award"). Through post-trial briefing, ATI and ATech sought to contest the judgment by obtaining a vacatur, remittitur, or amendment thereof. Such efforts were unavailing, and the District Court entered orders (a) awarding attorneys' fees to Qorvo on September 9, 2024, in the amount of $11,743,745.54 (the "Attorneys' Fees Award") and (b) awarding pre- and post-judgment interest to Qorvo on September 10, 2024, in the aggregate amount of $7,257,436.97 (the "Interest Award" and, together with the Jury Award and the Attorneys' Fees Award, the "Damages Award"). Qorvo thereafter submitted an Amended Final Judgment, compiling all of the District Court's findings and rulings into a single judgment, which the District Court entered on November 22, 2024 (the "Amended Final Judgment").

In addition to the Damages Award, the District Court also granted Qorvo a permanent injunction (the "Injunction"). On October 11, 2024 (though not entered on the docket until October 15, 2024), the District Court entered an order permanently enjoining ATI and ATech from possessing, reviewing, using, or disclosing certain information obtained from Qorvo (the "Qorvo Trade Secret Information"), offering, selling, or distributing products that were made using the Qorvo Trade Secret Information; or advertising, promoting, or offering services utilizing the Qorvo Trade Secret Information. In support of the Injunction, the District Court ordered ATI and ATech to engage in a review of their files, data, and information in order to identify, quarantine, and purge any Qorvo Trade Secret Information as well as other confidential Qorvo information, and the District Court granted Qorvo certain audit rights with respect to this process. Finally, the District Court also permanently enjoined ATI and ATech from making, using, selling, or otherwise offering to sell in the United States certain products that the jury found infringed on two of Qorvo's patents.

## B.     Restructuring Efforts.

In the months leading up to the Petition Date, the Debtors began exploring strategic options. This process dated back to late 2023, but it began in earnest in June 2024, when the Debtors engaged advisors to assist in exploring and assessing such options with the Debtors and understanding the Debtors' overall financial condition. In August 2024, the Debtors retained Raymond James & Associates, Inc. ("RJA") to serve as investment banker for purposes of exploring and assessing strategic options.

Ultimately, following its evaluation of all available options, the Debtors determined that filing for Chapter 11 protection and pursuing a sale process through the Chapter 11 Cases was the best available option to maximize value for the Debtors and their stakeholders.

1.   *Prepetition Marketing Efforts*

Together with RJA, the Debtors conducted an all-inclusive marketing process for both (a) financing proposals that would enable the Debtors either (i) to post a bond allowing ATI and ATech to appeal the Amended Final Judgment and the Injunction or (ii) to execute on their business plan and potentially pay down all or a portion of the Damages Award and (b) obtaining bids for the sale of all or a portion of the Debtors' assets.  Prior to the Petition Date, the Debtors and their advisors engaged with the parties that had submitted the strongest indications of interest and the Debtors accepted the bid of Gordon Brothers Commercial & Industrial, LLC (the "Stalking Horse") as the stalking horse bid for the sale of the Debtors' assets pursuant to the agreement with the Stalking Horse (the "Stalking Horse APA").

The Stalking Horse APA allowed the Debtors to continue pursuing a sale of the Purchased Assets (as defined in the Stalking Horse APA) while at the same time locking in a gross purchase price of at least $7 million, subject to certain price adjustment mechanisms (or $10 million if closed within the first 52 days after the Petition Date).

## ARTICLE VI.

## EVENTS OF THE CHAPTER 11 CASES

**A.    First Day Pleadings and Other Case Matters**

1.   **First Day Relief**

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors and customers following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Mark D. Podgainy in Support of Debtors' Chapter 11 Petitions and First Day Motions*, filed on the Petition Date.  The orders granting the First Day Motions authorized, among other things:

- the continued maintenance of the Debtors' bank accounts, continued use of existing business forms and continued use of the Debtors' existing cash management system;

- the appointment of Stretto Inc. as the noticing agent in the Chapter 11 Cases;

- continued payment of certain prepetition taxes, governmental assessments and related fees; and

- payments to employees for accrued prepetition wages, salaries and benefits.

The First Day Motions and related orders entered in the Chapter 11 Cases can be viewed free of charge at https://cases.stretto.com/ATech/.

## 2. Official Committee of Unsecured Creditors

On December 30, 2024, the United States Trustee for the District of Delaware formed an Official Committee of Unsecured Creditors (as reconstituted from time to time, the "Creditors Committee"), and appointed the following members of the Creditors' Committee: (i) The Bank of New York Mellon Trust Company, N.A.; (ii) Tai-Saw Technology Co., Ltd.; (iii) FTI Consulting Technology LLC; and (iv) Nineteen77 Global Multi-Strategy Alpha Master Limited. The Creditors' Committee selected Paul Hastings LLP and Young Conaway Stargatt & Taylor as its counsel and Alvarez & Marsal North America, LLC as its financial advisor. The next day, the United States Trustee filed an amended notice of appointment of members to the Creditors Committee, removing FTI Consulting Technology LLC therefrom. On January 8, 2025, the United States Trustee again filed an amended notice of appointment removing Tai-Saw Technology Co., Ltd., leaving only (i) the Bank of New York Mellon Trust Company, N.A. and (ii) Nineteen77 Global Multi-Strategy Alpha Master Limited as the members of the Creditors Committee.

## 3. Approval of Use of Cash Collateral

Based on the Debtors' need for immediate liquidity to administer the Chapter 11 Cases, on the Petition Date, the Debtors filed a motion seeking authorization to use cash collateral on an interim and final basis. On January 13, 2025, the Court entered the *Final Order (A) Authorizing the Debtors' Use of Cash Collateral; (B) Granting Adequate Protection to the Prepetition Secured Party; (C) Scheduling a Final Hearing; and (D) Granting Related Relief* [D.I. 179] authorizing the Debtors' use of cash collateral on a final basis.

On May 7, 2025, the Debtors filed the *Debtors' Second Motion for Entry an Order (A) Authorizing the Debtors' Use of Cash Collateral and (B) Granting Related Relief* [D.I. 548] (the "Second Cash Collateral Motion") seeking authorization for the continued use of cash collateral during the Chapter 11 Cases. On May 15, 2025, the Court entered an order granting the Second Cash Collateral Motion.

## B. Sales of the Debtors' Assets

On the Petition Date, the Debtors filed the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures For The Sale of Substantially All Of The Debtors' Assets, (B) Authorizing The Debtors To Enter Into The Stalking Horse Agreement And To Provide Bidding Protections Thereunder, (C) Scheduling An Auction And Approving The Form And Manner Of Notice Thereof, (D) Approving Assumption And Assignment Procedures, (E) Scheduling A Sale Hearing And Approving The Form And Manner Of Notice Thereof, And (F) Granting Related Relief; And (II)(A) Approving The Sale Of The Debtors' Assets Free And Clear Of Liens, Claims, Interests, And Encumbrances, (B) Approving The Assumption And Assignment Of Executory Contracts And Unexpired Leases, And (C) Granting Relied Relief* [D.I. 14] (the "Bid Procedures Motion").

Qorvo objected to the Bid Procedures Motion and, on January 8 and 9, 2025, the Court held a hearing to consider the Bid Procedures Motion (the "Bid Procedures Hearing"). At the Bid

Procedures Hearing, the Debtors reached an agreement with Qorvo with respect to the Bid Procedures Motion which provided, among other things, certain procedures by which the Debtors and Qorvo simultaneously engaged in a review process to identify any Enjoined Information in the assets the Debtors intended to sell in their sale process (the "Cleansed Assets"). On January 13, 2025, the Court entered the *Order (I) Approving Bidding Procedures For The Sale Of Substantially All Of The Debtors' Assets, (II) Authorizing The Debtors To Enter Into Stalking Horse Agreement And To Provide Bidding Protections Thereunder, (III) Scheduling An Auction And Approving The Form And Manner Of Notice Thereof, (IV) Approving Assumption And Assignment Procedures, (V) Scheduling A Sale Hearing And Approving The Form And Manner Of Notice Thereof, And (VI) Granting Related Relief* [D.I. 176] (the "Bidding Procedures Order").

In accordance with the Bidding Procedures Order, the Debtors conducted an extensive cleanse process identifying the Cleansed Assets the Debtors proposed to sell in connection with their sale process in the Chapter 11 Cases. Pursuant to the Bidding Procedures Order, the Court held a hearing on April 17, 2025 on the Qorvo Trade Secret Objection (as defined in the Bidding Procedures Order). On April 18, 2025, the Court issued its *Letter Ruling* [D.I. 453] ruling that the Debtors' sale could not include any Disputed Data (as defined in the Letter Ruling).

The Debtors received eight (8) qualified bids for the Debtors' assets, including the Stalking Horse Bid—contemplating various bid configurations. The eight qualified bids covered five separate auction packages of the Debtors' assets. Consistent with the Bidding Procedures Order, the Debtors, in their business judgment, assessed each of the qualified bids received and designated baseline bids for each of the five auction packages. This process was designed to allow the Debtors to review the different combinations of potential sales and determine the most valuable combination of the highest and best bids. Each qualified bid contained an allocation of value for the various assets the relevant bidder sought to purchase. On April 25, 2025, the Debtors commenced an auction (the "Auction"). One qualified bidder participated by submitting a bid with respect to only the Akoustis Assets (as defined below); four qualified bidders participated by submitting bids with respect to only the GDSI Assets (as defined below); and three qualified bidders submitted bids with respect to various combinations of GDSI Assets and Akoustis Assets. After the various Qualified Bids were compared, the Debtors designated the bid of Tune Holdings Corp. ("Tune Holdings") as the baseline bid with respect to substantially all of the Debtors' assets other than those owned by Debtor GDSI (such assets, the "Akoustis Assets"). The Auction included multiple rounds of bidding for the Akoustis Assets, including thirteen overbids submitted in total for such assets. The Debtors concluded in the exercise of their business judgment and consistent with the Bidding Procedures Order that the terms of the Tune Holdings Bid as set forth in that certain *Asset Purchase Agreement* (the "Tune Holdings APA"), which included a purchase price of $30.2 million in cash and contemplated a going-concern transaction, with Tune Holdings covenanting to offer employment to at least 50% of the selling Akoustis Entities' workforce was the successful bid for the Akoustis Assets. In addition, the Debtors concluded in the exercise of their business judgment and consistent with the Bidding Procedures Order that the terms of the bid submitted by Silitronics Solutions Inc. ("Silitronics") as set forth in that certain *Asset Purchase Agreement* by and between Silitronics and Debtor GDSI (the "Silitronics APA") was the successful bid for the GDSI Assets. The Silitronics APA provided, among other things, a purchase price of $5,295,000 in cash consideration for the GDSI Assets.

On May 1, 2025, the Court entered the *Order (I) Approving the Sale of Assets Free and Clear of Liens, Claims Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith and (III) Granting Related Relief* approving the sale of the Akoustis Assets to Tune Holdings (the "Akoustis Sale"). The Akoustis Sale closed on May 15, 2025. *See* D.I. 564. On June 20, 2025 the Court entered the *Order (I) Approving the Sale of Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith and (III) Granting Related Relief* [D.I. 641] approving the sale of the GDSI Assets to Silitronics pursuant to the Silitronics APA (the "GDSI Sale"). The GDSI Sale closed on June 25, 2025. *See* D.I. 647.

## C.    Executory Contracts and Unexpired Leases

### 1.    Rejection of Executory Contracts and Unexpired Leases

The Debtors were party to a substantial number of Executory Contracts and Unexpired Leases as of the Petition Date. The Debtors conducted a comprehensive analysis of their Executory Contracts and Unexpired Leases both prior to and after the Sale. To date, the Debtors have either assumed and assigned or have rejected all of their non-residential real property leases and nearly all of their other Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is the subject of a motion to assume such Unexpired Lease or Executory Contract that is pending on the Confirmation Date; (2) is a contract, release, or other agreement or document entered into in connection with the Plan; (3) is a directors and officers insurance policy; or (4) previously assumed, assumed and assigned, or rejected.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Bankruptcy Order approving the rejection of the Executory Contracts and Unexpired Leases rejected pursuant to the Plan. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Unless otherwise indicated, rejection of Executory Contracts and Unexpired Leases pursuant to the Plan shall be effective as of the Effective Date.

### 2.    Directors and Officers Insurance Policies

Any directors and officers insurance policies shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Post-Effective Date Debtors effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy previously was rejected by the Debtors or the Debtors' Estates pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under any such policies shall remain available to all individuals within the definition of "Insured" in any such policies.

**D.    Schedules and Statements**

On February 3 and 4, 2025, the Debtors filed their *Schedules of Assets and Liabilities* [D.I. 254, 255, 256, 257, 259, 260, 334] and *Statements of Financial Affairs* [D.I. 250, 251, 252, 253] (as may be amended or modified and together as, the "Schedules and Statements"). On January 15, 2025, the U.S. Trustee conducted the meeting of creditors convened pursuant to section 341 of the Bankruptcy Code (the "341 Meeting"). On February 12, 2025, the U.S. Trustee closed the 341 Meeting.

**E.    Litigation Matters**

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to release in connection with the Chapter 11 Cases.

As set forth in Article V.A, *supra*, Qorvo obtained the Amended Final Judgement prior to the Petition Date. On May 30, 2025, Qorvo filed proofs of claim numbers 53 and 54 asserting unsecured claims in the amount of $59,883,518.14. On July 10, 2025, the Bankruptcy Court entered the *Order (I) Approving the Compromise Between the Debtors and Qorvo, Inc. and (II) Granting Related Relief* [D.I. 672] approving the resolution of the Qorvo Claims and providing Qorvo with an Allowed Claim in the amount of $59,133,518.14 (the "Allowed Qorvo Claim"). The Allowed Qorvo Claim is an Allowed Class 4A ATech/ATI General Unsecured Claim under the Plan.

**F.    Claims Bar Date**

The Bankruptcy Court established June 17, 2025, at 5:00 p.m., prevailing Eastern Time, as the Claims bar date (the "Bar Date") in the Chapter 11 Cases for claims arising before the Petition Date. The following entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date, were required to file proofs of claim on or before the Bar Date: (i) all persons and entities, other than governmental units (as that term is defined in 11 U.S.C. § 101(27)), holding a claim against the Debtors arising (or deemed to arise) before the Petition Date (each, a "General Claim"), including any claim arising under Bankruptcy Code section 503(b)(9) for the value of goods received by the Debtors within twenty (20) days before the Petition Date. The Bankruptcy Court established June 15, 2025 at 5:00 p.m., prevailing Eastern Time, as the governmental entity bar date (the "Governmental Bar Date").

In accordance with Bankruptcy Rule 3003(c)(2), if any person or entity that is required, but fails, to file a proof of claim on or before the Bar Date, unless otherwise agreed by the Debtors, the Post-Effective Date Debtors or the Plan Administrator, as applicable, or otherwise ordered by

the Bankruptcy Court: (1) such person or entity will be forever barred, estopped and enjoined from asserting such Claim against the Debtors (or filing a proof of claim with respect thereto); (2) the Debtors and their property may be forever released from any and all indebtedness or liability with respect to or arising from such Claim; (3) such person or entity will not receive any distribution in the Chapter 11 Cases on account of that Claim; and (4) such person or entity will not be permitted to vote on the Plan on account of these barred Claims or receive further notices regarding such Claim.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which proofs of claim are filed on or before the Bar Date and the Governmental Bar Date.

## ARTICLE VII.

## SUMMARY OF THE PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as any exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Plan, and will, upon the occurrence of the Effective Date, be binding upon all holders of Claims against and Interests in the Debtors and the Debtors' Estates, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.   **Means for Implementation of the Plan**

1.   <u>**Limited Substantive Consolidation**</u>

The Plan contemplates and is predicated upon the deemed consolidation of all of the Debtors for voting purposes only; *provided, further*, that the Plan shall be deemed a motion by the Debtors seeking the approval, effective as of the Effective Date, of the substantive consolidation of the Chapter 11 Cases and Estates of ATI and ATech for the purposes of voting, distribution, and effectuating and implementing the Plan. On the Effective Date, each Claim filed or to be filed against ATech or ATI shall be deemed filed only against ATech and shall be deemed a single Claim against and a single obligation of ATech and the claims register shall be updated accordingly. This limited substantive consolidation effected pursuant to Article IV.A of the Plan

shall not otherwise affect the rights of any holder of any Claim, or affect the obligations of any Debtor with respect to such Claim.

Except as otherwise provided in the Plan, the substantive consolidation set forth in Article IV.A shall not: (i) affect the separate legal existence of the Debtors for purposes other than implementation of the Plan pursuant to its terms; (ii) constitute or give rise to any defense, counterclaim or right of netting or setoff with respect to any Cause of Action vesting in the Post-Effective Date Debtors that could not have been asserted against the Debtors; or (iii) give rise to any right under, any executory contract, insurance contract or other contract to which any Debtor is party, except to the extent required by section 365 of the Bankruptcy Code in connection with the assumption of such contract by the applicable Debtors.

## 2. <u>Post-Effective Date Debtors</u>

The Debtors shall continue in existence after the Effective Date as the Post-Effective Date Debtors solely for the purposes, at the discretion of the Plan Administrator, of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Post-Effective Date Debtors (2) resolving any Disputed Claims, (3) paying Allowed Claims, (4) enforcing and prosecuting claims, interests, rights, and privileges under any Causes of Action retained by the Post-Effective Date Debtors in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (5) filing appropriate tax returns, and (6) administering the Plan in an efficient manner. The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

## 3. <u>Plan Administrator</u>

On the Effective Date, the authority, power and incumbency of the persons acting as directors and officers of the Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole director and the sole officer of the Post-Effective Date Debtors and shall succeed to the powers of the Debtors' directors and officers. From and after the Effective Date, except as provided otherwise in the Plan, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors.

### (a) *Powers of the Plan Administrator*

Except as otherwise provided in the Plan or the Confirmation Order, the powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to make distributions thereunder and wind down the businesses and affairs of the Debtors and the Post-Effective Date Debtors, as applicable, including: (1) liquidating, receiving, holding, investing, supervising, and protecting the Remaining Estate Assets; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (3) the pursuit of objections to, estimation of and settlements of Claims or Interests, regardless of whether such Claim or Interest is listed on the Debtors' Schedules, other than Claims or Interests that are Allowed pursuant to the Plan; (4) calculating and making distributions as contemplated

under the Plan; (5) establishing and maintaining bank accounts in the name of the Post-Effective Date Debtors; (6) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (7) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors; (8) administering and paying taxes of the Post-Effective Date Debtors, including filing tax returns; (9) representing the interests of the Post-Effective Date Debtors before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (10) exercising such other powers as may be vested in it pursuant to an order of the Bankruptcy Court, the Plan, the Confirmation Order, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the Plan Administrator may not use any documents or information, however procured, that in any way, (i) are subject to the Permanent Injunction or (ii) is sequestered information in the possession of Stroz, in either case of the foregoing (i) or (ii), without Qorvo's written consent.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Post-Effective Date Debtors; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Post-Effective Date Debtors shall be terminated.

### (b)    *Appointment of the Plan Administrator*

The Plan Administrator shall be appointed by the Creditors' Committee in consultation with the Debtors and Qorvo. Any successor to the Plan Administrator shall be appointed by the Plan Administrator in consultation with the Post-Effective Date Debtors. The Plan Administrator shall retain and have all the rights, powers and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order.

### (c)    *Retention of Professionals*

The Plan Administrator shall have the right to retain the services of attorneys, accountants and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Post-Effective Date Debtors, upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

### (d)    *Compensation of the Plan Administrator*

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement and shall be determined by the Debtors, the Administrative Agent and the Creditors' Committee.

(e)     *Wind Down*

On and after the Effective Date, the Plan Administrator shall be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall take any and all actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  From and after the Effective Date, the Debtors (1) shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to the Plan all Interests other than the Intercompany Interests and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

(f)     *Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation*

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct or gross negligence, in all respects by the Post-Effective Date Debtors. The Plan Administrator may obtain, at the expense of the Post-Effective Date Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Post-Effective Date Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

(g)     *Tax Returns*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

(h)     *Dissolution of the Post-Effective Date Debtor*

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan, and entry of a final decree closing the last of the Chapter 11 Cases, the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Post-Effective Date Debtors, including the filing of any documents with the secretary of state for the state in which the Post-Effective Date Debtors are formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw

the Post-Effective Date Debtors from applicable states. For the avoidance of doubt, the Permanent Injunction continues to apply with respect to ATI, ATech, and all persons and entities encompassed by the Permanent Injunction, and Qorvo's rights are expressly retained and preserved with respect thereto.

### 4.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### (a)    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter, each holder of an Allowed Claim or Allowed Interest (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth herein. Except as otherwise provided in the Plan, holders of Claims or Interests shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

#### (b)    *Disbursing Agent*

The Plan Administrator shall make all distributions under the Plan on account of Allowed Claims, *provided*, *however*, that all Allowed Professional Fee Claims shall be paid out of the Professional Fee Reserve; *provided further* that all distributions on account of the Convertible Notes Claims shall be made to, or at the direction of, the Convertible Notes Agent for distribution in accordance with the Plan and the procedures specified in the Convertible Notes Documents.

The Plan Administrator shall not be required to give any bond or surety or other security for the performance of his or her duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Plan Administrator is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Post-Effective Date Debtors.

#### (c)    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

#### 1.    Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date. For the avoidance of doubt, no distribution record date shall apply to holders of public Securities (including the Convertible Notes). The Plan Administrator shall process and make an initial distribution by no later than 30 days after the Effective Date and such initial

distribution shall distribute to holders of Allowed Claims (together with, and accounting for, any reserves pursuant to the Plan for Disputed Claims or Interests), no less than half of the cash on hand of the Post-Effective Date Debtors at such time.

### 2. Delivery of Distributions

Except as otherwise provided herein, the Plan Administrator shall make distributions to holders of Allowed Claims and Allowed Interests at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Plan Administrator; *provided*, *further*, that the address for each holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that holder, and, *provided*, *further*, that the Plan Administrator shall not impact or impair the quantum of distribution received by the Holder of an Allowed Claim on account of the Holder's applicable Allowed Claim except as otherwise provided in the Plan with respect to the Convertible Notes Claim. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, all distributions to holders of Convertible Notes Claims shall be deemed completed when made to (or at the direction of) the Convertible Notes Agent, which shall be deemed to be the single holder of all Convertible Notes Claims for purposes of distributions to be made hereunder. Subject to the Convertible Notes Agent Charging Lien, the Convertible Notes Agent may (at its election) transfer, direct, or facilitate the transfer of such distributions (and may rely upon information received from the Debtors or the Plan Administrator, as applicable, for purposes of such transfer) through the facilities of DTC in accordance with DTC's customary practices; *provided, however*, that such distributions will only be issued in accordance with DTC book-entry procedures. For the avoidance of doubt, DTC shall be considered a single holder with respect to distributions made on account of the Convertible Notes. The Convertible Notes Agent shall not incur any liability whatsoever on account of any distributions under the Plan. If the Convertible Notes Agent is unable to make, or consents to the Debtors or the Plan Administrator (as applicable) making, such distributions through the facilities of DTC, the Debtors or the Plan Administrator (as applicable) shall make such distribution (subject to the Convertible Notes Agent Charging Lien). Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Convertible Notes Agent shall have no duties, obligations, responsibilities, or liability whatsoever with respect to distributions made or directed to be made by the Convertible Notes Agent or with respect to any form of distribution that is not DTC eligible, and the Debtors or the Plan Administrator, as applicable, shall make such distributions (subject to the Convertible Notes Agent Charging Lien).

### 3. Minimum Distributions

Notwithstanding any other provision of the Plan, the Plan Administrator will not be required to make distributions of Cash less than $50 in value, and each such Claim to which this limitation applies shall be fully satisfied pursuant to Article VIII of the Plan and its holder is forever barred pursuant to Article VIII of the Plan from asserting that Claim against the Debtors or their property.

### 4. No Double Recovery

For any Claim for which more than one Debtor is jointly and severally liable or asserted against one or more Debtor for the same liability, to the extent the holder of such Claim has

received payment or distribution under the Plan in full on account of an Allowed Claim in accordance with Article III.B of the Plan, such Allowed Claim shall be deemed satisfied and expunged from the claims registry without an objection to such Claim having been filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 5.  Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Plan Administrator has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that all distributions to holders of Allowed Claims that are unclaimed for a period of ninety (90) calendar days after the date of the first attempted distribution shall have its, his or her Claim for such undeliverable distribution deemed satisfied and will be forever barred from asserting any such Claim against the Debtors, the Post-Effective Date Debtors, or their respective property.  Any Cash payment made in the form of a check shall be null and void and deemed unclaimed within the meaning of Article VI.C of the Plan if not cashed within ninety (90) calendar days after date of issuance thereof, and all requests for reissuance of a check must be made to the Post-Effective Date Debtors within ninety (90) calendar days after first issuance.  Any distributions that are undeliverable, unclaimed or have not been negotiated within the time period set forth above shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code automatically and without need for further notice or order by the Bankruptcy Court and revert back to the Post-Effective Date Debtors notwithstanding any federal, state or other escheat, abandonment or unclaimed property law to the contrary.  The Post-Effective Date Debtors shall have no further obligation to make any distribution to the holder of such Claim on account of such Claim, any entitlement of any holder of such Claim to any such distributions shall be extinguished and forever barred, and the Claim(s) of such holder shall be waived, discharged and forever barred without further notice or order of the Bankruptcy Court.

### 5.  Setoffs and Recoupment

Except as expressly provided in the Plan, the Post-Effective Date Debtors and the Plan Administrator may, pursuant to section 553 of the Bankruptcy Code, set off or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims and rights that the Post-Effective Date Debtors may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the Post-Effective Date Debtors and holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Post-Effective Date Debtors or their successors of any and all claims and rights that such entities or their successors may possess against the applicable holder.  In no event shall any holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Post-Effective Date Debtors unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has or intends to preserve any right of recoupment.

### B.    Settlement, Release, Injunction, and Related Provisions

#### 1.    Satisfaction of Claims and Termination of Interests

As of the Effective Date, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall constitute the exclusive treatment, and be in complete satisfaction of Claims, Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such debt, right or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date with respect to a Claim or Interest that is Unimpaired under the Plan. The Confirmation Order shall be a judicial determination of the exclusive treatment and satisfaction of all Claims and Interests subject to the occurrence of the Effective Date.

Except as otherwise provided in the Plan, the Plan Supplement, Confirmation Order, or any agreement, instrument or other document incorporated in the Plan, on the Effective Date, except for the purpose of evidencing a right to a distribution under the Plan, all shares, certificates, notes, bonds, indentures (including, without limitation, the Convertible Notes Documents), agreements, and purchase rights, options, warrants or other instruments or documents evidencing or creating (directly or indirectly) any indebtedness or obligation of the Debtors, and all obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents, shall be deemed satisfied in full, cancelled, discharged, null and void, and of no further force and effect against the Debtors or the Convertible Notes Agent, without any further action on the part of the Debtors or the Convertible Notes Agent; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, the Convertible Notes Documents shall continue in effect solely for the purposes of (a) to the extent not previously paid, allowing holders of Convertible Notes Claims to receive and accept their respective distributions under the Plan, subject to the Convertible Notes Agent Charging Lien; and (b) allowing and preserving the rights of the Convertible Notes Agent to (1) assert or maintain any rights the Convertible Notes Agent may have against any money or property distributable or allocable to holders of Convertible Notes Claims, including, without limitation, the Convertible Notes Agent Charging Lien; (2) receive compensation or reimbursement for any reasonable and documented fees and expenses incurred

in connection with the implementation, consummation, and defense of the Plan or the Confirmation Order; (3) preserve, maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or subrogation, or any other claim or entitlement that the Convertible Notes Agent may have under the Plan, Plan Supplement, Confirmation Order, Convertible Notes Documents, or any other related agreement; and (4) preserve the rights of the Convertible Notes Agent to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including, without limitation, to enforce any right or obligation owed to the Convertible Notes Agent or holders of Convertible Notes Claims under the Plan, Plan Supplement, Confirmation Order, or other documents incorporated therein; *provided, further, however,* that the preceding provision shall not result in any expense or liability to the Debtors, except to the extent set forth in or provided for under the Plan.  Holders of or parties to such cancelled instruments, notes, and other documents will have no rights arising from or relating to such instruments, notes, and other documents or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to the Plan or the Confirmation Order, or as may be necessary to effectuate the terms of the Plan.  On the Effective Date, the Convertible Notes Agent and its agents, successors, professionals, representatives, and assigns shall be automatically and fully discharged and released of all of their duties, responsibilities, and obligations associated with the Convertible Notes Documents.

For the avoidance of doubt, on and after the final distribution on account of the Convertible Notes Claims, (i) the Convertible Notes shall be deemed to be null, void, and worthless, and (ii) at the request of the Convertible Notes Agent, DTC shall take down the relevant positions relating to the Convertible Notes at the request of the Convertible Notes Agent without any requirement of indemnification or security on the part of the Debtors, the Plan Administrator, or the Convertible Notes Agent (as applicable).

## 2. General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

## 3. Terms of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until

the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 4. Release of Liens

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, and required to be satisfied pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled and compromised, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Post-Effective Date Debtors to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

### 5. Releases by the Debtors

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed released and discharged by each and all of the Debtors, the Post-Effective Date Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Post-Effective Date Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Post-Effective Date Debtors, or their Estates or affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court sale and restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of**

Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that nothing in the Plan shall be construed to release the Released Parties from gross negligence, willful misconduct or actual fraud as determined by a Final Order; and *provided*, *further*, that any right to enforce the Plan, Plan Supplement, and the Confirmation Order is not released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.C of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.C of the Plan is: (1) a good-faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Claims and Interests; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors or Post-Effective Date Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

6. **Consensual Third Party Releases**

If a holder of a Claim or Interest opts-in to the Consensual Third Party Releases then each such holder of a Claim or Interest shall be a Releasing Party and, as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Debtor, Post-Effective Date Debtor, and Released Party from any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Post-Effective Date Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court sale and restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or

upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that nothing in the Plan shall be construed to release the Released Parties from gross negligence, willful misconduct or actual fraud as determined by a Final Order;  and *provided, further* that any right with respect to the Plan, Plan Supplement and the Confirmation Order is not released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.D of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.D of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties or the Debtors or Post-Effective Date Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

7. **Exculpation**

Notwithstanding anything in the Plan to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is exculpated from, any liability to any holder of a Cause of Action, Claim or Interest for any act or omission since the Petition Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the sale of the Debtors' assets, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by Final Order to have constituted actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

8. **Injunction**

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims or Interests that have been released, discharged or are subject

**to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.**

## ARTICLE VIII.

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. **The Bankruptcy Court has scheduled the Confirmation Hearing for December 16, 2025 at 2:00 p.m. (prevailing Eastern Time).** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the Filing of a notice of such adjournment served in accordance with the Solicitation Order. Any objection to the Plan must: (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of Delaware; (3) state the name, address, phone number, and email address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state

with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be Filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** by the Debtors no later than the Objection Deadline.  **Unless an objection to the Plan is timely served and Filed, it may not be considered by the Bankruptcy Court**.

## B.    Confirmation Standards

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

### 1.  *Feasibility*

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

The Plan provides for the liquidation and distribution of the Debtors' assets.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### 2.  *Best Interests of Creditors*

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such holder with a recovery that has a value at least equal to the value of the recovery that each such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7.

The Debtors believe that the Plan satisfies the best interests test because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their

collateral.  If any assets remain in the bankruptcy estate after satisfaction of the secured creditors' claims from their collateral, administrative expenses are next to be paid.  Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

Substantially all of the assets of the Debtors' business were liquidated through the sales.  Although the Plan effects a liquidation of the Debtors' remaining assets and a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to holders of Allowed General Unsecured Claims than would a chapter 7 liquidation.  Additionally, liquidating the Debtors' Estates under the Plan likely provides holders of Allowed General Unsecured Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases.  *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).  The conversion to chapter 7 would also require entry of a new bar date.  *See* Fed. R. Bankr. P. 1019(2); 3002(c).  Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

**C.      Alternative Plans**

The Debtors do not believe that there are any alternative plans for the reorganization or liquidation of the Debtors' Estates.  The Debtors believe that the Plan, as described herein, enables holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

**D.      Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to Confirmation that, except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan.  A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless the plan: (1) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (2) cures any default, reinstates the original terms of such obligation and compensates the applicable party in question; or (3) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of claims. Thus, a Class of creditor Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance, subject to Article III of the Plan. Only holders of Claims in the Voting Class will be entitled to vote on the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or reject a plan. Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of interests. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount actually voting cast their Ballots in favor of acceptance, not counting designated votes, subject to Article III of the Plan. No Class including holders of Interests is entitled to vote on the Plan.

Article III.E of the Plan provides in full: "Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan." Such "deemed acceptance" by an impaired class in which no class members submit ballots satisfies section 1129(a)(10) of the Bankruptcy Code. *See In re Tribune Co.*, 464 B.R. 126, 183 (Bankr. D. Del. 2011) ("Would 'deemed acceptance' by a non-voting impaired class, in the absence of objection, constitute the necessary 'consent' to a proposed 'per plan' scheme? I conclude that it may." (footnote omitted)); *see In re Adelphia Commc'ns Corp.*, 368 B.R. 14, 259–63 (Bankr. S.D.N.Y. 2007).

## E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if Impaired Classes entitled to vote on the Plan have not accepted it or if an Impaired Class is deemed to reject the Plan; *provided* that the Plan is accepted by at least one Impaired Class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of a plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 1.    No Unfair Discrimination

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a

plan discriminates unfairly in its treatment of Classes of Claims of equal rank (*e.g.*, classes of the same legal character).  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for nonconsensual Confirmation.

2.    **Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to a non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement because, for each applicable Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting Class that will receive or retain any property on account of the Claims or Interests in such Class.

(a)    *Secured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

(b)    *Unsecured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims requires that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

(c)    *Equity Interests*

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:  (i) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest; or (ii) if the class does not receive the amount as required under (i) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

## ARTICLE IX.

## CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

A.    **Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims Under the Plan**

  1.   *Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recoveries of Some holders of Allowed Claims*

The estimates of Allowed Claims and recoveries for holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the recoveries to holders of Allowed Claims and Allowed Interests under the Plan.  Some holders are not entitled to any recovery pursuant to the terms of the Plan, and, depending on the accuracy of the Debtors' various assumptions, even those holders entitled to a recovery under the terms of the Plan may ultimately receive no recovery.

  2.   *The Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Class*

The Debtors cannot know with certainty, at this time, the number or amount of Claims in the Voting Class that will ultimately be Allowed and how the amount of Allowed Claims will compare to the estimates provided herein.  For example, a number of Proofs of Claim allege Claims in an unliquidated amount that will require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Disclosure Statement. In addition, the Debtors are continuing to review the Proofs of Claim filed in their Chapter 11 Cases.  As such, the estimated amount of Claims may materially change due to the Debtors' ongoing review.  Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty what recoveries will be available to holders of Allowed Claims in the Voting Class.

  3.   *Any Valuation of Any Assets to be Distributed under the Plan Is Speculative and Could Potentially Be Zero*

Any valuation of any of remaining assets to be monetized and distributed under the Plan is necessarily speculative, and the value of such assets could potentially be zero, including the

ultimate value realized by the Debtors' Estates, and the Plan Administrator, as applicable. Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Debtors' creditors, including holders of Claims in the Voting Class.

### 4. *The Debtors Cannot Guaranty Recoveries or the Timing of Such Recoveries*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims, including Administrative Claims, Priority Tax Claims, and Other Priority Claims, it is possible that the actual amount of such Allowed Claims is materially higher than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim.

### 5. *Certain Tax Implications of the Debtors' Bankruptcy*

Holders of Allowed Claims should carefully review Article X of this Disclosure Statement, "Certain United States Federal Income Tax Consequences," for a description of certain tax implications of the Plan and the Chapter 11 Cases.

## B. Certain Bankruptcy Law Considerations

The occurrence or nonoccurrence of any or all of the following contingencies, and any others, may affect distributions available to holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

### 1. *Parties in Interest May Object to the Plan's Classification of Claims and Interests or the Amount of Such Claims or Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Furthermore, certain parties in interest, including the Debtors and the Plan Administrator, as applicable, reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim when such Claim is or may be subject to an objection or is not yet Allowed. Any holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 2. *Failure to Satisfy Vote Requirements*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind down the Estates, such as an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to chapter 7 cases, or other strategies.  There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

### 3. *The Debtors May Not Be Able to Secure Confirmation of the Plan*

The Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the Solicitation Procedures and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.  If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests.  The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4. *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one

impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

### 5. *Risk of Nonoccurrence of the Effective Date*

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether such an Effective Date will, in fact, occur.

### 6. *Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan*

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be Allowed. The occurrence of any and all such contingencies, which may affect distributions available to holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### 7. *Risk Affecting Potential Recoveries of holders of Claims in the Voting Classe*

The Debtors cannot state with any degree of certainty what recovery will be available to holders of Allowed Claims in the Voting Class. In particular, the Debtors cannot know, at this time, the number or size of Claims in the Voting Class which will ultimately be Allowed or how many assets will remain after paying all Allowed Claims which are senior to the Claims of holders in the Voting Class. The ultimate amount of Allowed Claims in the Voting Class could materially reduce the recovery available to holders of Allowed Claims in the Voting Class.

## C.   Disclosure Statement Disclaimer

### 1. *The Financial Information Contained in this Disclosure Statement Has Not Been Audited*

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

2. *Information Contained in this Disclosure Statement Is for Soliciting Votes*

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3. *This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission*

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

4. *This Disclosure Statement May Contain Forward Looking Statements*

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

5. *No Legal or Tax Advice Is Provided to You by this Disclosure Statement*

***This Disclosure Statement is not legal advice to you.*** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or an Interest should consult his or her own legal counsel, accountant or other applicable advisor with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan, whether to opt-out or opt-in, as applicable, to the Consensual Third Party Releases or object to Confirmation of the Plan.

6. *No Admissions Made*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Allowed Interests, or any other parties in interest.

7. *Failure to Identify Litigation Claims or Projected Objections*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Plan Administrator, as applicable, may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date

of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

### 8. *No Waiver of Right to Object to Claim or Interest*

The vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action or rights of the Debtors (or any entity, as the case may be) to object to that holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

### 9. *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

### 10. *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 11. *No Representations Outside this Disclosure Statement Are Authorized*

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

### D. Liquidation under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. As discussed above, conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and additional retained professionals, and such expenses may decrease recoveries for holders of Allowed Claims in the Voting Class. *See, e.g.*, 11 U.S.C.

§§ 326(a), 503(b)(2).  The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries.  *See* Fed. R. Bankr. P. 1019(2), 3002(c).  The Debtors' liquidation analysis is attached hereto as **Exhibit B**.

## ARTICLE X.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain United States ("U.S.") federal income tax consequences of the Plan to the Debtors and certain holders of Allowed Claims.  It does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations thereunder ("Treasury Regulations"), and administrative and judicial interpretations, all as in effect on the date hereof (collectively, "Applicable U.S. Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  There can be no assurance that the IRS will not challenge one or more of the U.S. federal income tax consequences of the Plan described below.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors). This summary does not apply to holders of a Claim or Interest that are not United States persons, as such term is defined in the Internal Revenue Code ("Non-U.S. Holders"), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, persons who hold Claims or who will hold any consideration received pursuant to the Plan as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy).  Furthermore, this summary assumes that a Holder of a Claim or Interest holds only Claims or Interests in a single Class and holds a Claim or Interest only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that Claims will be treated in accordance with their form for U.S. federal income tax purposes.  The U.S. federal income tax consequences of the implementation of the Plan to the Debtors and holders of Claims or Interests described below also may vary depending on the nature of any Restructuring Transactions that the Debtors engaged in.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a

corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner and the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities) that are holders of Claims or Interests should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF ALLOWED CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## A.    Certain U.S. Federal Income Tax Consequences to the Debtors

### 1.    Taxable Transaction

The Debtors generally anticipate that the disposition of their assets will be taxable from a U.S. tax perspective. Whether such disposition will give rise to any tax liability will depend upon, among other things, the proceeds received for such assets, any liabilities assumed in connection with the disposition of such assets, the Debtors' tax basis in their assets, and the Debtors' available tax attributes. The Debtors cannot currently estimate whether they will incur any tax liability in connection with the disposition of their assets.

### 2.    Survival of Tax Attributes

Because the Debtors expect to dispose of all of their assets in a taxable disposition and dissolve, none of the Debtors' existing tax attributes will survive, even if such attributes are not eliminated as a result of the implementation of the Plan.

**B.     Certain U.S. Federal Income Tax Consequences to holders of General Unsecured Claims**

Because holders of General Unsecured Claims are expected to receive nothing but Cash in satisfaction of their Claims, such holders will be treated as receiving their distribution under the Plan in taxable exchange under Section 1001 of the Tax Code. Accordingly, other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), a U.S. Holder of such a claim would recognize gain or loss equal to the difference between (a) the sum of the cash and the fair market value (or issue price, in the case of debt instruments) of the consideration received and (b) such U.S. Holder's adjusted basis in such Claim.

See discussion below regarding the extent to which any consideration should be treated as attributable to accrued interest (or OID).

**1.     Disputed Ownership Fund Treatment**

Certain proceeds from the disposition of the Debtors' assets may be deposited into an account pending the resolution of disputed claims. The Debtors intend that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). To the extent property is not distributed to U.S. Holders of applicable Claims or Interests on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

To the extent that a U.S. Holder receives distributions with respect to a Claim or Interest subsequent to the Effective Date, such U.S. Holder may recognize additional gain (if such U.S. Holder is in a gain position), and a portion of such distribution may be treated as imputed interest income.  In addition, it is possible that the recognition of any loss realized by a U.S. Holder may be deferred until all payments have been made out of any such account.  U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such U.S. Holders in respect of their Claims or Interests due to the receipt of property in a taxable year subsequent to the taxable year in which the Effective Date occurs.  The discussion herein assumes that the installment method does not apply.

**2.     Accrued Interest and OID**

A portion of the consideration received by holders of Allowed Claims may be attributable to accrued interest or OID on such Claims. Such amounts should be taxable to that U.S. Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be

able to recognize a deductible loss to the extent any accrued interest or OID on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest or OID on Allowed Claims, the extent to which such consideration will be attributable to accrued interest or OID is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest or OID that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for U.S. federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest or OID and then as a payment of principal. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

3.      **Market Discount**

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

4.      **Medicare Tax on Net Investment Income**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of consideration received pursuant to the Plan.

C.      **Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of General Unsecured Claims**

The following discussion includes only certain U.S. federal income tax consequences of the implementation of the Plan to Non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-

U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the Plan to such Non-U.S. Holder and the ownership and disposition of non-Cash consideration.

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

### 1. Gain Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the restructuring transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide properly executed original copies of IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2. Interest Payments; Accrued but Untaxed Interest

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest (or OID) on their Allowed Claim generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

1. the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of the Debtors;

2. the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors (each, within the meaning of the Tax Code);

3. the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

4. such interest (or OID) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (i) generally will not be subject to withholding tax, but (ii) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest (or OID) at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on (a) interest on debt received under the Plan and (b) payments that are attributable to accrued but untaxed interest (or OID) on such Non-U.S. Holder's Allowed Claim.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

## D.    Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will also comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan, as well as future payments made with respect to consideration received under the Plan.  The Debtors do not expect distributions or payments to holders of Claims under the Plan to be subject to material withholding under the Tax Code.

Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

## E.    FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain

*SOLICITATION VERSION*

information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on equity received pursuant to the Plan). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax. Additionally, although FATCA withholding may also apply to gross proceeds of a disposition of stock, recently proposed regulations suspend withholding on such gross proceeds payments indefinitely.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XI.

## RECOMMENDATION OF THE DEBTORS

The Debtors believe that the Plan is in the best interests of all holders of Claims against and Interests in the Debtors, and urge all holders of Claims against and Interests in the Debtors entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Notice, Claims, and Balloting Agent by the Voting Deadline.

ATech (Parent) Resolution Corp and its Debtor Affiliates

By:    */s/ Mark D. Podgainy*
Name: Mark D. Podgainy
Title:  Finance Transformation Officer

Dated:  September 30, 2025