## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ATECH (PARENT) RESOLUTION CORP., *et al.*,[1] | Case No. 24-12796 (LSS) |
| | (Jointly Administered) |
| Debtors. | **Ref. Nos. 823, 825, 879** |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF (A) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND (B) CONFIRMATION OF THE PLAN

**LANDIS RATH & COBB LLP**
Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5946)
Joshua B. Brooks (No. 6765)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: mcguire@lrclaw.com
     pierce@lrclaw.com
     brooks@lrclaw.com

**K&L GATES LLP**
Jeffrey T. Kucera (admitted *pro hac vice*)
Southeast Financial Center, Suite 3900
200 South Biscayne Blvd.
Miami, Florida 33131
Telephone:    (305) 539-3300
Email:        jeffrey.kucera@klgates.com

- and -

Margaret R. Westbrook (admitted *pro hac vice*)
301 Hillsborough Street, Suite 1200
Raleigh, North Carolina 27603
Telephone:    (919) 743-7300
Email: margaret.westbrook@klgates.com

*Counsel to the Debtors and Debtors-In-Possession*

Dated: December 11, 2025

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: ATech (Parent) Resolution Corp. (9046), ATech Resolution Corp. (5617), GD Chips Resolution Corp. (f/k/a Grinding and Dicing Services, Inc.) (7929), and RF Chips Resolution Corp. (1138). The Debtors' mailing address is c/o Getzler Henrich & Associates LLC, 295 Madison Avenue, 20th Floor, New York, NY 10017, Attn: Mark D. Podgainy.

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS .....................................................................................................2

    I.    The Debtors' Business .................................................................................2

    II.    Events Leading to the Bankruptcy Filing ................................................3

        A.    Qorvo Judgment and Employee Attrition ....................................3

        B.    Restructuring Efforts.....................................................................4

    III.    The Chapter 11 Cases .................................................................................4

        A.    First Day Relief.............................................................................4

        B.    The Sale Process ...........................................................................5

        C.    The Plan and the Disclosure Statement .......................................7

THE DISCLOSURE STATEMENT SATISFIES THE  REQUIREMENTS OF BANKRUPTCY CODE SECTION 1125.................................................................................8

THE PLAN MEETS ALL APPLICABLE CONFIRMATION REQUIREMENTS...................10

    I.    The Plan Complies with Bankruptcy Code section 1129(a)..................11

        A.    Bankruptcy Code section 1129(a)(1) .........................................11

            1.    Bankruptcy Code section 1122 – Classification of Claims and Interests .................................................................11

            2.    Compliance with Bankruptcy Code section 1123(a) – Mandatory Contents of the Plan .....................................13

            3.    Bankruptcy Code section 1123(b) – Discretionary Contents of the Plan .....................................................15

        B.    Bankruptcy Code Section 1129(a)(2) ........................................16

        C.    Bankruptcy Code section 1129(a)(3)..........................................18

        D.    Bankruptcy Code section 1129(a)(4)..........................................20

        E.    Bankruptcy Code section 1129(a)(5)..........................................21

F.       Bankruptcy Code section 1129(a)(6) ........................................21

G.      Bankruptcy Code section 1129(a)(7) ........................................21

H.      Bankruptcy Code section 1129(a)(8) ........................................24

I.       Bankruptcy Code section 1129(a)(9) ........................................25

J.       Bankruptcy Code section 1129(a)(10) ......................................27

K.      Bankruptcy Code section 1129(a)(11) ......................................27

L.      Bankruptcy Code section 1129(a)(12) ......................................28

M.     Bankruptcy Code section 1129(a)(13) ......................................29

II.      Bankruptcy Code Section 1129(b) ...............................................29

      A.      The Plan Is Fair and Equitable with Respect to the Impaired Rejecting Classes ...............................................29

      B.      The Plan Does Not Discriminate Unfairly with Respect to the Impaired Rejecting Classes ...............................................30

III.     Section 1129(c) – No Other Plan Has Been Proposed or Confirmed ...................31

IV.    Section 1129(d) – The Plan's Purpose Is Consistent with the Bankruptcy Code ...............................................32

OTHER PLAN PROVISIONS ARE NECESSARY AND APPROPRIATE ..............................32

I.       The Plan's Releases and Exculpation Provisions Are Appropriate and Should Be Approved ...............................................32

      A.      The Debtor Releases ...............................................32

      B.      The Consensual Third Party Releases Are Fair and Reasonable ..............35

      C.      The Exculpation Provision ...............................................35

II.      Limited Substantive Consolidation of the Debtors' Estates ....................................36

RESPONSES TO CONFIRMATION OF THE PLAN ...............................................38

I.       The Reservations of Rights are Not Objections to Confirmation of the Plan........39

II.      The U.S. Trustee Objection Should be Overruled ...............................................39

WAIVER OF STAY ...............................................41

CONCLUSION.................................................................................................................................42

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Century Glove, Inc. v. First Am. Bank N.Y.*, 860 F.2d 94 (3d Cir. 1988) ...................................... 9

*CoreStates Bank, N.A. v. United Chem. Techs.*, 202 B.R. 33 (E.D. Pa. 1996) ............................ 21

*Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*,
    116 F.3d 790 (5th Cir. 1997) ............................................................................................. 22

*Hanson v. First Bank of S.D.*, 828 F.2d 1310 (8th Cir. 1987) ....................................... 20

*In re 203 N. LaSalle*, 190 B.R. 567 (Bankr. N.D. Ill. 1995) ........................................... 34

*In re Aleris Int'l, Inc.*,
    2010 Bankr. LEXIS 2997 (Bankr. D. Del. May 3, 2010) ............................................ 31

*In re AOV Indus.*, 31 B.R. 1005 (D.D.C. 1983) ............................................................... 25

*In re Apex Oil Co.*, 118 B.R. 683, 708 (Bankr. E.D. Mo. 1990) .................................... 32

*In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006) ............................... passim

*In re Aztec Co.*, 107 B.R. 585 (Bankr. M.D. Tenn. 1989) ............................................. 35

*In re Block Shim Dev. Co.*,
    939 F.2d 289 (5th Cir. 1991) ..................................................................................... 21

*In re Bowles*, 48 B.R. 502 (Bankr. E.D. Va. 1985) .......................................................... 34

*In re Cellular Info. Sys., Inc.*, 171 B.R. 926 (Bankr. S.D.N.Y. 1994); ........................... 31

*In re Century Glove, Inc.*, 1993 LEXIS 2286 (D. Del. Feb. 10, 1993) .......................... 22

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004) ................................... 20, 22

*In re Coram Healthcare Corp.*, 271 B.R. 228 (Bankr. D. Del. 2001) ........................... 21

*In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) ..................... 13, 35

*In re Crdentia Corp.*, 2010 Bankr. LEXIS 2838 (Bankr. D. Del. May 26, 2010) ....................... 23

*In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279 (Bankr. S.D.N.Y. 1990) ........................ 25

*In re DBSD North America, Inc.*, 419 B.R. 179 (Bankr. S.D.N.Y. 2009) ................................... 39

*In re Eagle-Picher Indus., Inc.*, 203 B.R. 256 (S.D. Ohio 1996) ............................... 11, 13, 23, 25

*In re Econ. Lodging Sys., Inc.*,
   205 B.R. 862 (Bankr. N.D. Ohio 1997) .................................................................. 25

*In re Elm Creek Joint Venture*, 93 B.R. 105 (Bankr. W.D. Tex. 1988) ......................................... 32

*In re Exide Techs.*, 303 B.R. 48 (Bankr. D. Del. 2003) ................................................... 37

*In re Freymiller Trucking, Inc.*, 190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................... 34

*In re HSH Del. GP LLC*, Case No. 10-10187 (MFW) (Bankr. D. Del. Jan. 18, 2011) ............... 41

*In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013) ................................... 38, 40

*In re Jartran, Inc.*, 44 B.R. 331 (Bankr. N.D. Ill. 1984) ................................................ 25

*In re Jersey City Med. Ctr.*, 817 F.2d 1055 (3d Cir 1987) ............................................... 13

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986) ................................ 23, 31, 36

*In re Koelbl*, 751 F.2d 137 (2d Cir. 1984) .............................................................. 22

*In re Lernout & Hauspie Speech Prods., N.V.*,
   301 B.R. 651 (Bankr. D. Del. 2003) .................................................................. 35

*In re Martin*, 66 B.R. 921 (Bankr. D. Mont. 1986) ...................................................... 30

*In re Nutritional Sourcing Corp.*, 398 B.R. 816 (Bankr. D. Del. 2008) ..................................... 46

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) ....................................................... 42

*In re Phoenix Petroleum Co.*, 278 B.R. 385 (Bankr. E.D. Pa. 2001) ...................................... 10

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000) .............................................. 18, 41

*In re Revco*, 131 B.R. 615 (Bankr. N.D. Ohio 1990) ..................................................... 32

*In re Rivers End Apartments, Ltd.*, 167 B.R. 470 (Bankr. S.D. Ohio 1994); ............................... 31

*In re Spansion, Inc.*,
   426 B.R. 144 (Bankr. D. Del 2010) ................................................................... 40

*In re Texaco, Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y. 1988) ............................................. 18, 32

*In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141 (Bankr. S.D.N.Y. 1984) ............................... 12

*In re Tranel*,
   940 F.2d 1168 (8th Cir. 1991 ....................................................................... 25

*In re Tribune Co.*, 476 B.R. 843 (Bankr. D. Del 2012) ................................................. 13

*In re Victory Constr. Co.*, 42 B.R. 145 (Bankr. C.D. Cal. 1984)..................................... 25

*In re Wash. Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) ................................... 37, 38

*In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 772 (Bankr. D. Del. 2018)........................ 46

*In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) ................................ 21, 38

*In the Matter of Sound Radio, Inc.*, 93 B.R. 849 (Bankr. D.N.J. 1988)........................................ 22

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993)
............................................................................................................ 13

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636 (2d Cir. 1988).. 12, 31

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314 (3d Cir. 2003) ............................................................................................................ 9

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650 (9th Cir. 1997) ............................................................ 35

*Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491 (D.N.J. 2005), *aff'd*, 241 Fed. App'x. 1 (3d Cir. Aug. 2, 2007)............................................................ 10

*McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d 1524 (11th Cir. 1995)...... 21

*Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180 (3d Cir. 2001) .................................... 47

*Official Comm. of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715 (Bankr. E.D. Cal. 1992)............................................................ 18

*Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154 (3d Cir. 1999)............................................................ 20

*Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988)........................ 10

*Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.)*, 755 F.2d 1336 (8th Cir. 1985).... 31

*Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 591 (D. Del. 2009)............................................................ 42

*U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114 (Bankr. D. Del. 2010)............................................................ 39

**Statutes**

11 U.S.C. § 1122.................................................................................................... 13

11 U.S.C. § 1123(a) ....................................................................................... 15, 16

11 U.S.C. § 1123(b) ................................................................................................................. 17

11 U.S.C. § 1125 ................................................................................................. 9, 18, 19, 41

11 U.S.C. § 1126(c) ............................................................................................................... 28

11 U.S.C. § 1129(a)(1) .................................................................................................. passim

11 U.S.C. § 1129(a)(4) ........................................................................................................... 23

11 U.S.C. § 1129(b)(1) ........................................................................................................... 33

11 U.S.C. § 1129(b)(2) ........................................................................................................... 34

## Other Authorities

COLLIER ON BANKRUPTCY ................................................................................................ 16, 31

H.R. Rep. No. 95-595(1977) ............................................................................................ 12, 18

S. Rep. No. 95-989 (1978) ............................................................................................... 12, 18

## Rules

Fed. R. Bankr. P. 3020 ........................................................................................................... 47

## INTRODUCTION

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") submit this memorandum of law (the "Memorandum of Law") in support of (i) final approval of the *Disclosure Statement for the Joint Chapter 11 Plan of ATech (Parent) Resolution Corp. and Its Debtor Affiliates* [D.I. 823] (as modified, revised, supplemented, and amended including all attachments and exhibits thereto, the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code (as amended or modified, the "Bankruptcy Code") and (ii) confirmation of the *Joint Chapter 11 Plan of ATech (Parent) Resolution Corp. and Its Debtor Affiliates* [D.I. 825] (as modified, revised, supplemented and amended including all attachments and exhibits thereto, the "Plan"),[1] pursuant to section 1129 of the Bankruptcy Code.  In addition, as set forth herein, the Debtors request a waiver of the fourteen (14) day stay of the order confirming the Plan imposed by rule 3020(e) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## PRELIMINARY STATEMENT

On December 16, 2024 (the "Petition Date"), the Debtors commenced these bankruptcy cases (the "Chapter 11 Cases") by each filing a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").  After exploring out-of-court strategic alternatives, the Debtors concluded that the best way to maximize value for the benefit of all stakeholders was through filing for Chapter 11 protection and pursuing an orderly sale of their assets in a controlled, court-supervised process (the "Sale").  Following successful Sales of substantially all of their assets and winddown of operations, the Debtors now seek confirmation of the Plan.  If confirmed, the Plan will fairly and appropriately

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Declaration of Mark D. Podgainy in Support of Chapter 11 Petitions and First Day Motions* [D.I. 2] (the "First Day Declaration"), the Plan or the Disclosure Statement, as applicable.

distribute the remaining assets in and value of the Debtors' estates to their creditors and provide for the orderly wind down of the Debtors' estates.

The Plan is the culmination of the Debtors' substantial efforts over the past twelve months to bring these Chapter 11 Cases to a value-maximizing close following the Sales of substantially all of the Debtors' assets.   The Plan provides for the liquidation of all of the Debtors' remaining assets to cash and the distribution of the net proceeds realized therefrom, along with existing cash, to creditors holding Allowed Claims in accordance with the relative priorities established in the Bankruptcy Code.

As set forth herein, in the First Day Declaration and the declarations of Mark D. Podgainy [D.I. 125, 499, 625] and Michael Pokrassa [D.I. 15, 500, 626] in support of the Sales, and as will be shown at the confirmation hearing, the Disclosure Statement and the Plan meet all of the requirements under the Bankruptcy Code to be approved and confirmed.   Accordingly, the Debtors request that the Disclosure Statement be approved on a final basis and the Plan be confirmed.

## STATEMENT OF FACTS

### I.     The Debtors' Business

1.     Prior to the Petition Date, the Debtors developed, designed and manufactured innovative RF filter solutions for the wireless industry, including for products such as smartphones and tablets, network infrastructure equipment, WiFi Customer Premise Equipment, and defense applications.   These filters are critical in selecting and rejecting signals, and their performance enables differentiation in the functionality of the "RF front-end."   Debtor ATech (Parent) Resolution Corp. (f/k/a Akoustis Technologies, Inc.) ("ATech Parent") is a holding company for Debtor ATech Resolution Corp. (f/k/a Akoustis, Inc.) ("ATech"), which holds, in turn, the other Debtors, GD Chips Resolution Corp. (f/k/a Grinding and Dicing Services, Inc.) and RF Chips Resolution Corp. (f/k/a RFM Integrated Device, Inc.).

## II.    Events Leading to the Bankruptcy Filing

### A.    Qorvo Judgment and Employee Attrition

2.    Since the inception of the Debtors' business in 2013, it has suffered losses each year but was able to maintain operations for several years until the company became embroiled in litigation.  In October 2021, Qorvo, Inc. ("Qorvo") filed an action against ATech and ATech Parent in federal district court alleging, among other things, patent infringement, false advertising, false patent marketing, and unfair competition, and sought to enjoin the alleged infringement and to recover monetary damages.  In May 2024, a jury returned a verdict in favor of Qorvo, awarding damages in the amount of $38.6 million.  ATech and ATech Parent's post-trial efforts contesting the judgment were unsuccessful, and the district court entered orders awarding attorneys' fees to Qorvo in September 2024 in the amount of $11,743,745.54, and pre- and post-judgment interest in the aggregate amount of $7,257,436.97.

3.    Additionally, in October 2024, Qorvo was granted a permanent injunction, which enjoined the Debtors and related parties from possessing, reviewing, using, or disclosing certain information obtained from Qorvo (the "Qorvo Trade Secret Information"), offering, selling, or distributing products that were made using the Qorvo Trade Secret Information, or advertising, promoting, or offering services utilizing the Qorvo Trade Secret Information.  The federal district court ordered ATech and ATech Parent to engage in a review of their files, data, and information in order to identify, quarantine, and purge any Qorvo Trade Secret Information as well as other confidential Qorvo information.  Qorvo was also granted audit rights with respect to this process. Finally, the federal district court also permanently enjoined the Debtors from making, using, selling, or otherwise offering to sell in the United States certain products that the jury found infringed on two of Qorvo's patents.

4.    As a result of the litigation with Qorvo, many employees, including key executives,

departed from the Debtors' ranks.  By the Petition Date, the Debtors' employee roster dropped

from over 200 individuals to approximately 110 employees.  While the Debtors hired employees

to fill vacancies on an interim basis and stabilized their operations, the Debtors realized in June

2024 that they would need to take steps to ensure that they retained sufficient employee levels to

meet production demands.  Ultimately, as set forth more fully in the First Day Declaration,

commencement of the Chapter 11 Cases became necessary to obtain a breathing spell so that the

Debtors' assets could be marketed and sold for maximum recovery to their creditors.

**B.    Restructuring Efforts**

5.    Before the Petition Date, the Debtors engaged Raymond James & Associates, Inc.

("RJA") to commence analyzing potential strategic alternatives for the Debtors, including focusing

on potential strategic partners to assist the Debtors in either providing financing to the Debtors or

acquiring the Debtors' assets.

6.    Beginning in August 2024 and continuing through the Petition Date, RJA

conducted an all-inclusive marketing process for both (a) financing proposals that would enable

the Debtors either (i) to post a bond without allowing the Debtors to appeal the jury award or (ii) to

execute on their business plan and potentially pay down all or a portion of the $38.6 million

damages award and (b) obtaining bids for the sale of all or a portion of the Debtors' assets.  While

the Debtors received some interest from parties to provide additional financing, no such offers

would provide complete resolution to the Debtors' issues.  Accordingly, the Debtors pivoted to a

chapter 11 sale process as the most viable option forward.

**III.    The Chapter 11 Cases**

**A.    First Day Relief**

7.    On the Petition Date, along with their voluntary petitions for relief under chapter

11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day

Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, permitting the Debtors to meet certain obligations to their employees, continued maintenance of their bank accounts and continued payment of certain prepetition taxes, governmental assessments and related fees following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions, the relief requested therein and the evidence in support thereof is set forth in the First Day Declaration filed on the Petition Date.

### B.    The Sale Process

8.    As explained above, the Debtors filed their Chapter 11 Cases to engage in a process to sell substantially all of their assets so that they could maximize the value of their estates for the benefit of all of their constituents. To that end, on the Petition Date, the Debtors filed the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into the Stalking Horse Agreement and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. 14] (the "Sale Motion"). By order dated January 13, 2025 [D.I. 176] (the "Bid Procedures Order"), the Court approved the bidding procedures in connection with the Sale Motion. On March 25, 2025, the Court entered an order [D.I. 384] amending certain key dates and deadlines set by the Bid Procedures Order and modifying certain bid protections in connection with the stalking horse agreement.

9.     Pursuant to the Sale Motion and Bid Procedures Order, RJA, the Debtors' investment banker, continued to market the Debtors' assets.  The Debtors and RJA contacted approximately 152 prospective buyers, including a number of buyers who had been contacted prior to the Chapter 11 Cases by the Debtors but did not engage at that time.  Throughout the Sale process, the Debtors continued the cleansing process to ensure that none of Qorvo's confidential information, including the Qorvo Trade Secret Information, was sold to any potential purchaser. Ultimately, the sale of the Debtors' assets was parsed into two sales—one for substantially all the assets of Debtors ATech, ATech Parent and RF Chips Resolutions Corp. (the "ATech Assets") and the other for the sale of substantially all the assets held by Debtor GD Chips Resolution Corp. (the "GDSI Assets").

10.     In connection with the Sale, the Debtors received eight Qualified Bids before the bid deadline for various configurations of the Debtors' assets.  After holding an auction for their assets on April 25, 2025, the Debtors exercised their business judgment and selected Tune Holdings Corp. ("Tune Holdings") as the Successful Bidder and Skyworks Solutions, Inc. as the Backup Bidder with respect to the ATech Assets.  On May 1, 2025, the Court entered an order [D.I. 525] approving the sale of the ATech Assets to Tune Holdings for total consideration of approximately $30.2 million, and the sale closed on May 15, 2025.

11.     Following another auction for the GDSI Assets, the Debtors exercised their business judgment and selected Silitronics Solutions Inc. ("Silitronics") as the Successful Bidder and Spirit America Corp. as the Backup Bidder.  On June 20, 2025, the Court entered an order [D.I. 641] approving the sale of the GDSI Assets to Silitronics for total consideration of over $6 million, and the sale closed on June 25, 2025.

12.     To the extent any remaining assets are not monetized or otherwise disposed of prior to the Effective Date of the Plan, the Plan provides that the Plan Administrator will monetize or otherwise dispose of such assets and distribute the proceeds thereof in accordance with the terms of the Plan.

### C.     The Plan and the Disclosure Statement

13.     The Debtors filed the Plan and Disclosure Statement on September 30, 2025 [D.I. 780 and 781, respectively].   The solicitation versions of the Plan and the Disclosure Statement were filed on October 30, 2025 [D.I. 825 and 823] and served in accordance with the Interim Approval and Procedures Order.   On November 24, 2025, the Debtors filed the Plan Supplement [D.I. 857] (as amended, revised, updated, or supplemented, the "Plan Supplement").

14.     The Disclosure Statement is the product of the Debtors' extensive review and analysis of their businesses, assets and liabilities, and circumstances leading to the Chapter 11 Cases.   The Disclosure Statement provides information regarding: (a) the terms of the Plan, including a summary of the classifications and treatment of all Classes of Claims and Interests; (b) the distributions to holders of Allowed Claims; (c) the effect of the Plan on holders of Claims and Interests and other parties in interest thereunder; (d) the estimated amount of Claims that will ultimately be Allowed; (e) certain risk factors to consider that may affect the Plan; (f) certain tax issues related to the Plan and distributions; and (g) the means for implementation of the Plan.

15.     The Plan classifies holders of Claims and Interests into certain Classes for all purposes, including with respect to voting rights, if any, as follows:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote - Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote - Deemed to Accept |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote - Deemed to Accept |
| 4A | ATech/ATI General Unsecured Claims | Impaired | Entitled to Vote |

| Class | Claim/Interest | Status | Voting Rights |
|-------|---------------|--------|---------------|
| 4B | GD Chips General Unsecured Claims | Unimpaired | Not Entitled to Vote -Deemed to Accept |
| 4C | RF Chips General Unsecured Claims | Unimpaired | Not Entitled to Vote - Deemed to Accept |
| 5 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote - Deemed to Reject, Deemed to Accept |
| 6 | Intercompany Interests | Impaired | Not Entitled to Vote - Deemed to Reject |
| 7 | Interests in ATI | Impaired | Not Entitled to Vote - Deemed to Reject |

16.    As set forth in the chart above, Class 4A (ATech/ATI General Unsecured Claims) was the only class of Claims or Interests that was entitled to vote on the Plan (the "Voting Class"). All other holders of Claims or Interests were not entitled to vote on the Plan because each such holder holds a Claim or Interest presumed to accept or deemed to reject under the Plan.  As such, the Debtors did not solicit votes from holders of Claims or Interests in Classes 1, 2, 3, 4B, 4C, 5, 6 and 7.

17.    The deadline for the Voting Class to cast their ballots was December 3, 2025 at 5:00 p.m. (prevailing Eastern Time).  As set forth in the *Declaration of Angela Tsai on Behalf of Stretto Regarding Solicitation and Tabulation of Votes on the Joint Chapter 11 Plan of ATech (Parent) Resolution Corp. and Its Debtor Affiliates* [D.I. 874] (the "Voting Declaration"), the holders of Claims or Interests in the Voting Class overwhelmingly accepted the Plan.  To be precise, of 19 Ballots received, 94.7% of $108,088,735.70 voted to accept the Plan by Holders of Claims representing $108,080,780.70 voting dollars.  *See* Voting Declaration, Ex. A.

## THE DISCLOSURE STATEMENT SATISFIES THE
## REQUIREMENTS OF BANKRUPTCY CODE SECTION 1125

18.    The Debtors request that the Court approve the Disclosure Statement as containing "adequate information" in accordance with Bankruptcy Code section 1125 on a final basis. Bankruptcy Code section 1125(b) states that "[a]n acceptance or rejection of a plan may not be solicited . . . unless, at the time of or before such solicitation, there is transmitted to such holder

the plan or a summary of the plan, and a written disclosure statement approved, after notice and a

hearing, by the court as containing adequate information."   11 U.S.C. § 1125(b).   In turn,

Bankruptcy Code section 1125(a) defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtor and the
> condition of the debtor's books and records, including a discussion
> of the potential material Federal tax consequences of the plan to the
> debtor, any successor to the debtor, and a hypothetical investor
> typical of the holders of claims or interests in the case, that would
> enable such a hypothetical investor of the relevant class to make an
> informed judgment about the plan, but adequate information need
> not include such information about any other possible or proposed
> plan and in determining whether a disclosure statement provides
> adequate information, the court shall consider the complexity of the
> case, the benefit of additional information to creditors and other
> parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a).

19.     The primary purpose of a disclosure statement is to provide information that is

"reasonably practicable" to permit an "informed judgment" by creditors and interest holders

entitled to vote on the plan.  *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors

Corp.*, 337 F.3d 314, 321 (3d Cir. 2003); *see also Century Glove, Inc. v. First Am. Bank N.Y.*, 860

F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information

to the creditor asked for its vote.").

20.     Bankruptcy courts have broad discretion in determining whether a disclosure

statement contains adequate information based on the unique facts and circumstances of each case.

*See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From

the legislative history of § 1125 we discern that adequate information will be determined by the

facts and circumstances of each case."); *Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R.

491, 507 (D.N.J. 2005), *aff'd*, 241 Fed. App'x. 1 (3d Cir. Aug. 2, 2007) ("Section 1125 affords the

Bankruptcy Court substantial discretion in considering the adequacy of a disclosure statement.");

*In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("The general language

of the statute and its surrounding legislative history make clear that the determination of what is

adequate information is subjective and made on a case by case basis.  This determination is largely

within the discretion of the bankruptcy court.") (internal quotations omitted).

21.     In accordance with Bankruptcy Code section 1125, the Disclosure Statement

provides "adequate information" to allow holders of Claims entitled to vote to make an informed

decision on the Plan.  The Disclosure Statement is the product of the Debtors' extensive review

and analysis of their business, assets and liabilities, and circumstances leading to the Chapter 11

Cases.   The Disclosure Statement provides information regarding: (a) the terms of the Plan,

including a summary of the classifications and treatment of all Classes of Claims and Interests;

(b) the distributions to holders of Allowed Claims; (c) the effect of the Plan on holders of Claims

and Interests and other parties in interest thereunder; (d) the Claims asserted against the Debtors

and the estimated amount of Claims that ultimately will be Allowed; (e) certain risk factors to

consider that may affect the Plan; (f) certain tax issues related to the Plan and distributions; and

(g) the means for implementation of the Plan.  Accordingly, the Debtors believe that the Disclosure

Statement complies with all aspects of Bankruptcy Code section 1125 and contains information

more than sufficient for a hypothetical reasonable investor to make an informed judgment about

the Plan.

22.     Accordingly, for the foregoing reasons the Debtors submit that the Disclosure

Statement contains adequate information within the meaning of Bankruptcy Code section 1125(a)

and should be approved on a final basis.

### THE PLAN MEETS ALL APPLICABLE CONFIRMATION REQUIREMENTS

23.     To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan

satisfies the applicable provisions of Bankruptcy Code section 1129 by a preponderance of the evidence. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006). As set forth below and based on the record and filings in these Chapter 11 Cases and as may be further demonstrated at the Confirmation Hearing, the Plan meets all applicable requirements of Bankruptcy Code section 1129 and should be confirmed.

## I.     The Plan Complies with Bankruptcy Code section 1129(a)

### A.     Bankruptcy Code section 1129(a)(1)

24.     The Plan complies with Bankruptcy Code section 1129(a)(1), which provides that a plan may be confirmed only if "[t]he plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1); *see also In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 270-73 (S.D. Ohio 1996) (examining each requirement of chapter 11 to demonstrate that Bankruptcy Code section 1129(a)(1) was satisfied); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (stating that "[i]n order for a plan of reorganization to pass muster . . . it must comply with all the requirements of Chapter 11").

25.     The legislative history of Bankruptcy Code section 1129(a)(1) indicates that the primary focus of this requirement is to ensure that a plan complies with Bankruptcy Code sections 1122 and 1123, which govern classification of claims and interests and the contents of a plan, respectively. *See* S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368 (1977); *see also Kane v. Johns-Manville Corp. (In re Johns Manville Corp.)*, 843 F.2d 636, 648-49 (2d Cir. 1988) (holding that legislative history indicates that Section 1129(a)(1) was intended to require compliance with Sections 1122 and 1123).

### 1.     Bankruptcy Code section 1122 – Classification of Claims and Interests

26.     Bankruptcy Code section 1122 provides that the claims or interests within a given

class must be "substantially similar" to the other claims or interests in that class:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122. Courts consistently have held that Bankruptcy Code section 1122(a) is satisfied so long as similar claims are classified together. *See In re Armstrong World Indus.*, 348 B.R. at 160 (holding that Bankruptcy Code section 1122(a) was satisfied where similar claims were classified together); *In re Eagle-Picher Indus.*, 203 B.R. at 270 (same).

27.    Accordingly, the sole mandatory obligation of section 1122(a) is that substantially similar claims may be classified together. *In re Tribune Co.*, 476 B.R. 843, 854 (Bankr. D. Del 2012). Section 1122(a) is, in fact, permissive inasmuch as "it does *not* provide that *all* similar claims must be placed in the same class." *Id.* at 855 (emphasis in original); *see also John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) ("[W]e agree with the general view which permits the grouping of similar claims in different classes"); *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004) (explaining the Bankruptcy Code "does not expressly prohibit placing 'substantially similar' claims in separate classes.").

28.    The Plan classifies Claims and Interests in accordance with Bankruptcy Code section 1122(a), as each of the Plan's Classes contains Claims or Interests that share the same priority status, contractual rights and enforcement rights against the Debtors' estates. In particular, Article III of the Plan segregates into separate Classes:[2] Class 1 (Secured Tax Claims), Class 2 (Other Secured Claims), Class 3 (Other Priority Claims), Class 4A (ATech/ATI General

---

[2] In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims have not been classified. *See* Plan, Art. II.

Unsecured Claims), Class 4B (GD Chips General Unsecured Claims), Class 4C (RF Chips General Unsecured Claims), Class 5 (Intercompany Claims), Class 6 (Intercompany Interests) and Class 7 (Interests in ATI).  The number of Classes in the Plan reflects the diverse characteristics of the Claims and Interests classified in the various Classes, and the legal rights under the Bankruptcy Code of each of the holders of Claims or Interests within a particular Class are substantially similar to other holders of Claims or Interests within the same Class.

29.    In addition, valid business, factual and legal reasons exist for the separate classification of Claims and Interests.  For example, the Plan separates Claims from Interests and Priority Claims from both secured claims (including Secured Tax Claims and Other Secured Claims) and General Unsecured Claims.  Further, the general unsecured claims are separately classified by Debtor with the exception of general unsecured claims held by Debtors ATech and ATech Parent, which are classified together in Class 4A due to the integrated nature of their operations and contractual practices.

30.    Accordingly, the classification of Claims and Interests under the Plan is appropriate and should be approved.

### 2.    Compliance with Bankruptcy Code section 1123(a) – Mandatory Contents of the Plan

31.    Bankruptcy Code section 1123(a) requires that a chapter 11 plan: (a) designate classes of claims and interests; (b) specify unimpaired classes of claims and interests; (c) specify treatment of impaired classes of claims and interests; (d) provide for equality of treatment within each class; (e) provide adequate means for the plan's implementation; (f) provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (g) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the  manner of

selection of any officer, director, trustee, or their respective successors under the plan.  *See* 11 U.S.C. § 1123(a).

32.     The Plan fully complies with each requirement of Section 1123(a).  As previously noted with respect to the Plan's compliance with Bankruptcy Code section 1122, Article III of the Plan designates seven (7) separate Classes of Claims and Interests, as required by Bankruptcy Code section 1123(a)(1).  Article III.B of the Plan specifies that the Claims in Classes 1-3, 4B, 4C and 6 are unimpaired under the Plan, as required by Bankruptcy Code section 1123(a)(2) of the Bankruptcy Code.  Article III.B further specifies that the Claims or Interests in Classes 4A and Class 7 are impaired and describes the treatment of each such Class in accordance with Bankruptcy Code section 1123(a)(3).  As set forth in Article III.B of the Plan, Claims in Class 5 may be impaired or unimpaired under the Plan.  Further, as required by Bankruptcy Code section 1123(a)(4), the treatment of each Claim or Interest within a Class is either (i) the same as the treatment of each other Claim or Interest in such class or (ii) otherwise consistent with the legal rights of such claimant.

33.     In accordance with the requirements of Bankruptcy Code section 1123(a)(5), the Plan provides adequate means for its implementation through Article IV and various other provisions.  Specifically, the Plan provides for, among other things:

> (a) the cancellation of all existing securities and related documents of Debtor ATI;
>
> (b) the dissolution of the existing boards of directors of the Debtors;
>
> (c) the appointment of the Plan Administrator as the Debtors' sole officer and director; and
>
> (d) the exemption from certain transfer taxes.

34.     Bankruptcy Code section 1123(a)(6) requires that a debtor's corporate organizational documents prohibit the issuance of nonvoting equity securities.  The Plan does not

contemplate reorganization or amended organizational documents.  Thus, this provision is not applicable to the Plan.

35.    Finally, Bankruptcy Code section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, directors, or trustee under the plan . . . ."  11 U.S.C. § 1123(a)(7).  This provision is supplemented by Bankruptcy Code section 1129(a)(5), which directs the scrutiny of the court to the methods by which the management of the reorganized corporation is to be chosen to provide adequate representation of those whose investments are involved in the reorganization — *i.e.*, creditors and equity holders.  *See* 7 Alan N. Resnick et al., COLLIER ON BANKRUPTCY ¶ 1123.01[7] (16th ed. rev. 2025).

36.    The Plan appoints the Plan Administrator as the Debtors' sole officer and director following the Effective Date.  This appointment is consistent with the interests of creditors and equity security holders as the Debtors are liquidating and the remaining matters for the post-Effective Date estates will involve monetizing any remaining assets, implementing the Plan transactions and winding down the Debtors' affairs and closing the Chapter 11 Cases.

### 3.    Bankruptcy Code section 1123(b) – Discretionary Contents of the Plan

37.    Bankruptcy Code section 1123(b) identifies various discretionary provisions that may be included in a plan but are not required.  For example, a plan may impair or leave unimpaired any class of claims or interests and provide for the assumption or rejection of executory contracts and unexpired leases.   11 U.S.C.  §§ 1123(b)(1)-(2).   A plan also may provide for (a) "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate;" (b) "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;" (c) "the sale of all or substantially all of the property of the estate;" and (d) "the distribution of the proceeds of such sale among holders

of claims or interests." 11 U.S.C. §§ 1123(b) (1-4), (6).

38.    The Plan includes various provisions that fall under the broad spectrum of Bankruptcy Code section 1123(b).  For instance, the Plan impairs Class 4A and Class 6, leaving Classes 1 through 3, 4B, 4C and Class 6 unimpaired.  *See* Plan, Art. III.  Class 5 will be either impaired or unimpaired under the Plan.  *See id.*  The Plan further provides for approval of the treatment of executory contracts and unexpired leases to which the Debtors are a party.  *See* Plan, Art. V.

39.    In accordance with Bankruptcy Code section 1123(b)(6), the Plan includes other provisions designed to ensure its implementation that are consistent with the Bankruptcy Code, including the provisions of Article XI, regarding retention of jurisdiction by the Court over certain matters after the Effective Date.  The Debtors believe each of these provisions is appropriate under applicable law, including Bankruptcy Code sections 1123(b)(1), (3) and (6).  A further analysis of these provisions is set forth below.

## B.    Bankruptcy Code Section 1129(a)(2)

40.    The Plan complies with Bankruptcy Code section 1129(a)(2), which requires that a plan proponent comply with applicable provisions of the Bankruptcy Code.  The legislative history accompanying section 1129(a)(2) indicates that the principal purpose of this section is to ensure compliance with the disclosure and solicitation requirements set forth in Bankruptcy Code section 1125.  *See In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) ("[Section] 1129(a)(2) [of the Bankruptcy Code] requires that the plan proponent comply with the adequate disclosure requirements of § 1125"); *Off. Comm. of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992) ("Compliance with the disclosure and solicitation requirements is the paradigmatic example of what Congress had in mind when it enacted Section 1129(a)(2)."); *In re Texaco, Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988) ("[The] principal

purpose of Section 1129(a)(2) is to assure that the proponents have complied with the requirements of Section 1125 in the solicitation of acceptances to the plan"); *see also* S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 (1978) ("Paragraph (2) [of Section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as Section 1125 regarding disclosure."); H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368 (1977).

41.     The Debtors have complied with the applicable provisions of the Bankruptcy Code, including the provisions of section 1125 regarding disclosure and plan solicitation.  Bankruptcy Code section 1125 prohibits the solicitation of acceptances or rejections of a plan from holders of claims or interests "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or summary of the plan, and a written disclosure statement approved . . . by the court as containing adequate information."  11 U.S.C. § 1125(b).  In the instant case, the Debtors solicited votes to accept the Plan from Class 4A (ATech/ATI General Unsecured Claims) as such Class is impaired and not deemed to reject the Plan.  The Debtors did not solicit votes from Classes 1, 2, 3, 4B, 4C, 5, 6 or 7 as such Classes are either presumed to accept or deemed to reject the Plan.

42.     Pursuant to the Interim Approval and Procedures Order, the Court determined on an interim basis that the Disclosure Statement contained adequate information within the meaning of Bankruptcy Code section 1125.  *See Interim Approval and Procedures Order* ¶ 2.  The Court further approved the form of notices of (i) the hearing on final approval of the Disclosure Statement and confirmation of the Plan (the "<u>Combined Hearing Notice</u>") and (ii) the rights of holders of Claims and Interests not entitled to vote on the Plan (the "<u>Non-Voting Notices</u>").  The Court also required that the Debtors serve creditors the Combined Hearing Notice and/or the Non-Voting Notices, as applicable, pursuant to the Interim Approval and Procedures Order.

43.     The Debtors have complied with the Interim Approval and Procedures Order and caused the mailing of the Combined Hearing Notice and the Non-Voting Notices to occur in accordance with the requirements of the Interim Approval and Procedures Order.  *See Affidavit of Service* [D.I. 876].  The Debtors further complied with all applicable provisions of the Bankruptcy Code, including Bankruptcy Code section 1125 and Bankruptcy Rules 3017 and 3018. Additionally, the Debtors caused the Plan, the Disclosure Statement, the Interim Approval and Procedures Order, the Combined Hearing Notice, the Solicitation Procedures, the Plan Supplement, and other information pertinent to voting on the Plan and responding to final approval of the Disclosure Statement and confirmation of the Plan to appear conspicuously on the main page of the website maintained by the Debtors' noticing, claims and administrative agent, Stretto, in these Chapter 11 Cases.  As a result, the Plan meets the requirements of Bankruptcy Code section 1129(a)(2).

### C.     Bankruptcy Code section 1129(a)(3)

44.     The Plan satisfies Bankruptcy Code section 1129(a)(3), which requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3). Courts consider a plan as proposed in good faith "if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code." *Hanson v. First Bank of S.D.*, 828 F.2d 1310, 1315 (8th Cir. 1987); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004) ("for purposes of determining good faith under Section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code") (quotations and citation omitted); *Off. Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999) (explaining the good faith standard in Section 1129(a)(3) requires that there be "'some relation'" between the chapter 11 plan and the

"reorganization-related purposes" that chapter 11 was designed to serve) (citations omitted); *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) ("The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.") (quoting *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999)) (internal quotations omitted).

45.     One must view the requirement of good faith in the context of the totality of the circumstances surrounding the formulation of a chapter 11 plan.  *See McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d 1524, 1526 (11th Cir. 1995) ("The focus of a court's inquiry is the plan itself, and courts must look to the totality of the circumstances surrounding the plan."); *In re Block Shim Dev. Co.*, 939 F.2d 289, 292 (5th Cir. 1991) (finding that good faith requirement "is viewed in the context of the circumstances surrounding the plan"); *CoreStates Bank, N.A. v. United Chem. Techs.*, 202 B.R. 33, 57 (E.D. Pa. 1996) (concluding that courts must view good faith by looking at the totality of circumstances).

46.     In determining whether a plan will succeed and accomplish goals consistent with the Bankruptcy Code, courts look to the terms of the plan itself and not the proponent of the plan. *See In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988) (concluding that the good faith test provides the court with significant flexibility and is focused on an examination of the plan itself, rather than other, external factors), *aff'd in part, remanded in part on other grounds*, 103 B.R. 521 (D.N.J. 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990); s*ee also In re Combustion Eng'g*, 391 F.3d at 246.

47.     The Debtors must show, therefore, that the Plan has not been proposed by any means forbidden by law and that the plan has a reasonable likelihood of success.  *See In re Century*

*Glove, Inc.*, 1993 LEXIS 2286, at *15 (D. Del. Feb. 10, 1993) ("A court may only confirm a plan for reorganization if . . . 'the plan has been proposed in good faith and not by any means forbidden by law.' . . . Moreover, '[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of Section 1129(a)(3) is satisfied.'") (citations omitted); *see also Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (same); *In re Koebl*, 751 F.2d 137, 139 (2d Cir. 1984) (noting that plan provisions may not contravene any law, including state law, and a plan must have been proposed with "a basis for expecting that a reorganization can be effected") (citations omitted).

48.    The Debtors structured and proposed the Plan in a manner that effectuates the objectives and purposes of the Bankruptcy Code and is proposed in good faith. *See In re Eagle-Picher Indus.*, 203 B.R. at 274 (finding that a plan of reorganization was proposed in good faith when, among other things, it was based on extensive arms-length negotiations among plan proponents and other parties in interest). The Plan contains no provisions that are contrary to state or other laws nor is there any indication the Debtors lack the ability to consummate the Plan. Accordingly, the Debtors submit that they have met the requirements of Bankruptcy Code section 1129(a)(3).

### D.    Bankruptcy Code section 1129(a)(4)

49.    The Plan also complies with Bankruptcy Code section 1129(a)(4), which states the following:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). In essence, Bankruptcy Code section 1129(a)(4) requires that any and all

fees promised or received in connection with or in contemplation of a chapter 11 case must be disclosed and subject to the court's review. *See In re Crdentia Corp.*, 2010 Bankr. LEXIS 2838, at *8 (Bankr. D. Del. May 26, 2010) (holding that plan complied with Section 1129(a)(4) where all final fees and expenses payable to professionals remained subject to final review by bankruptcy court); *In re Johns-Manville Corp.*, 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986) (explaining that all payments contemplated by a plan must "have been or will be" made subject to the court's approval), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987). Pursuant to the Plan and other orders of the Court, all Professional Fee Claims are subject to Court approval. *See* Plan, Art. II.B.1. Accordingly, the Plan complies with the requirements of Bankruptcy Code section 1129(a)(4).

### E.  Bankruptcy Code section 1129(a)(5)

50.    The Debtors are not reorganizing under the Plan and accordingly, the appointment of the Plan Administrator as the Debtors' sole officer and director is not inconsistent with Bankruptcy Code section 1129(a)(5).

### F.  Bankruptcy Code section 1129(a)(6)

51.    Bankruptcy Code section 1129(a)(6) is inapplicable to the Debtors, as it requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." 11 U.S.C. § 1129 (a)(6). The Debtors' business has no involvement with the establishment of rates over which any regulatory commission has jurisdiction or will have jurisdiction after the Plan's confirmation. Accordingly, Bankruptcy Code section 1129(a)(6) is inapplicable to the Debtors.

### G.  Bankruptcy Code section 1129(a)(7)

52.    The Plan satisfies the "best interests of creditors" test set forth in Bankruptcy Code

section 1129(a)(7).  This test requires that, with respect to each impaired class of claims or interests, each holder of such claims or interests (a) has accepted the plan or (b) will receive or retain property of a value not less than what such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  *See In re Armstrong World Indus.*, 348 B.R. at 165-66; *see also In re Tranel*, 940 F.2d 1168, 1172 (8th Cir. 1991) (considering evidence supporting best interests of creditors test outcome); *In re AOV Indus.*, 31 B.R. 1005, 1008-13 (D.D.C. 1983) (if no impaired creditor receives less than liquidation value, plan of reorganization is in best interests of creditors), *aff'd in part, rev'd in part*, 792 F.2d 1140, 1144 (D.C. Cir. 1986), *vacated in light of new evidence*, 797 F.2d 1004 (D.C. Cir. 1986); *In re Econ. Lodging Sys., Inc.*, 205 B.R. 862, 864-65 (Bankr. N.D. Ohio 1997) (analyzing evidence relating to best interests of creditors test); *In re Eagle-Picher Indus.*, 203 B.R. at 266 (best interest of creditors test must be met even in cramdown situation).  A court, in considering whether a plan is in the "best interests" of creditors, is not required to consider any alternative to the plan other than the dividend projected in a liquidation of all the debtor's assets under chapter 7 of the Bankruptcy Code.  *See, e.g.*, *In re Victory Constr. Co.*, 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990); *In re Jartran, Inc.*, 44 B.R. 331, 389-93 (Bankr. N.D. Ill. 1984) (best interests test satisfied by showing that, upon liquidation, cash received would be insufficient to pay priority claims and secured creditors so that unsecured creditors and equity holders would receive no recovery).

53.     The first step in meeting the best interests test is to determine the proceeds that the hypothetical liquidation of a debtor's assets and properties would generate in the context of a liquidation under chapter 7 of the Bankruptcy Code. The gross amount available would be the sum of the proceeds from liquidating the debtor's assets plus the cash held by the debtor at the time of

commencement of the hypothetical case under chapter 7 of the Bankruptcy Code. The amount of any claims secured by these assets, the costs and expenses of the liquidation, and any additional administrative expenses and priority claims that may result from the termination of the debtor's business and the use of chapter 7 of the Bankruptcy Code for the purposes of a hypothetical liquidation would reduce the amount of these proceeds. Any remaining net cash would be allocated to creditors and equity interest holders in strict priority in accordance with Bankruptcy Code section 726.

54.     The Debtors submit that liquidation under chapter 7 of the Bankruptcy Code would result in significantly smaller, if any, distributions to holders of Claims and Interests than those provided for in the Plan because of (a) the likelihood that the Debtors' assets would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) the inability of a chapter 7 trustee to maximize the return to the Debtors' creditors to the same degree as set forth in the Plan.

55.     Specifically, as described in the hypothetical Liquidation Analysis attached to the Disclosure Statement as Exhibit B, the Debtors assumed that any liquidation of their assets would be accomplished through conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code on or about November 30, 2025.  On the hypothetical conversion date, it is assumed that the Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' estates, during which time all of the Debtors' remaining assets would be sold, distributed or surrendered to the respective lien holders, and the cash proceeds, net of liquidation related costs, would then be distributed to creditors in accordance with relevant law.  There could be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.

56.     Additionally, the costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such trustee would engage.  Moreover, the foregoing types of claims and other claims that might arise in a chapter 7 liquidation case (including claims from potentially redundant activities that could be engaged in by a chapter 7 trustee) or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors during the Chapter 11 Cases such as compensation for attorneys and financial advisors, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available for distributions to other creditors.

57.     After considering the effects that a liquidation under chapter 7 of the Bankruptcy Code would have on the ultimate proceeds available for distribution to the holders of Claims and Interests in the Chapter 11 Cases, including (a) the decrease in value caused by a chapter 7 liquidation of the Debtors' assets, (b) the increased costs and expenses of a liquidation under chapter 7 of the Bankruptcy Code arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, and (c) the costs of a corporate wind-down of operations, the Debtors assert that confirmation of the Plan will provide each holder of a Claim with a recovery that is not less than what such holder would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Indeed, no party has objected to confirmation under the "best interests" test.  Thus, the Debtors submit that they have satisfied the requirements of Bankruptcy Code section 1129(a)(7).

### H.     Bankruptcy Code section 1129(a)(8)

58.     Bankruptcy Code Section 1129(a)(8) requires that "with respect to each class of claims or interests — (A) such class has accepted the plan or (B) such class is not impaired under the Plan." 11 U.S.C. § 1129(a)(8).  Pursuant to Bankruptcy Code section 1126(c), a class of claims

accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class vote to accept the plan.  11 U.S.C. § 1126(c).  Pursuant to Bankruptcy Code section 1126(d), a class of interests accepts a plan if at least two-thirds in amount of allowed interests in that class vote to accept the plan.  11 U.S.C. § 1126(d).

59.    As set forth above, the holders of Claims in Classes 1 through 3, 4B, 4C and 6 are unimpaired under the Plan and, pursuant to Bankruptcy Code section 1126(f), are conclusively presumed to have voted to accept the Plan.  Thus, the requirements of section 1129(a)(8) have been satisfied as to each of Classes 1 through 3, 4B, 4C and 6.

60.    As set forth above and in the Voting Declaration, the holders of Claims in Class 4A (ATech/ATI General Unsecured Claims) overwhelmingly voted to accept the Plan.  Thus, as to the impaired and accepting Class 4A, the requirements of section 1129(a)(8) likewise have been satisfied.

61.    Certain Holders of Claims in Class 5 (Intercompany Claims) are unimpaired under the Plan and deemed to accept the Plan, and certain holders of Claims in Class 5 (Intercompany Claims) are impaired and deemed to reject the Plan pursuant to Bankruptcy Code section 1126(g).  Holders of Claims in Class 7 (Interests in ATI) are not entitled to receive or retain any property from the Debtors' estates under the Plan on account of their Claims and Interests and, therefore, are deemed to reject the Plan pursuant to Bankruptcy Code section 1126(g).

### I.    Bankruptcy Code section 1129(a)(9)

62.    The Plan satisfies Bankruptcy Code section 1129(a)(9), which requires that a chapter 11 plan provide for the payment of certain priority claims in full on the effective date in the allowed amount of such claims.  In particular, pursuant to Bankruptcy Code section 1129(a)(9)(A), unless otherwise agreed by the holder, holders of claims of a specific kind specified in Bankruptcy Code section 507(a)(1) — administrative claims allowed under Bankruptcy Code

section 503(b) — must receive cash equal to the allowed amount of such claims on the effective date of a plan. 11 U.S.C. § 1129(a)(9)(A). Bankruptcy Code section 1129(a)(9)(B) further requires that the holders of claims of a kind specified in Bankruptcy Code sections 507(a)(1) and 507(a)(4) through (7) (generally, wage and employee benefit claims and consumer deposits that are entitled to priority) must receive, if the class in which such claimants are members has accepted the plan, deferred cash payments of a value equal to the allowed amount of these claims or, if the class in which such claimants are members has not accepted the plan, cash equal to the allowed amount of these claims on the effective date of a plan. *See id.* § 1129(a)(9)(B). Finally, Bankruptcy Code sections 1129(a)(9)(C) and (D) provide for the payment of priority tax claims, including secured claims that would otherwise meet the requirements of Bankruptcy Code section 507(a)(8) absent the secured status of such claims, in cash in regular installments. *See id.* § 1129(a)(9)(C) and (D).

63.     In accordance with Bankruptcy Code section 1129(a)(9)(A), Article II.B.1 of the Plan provides that, except to the extent that an Administrative Claim (not including Professional Fee Claims and 503(b)(9) Claims which treatment is otherwise set forth in the Plan) has already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the Debtors agree to less favorable treatment, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of an in exchange for its Allowed Administrative Claim, payment from the Post-Effective Date Debtors on or as soon as practical after the Effective Date.

64.     In accordance with Bankruptcy Code section 1129(a)(9)(B), Article II.B.3 of the Plan provides that, except to the extent that a holder of an Allowed Priority Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, Cash payment

in the amount of the Allowed Priority Tax Claim from the Post-Effective Date Debtors.

65.    Accordingly, the Plan satisfies the requirements set forth in Bankruptcy Code section 1129(a)(9).

**J.    Bankruptcy Code section 1129(a)(10)**

66.    Bankruptcy Code section 1129(a)(10) provides the following:

> If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10); *see also In re Martin*, 66 B.R. 921, 924 (Bankr. D. Mont. 1986) (holding that acceptance by three classes of impaired creditors, exclusive of insiders, satisfied requirement of Section 1129(a)(10)).  As set forth in the Voting Declaration, Class 4A (ATech/ATI General Unsecured Claims) voted to accept the Plan.  Accordingly, the Debtors submit that the requirements of Bankruptcy Code section 1129(a)(10) are satisfied because the Plan received broad support and was accepted by at least one impaired class for which votes were cast.

**K.    Bankruptcy Code section 1129(a)(11)**

67.    The Plan satisfies Bankruptcy Code section 1129(a)(11), which provides that a court may confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan."  11 U.S.C. § 1129(a)(11).  One leading commentator has stated that this section "requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable."  COLLIER ON BANKRUPTCY ¶ 1129.03[11]; *accord In re Aleris Int'l, Inc.*, 2010 Bankr. LEXIS 2997, at *27 (Bankr. D. Del. May 3, 2010) ; *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994); *In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 476 (Bankr. S.D. Ohio 1994); *In re Johns-Manville*, 68 B.R. at 635.

68.     Section 1129(a)(11), however, does not require a guarantee of the plan's success; rather, the proper standard is whether the plan offers a "reasonable assurance" of success.  *See, e.g.*, *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d at 649 (noting plan may be feasible although its success is not guaranteed); *Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.)*, 755 F.2d 1336, 1341 (8th Cir. 1985) (same); *In re Rivers End Apartments*, 167 B.R. at 476 (to establish feasibility, "a [plan] proponent must demonstrate that its plan offers 'a reasonable prospect of success' and is workable"); *In re Apex Oil Co.*, 118 B.R. 683, 708 (Bankr. E.D. Mo. 1990) (guarantee of success is not required to meet feasibility standard of section 1129(a)([11])); *In re Elm Creek Joint Venture*, 93 B.R. 105, 110 (Bankr. W.D. Tex. 1988) (a guarantee of success is not required under Section 1129(a)(11), only reasonable expectation that payments will be made); *In re Texaco, Inc.*, 84 B.R. at 910 ("All that is required is that there be reasonable assurance of commercial viability.").

69.     Since the Plan expressly provides for the liquidation of the Debtors' assets, Bankruptcy Code section 1129(a)(11) is satisfied.  *See In re Revco*, 131 B.R. 615, 622 (Bankr. N.D. Ohio 1990) (holding that "[s]ection 1129(a)(11) is satisfied as the plan provides that the property of [the] Debtors shall be liquidated").  As a result, confirmation of the Plan is not likely to be followed by a further financial reorganization of the Debtors.  Accordingly, the Plan satisfies Bankruptcy Code section 1129(a)(11).

## L.     Bankruptcy Code section 1129(a)(12)

70.     The Plan complies with Bankruptcy Code section 1129(a)(12), which requires that, as a condition precedent to the confirmation of a plan, "[a]ll fees payable under Section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."  11 U.S.C. § 1129(a)(12).  The Plan and the proposed Confirmation Order specifically provide that all fees

payable pursuant to Section 1930 of Title 28 of the United States Code will be paid as required and all fees due and owing will be paid on or prior to the Effective Date. *See* Plan, Art. XII.C. As such, the Debtors are in compliance with Bankruptcy Code section 1129(a)(12).

### M.    Bankruptcy Code section 1129(a)(13)

71.    Bankruptcy Code section 1129(a)(13) is inapplicable to the Plan, as it requires that a plan of reorganization provide for the continuation of all retiree benefits at the level established by agreement or by court order pursuant to Bankruptcy Code section 1114 at any time prior to confirmation of the plan, for the duration of the period that the debtor has obligated itself to provide such benefits. The Debtors have no retiree benefits plans. Accordingly, Bankruptcy Code section 1129(b)(13) is inapplicable to the Plan.

### II.    Bankruptcy Code Section 1129(b)

72.    Bankruptcy Code section 1129(b)(1) allows for confirmation of a plan in cases where all requirements of Bankruptcy Code section 1129(a) are met other than section 1129(a)(8) (*i.e.*, the plan has not been accepted by all impaired classes of claims or interests), by allowing a court to "cram down" the plan notwithstanding objections or deemed rejections as long as the court determines that the plan is "fair and equitable" and does not "discriminate unfairly" with respect to the rejecting classes. 11 U.S.C. § 1129(b)(1).

73.    The Debtors meet the "cram down" requirements of Bankruptcy Code section 1129(b) to confirm the Plan over the deemed rejection by Classes 5 and 7 because the Plan is fair and equitable and does not discriminate unfairly with respect to holders of Claims or Interests in those rejecting Classes.

### A.    The Plan Is Fair and Equitable with Respect to the Impaired Rejecting Classes

74.    Bankruptcy Code section 1129(b)(2) provides that a plan is fair and equitable with respect to a class of unsecured claims or interests if the plan provides that the holder of any claim

or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest.  11 U.S.C. § 1129(b)(2).

75.    The Plan does not provide any recovery from the Debtors' estates for any claims or interests junior to Class 4A (ATech/ATI General Unsecured Claims).  Accordingly, the Plan is fair and equitable with respect to holders of Claims or Interests in Class 5 (Intercompany Claims), Class 7 (Interests in ATI).

**B.    The Plan Does Not Discriminate Unfairly with Respect to the Impaired Rejecting Classes**

76.    Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.  *See In re 203 N. LaSalle*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a chapter 11 plan" and that "the limits of fairness in this context have not been established"); *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-by-case basis."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").  *See also In re Armstrong World Indus.*, 348 B.R. at 121-22 (relying heavily on the facts of the case to determine whether the plan unfairly discriminated against certain classes).

77.    In general, courts have held that a plan unfairly discriminates in violation of Bankruptcy Code section 1129(b) only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.  *See, e.g., In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (citing cases and

noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 655-56 (9th Cir. 1997) (same); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989) (stating that plan which preserved assets for insiders at the expense of other creditors unfairly discriminated); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination). A threshold inquiry in assessing whether a proposed plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to the class allegedly receiving more favorable treatment. *See In re Armstrong World Indus.*, 348 B.R. at 121.

78.     No Holder of a Claim or Interest in a dissenting or rejecting Class has raised a concern that the Plan fails to satisfy the absolute priority rule. The Claims and Interests in Classes 5 and 7 are all subordinate to the priority of the Claims in Classes 1 through 4C. The Plan provides for the same treatment by the Debtors of all holders of Claims and Interests within each of these rejecting Classes. Thus, the Plan does not discriminate unfairly with respect to holders of Claims or Interests in Class 5 (Intercompany Claims) and Class 7 (Interests in ATI) and is fair, equitable and reasonable with respect to the rejecting Classes. Accordingly, the Plan should be confirmed even if these Classes are deemed to reject the Plan.

### III.    Section 1129(c) – No Other Plan Has Been Proposed or Confirmed

79.     The Plan satisfies Bankruptcy Code section 1129(c), which provides that, with a limited exception, a bankruptcy court may only confirm one plan. The Plan is the only plan that

has been filed in these Chapter 11 Cases and is the only plan that satisfies the requirements of subsections (a) and (b) of Bankruptcy Code section 1129. Accordingly, the requirements of Bankruptcy Code section 1129(c) are satisfied.

## IV.    Section 1129(d) – The Plan's Purpose Is Consistent with the Bankruptcy Code

80.    The Plan satisfies Bankruptcy Code section 1129(d), which provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities Act of 1933. In the instant case, the Plan's principal purpose is not the avoidance of taxes or the avoidance of the requirements of Section 5 of the Securities Act of 1933, and there has been no filing by any governmental agency asserting the contrary. Accordingly, the Plan complies with Bankruptcy Code section 1129(d).

## OTHER PLAN PROVISIONS ARE NECESSARY AND APPROPRIATE

## I.    The Plan's Releases and Exculpation Provisions Are Appropriate and Should Be Approved

81.    Article VIII.B of the Plan provides for the releases by the Debtors of the Released Parties (the "Debtor Releases") and Article VIII.C of the Plan provides for the releases by all holders of Claims who timely exercise their right to opt-in to such release when submitting their Ballot in accordance with the terms of the Plan (the "Consensual Third Party Releases," together with the Debtor Release, the "Releases"). The Plan also includes in Article VIII.D a customary exculpation and limitation of liability provision (the "Exculpation Provision").

### A.    The Debtor Releases

82.    The Debtor Releases appropriately are tailored under the facts and circumstances of these Chapter 11 Cases and are supported by ample consideration. The Debtor Releases are an integral part of the Plan and provide appropriate levels of protection to the Released Parties. Accordingly, the Debtor Releases represent the sound and valid exercise of the Debtors' business

judgment and are permissible under Bankruptcy Code section 1123(b)(6).

83.     In evaluating releases, courts distinguish between a debtor's release of non-debtors and third parties' release of non-debtors.  *See In re Wash. Mut., Inc*., 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Exide Techs.*, 303 B.R. 48, 71-74 (Bankr. D. Del. 2003)).  With respect to a debtor's release of non-debtors, courts in the Third Circuit consider the following five *Zenith* factors:

> (a) An identity of interest between the debtor and third-party, such that a suit against the third-party is, in essence, a suit against the debtor or will deplete the assets of the estate;
>
> (b) Substantial contribution by the third-party to the plan;
>
> (c) The essential nature of the release to the debtor's plan;
>
> (d) An agreement by a substantial majority of creditors to support the plan and the release; and
>
> (e) Provision in the plan for payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*In re Zenith*, 241 B.R. at 110; *see also In re Wash. Mut., Inc.*, 442 B.R. at 314.  No factor is dispositive, nor is a proponent required to establish each factor required for the release to be approved; rather the factors are intended to provide guidance to the Court in determining the fairness of the releases.  *In re Wash. Mut., Inc.*, 442 B.R. at 346; *see also In re Exide Techs.*, 303 B.R. at 72 (finding that the factors are not exclusive or conjunctive requirements); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (approving debtors' releases despite not meeting the third and fifth *Zenith* factors).

84.     The Debtor Releases pursuant to section 1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtors' business judgment, and the Debtors have satisfied the business judgment standard in granting such releases under the Plan.  The released directors and officer have each substantially contributed to the Chapter 11 Cases.  The released directors and

officer also substantially contributed to these cases by assisting with the Sale and Plan processes to maximize value for the estates.

85.     The releases easily meet the applicable standard because they are fair, reasonable and in the best interests of the Debtors' estates.  First, the Debtor Releases constitute an integral part of the Plan that was negotiated between the Debtors and their primary creditor constituencies in the context of the overall Plan.  The Debtor Releases are important to the Plan as a whole, as well as to the numerous compromises negotiated in these Chapter 11 Cases and implemented in the Plan, which will ultimately result in the Debtors making meaningful distributions to certain of their creditors that would otherwise not be possible.

86.     Second, and perhaps more importantly, the Debtors do not believe they are releasing any material claims.  As such, pursuing non-material claims against the Released Parties is not in the best interests of the Debtors' various constituencies as the costs involved likely would outweigh any potential benefits from pursuing such claims.  The Debtors' Transaction Committee reviewed, considered and approved such releases.  Thus, reviewing the *Zenith* factors in their totality, the Debtor Releases are fair and reasonable and should be approved as a valid exercise of the Debtors' business judgment.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 142 (Bankr. D. Del. 2010) (approving as a valid exercise of business judgment the debtors' releases of, among others, the debtors' current directors, officers and employees, the debtors' current and former professionals, secured creditors and their advisors, the debtors and their affiliates, and their officers, directors, employees, and advisors and senior noteholders and their advisors) (citing *In re DBSD North America, Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (approving a debtor's release of third parties when the debtor testified that it was unaware of any significant potential claims that were being released).

**B.** **The Consensual Third Party Releases Are Fair and Reasonable**

87.    The Consensual Third Party Releases are fair and reasonable and should be approved.  As a threshold matter, the Consensual Third Party Releases are consensual in nature and may be approved on the basis that they are premised upon the releasing creditor's consent. *See In re Indianapolis Downs*, 486 B.R. at 306; *In re Spansion, Inc.*, 426 B.R. 144 (Bankr. D. Del. 2010).  The only creditors that are granting the Consensual Third Party Releases are creditors in Classes 1-3, 4A, 5 and 6 that opted in to the releases via the opportunity on their Opt-In Form. Here, the holders of Claims or Interests have been provided sufficient information to determine whether to grant the Consensual Third Party Releases and those holders entitled to vote on the Plan have been provided the option to opt in to the releases in Article VIII.C.  Accordingly, the Consensual Third Party Releases are entirely optional and should be approved.

**C.** **The Exculpation Provision**

88.    The proposed Exculpation Provision is appropriate based on the limitation of liability provided in Bankruptcy Code section 1125(e).  That section provides:

> A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.

11 U.S.C. § 1125(e).  This statutory limitation of liability encompasses the matters listed in the proposed Exculpation Provision in Article VIII.D of the Plan.  *See In re HSH Del. GP LLC*, Case No. 10-10187 (MFW) (Bankr. D. Del. Jan. 18, 2011) (confirming plan that provided exculpation to, among others, debtors' lenders and stating that provision was "appropriate under [Bankruptcy

Code Section] 1125(e)" because it was "limited to the activities so far in the Chapter 11" and only related to prospective acts in connection with execution and implementation of plan). Accordingly, the Court has authority and should approve the Exculpation Provision as appropriate under Bankruptcy Code section 1125(e).

89.    The Plan's Exculpation Provision complies with the Bankruptcy Code and is of the type typically afforded to debtors, estate fiduciaries and third parties that participated in the plan process. Article VIII.D of the Plan is narrowly tailored to limit the liability of the Debtors and the Exculpated Parties in connection with, relating to, or arising out of these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or implementation of the Plan and its related documents, the solicitation of acceptances of the Plan, the filing of these Chapter 11 Cases; any postpetition act taken or omitted to be taken in connection with these Chapter 11 Cases; the pursuit of Confirmation and Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan. *See* Plan, Art. VIII.D. The proposed Exculpation Provision does not, consistent with Third Circuit precedent, affect any liability that is determined to have constituted gross negligence, fraud or willful misconduct. *Id.*; *In re PWS Holding.,* 228 F.3d at 245-46 (holding that exculpation provision must not eliminate liability arising from willful misconduct or gross negligence). The Court should approve the Exculpation Provision in Article VIII.D of the Plan because it is consistent with: (i) the limitation of liability contained in Bankruptcy Code section 1125(e), and (ii) similar provisions approved by this Court.

## II.    Limited Substantive Consolidation of the Debtors' Estates

90.    The Plan serves as a motion by the Debtors to substantively consolidate the estates of Debtors ATech and ATech Parent into a single consolidated estate for all purposes associated with voting, distributions and effectuating and implementing the Plan. *See* Plan, Art. IV.A. Sections 105(a) and 1123(a)(5) of the Bankruptcy Code empower a bankruptcy court to authorize

substantive consolidation pursuant to a chapter 11 plan over the objections of creditors. *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005). The Third Circuit in *Owens Corning* discussed at length substantive consolidation in bankruptcy proceedings, as well as its genesis and the impact it has on debtors' creditors and their rights and recoveries. The court provided the following baseline standards for approval of non-consensual substantive consolidation, while leaving the trial court with discretion to assess what facts are necessary to meet these standards:

> (i) prepetition [the debtors] disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*Id.* at 211. Courts in this District have clarified that substantive consolidation is also appropriate where the parties consent to it. *See Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 591 (D. Del. 2009).

91.     This limited consolidation shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets or the assumption of any liabilities; and, except as otherwise provided by or permitted in the Plan, all of the Debtor Entities shall continue to exist as separate legal entities. Nor will the Plan's proposed limited substantive consolidation adversely impact the treatment of the Debtors' creditors. Instead, limited substantive consolidation pursuant to the Plan will allow for greater efficiencies and simplification in administration, and thus, will reduce expenses by decreasing the administrative difficulties and costs related to the administration of and distributions from the Debtors' estates

92.     In addition, the Debtors' creditors, stakeholders and other parties in interest will benefit from the limited substantive consolidation. Given the potential expense of making

distributions on an unconsolidated basis for each of the Debtors, the Debtors believe that the overall effect of the limited substantive consolidation will be more beneficial than harmful to creditors and will allow for greater efficiencies and simplification in administering distributions under the Plan.  Accordingly, the Debtors believe that limited substantive consolidation of the estates of ATech and ATech Parent under the terms of the Plan will not adversely impact the treatment of the Debtors' creditors, but rather will reduce expenses by decreasing the administrative difficulties and costs related to the distribution of the Debtors' estates separately.

93.     As set forth above, limited substantive consolidation in these Chapter 11 Cases is appropriate and consistent with Third Circuit precedent.  Limited substantive consolidation of ATech and ATech Parent's estates as requested is consensual as not a single creditor has objected to it, which alone is a sufficient basis for such relief.  Therefore, limited substantive consolidation of the estates of ATech and ATech Parent pursuant to the provisions of the Plan with respect thereto should be approved.

## **RESPONSES TO CONFIRMATION OF THE PLAN**

94.     The deadline to object to confirmation of the Plan and final approval of the adequacy of the Disclosure Statement was December 3, 2025 at 4:00 p.m. (prevailing Eastern Time) (the "Confirmation Objection Deadline").[3]  Before the Confirmation Objection Deadline lapsed, the Debtors received three reservations of rights [D.I. 866, 867, 869] (the "Reservations") and one objection [D.I. 872] (the "U.S. Trustee Objection") as set forth on **Exhibit A** attached hereto.  The Debtors did not receive any informal or formal responses to final approval of the Disclosure Statement.

---

[3] The Debtors extended the Confirmation Objection Deadline to December 8, 2025 for the U.S. Trustee.

## I.      The Reservations of Rights are Not Objections to Confirmation of the Plan

95.      The parties who filed the Reservations (the "Responding Parties") did not lodge objections to confirmation of the Plan.  Rather, the Reservations merely reserve (i) certain rights in connection with Claims that are currently contingent and unliquidated, (ii) the right to make arguments at the Confirmation Hearing, or (iii) the right to object to any modifications to the Plan or Confirmation Order that affects the Responding Parties.  To the extent the Responding Parties purport to have a right to change their vote to accept the Plan after the Voting Deadline, the Debtors submit that no such right exists.  The Solicitation Procedures do not contemplate that parties may change their vote on the Plan after the Voting Deadline, and the Court should not permit a modification of the Solicitation Procedures for that purpose to the extent a Responding Party attempts to do so.

## II.     The U.S. Trustee Objection Should be Overruled

96.      The Debtors respectfully request that the Court overrule the U.S. Trustee Objection. The U.S. Trustee asserts that the Plan impermissibly treats the Plan itself as a Bankruptcy Rule 9019 settlement.  The U.S. Trustee cites no authority to support the proposition that a plan cannot also be deemed a settlement pursuant to Bankruptcy Rule 9019.  There is no reason why a plan may not be used as a vehicle for effectuating a settlement of claims and interest so long as it complies with all applicable Bankruptcy Rules.

97.      Contrary to the U.S. Trustee's assertion, the resolution of claims against the Debtors is governed by section 502 of the Bankruptcy Code, which addresses allowance of claims or interests.  *See* 11. U.S.C. § 502.  Section 1129 of the Bankruptcy Code addresses confirmation of a plan, and section 1141 of the Bankruptcy Code addresses the effect of confirmation.  *See* 11 U.S.C. §§ 1129, 1141.  Further, the U.S. Trustee ignores that the Opt-In Form is an express agreement between the Debtors, the Released Parties and any holder of a claim that executed and

returned the Opt-In Form to the Balloting Agent of their election to be bound by the Consensual

Third Party Releases under the Plan. *See* Opt-In Form (requiring election and execution to opt in

to the Consensual Third Party Release under the Plan). The U.S. Trustee incorrectly contends that

two subparts of the Plan make up the entire Plan (U.S. Trustee Obj. ¶ 19), confuses those two

provisions as converting the entire Plan into a settlement (*id.)*, and argues that those two provisions

render the entire Plan unconfirmable without the filing of a motion pursuant to Bankruptcy Rule

9019 (*id.* ¶¶ 17, 19). The opposite is true; and even if the U.S. Trustee's argument that the releases

convert the Plan into a settlement were true, a separate motion pursuant to Bankruptcy Rule 9019

would not be required.

98.     Courts have consistently recognized that plan settlements under Bankruptcy Code

section 1123(b)(3) should be evaluated under the same standard applicable to Bankruptcy Rule

9019 settlements. *See*, *e.g.*, *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 772 (Bankr. D.

Del. 2018) ("A bankruptcy court may approve settlements under Bankruptcy Rule 9019 or as part

of a debtor's plan. The standards for approving settlements under Rule 9019 or as part of a plan

are the same."); *Aleris Int'l*, 2010 Bankr. LEXIS 2997, at *60 (Bankr. D. Del. May 3, 2010)

("Section 1123(b)(3)(A) of the Bankruptcy Code permits a plan to provide for 'the settlement or

adjustment of any claim or interest belonging to the debtor or the estate.' When evaluating a

settlement under section 1123(b)(3)(A), courts apply the same standard as applied under

Bankruptcy Rule 9019. In addition, courts have construed section 1123(b)(3)(A) also to apply to

the settlement of claims against the estate."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816

(Bankr. D. Del. 2008) ("[T]he standards for approving settlements as part of a plan of

reorganization are the same as the standards for approving settlements under Fed. R. Bankr. P.

9019."). The U.S. Trustee argues that "[s]ending a plan to impaired creditors for a vote is not

equivalent to parties negotiating a settlement among themselves." U.S. Trustee Obj. ¶ 16. This argument puts form over substance and forsakes the understanding that parties routinely enter into enforceable contractual arrangements. Here, the Debtors provided the terms of the releases in the Plan with information describing the releases in the Disclosure Statement, as well as notice of the hearing to consider confirmation of the Plan. Additionally, parties who vote or are deemed to reject the Plan and parties who do not affirmatively opt into the Consensual Third Party Release are not bound by the Consensual Third Party Release. The Debtors are not attempting to circumvent any requirement imposed by the Bankruptcy Code or the Bankruptcy Rules, and the Debtors satisfy Bankruptcy Code section 1123(b). Accordingly, the U.S. Trustee Objection should be overruled.

## **WAIVER OF STAY**

99. The Debtors respectfully request that the Court cause the Confirmation Order to become effective immediately upon its entry notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e), which states that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e); *see also* Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend. (stating that a "court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately") (emphasis added). According to the Advisory Committee notes to the 1999 amendments to the Bankruptcy Rules, the purpose of Bankruptcy Rule 3020(e) is to permit a party in interest to request a stay of the confirmation order pending appeal before the plan is implemented and an appeal becomes moot. Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend. To the extent a party wishes to seek an appeal, it may

seek to stay the effectiveness of the Confirmation Order in connection with the appeal.[4]  As a result,

the Debtors respectfully request that the Court cause the Confirmation Order to become effective

immediately upon its entry.

## CONCLUSION

100.    For the reasons set forth in this Memorandum of Law, the Debtors respectfully

submit that: (a) the Disclosure Statement and the Plan fully satisfy all applicable requirements of

the Bankruptcy Code; (b) the Disclosure Statement should be approved on a final basis and the

Plan should be confirmed by the Court; and (c) the 14-day stay of the Confirmation Order should

be waived.

---

[4]  If for some reason a party in interest appeals the Confirmation Order, such party is on notice that the Debtors are asking the Court for a waiver of the stay imposed by Bankruptcy Rule 3020(e).  Therefore, such party is on notice that it must request a stay pending appeal immediately after the entry of the Confirmation Order.  *See, e.g.*, *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 187 (3d Cir. 2001) (noting that all parties were on notice that plan called for "Immediate Effectiveness," allowing appellants the opportunity to seek stay immediately upon confirmation of plan).

Dated:  December 11, 2025
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Joshua B. Brooks*
Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5946)
Joshua B. Brooks (No. 6765)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:    (302) 467-4400
Email:        mcguire@lrclaw.com
              pierce@lrclaw.com
              brooks@lrclaw.com

- and -

**K&L GATES LLP**
Jeffrey T. Kucera (admitted *pro hac vice*)
Southeast Financial Center, Suite 3900
200 South Biscayne Blvd.
Miami, Florida 33131
Telephone:    (305) 539-3300
Email:        jeffrey.kucera@klgates.com

- and -

Margaret R. Westbrook (admitted *pro hac vice*)
301 Hillsborough Street, Suite 1200
Raleigh, North Carolina 27603
Telephone:    (919) 743-7300
Email:        margaret.westbrook@klgates.com

*Counsel to the Debtors and Debtors in Possession*